## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE LEARNING EXPERIENCE AT QUEENS-LONG ISLAND CITY, LLC, and THE LEARNING EXPERIENCE SYSTEMS LLC, | Case No. |
| Plaintiffs, | **COMPLAINT & JURY DEMAND** |
| -against- | |
| BRITE TIKES LLC, NICOLE COLLINS, ARA PASAOGLU, and JUBRAN C. JUBRAN, | |
| Defendants. | |

Plaintiffs The Learning Experience at Queens-Long Island City, LLC ("TLE at Queens-LIC") and The Learning Experience Systems, LLC ("TLE Systems" and together with TLE at Queens-LIC the "Plaintiffs") by their attorneys, Greenberg Traurig, LLP, for its Complaint against Defendants Brite Tikes, LLC ("Brite Tikes"), Nicole Collins ("Collins"), Ara Pasaoglu ("Pasaoglu") and Jubran C. Jubran ("Jubran") (collectively "Defendants"), allege as follows:

### SUMMARY OF THE ACTION

1.      About a year after purchasing the assets of the Brite Tikes childcare franchise, and about six months into Plaintiffs' active operation of the center, Plaintiffs uncovered substantial and long-running fraudulent conduct at the childcare center.  Defendant Pasaoglu, the Center Director, had been fabricating and doctoring required background check and medical clearance forms for the Brite Tikes staff.  And, Defendant Collins, an owner of Brite Tikes and its Executive Director, either knew and condoned of the conduct or was grossly negligent in her supervisory duties and other duties owed to Plaintiffs.

2.      After conducting a thorough investigation to determine the extent of the fraud, Plaintiffs reported the issues to the appropriate authorities, the New York City Department of

Health and Mental Hygiene ("DOHMH"). The DOHMH had no choice but to temporarily shut down the childcare facility.

3. Defendants' conduct has caused Plaintiffs significant harm and damages, including, but not limited to, the costs associated with investigating the fraud and working with the DOHMH to remediate the issues caused by the fraud, the loss of substantial revenue for the period of time the center has been shut down, which continues, in part, as of the filing of this complaint, and the utter decimation of the goodwill associated with the center, which accounted for about 80 percent of the purchase price.

4. In fact, because the Defendants' conduct was so inimical to the purpose of the transaction through which Plaintiff, TLE at Queens-LIC acquired the assets of Brite Tikes, rescission would be an appropriate remedy, if practicable. That said, based on the amount of work performed by Plaintiffs to cure the harms caused by Defendants and the fact that Defendants simply cannot be trusted to run a childcare center, rescission is impractical and, thus, rescissory damages are necessary to make Plaintiffs whole.

## **PARTIES**

5. Plaintiff TLE at Queens-Long Island City is a Delaware limited liability company whose principal place of business is located at 210 Hillsboro Technology Drive, Deerfield Beach, Florida.

6. Plaintiff The Learning Experience Systems LLC, is a Delaware limited liability company whose principal place of business is located at 210 Hillsboro Technology Drive, Deerfield Beach, Florida. The sole member of TLE Systems is The Learning Experience Corp. ("TLE Corp."), which is a Delaware corporation with its principal place of business located in Deerfield Beach, Florida.

7.     Defendant Brite Tikes is a New York limited liability company whose principal place of business is located at 375 North Broadway, Suite 311, Jericho New York. Brite Tikes was engaged in the business of operating a franchised child learning and care center located at 27-28 Thomson Avenue, Long Island City, New York 11101, doing business as The Learning Experience at Queens-Long Island City (the "Center").

8.     Defendant Nicole Collins is the former owner of the Center and a resident of the State of New York.

9.     Defendant Ara Pasaoglu is the former Center Director, and a resident of the State of New York.

10.    Defendant Jubran C. Jubran is the former owner of the Center and a resident of the State of New York.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332(a), because there is complete diversity of citizenship between Plaintiffs and Defendants and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the transactions forming the basis for the claims asserted by Plaintiffs in this Complaint took place within the Eastern District of New York. Moreover, the Purchase Agreement between Plaintiff TLE at Queens-LIC and Brite Tikes, LLC, executed on January 8, 2019, ("the Purchase Agreement") provides in pertinent part:

> Each party (i) agrees that all actions or proceedings shall be heard and determined in federal or New York State court located in the County of Nassau, New York, (ii) irrevocably submits to the jurisdiction of such courts in any such action or proceeding, and (iii) consents that any such action or proceeding may be brought in such courts and waives any objection that such party may now or hereafter have to the venue or jurisdiction . . . .

A copy of the Purchase Agreement is annexed hereto as Exhibit A.

## FACTUAL ALLEGATIONS

### A.     BACKGROUND

13.    On May 3, 2013, Jubran C. Jubran ("Jubran") entered into a Franchise Agreement with TLE Systems, which created Franchise No. 286 ("the Franchise Agreement").    By subsequent addendum dated September 5, 2015, Collins was added as a party to the Franchise Agreement and all related and ancillary agreements thereto. A copy of the Franchise Agreement including all related and ancillary franchise documents, is annexed hereto as Exhibit B.

14.    On October 17, 2016, Jubran and Collins assigned all rights and obligations under the Franchise Agreement to Brite Tikes LLC, of which Jubran and Collins are each a managing member ("the Assignment Agreement"). A copy of this Assignment Agreement is annexed hereto as Exhibit C.

15.    Brite Tikes was engaged in business of operating a franchised child learning and care center located at 27-28 Thomson Avenue, Long Island City, New York 11101, doing business as The Learning Experience (the "Center").

16.    While operating under Brite Tikes' auspices, the Center was run by Defendant Nicole Collins – the Executive Director, the daughter of Jubran, and a former owner of the Center, and Defendant Ara Pasaoglu – the Center Director.   Pasaoglu remained the Center Director after TLE at Queens-LIC took over operations and was employed there until Defendants' conduct was uncovered.

17.    The Center, while run by Defendants, was one of the highest grossing TLE franchises in the country. The Center's positive reputation in the community, which is essential in the child care industry, contributed to the Center's strong client base and expanding growth. Indeed, the success of the Center and its strong community reputation is what attracted Plaintiffs to initially consider purchasing the Center and running it as a corporate location.

18.     Plaintiffs expressed their interest in purchasing the Center and its Assets, the most valuable of which was the Center's goodwill. The Defendants were aware, before entering the Purchase Agreement, that Plaintiffs did not intend to change, in any significant way, the day-to-day operations of the Center. To the contrary, Defendants were aware of Plaintiffs' plan to keep the Center running as it had under Brite Tikes, including keeping the then current staff – in order to build on the goodwill and community reputation already established by Defendants. In fact, once the transaction was consummated, Plaintiffs kept Pasaoglu on as Center Director, as it was made clear to Plaintiffs that Pasaoglu not only had a strong and trusting relationship with clients, but was also running the day-to-day operations of the Center successfully.

19.     The goodwill and reputation of the Center, which Plaintiffs were most interested in acquiring, and which ultimately made up about 80 percent of the agreed-to purchase price, was contingent on the fundamental premise that Defendants were operating the Center lawfully and complying with all relevant local, state, and federal laws and regulations. In other words, parents would not enroll their children in a child care center that was not complying with the laws and regulations that were specifically designed to ensure the health, safety, and well-being of their children. And, more fundamentally, a child care center that is not in compliance with all laws and regulations is subject to immediate closure by the relevant authorities.

20.     The financial success of the Center, like all child care related businesses, is highly dependent on community reputation and goodwill – both of which ultimately stem from the clients' (e.g., parents) satisfaction and trust in the Center, and its employees, to care for their children.   Once a child care center's reputation is tarnished, it is difficult to repair, and a significant loss of goodwill generally follows.

21.     Unbeknownst to Plaintiffs, the Center was not operating in compliance with relevant laws and regulations, and in fact, had been doctoring and/or completely fabricating

documentation and credentials for Center staff for years prior to Plaintiffs even expressing interest in purchasing the Center.

22. Had Plaintiffs known that the Center was not compliant with the relevant laws and regulations, and that Defendants had been engaging, for years, in a pattern and practice of using doctored and/or completely fabricated documentation and credentials for Center staff in order to satisfy the relevant regulatory requirements, Plaintiffs would have never considered purchasing the Center, and in fact would likely have terminated Brite Tikes' franchise in connection with such a material breach of the Franchise Agreement.

23. Plaintiffs could not have learned about the Center's non-compliance and the pervasive fraud without disclosure by Brite Tikes, Collins, Pasaoglu, or other representatives or agents of Brite Tikes. In fact, at all relevant times, Brite Tikes, Collins and Pasaoglu concealed and covered up their wrongdoing, including by working primary on personal laptops and through personal email addresses, in contravention of TLE policy.

24. Based on the Defendants' wrongful actions and willful misleading, Plaintiffs were always acting with the understanding that the Center was operating in accordance with regulations, and maintained all necessary licenses and permits.

25. Indeed, separate and apart from any transaction between Brite Tikes and TLE at Queens-LIC, Defendants had an independent duty to comply with all relevant laws and regulations and to operate the Center consistent with the standards of a The Learning Experience franchise.

**B. PURCHASE AGREEMENT BETWEEN BRITE TIKES AND TLE AT QUEENS-LIC.**

26. On January 8, 2019, Brite Tikes (and by implication Defendants Jubran and Collins, who were the then-owners of Brite Tikes) and Plaintiff TLE at Queens-LIC executed a Purchase Agreement, pursuant to which Brite Tikes would sell the Business (defined as the operation of a

child learning and care center) and the Assets (including all furniture, fixtures, student records, and goodwill associated with the Business) to Plaintiff for a total purchase price of $2,500,000.00. Indeed, as discussed *surpa*, the success and goodwill associated with the Center, which made it one of the highest grossing TLE franchises in the country, was the primary reason Plaintiffs chose to purchase the Center and run it as a corporate location.

27.     The payment breakdown outlined within the Purchase Agreement itself reflects how highly Plaintiff valued the goodwill associated with the Center, with TLE at Queens-LIC paying $2,000,000 for goodwill, $100,000 for a covenant not to compete, $100,000 for customer lists, and $300,000 for tangible property.  In other words, the most valuable asset to Plaintiffs was the goodwill associated with the business.

28.     In Article II subsection (H) of the Purchase Agreement, Brite Tikes represented and warranted that it "shall maintain all required licenses for the Business in its own name, until such licenses are transferred to [Plaintiff], or until [Plaintiff] is fully licensed by the State of New York in its own name, whichever occurs first. Seller shall cooperate with Purchaser with respect to Purchaser obtaining a childcare license and take such reasonable and customary measures necessary to assist Purchaser to obtain its required licenses. This Paragraph shall survive Closing and termination of the franchise." Exhibit A, Art. II(H).

29.     Similarly, in Article II, subsection (I) of the Purchase Agreement, Brite Tikes represented and warranted that "at all times prior to the Closing, Seller shall operate the Business in the ordinary course of business." Exhibit A, Art. II(I).

30.     In sum, Brite Tikes represented and warranted to Plaintiffs that it would maintain all required licenses and prior to closing would operate the Center in the ordinary course.

31.     Despite the clear obligations set forth in the Purchase Agreement, Brite Tikes did not maintain required licenses and was not operating in the ordinary course of business. Instead,

Brite Tikes, through the conduct of its agents and employees Collins and Pasaoglu, had been fraudulently altering background check forms and medical clearance forms of staff working at the Center for years prior to Plaintiff's purchase.

32.     To the extent that Collins was not directly involved in the fraudulent conduct, she knew or should have known about the conduct and failed to take appropriate action to stop it.

### C.     LICENSING AND PERMIT REQUIREMENTS FOR OPERATING CHILD CARE CENTER.

33.     TLE at Queens-LIC assumed direct responsibility for the Center on June 28, 2019, after receiving the necessary permits from the New York City Department of Health and Mental Hygiene ("DOHMH").

34.     TLE at Queens-LIC thereafter extended an offer of employment to Defendant Pasaoglu, and he continued in his position as Center Director. As Center Director, both before and after Plaintiff's purchase, Pasaoglu was responsible for, among other things, ensuring that the Center and Center employees were complying with local, state, and federal laws and regulations, including Article 47 of New York City Health Code ("Health Code"), which governs child care services.

35.     Collins, in her role as an owner and Executive Director of the Center prior to Plaintiff's purchase, was Pasaoglu's direct supervisor and, upon information and belief, was heavily involved in the day-to-day operations of the Center and had a close working relationship with Pasaoglu.

36.     Health Code § 47.19(c) requires that personnel working at a child care center complete two background checks: a criminal background check from the City of New York Department of Investigations ("DOI"); and screening of the Statewide Central Register of Child Abuse and Maltreatment provided by the New York State Office of Children and Family

Services ("NYOCFS"). These background checks are for current and prospective staff, and are to be arranged by the permittee, in this case the Center.

37.    In or around August 2019, New York State notified child care center providers that as of September 25, 2019, New York State would be implementing new comprehensive criminal background clearance requirements for new/prospective employees of child care centers. In other words, effective September 25, 2019, any new/prospective employee would have to successfully complete the **new** comprehensive criminal background check clearance requirements prior to beginning employment at the child care program; however, any employee hired prior to September 25, 2019 would be "grandfathered into" the new requirements; i.e., they would be permitted to continue working in a child care setting, and would have additional time to ensure compliance with the new requirements.

38.    In addition to the background check requirements and clearances, Health Code § 47.33(b) requires, as a condition of continued employment, that child care center personnel undergo a physical evaluation every two years and submit a certificate from a medical professional confirming that the individual is both physically and mentally able to perform assigned duties.

39.    As Executive Director and Director of the Center, Collins and Pasaoglu, respectively, were responsible for ensuring that staff employed at the Center had successfully completed the background check clearance requirements set forth in Health Code § 47.19(c), which includes the requirement that new/prospective employees successfully complete the new comprehensive background clearance requirements, effective September 25, 2019.

40.    As Executive Director and Director of the Center, Collins and Pasaoglu, respectively, were responsible for ensuring that staff employed at the Center had undergone a medical examination every two years.

**D.  PLAINTIFFS UNCOVER DEFENDANTS' ALTERATION AND FORGERY OF OFFICIAL PERSONNEL FORMS IN VIOLATION OF HEALTH CODE REGULATIONS.**

41.  After the new background check requirements went into effect, TLE Systems dispatched field teams to all TLE centers across New York State to assist in the review of personnel files and ensure that all staff clearances were updated and compliant with state and local laws and regulations. Regional Manager Danielle Morris (f/k/a Danielle LaPolla) was tasked with reviewing personnel files at the Center.

42.  On or around January 14, 2020, during her review of personnel files, Morris made note of certain documents she could not locate and went to Pasaoglu to inquire about those records. Pasaoglu informed Morris that the documents were on his personal laptop, and when he opened the laptop, he pulled up a Microsoft Word document that appeared to be a template for the letter the Center would receive from the New York Office of Children and Family Services ("NYOCFS") after a successful background check was completed. The template letter on Pasaoglu's laptop was nearly identical to the official letter issued by the NYOCFS.

43.  Morris was very concerned after seeing the NYOCFS letter template on Pasaoglu's personal laptop, as there was clearly no valid reason for him to have a template of an official government document. Morris immediately contacted her supervisors at TLE's corporate offices to inform them of what she had witnessed.

44.  Morris was instructed to immediately review and send copies of the background check clearance forms for all employees hired at Center after September 25, 2019, because anyone hired before that date would be "grandfathered in" to the new background check requirements, and granted a period of time to come into compliance, but anyone hired after September 25 could not start working at the school until the new background check came back.

45.  Upon information and belief, Pasaoglu purposely falsified certain NYOCFS letters using the Word document template to backdate these documents in order to make it seem as

10

though certain employees were hired prior to September 25, and thus would be immediately cleared to work in the Center, without having to first undergo the new background check requirements.

46. As Morris continued her review of the Center's personnel files, on or around January 15, 2020, she uncovered significant discrepancies in medical clearance forms for Center staff. A visual inspection of personnel files revealed that some of the medical clearance forms for staff – specifically the dates of the medical examinations and vaccinations – had been physically altered.

47. On or around January 15, 2020, after uncovering the altered and suspicious medical forms, Morris, along with TLE Regional Vice President Jennifer Murray, confronted Pasaoglu, and questioned him about the documents at issue. While Pasaoglu agreed that the documents appeared forged, he vehemently denied any knowledge or involvement.

48. The next day, January 16, 2020, Pasaoglu tendered his resignation as Center Director.

49. After uncovering the serious discrepancies with staff personnel forms and other Center documentation, Plaintiff engaged a private investigative group to conduct a thorough internal investigation, in order to determine the extent of the documentation issues.

**E.     INTERNAL INVESTIGATIONS FINDINGS INTO CENTER BY PRIVATE INVESTIGATIVE GROUP.**

50. The investigation determined that the documentation issues first identified by Morris were only the tip of the iceberg. The investigation revealed a pattern and practice of using doctored and/or completely fabricated documentation and credentials for Center staff in order to satisfy the relevant regulatory requirements. Specifically, background check forms, medical examination forms and, in some instances, education credentials, appear to have been doctored or fabricated completely.

51.    The investigators were given access to the Center's office desktop computer, personnel files of the Center's staff, and the company email files of Pasaoglu and Collins.

**(1)    *Investigators' Discovery of Falsified DOI And NYOCFS Background Check Forms for Center Staff.***

52.    On the Center's desktop computer, the investigators found the NYOCFS letter template, which was named "GFSCR.docx." The forensic analysis of the GFSCR document revealed that it was last accessed by the email address ara881@gmail.com on January 13, 2020 and was first saved onto the Center's computer on November 13, 2019. Upon information and belief, the address ara881@gmail.com is the personal email address of Pasaoglu.

53.    Moreover, the analysis revealed that the document was created using a software that specializes in manipulating PDFs in March 2015, in or around the same time Nicole Collins joined the Center.

54.    The investigators determined that although the NYOCFS letter template was similar to the authentic letter produced by the NYOCFS, there were some visual cues that enabled them to differentiate between an authentic letter and a letter from the template.  Based on these visual cues and a comparison of the memo line, font size, date, and request number, the investigators uncovered at least five employees (three current employees and two former employees) whose NYOCFS background checks appear to have been produced from the NYOCFS template or were otherwise manipulated.

55.    Notably, the two former employees were hired in 2017, meaning the template was being fraudulently utilized well before Plaintiff purchased the Center. Moreover, the two former employees whose NYOCFS background check appears to have been produced from the template were hired before Pasaoglu was hired by the Center, indicating that Collins was using the NYOCFS letter template to forge NYOCFS background check forms, or at the very least, knew about the use of the NYOCFS template in her role as Executive Director of the Center.

56. Upon information and belief, Defendant Pasaoglu fraudulently used the NYOCFS Word template to reproduce false background check clearances for Center employees, in a ruse to appear to be compliant with applicable Health Code regulations.

57. Upon information and belief, Defendant Collins was either involved in the use of the NYOCFS Word template or knew or should have known, as Executive Director of the Center, that NYOCFS background checks were being falsified. As Executive Director of the Center, Pasaoglu answered directly to Collins and Collins had ultimate responsibility for his conduct and the Center's compliance with the relevant laws and regulations.

58. The investigators also discovered additional falsifications relating to DOI criminal background checks. The investigation identified thirteen current employees and eight former employees whose DOI background check forms were duplicated or manipulated.

59. Specifically, background check documents for five current employees contained the *same* DOI identification number (138597/DOHMH), despite the fact that DOI identification numbers are uniquely assigned to each individual. It was subsequently discovered that the DOI identification number appearing on the background check document for these five employees was actually **Pasaoglu's own unique DOI number**.

60. Another DOI identification number, 203396/DOHMH, was found to be shared between two current employees. Again, DOI identification numbers are unique to each individual, and would not be duplicated or shared between individuals.

61. Two former employees, one of whom left the Center in November 2017, and the other who was hired in 2017 and left in September 2019, were found to have multiple DOI identification numbers, which should not be possible. Again, the falsification of DOI documents for employees hired in 2017 indicates that the fraudulent practices identified began before Pasaoglu was hired.

62.    In addition to the shared/duplicated DOI identification numbers for current and former employees, the investigators found additional inconsistencies with the personal information contained in the DOI background check forms themselves. The personal information for one former employee, including her social security number, the date she was finger printed (1/28/2010), and her DOI identification number, were copied directly onto the DOI forms of two current employees.  If the fingerprint data were accurate, one of the current employees would have been 12 years old on the date he was fingerprinted (he was born in October 1997; according to his DOI background form, he was apparently fingerprinted on January 28, 2010).

63.    Upon information and belief, Defendant Pasaoglu falsified DOI background check forms by duplicating DOI identification numbers, using personal information of one employee on the DOI forms for numerous other employees, and otherwise manipulating the information contained in the DOI forms, in a ruse to appear to be compliant with applicable Health Code regulations.

64.    Defendant Collins, as Executive Director of the Center, either knew or should have known about Pasaoglu's conduct.  In addition, Defendant Collins, in her position as Executive Director of the Center, was ultimately responsible for the Center's compliance with relevant laws and regulations.

**(2)    *Investigators' Discovery of Falsified Medical Clearance Forms for Center Staff.***

65.    The investigators identified 12 employee medical forms on which, based on visual inspection, the dates of medical examinations and vaccinations – specifically the year – appear to have been physically altered by crudely writing over the year, in order to make it appear as though the employee had received their medical examination more recently. In other words, the date would be changed from 2016 to 2018, by simply making the "6" look like an "8."

66. Upon information and belief, the dates on staff medical clearance forms were altered so it appeared that the employee had received their medical examination within the two-year period required by Health Code § 47.33 (c).

67. A visual inspection of the medical examination form – which is a standard form issued by the DOHMH for all day care center staff – indicates that the form for one current Center employee had the date of her exam changed from 2017 to 2019, and the dates of several of her vaccinations changed from 2016 to 2018. Medical forms of other current Center employees also indicate that the date of their respective examinations had been changed from 2016 to 2018, or from 2017 to 2019. With the altered year recorded on the forms, the employee would be "due" for their physical examination two years after the false date. So, for example, an employee who actually received their physical in 2017, would be due (absent falsification) for another physical in 2019, but now, because of the falsification, would appear to be due for their physical in 2021. The same theory applies to employees who had their examination dates changed from 2016 to 2018.

68. In fact, at least one current Center employee, Vanessa Sanchez, confirmed that her medical records had been falsified and that she was aware of the falsification of medical records under the Center's previous management and ownership. Sanchez provided a genuine copy of her medical record to Morris after Pasaoglu's resignation in the middle of January 2020. The medical form provided by Sanchez indicated that she had a physical examination in July 2017, which she verbally confirmed was accurate. However, the copy of the medical form found in her personnel file had been altered to show examination and vaccination dates in July 2018. As a result, Sanchez was six months over-due for a physical examination, and thus not compliant with DOMHM regulations.

69.    The original date on the medical forms indicate that the employees were employed by the Center beginning in 2016 or 2017. Therefore, the falsification of the dates would have logically happened before Plaintiff purchased the center and took over operations, and would have likely continued if Plaintiff did not discover the fraud.

70.    Upon information and belief, Defendants Pasaoglu, who was one of only two individuals authorized to access staff personnel files (Defendant Collins being the other), altered the dates of staff medical clearance forms so it appeared that appear that the employee had received their medical examination within the two-year period required by Health Code § 47.33 (c).

71.    Defendant Collins, as Executive Director of the Center, either knew or should have known about Pasaoglu's conduct.   In addition, Defendant Collins, in her position as Executive Director of the Center, was ultimately responsible for Pasaoglu's conduct and the Center's compliance with relevant laws and regulations.

**F.    PLAINTIFFS' SELF-REPORTING TO THE DEPARTMENT OF HEALTH AND MENTAL HYGIENE.**

72.    After reviewing the detailed investigative report and realizing the extent of Defendants' fraudulent practice of using doctored and/or completely fabricated documentation and credentials for Center staff in order to satisfy the relevant regulatory requirements, Plaintiffs, on or around February 13, 2020, self-reported to the DOHMH.

73.    After Plaintiffs' self-reporting, the DOHMH conducted two field inspections of the Center on or around February 14 and February 17, 2020. After the field inspections, Assistant Commissioner of the DOHMH, Simone C. Hawkins, issued an order, dated February 18, 2020 (a true and accurate copy of the DOHMH Order is annexed hereto as Exhibit D), finding the "operation of any child care service at the above-mentioned premises without cleared and qualified staff, constitutes a detriment and a danger to the health and safety of the children being

cared for at such premises" and therefore ordered the closure of the Center until it complied with Health Code regulations.

74.    The Order found, among other things, that the Center did not have a qualified Education Director, as Pasaoglu had resigned and the designated backup Education Director, Ambar Rodriquez, was not cleared. Specifically, the Order found "[e]vidence that Mr. Pasaoglu submitted altered documents in violation of Health Code §3.19(b) in relation to the qualifications of staff Ambar Rodriquez. Said evidence including indications that the qualifications were pending and under review by the State Education Department (SED) for an Initial Certification in Early Childhood Education. However, a review of the SED qualification tracking data system TEACH found significant discrepancies in the status of her qualifications in that she has not completed course work in Early Child Development, Language Development or passed her content specialty exam." Exhibit D, p. 2.

75.    Since the DOHMH closed the Center in late February 2020, Plaintiffs have expended a tremendous amount of time, effort, and money to remedy the violations and get the Center operational again. Those efforts continue to this day, as the Center is still not fully operational because, while Plaintiffs have been successful in curing the bulk of the problems caused by Defendants' conduct, it is still working with the relevant authorities to close out all of the issues, obtain final inspections, and gain authorization to fully reopen its business.

76.    Plaintiffs also suffered damages from lost business revenue, loss of customers, and more significantly, the loss of goodwill, for which it paid $2,000,000 a year prior. Indeed, after being shut down by the DOHMH, Plaintiffs were ordered to immediately email the parents of all children in the Center's care to inform them that the Center had to be temporarily closed because of the staff documentation issues.

77.   Not only did this harm Plaintiffs' reputation with its customers, but also hurt their reputation in the community and in the industry, as word of the closure was quickly picked up by multiple news outlets.[1]

**COUNT I**
**BREACHES OF REPRESENTATIONS & WARRANTIES**
**IN THE PURCHASE AGREEMENT**
*(Against Brite Tikes and Defendant Collins)*

78.   Plaintiffs incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

79.   In executing the Purchase Agreement, Brite Tikes undertook the contractual obligations to make truthful representations and warranties.  Those representations and warranties included representations that Brite Tikes would maintain the required licenses to continue operation as a child care center (Art. II. (H)), and would operate the Center in the ordinary course prior to closing (Art. II. (I)).

80.   Brite Tikes breached the representations and warranties in the Purchase Agreement by engaging in a pattern and practice of using doctored and/or completely fabricated documentation and credentials for Center staff in order to satisfy the relevant regulatory requirements.

81.   Contrary to the representations contained in the Purchase Agreement, Brite Tikes and Collins, as a former owner, were aware at the time the Purchase Agreement was entered into, or should have been aware at that time, that the Center was submitting doctored documentation and credentials for Center staff to the DOHMH, which ultimately meant that Center was

_____

[1] *Queens daycare shuts down suddenly, leaving parents scrambling*, ABC7NY (Feb. 19, 2020) https://abc7ny.com/queens-daycare-shut-down-closed-long-island-city/5948362/; *Health Department shuts down LIC daycare for 'serious violations'*, QUEENS DAILY EAGLE, (Feb. 19, 2020) https://queenseagle.com/all/lic-daycare-shut-down-health-department.

unlawfully operating without the required licenses and permits prior to the closing of the Purchase Agreement.

82. Moreover, the Center was not being operated in the ordinary course because falsifying documents to submit to a government agency, which is a felony,[2] is clearly does not constitute the "ordinary" course of business.

83. Plaintiffs were damaged as a result of the breaches of representations and warranties described herein.

84. Plaintiffs seek rescissory damages as the breaches are so numerous, substantial, and fundamental that they frustrate and defeat the central purpose of the Purchase Agreement, but it is wholly impracticable, after Plaintiffs went through great pains and expense to address the licensing and permitting problems and have been running the Center for nearly a year, to rescind the Purchase Agreement.

**COUNT II**
**COMMON LAW FRAUD**
*(Against All Defendants)*

85. Plaintiffs incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

86. As alleged in the preceding paragraphs, Defendants made false and misleading statements of material fact and/or omitted material facts relating to their use of falsified, forged, and/or completely fabricated documentation and credentials for Center staff in order to satisfy the relevant regulatory requirements. As a result, Defendants made misleading statements of material fact and/or omitted material facts relating to their maintenance of the required licenses and permits.

---

[2] *See* N.Y. Penal Law § 175.35 ("Offering a false instrument for filing in the first degree").

87. Brite Tikes directed and controlled the activities of its agents, representatives, Collins and Pasaoglu, and used them as conduits to conduct the pervasive fraudulent conduct alleged herein.

88. The fact that the Center, through the conduct of Collins and Pasaoglu, which was under the control of Brite Tikes, had been engaging in a pattern of fraudulently doctoring documentation and credentials of Center staff in order to satisfy licensing and permitting requirements, was unknown to Plaintiffs at all times relevant to this matter (and not discoverable using reasonable diligence).

89. The facts relating to Defendants' use of altered and/or forged documentation were exclusively within the knowledge of Collins, Pasaoglu, and Brite Tikes. Collins, Pasaoglu, and Brite Tikes knew that this information was not readily accessible to Plaintiffs, and led Plaintiffs to believe that their conduct was consistent with all laws and regulations. Defendant Collins and Pasaoglu worked almost exclusively on their private laptops, which made it impossible for Plaintiffs to uncover their fraudulent conduct. Accordingly, Defendants had a duty to disclose the facts relating to their use of altered and/or forged documentation.

90. Defendants duty to disclose the use of altered and/or forged documentation arose because of the affirmative representations they made to the contrary and separately from the pre-existing franchisor/franchisee relationship and the very nature of the material information omitted.

91. Defendants made these materially false and misleading statements and omissions for the purpose of inducing Plaintiffs to purchase the Center.

92. Defendants knew or recklessly disregarded that Plaintiffs would rely upon Defendants' representations in connection with their decisions to purchase the Center. As alleged

herein, Defendants were in a position of unique and superior knowledge regarding the true facts concerning the foregoing material misrepresentations and omissions.

93.    Plaintiffs would not have purchased the Center but for Defendants' fraudulent representations and omissions regarding, among other things, the status of the Center's licenses, permits, and compliance with local, state, and federal laws and regulations.

94.    Defendants' misrepresentations and omissions were material and were made with the intent that Plaintiffs rely upon them.   Defendants knew that Plaintiffs would not have purchased the Center at all, or would not have purchased it for $2.5 million, unless it was satisfied that the Center was complying with regulatory requirements. Indeed, the bulk of purchase price, $2 million, was for the Center's "goodwill."

95.    Plaintiffs reasonably and justifiably relied upon Defendants' representations and material omissions, both in executing the Purchase Agreement (and related documents) and ultimately closing on the purchase and taking over the Center.

96.    By virtue of Defendants' false and misleading statements and omissions, as alleged herein, Plaintiffs have suffered substantial damages in an amount to be determined at trial, but in no event in an amount less than $2.5 million, plus interest and other consequential damages.

97.    Moreover, because Defendants committed these acts and omissions maliciously, wantonly and oppressively, and because the consequences of these acts knowingly affected the general public, including, but not limited to, all persons who had children enrolled at the Center during the relevant period, Plaintiffs are entitled to recover punitive damages.

## COUNT III
## FRAUDULENT INDUCEMENT
### *(Against All Defendants)*

98.    Plaintiffs incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

99.     As alleged above, Brite Tikes, through its agents, employees and representatives, and Collins and Pasaoglu individually, made false and misleading statements of material fact and/or omitted material facts relating to their use of falsified, forged, and/or completely fabricated documentation and credentials for Center staff in order to satisfy the relevant regulatory requirements. As a result, Defendants made misleading statements of material fact and/or omitted material facts relating to their maintenance of the required licenses and permits.

100.     Brite Tikes directed and controlled the activities of its agents, representatives, Collins and Pasaoglu, and used them as conduits to conduct the pervasive fraudulent conduct alleged herein.

101.     Defendants knew before, during, and after the negotiations period, that the foregoing statements were false and misleading or, at the very least, were made recklessly.

102.     Defendants made these materially false and misleading statements and omissions for the purpose of inducing Plaintiffs to purchase the Center. Furthermore, these statements related to Defendants' own acts and omissions.

103.     Defendants knew or recklessly disregarded that Plaintiffs would rely upon Defendants' representations in connection with their decisions to purchase the Center. As alleged herein, Defendants were in a position of unique and superior knowledge regarding the true facts concerning the foregoing material misrepresentations and omissions.

104.     It was only by making such misrepresentations and omissions that Defendants were able to induce Plaintiffs to buy the Center. Plaintiffs would not have purchased or otherwise acquired the Center but for Defendants' fraudulent representations and omissions regarding, among other things, the status of the Center's licenses, permits, and compliance with local, state, and federal laws and regulations.

105. Plaintiffs actually, justifiably, reasonably, and foreseeably relied upon Defendants' false and misleading representations and omissions regarding, among other things, the status of the Center's licenses, permits, and compliance with local, state, and federal laws and regulations.

106. By virtue of Defendants' false and misleading statements and omissions, as alleged herein, Plaintiffs have suffered substantial damages in an amount to be determined at trial, but in no event in an amount less than $2.5 million, plus interest and other consequential damages.

107. The misrepresentations and omissions were so fundamental to the Purchase Agreement and the very reason that Plaintiffs executed the Purchase Agreement, which Defendants were keenly aware of, that they render the agreement voidable and would entitle the Plaintiff to rescission.

108. As set forth above, however, Plaintiffs took over the Center in June 2019 and since uncovering Defendants' fraudulent conduct in January 2020, Plaintiffs have spent a tremendous amount of time and money correcting the serious issues uncovered and ensuring compliance with all laws and regulations. Plaintiffs have done so in an effort to salvage the reputation of the Center, which has suffered extreme damage, and to ensure that there is no damage to the broader The Learning Experience brand, which, as a franchisor, is of paramount importance.

109. Based on Plaintiffs' efforts to run the Center and correct the issues, and the risk to Plaintiffs' broader reputation if Defendants were allowed to resume operations of the Center, rescission is impractical and rescissory damages are appropriate.

110. Moreover, because Defendants committed these acts and omissions maliciously, wantonly and oppressively, and because the consequences of these acts knowingly affected the

general public, including, but not limited to, all persons who had children enrolled at the Center during the relevant period, Plaintiffs are entitled to recover punitive damages.

## COUNT IV
## CONSPIRACY TO COMMIT FRAUD
### *(All Defendants)*

111.    Plaintiffs incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

112.    As discussed herein, Defendants committed fraud through representations and material omissions to Plaintiff, upon which Purchaser justifiably relied.

113.    All Defendants were in agreement to commit all acts necessary to misrepresent and mislead Plaintiffs into believing the Center was complying with all regulatory requirements, maintained all licenses, and operated the business in the ordinary course, in furtherance of the objective of selling the Center to Plaintiffs for $2.5 million. As discussed herein, Defendants Pasaolgu and Collins had been fraudulently altering official personnel forms for years, and Brite Tikes knew or should have known about its' employees' fraudulent conduct.

114.    Plaintiffs have suffered damages as a result of Defendants' acts and omissions.

115.    Defendants are liable for conspiracy to commit fraud in furtherance of the agreement amongst them to hide their fraudulent conduct and extensive document falsification in order to sell the Center by all means necessary and at the earliest possible date.

## COUNT V
## INDEMNIFICATION
### *(Brite Tikes and Collins)*

116. Plaintiffs incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

117. Article VI.A.(i) of the Purchase Agreement provides that "Seller shall hold harmless and indemnify Purchaser and Purchaser's parent, affiliates, subsidiaries and

franchises…from and against all liabilities of Seller accrued prior to Closing, other than Assumed Liabilities . . . "

118. As a result of Defendants' pre-closing conduct, Plaintiffs have incurred liabilities including, but not limited to, the costs incurred to report the documentation issues to the relevant authorities and to remediate the issues caused by Defendants' conduct.

119. Pursuant to the Purchase Agreement, Brite Tikes is required to indemnify Plaintiffs for those liabilities.

## COUNT VI
## BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING
### *(Brite Tikes and Collins)*

120.    Plaintiffs incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

121.    In New York, a duty of good faith and fair dealing is implied in all agreements.

122.    The duty of good faith and fair dealing acts to protect the parties' right to receive the benefits of their agreement.

123.    Through Defendants' conduct, Plaintiffs have been deprived of the benefit of their agreement.  Specifically, Plaintiffs' primary benefit under the Purchase Agreement was to obtain the goodwill associated with the Center, which was purportedly operating under a valid license and, thus, consistent with the relevant laws and regulations.

124.    Because of the fraudulent practices employed by Defendants, the Center was not operating under a valid license and Plaintiffs lost the goodwill associated with the ongoing operations of the Center.

## COUNT VII
## NEGLIGENCE
### *(Brite Tikes and Collins)*

125. Defendant Brite Tikes, as the licensed entity, and Defendant Collins, as the Executive Director of the Center had a duty to carry out the operations of the Center consistent with the relevant laws and regulations.

126. Defendants Brite Tikes and Collins either knew or should have known about, or recklessly disregarded, the fraudulent documentation being used to satisfy the Center's regulatory obligations.

127. By failing to know or by recklessly disregarding the Center's use of the fraudulent documentation, Defendants Brite Tikes and Collins breached their duty to carry out the operations of the Center consistent with the relevant laws and regulations.

128. Plaintiffs have been harmed and damaged by Defendants Brite Tikes and Collins' breach of their duty.

## COUNT VIII
## NEGLIGENT SUPERVISION
### *(Collins)*

129. Defendant Collins, as Executive Director of the Center, had a duty and obligation to supervise Defendant Pasaoglu, the Center Director and her direct report.

130. Defendant Collins breached her duty and obligation to supervise by failing to identify and/or intervene to stop Pasaoglu's fraudulent conduct identified above, including forging and altering documentation used to satisfy the Center's regulatory requirements.

131. To the extent that Collins was unaware of Pasaoglu's and the Center's use of fraudulent documentation, had she acted reasonably and diligently, she would have uncovered the use of the fraudulent documentation.

132. Indeed, as Executive Director of the Center, Collins was ultimately responsible for the Center's compliance with the relevant laws and regulations and, in that regard, she was obligated to at least review the documentation created by Pasaoglu and the Center that was maintained for regulatory compliance purposes.

133.    Collins' utter failure to supervise Pasaoglu constitutes a gross breach of her duty to supervise and it has caused Plaintiffs' direct and substantial harm and injury.


**COUNT IX**
**BREACH OF THE BRITE TIKES FRANCHISE AGREEMENT**
*(Against Brite Tikes, Collins, and Jubran)*

134.    On May 3, 2013, Jubran C. Jubran ("Jubran") entered into a Franchise Agreement with TLE Systems, which created Franchise No. 286. Exhibit B.

135.    In connection with the execution of the Franchise Agreement and in order to induce TLE Systems to grant it franchise rights, Jubran C. Jubran executed a Personal Guaranty and Subordination Agreement in which he "unconditionally, jointly and severally, personally and individually" guaranteed all obligations of the franchisee, "including all obligations arising under, resulting from or in any way in connection with the Franchise Agreement . . . in the same manner as if the Franchise Agreement was signed between Franchisor and the Guarantor directly." Exhibit B, Attachment 4.

136.    In the Second Addendum to the Franchise Agreement, the parties to the Franchise Agreement added Defendant Collins to all of the Franchise Documents. Exhibit B, Second Addendum.

137.    On or about October 17, 2016, Jubran C. Jubran and Nicole Collins assigned their rights and obligations under the Franchise Agreement to Brite Tikes. Exhibit C. In the Assignment and Assumption of Franchise Documents, however, the assignors, Collins and Jubran, acknowledged and agreed that the Assignment did not, in any way, impact the personal guaranty they provided and, further, reaffirmed and ratified their individual liability thereunder. Exhibit C, ¶ 2.

138. Under the Franchise Agreement, Section 8.6.2 required Brite Tikes to refrain from operating "in any manner which reflects adversely on [the Learning Experience's] Marks, Trade Name and the Franchise System." Exhibit B, § 8.6.2.

139. Section 8.72 prohibited Brite Tikes and its staff from engaging in immoral conduct or criminal behavior and further prohibited Brite Tikes and its staff from engaging in conduct that might jeopardize the welfare of the children in the Center or reflect adversely on the Learning Experience's goodwill. Exhibit B, § 8.72.

140. Section 8.7.3 required Brite Tikes to maintain a proper and competent staff sufficient to satisfy applicable governmental licensing and labor laws. Exhibit B, § 8.7.3.

141. Section 8.12 requires Brite Tikes to comply with all state and local laws and regulations pertaining to the Center and to keep current all licenses and permits required by any government agency in connection with the operation of the Center. Exhibit B, § 8.12.

142. Because of the personal guaranty, the obligations of Brite Tikes set forth above were also obligations of Jubran and Collins.

143. Based on the extraordinary fraudulent conduct detailed above, including the use of forged, doctored and fabricated documents to satisfy the Center's regulatory requirements, Brite Tikes, Jubran and Collins breached their obligations under the Franchise Agreement.

144. The breaches of the Franchise Agreement have caused Plaintiffs significant harm and damage by way of the significant costs incurred to investigate the wrongful conduct, report same to the relevant authorities and work with those authorities to remediate the problem. In addition, Plaintiffs have lost revenue from having to close the Center while remediating the problems and have further suffered damage to their goodwill and reputation.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully demands judgment in their favor and against Defendants as follows:

a.  An award of damages on each cause of action, according to proof at trial;

b.  An award of attorneys' fees and costs based on the Purchase Agreement and any other basis in law or equity;

c.  An award of rescissory damages including the return of the purchase price paid by Purchaser;

d.  An award of punitive damages for all causes of action where such damages are appropriate;

e.  An award of interest on any monetary relief obtained; and

f.  Any other relief that this Court may deem just, equitable and proper under the circumstances.

**GREENBERG TRAURIG, LLP**

DATED: Florham Park, New Jersey
June 4, 2020

By:  */s/ Jason Kislin*
Jason Kislin, Esq.
500 Campus Drive, Suite 400
Florham Park, New Jersey 07932
Telephone: 973-360-7900
Fax: 973-301-8410
Email: kislinj@gtlaw.com
*Attorneys for Plaintiffs*

# EXHIBIT A

## AGREEMENT OF PURCHASE AND SALE

This AGREEMENT OF PURCHASE AND SALE (the "Agreement") is made as of January 8, 2019 (the "Effective Date"), by and between BRITE TIKES LLC, a New York limited liability company (the "Seller") whose principal place of business is located at 375 North Broadway, Suite 311, Jericho, New York 11753; and TLE AT QUEENS-LONG ISLAND CITY, LLC, a Delaware limited liability company (the "Purchaser"), whose principal place of business is located at 210 Hillsboro Technology Drive, Deerfield Beach, Florida 33441.

### RECITALS:

WHEREAS, Jubran C. Jubran ("Original Franchisee"), on behalf of an entity to be formed, entered into that certain franchise agreement with The Learning Experience Systems LLC (the "Franchisor") dated May 3, 2013, and certain other franchise documents in connection therewith, designated as Franchise No. 268 (collectively, the "Franchise Documents");

WHEREAS, pursuant to that certain Assignment and Assumption of Franchise Documents dated October 27, 2016, Original Franchisee assigned all rights and obligations under the Franchise Documents to Seller;

WHEREAS, Seller is engaged in the business of operating a child learning and care center located at 27-28 Thomson Avenue, Long Island City, New York 11101 (the "Center"), doing business as The Learning Experience (such activities being hereinafter referred to, collectively, as the "Business");

WHEREAS, Purchaser desires to engage in the Business by purchasing the assets of Seller utilized in the operation of the Business, including without limitation the goodwill thereof (the "Assets"), and Seller desires to sell the Assets to Purchaser, upon the terms and subject to the conditions hereinafter provided; and

WHEREAS, Franchisor has agreed to permit the sale of the Assets by Seller to Purchaser, pursuant to the Franchise Documents, and has indicated such agreement by its execution of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter set forth, the parties hereto hereby agree as follows:

### ARTICLE I

#### Sale of the Business and the Assets; Purchase Price

A.     Subject to the terms and conditions of this Agreement and on the basis of the representations, warranties and covenants herein contained, effective at the Closing (as hereinafter defined), Seller hereby agrees to sell, assign and convey the Assets to Purchaser, and Purchaser hereby agrees to purchase, acquire and accept the Assets from Seller. The Assets consist of: (i) all furniture, fixtures, equipment and materials located at the Business and utilized

in the operation of the Business; (ii) student records relating to the Business, (iii) Seller's rights under all ordinary course purchase and supply orders as of and at the Closing; and (iv) all of Seller's goodwill associated with the Business.

B.     The aggregate purchase price (the "Purchase Price") for the Assets is **TWO MILLION FIVE HUNDRED THOUSAND DOLLARS ($2,500,000.00)**, which shall be payable in full at Closing; provided, however, that Purchaser shall at closing pay to Rivkin Radler LLP as "Escrow Agent" the sum of Fifty Thousand Dollars ($50,000.00) (the "Escrow Holdback Amount"). The Escrow Agent shall hold and maintain the Escrow Holdback Amount for up to sixty (60) days from Closing pursuant to the Escrow Agreement annexed as Exhibit A (the "Escrow Agreement"). The Escrow Holdback Amount may be applied to cover any net adjustments, costs or prorations due from Seller to Purchaser, and at the end of the sixty-day period following Closing, the Escrow Agent shall remit to Seller any then-remaining balance of the Escrow Holdback Amount within two (2) business days thereafter.

C.     In addition, at Closing Purchaser shall assume Seller's liabilities and obligations as at the Closing date with respect to (i) accrued vacation days and/or bonuses of Seller's employees, (ii) accrued customer credits of Seller and (iii) accounts payable for inventory and supplies in transit and not yet invoiced to Seller (collectively, the "Assumed Liabilities"). Seller shall cooperate with and assist Purchaser with respect to the handling of each of the Assumed Liabilities. The parties agree that any payroll taxes incurred and/or payable prior to Closing are expressly excluded from the Assumed Liabilities and shall remain the responsibility of Seller.

D.     The Assets are expressly deemed to include the pro-rated portion of any payments received by Seller prior to Closing for tuitions applicable to any time period after the Closing.

E.     After the Closing, with Seller's express approval, Purchaser may pay any cost or expense incurred prior to Closing which is not an Assumed Liability and which is unpaid as of the Closing, and in that case, the Purchase Price shall be reduced by the corresponding amount of any such payment(s). Otherwise, Seller shall pay and discharge its accounts payable and other liabilities in due course.

F.     Each of Seller and Franchisor agrees to execute, to be bound by, and to deliver to the other party the Franchise Terminations and General Release Agreements attached hereto as Exhibit B for the Center and separately for franchise 334, for a Brooklyn, New York location.

G.     By executing this Agreement, Franchisor hereby agrees to waive any and all royalties or other fees due from Seller that it may have been otherwise able to collect in connection with Seller's sale and transfer of the Center and its franchise pursuant to the Franchise Documents. Franchisor further agrees to waive any upgrade or renovation requirements imposed upon Seller by the Franchise Documents. Notwithstanding anything herein to the contrary, if the transaction contemplated herein does not successfully close, the aforementioned waivers shall be deemed null, void, and of no further force or effect.

H.     At Closing, in addition to the Purchase Price, Purchaser shall refund in cash the $40,729.17 lease security deposit Seller paid to Purchaser.  The parties agree that Seller did not pay any lease security deposit to the actual landlord for the physical premises of the Business.

I.     The Purchase Price shall be allocated in accordance with Section 1060 of the Internal Revenue Code and the Regulations promulgated thereunder, as set forth below.  All income tax returns and reports filed by Purchaser and Seller shall be prepared consistently with such allocation, and neither Purchaser nor Seller shall take any position inconsistent with such allocation.

> Covenant not to Compete - $100,000
> Customer List - $100,000
> Tangible Personal Property - $300,000
> Goodwill - $2,000,000
> **Purchase Price - $2,500,000**

## ARTICLE II

### Seller's Representations

Seller hereby represents, warrants and covenants that:

A.     Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New York, and has the full power and authority to own the Business and the Assets.

B.     The execution and delivery of this Agreement by Seller, the performance by Seller of its covenants and agreements hereunder and the consummation by Seller of the transactions contemplated hereby have been duly authorized by all necessary limited liability company action. When executed and delivered by Seller, this Agreement shall constitute the valid and legally binding obligation of Seller enforceable against Seller in accordance with its terms, except as may be limited by bankruptcy, insolvency or other laws affecting generally the enforceability of creditors' rights.

C.     Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated herein, will violate any provision of the articles of organization or operating agreement of Seller, or any law, rule, regulation, writ, judgment, injunction, decree, determination, award or other order of any court, government, or governmental agency or instrumentality, or, conflict with or result in any breach of any of the terms of or the creation or imposition of any mortgage, deed of trust, pledge, lien, security interest or other charge or encumbrance of any nature pursuant to the terms of any material contract or agreement to which Seller is a party or by which Seller, the Business, or any of the Assets is bound.

D.     Seller will convey to Purchaser at Closing good and marketable title to all of the Assets free and clear of any mortgage, deed of trust, security interest, pledge, lien, or other charge or encumbrance of any nature.

E.     Except for the Assumed Liabilities, Purchaser is assuming no other obligation of Seller that is not detailed herein.

F.     Except for the Assumed Liabilities, Seller shall pay any and all liabilities of the Center relating to the period prior to Closing or with Seller's consent, by Purchaser on Seller's behalf. At Closing, the Purchase Price will be reduced by any prepaid tuitions collected by Seller applicable to any time period after the Closing, or paid to Purchaser no later than 5 business days after Closing. If either of these conditions are not satisfied by Seller within 5 days of notice by Purchaser, then Purchaser shall have the right to receive the corresponding amounts from the balance of the Holdback Amount.

G.     Seller shall cooperate as reasonably necessary to ensure the orderly transition of the operations of the Business to Purchaser, whether before, at or after the Closing, including without limitation the transfer of all utility and service accounts.

H.     Seller shall maintain all required licenses for the Business in its own name, until such licenses are transferred to Purchaser, or until Purchaser is fully licensed by the State of New York in its own name, whichever occurs first. Seller shall cooperate with Purchaser with respect to Purchaser obtaining a childcare license, and take such reasonable and customary measures necessary to assist Purchaser to obtain its required licenses. This Paragraph shall survive the Closing and termination of the franchise.

I.     At all times prior to the Closing, Seller shall operate the Business in the ordinary course of business, including without limitation the timely payment of all Base Rent, Additional Rent, and any other sums required to be paid pursuant to the Lease Agreement for the Center, unless otherwise set forth herein.

J.     Within five (5) days of the Effective Date, Seller shall provide to Purchaser a full and accurate listing of all current vendor/supplier contracts, and Purchaser shall determine which such contracts, if any, to transfer to itself. Seller shall be responsible for terminating any such contract that Purchaser does not elect to assume, and shall bear any costs associated therewith.

## ARTICLE III

### Purchaser's Representations

Purchaser represents, warrants and covenants that:

A.     Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, is qualified and in good standing in the State of New York, and has the full corporate power and authority to acquire the Business and the Assets.

B.     The execution and delivery of this Agreement by Purchaser, the performance by Purchaser of its covenants and agreements hereunder and the consummation by Purchaser of the

4

transactions contemplated hereby have been duly authorized by all necessary limited liability company action. When executed and delivered by Purchaser, this Agreement will constitute the valid and legally binding obligation of Purchaser enforceable against Purchaser in accordance with its terms, except as may be limited by bankruptcy, insolvency, or other laws affecting generally the enforceability of creditors' rights.

C.     Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated herein, will violate any provision of the articles of organization or operating agreement of Seller, or law, rule, regulation, writ, judgment, injunction, decree, determination, award, or other order of any court, government or governmental agency or instrumentality, or conflict with or result in any breach of any of the terms of or constitute a default under or result in the termination of or the creation or imposition of any mortgage, deed of trust, pledge, lien, security interest or other charge or encumbrance of any nature pursuant to the terms of any contract or agreement to which Purchaser is a party or by which Purchaser, the Business, or any of the Assets is bound.

D.     Purchaser (i) knows, and has examined, inspected and investigated to the full satisfaction of the Purchaser, the Business and the Assets, and (ii) has independently investigated, analyzed and appraised the value and profitability of the Assets and the Business. The Purchaser acknowledges that, except as specifically set forth in Article II hereof, neither the Seller nor any broker, agent, employee, servant or representative of the Seller has made any representations whatsoever regarding the subject matter of the transactions contemplated hereunder and the Purchaser agrees to purchase the Business and the Assets "as is" subject to reasonable use, wear, tear and material deterioration between the date hereof and the Closing.

## ARTICLE IV

### Closing Conditions

A.     Seller hereby covenants and agrees that, except as consented to by Purchaser, from and after the date of this Agreement and until the Closing, Seller shall not mortgage, pledge, or subject to any lien, charge or encumbrance of any of the Business or the Assets.

B.     The obligation of each party to consummate the transactions hereunder is subject to the following conditions precedent, any or all of which may be waived by such party in its sole discretion:

(i)     The representations and warranties of the other party contained herein shall be true and correct in all material respects at and as of the Closing with the same effect as though all such representations and warranties were made at and as of the Closing;

(ii)     Each party shall have received a resolution authorizing the execution of this Agreement and the consummation of the transactions contemplated hereby;

(iii)     Purchaser shall deliver to Seller executed Franchise Terminations and General Release Agreements attached hereto as Exhibit B and for franchise 334; and

(iv)     Each party shall have received such additional certificates, instruments and other documents, in form and substance reasonable satisfactory in connection with the transactions contemplated hereby.

C.     Neither party shall disclose the pendency or existence of the transaction contemplated herein to any current or prospective staff or customers of the Business, or to any other third party, except with the express written consent of the other parties hereto. The parties may disclose the pendency of the transaction contemplated herein to their respective retained professionals (including attorneys and accountants) as necessary to facilitate the transaction.

D.     At Closing, the parties shall reconcile all revenue paid and received against all expenses for the month, based on a 30-day month, and shall allocate such amounts on a *pro rata* basis. A list of items to be adjusted and prorated is set forth on <u>Exhibit C</u>.

E.     Purchaser shall have through January 7, 2019 to conduct all due diligence it deems necessary to evaluate the Business, the Assets, and the transaction contemplated herein, and Seller shall provide any reasonable assistance requested by Purchaser in connection with such due diligence and shall promptly supply to Purchaser any reasonably requested information and documents concerning the Business and the Assets, including without limitation all current contracts, student files, staff files, and other books and records of Seller relating to the Business or the Assets. If Purchaser has not informed Seller of its intent to cancel the transaction contemplated herein by the close of business on January 8, 2019, Purchaser shall be deemed to have waived its right to cancel the transaction based on Purchaser's due diligence (but any other cancellation rights or conditions precedent to Closing set forth in this Agreement shall remain in full force and effect).

F.     Seller understands, acknowledges and agrees that the Closing is expressly conditioned upon and subject to approval by the Board of Directors of TLE Holdings, LLC, and that such approval shall not occur prior to such Board's next regularly scheduled meeting, which is currently scheduled for January 17, 2019.

## ARTICLE V

### Closing Procedures

A.     Subject to satisfaction of the closing conditions set forth in Article IV above, unless the parties otherwise mutually agree, the closing of the purchase and sale of the Business and the Assets as set forth herein (the "Closing") shall take place on the later of (i) within five (5) days after the relevant governmental agency has either issued a childcare license to Purchaser in its own name to operate the Center, or has approved the transfer of Seller's childcare license to Purchaser and (ii) January 31, 2019. The parties intend to conduct the Closing by electronic exchange of documents and funds, and same will not be conducted in person. Immediately upon Closing, Purchaser shall assume control over all operations of the Business and over all the Assets.

B.    Delivery of the Business and the Assets shall be made by Seller to Purchaser at the Closing by delivering such bills of sale, assignments and other instruments of conveyance and transfer as shall be effective to vest in Purchaser title to, and the right to full custody and control of, the Business and the Assets in accordance with the provisions of this Agreement. At the Closing, Purchaser and Franchisor shall deliver to Seller such instruments as shall be sufficient to effect the assumption by Purchaser of the Assumed Liabilities. At Closing, Seller shall surrender possession of the Business premises to Purchaser, and Purchaser shall assume possession of same.

## ARTICLE VI

### Post Closing Requirements

A.    From and after the Closing, (i) Seller shall hold harmless and indemnify Purchaser and Purchaser's parent, affiliates, subsidiaries and franchises, and their respective officers, directors, shareholders, members, employees, agents and representatives from and against all liabilities of Seller accrued prior to Closing, other than the Assumed Liabilities, and (ii) Purchaser and Franchisor shall hold harmless and indemnify Seller, and Seller's parent, affiliates, subsidiaries and franchises, and their respective officers, directors, shareholders, members, employees, agents and representatives from and against the Assumed Liabilities and all liabilities of Purchaser accrued subsequent to Closing.

B.    Neither party shall have any obligation to pay any brokerage, finders or similar fee or other compensation to any person, firm or other corporation that a party hereunder may have dealt with, and the parties each agree to indemnify and hold the other harmless from any such fees or compensation claiming to act on behalf of such indemnifying party.

C.    Following the Closing, Purchaser shall operate the Business, and neither Seller, Jubran C. Jubran nor any of his immediate family members shall have any involvement whatsoever with the operation of the Business, except as provided in E. below.

D.    Following the Closing, Purchaser may, in its sole discretion, extend an offer of employment with Purchaser to any member(s) of Seller's staff, but such offer of employment shall under no circumstances constitute a guarantee of continuing employment for any such staff member(s).

E.    Following the Closing, Purchaser may, in its sole discretion, request that Nicole Collins provide reasonable assistance to Purchaser with respect to the transition of operations from Seller to Purchaser, for a period of up to five (5) business days.

## ARTICLE VII

### Miscellaneous

A.    All notices, requests or instructions hereunder shall be in writing and sent by registered or certified mail, postage prepaid, to the addresses first set forth above. Any of the

above addresses may be changed at any time by notice given as provided above; provided, however, that any such notice of change of address shall be effective only upon receipt.

B.    This Agreement and the documents referred to herein contain the entire agreement between the parties hereto with respect to the transactions contemplated hereby, and no modification hereof shall be effective unless in writing and signed by the party against which it is sought to be enforced.

C.    Each of the parties hereto shall take such actions as may be necessary or reasonably requested by the other parties hereto to carry out and consummate the transactions contemplated by this Agreement.

D.    Seller shall not be deemed to have made to Purchaser (or any representative of Purchaser) any representation or warranty other than as expressly made by Seller in Article II hereof.  Without limiting the generality of the foregoing and notwithstanding any otherwise express representations and warranties made by Seller in Article II hereof, Seller makes no representation or warranty to Purchaser with respect to: (i) any projections, estimates or budgets available or made available to Purchaser or its counsel of future revenues, expenses or expenditures, or future or past results of the Business; or (ii) any other information or documents available or made available to Purchaser or its counsel, accountants or advisors with respect to the Business, except as expressly covered by a representation and warranty contained in Article II hereof.

E.    Each of the parties hereto shall bear such party's own expenses in connection with this Agreement and the transactions contemplated hereby.

F.    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, assigns and legal representatives.  The representations and warranties contained in this Agreement shall not survive the Closing hereunder unless otherwise set forth herein.

G.    This Agreement shall be governed by and construed in accordance with the laws of New York State, without regard to that State's conflict of laws principles.

H.    If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

I.    This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.  A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic

transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

J.    By executing this Agreement, Seller expressly warrants, represents and agrees that it will not remove or destroy any of the Assets or any fixtures or equipment located upon the Business premises, and that it will not interfere with the operations of the Business.

K.    Purchaser and Seller expressly warrant, represent, and agree that neither of them shall make any public announcement whatsoever regarding the transaction contemplated herein, including without limitation to current and prospective Center parents and staff members, unless and until the form of any communication regarding such transaction has been reasonably approved by both parties.

L.    Purchaser shall be responsible for the New York State sales tax that may be due and payable by Purchaser pursuant to any law in connection with the transfer of any of the Assets hereunder.  Seller and Purchaser shall each be responsible for any other tax that may be due and payable by them, respectively, in connection with this transaction.

M.    Purchaser and Seller acknowledge the pendency of that certain litigation styled *TLE at Queens-Long Island City, LLC et al. v. Tag-Arris Retail, LLC*, Index No. 703258/2017, currently pending in the Supreme Court of New York, County of Queens (the "Litigation").  In connection with the Litigation, Purchaser and Seller expressly warrant, represent, and agree as follows:

(a) Purchaser and its affiliates retain all rights to any amounts recovered in the Litigation, and Seller expressly waives any and all claim to any funds recovered by Purchaser in connection with the Litigation.

(b) Purchaser and Franchisor each hereby agrees that it and/or its affiliates, as appropriate, shall indemnify, defend and hold harmless Seller and Seller's officers, members, managers, affiliates, employees and agents (the "Seller Indemnified Parties") from and against any loss, liability, or expense, including reasonable legal fees and expenses, arising out of or relating to (i) the Litigation, (ii the Lease Agreement for the Center and/or (iii) the assignment to Seller of the Lease Agreement for the Center.

(c) Purchaser has and retains the exclusive right to settle, amend, and/or dismiss the Litigation in its entirety, in Purchaser's sole discretion, and Seller expressly waives any and all claims arising from any decision made by Purchaser in connection with the Litigation, provided any such settlement, dismissal or other action with respect to the Litigation does not involve or lead to any liability or create any financial or other obligation on the part of Seller or the other Seller Indemnified Parties.  In addition, in connection with any such settlement, Purchaser shall request (but shall not be obligated to deliver) the landlord's unconditional release in customary form of the Seller

Indemnified Parties from all liabilities and obligations in connection with the Lease.

(d) Seller acknowledges its obligation to pay all Base Rent, Additional Rent, and other sums due under the Lease from and after January 1, 2019. Upon the Closing, Seller shall be released from any obligation in connection with such payments under the Lease which were due, payable or accrued prior to January 1, 2019, and any claim in connection therewith that is brought against Seller shall be subject to the indemnity set forth in the preceding sub-paragraph (b).

[End of text. Signatures on the following page.]

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto as of the date first above written.

PURCHASER:

TLE AT QUEENS-LONG ISLAND CITY, LLC

By: _____
Name: Michael Shafir
Title: Secretary


SELLER:

BRITE TIKES, LLC

By: _____
Name: Jubran C. Jubran
Title: Managing Member


FRANCHISOR:

THE LEARNING EXPERIENCE SYSTEMS, LLC

By: _____
Name: Michael Shafir
Title: Senior Vice President & General Counsel

# EXHIBIT A

## ESCROW AGREEMENT

[attached]

# ESCROW AGREEMENT

ESCROW AGREEMENT dated January ___, 2019, among TLE at Queens-Long Island City, LLC ("Buyer"), Brite Tikes LLC ("Seller") and Rivkin Radler LLP ("Escrow Agent").

## R E C I T A L S

Buyer and Seller are parties to an Agreement of Purchase and Sale dated January 8, 2019 (the "Purchase Agreement") for Buyer's acquisition of substantially all of the Assets used in Seller's Business. Capitalized Terms not otherwise defined herein have the meaning ascribed thereto in the Purchase Agreement;

Article II B. of the Purchase Agreement contemplates the execution and delivery of this Agreement and the deposit of $50,000 with the Escrow Agent (the "Escrow Fund") as a source to pay Buyer amounts due in respect of adjustments and pro-rations that are required to be made pursuant to the Purchase Agreement.

Accordingly, the parties agree as follows:

1. <u>Appointment of Escrow Agent</u>. Buyer and Seller appoint Escrow Agent to act as such pursuant to the Purchase Agreement and this Agreement, and Escrow Agent accepts such appointment according to the terms and conditions set forth herein.

2. <u>Acknowledgment of Delivering of Escrow Fund</u>. On the date hereof, Buyer has deposited with Escrow Agent the $50,000 Escrow Holdback Amount, and Escrow Agent hereby acknowledges receipt. Escrow Agent shall hold, invest, administer, distribute and dispose of the Escrow Holdback Amount solely in accordance with the terms and conditions of this Agreement.

3. <u>Deposit of Escrow Fund</u>. (a) Escrow Agent shall deposit Escrow Holdback Amount in an interest bearing account, established in the name of Escrow Agent for the purposes contemplated herein. The Escrow Holdback Amount, and any interest thereon, is referred to as the "Escrow Fund". Escrow Agent shall advise Buyer and Seller of the name of the bank which holds Escrow Fund.

(b) The interest on the Escrow Fund shall be added to and become a part of the Escrow Fund and shall be administered and distributed by the Escrow Agent pursuant to the terms and conditions of this Agreement applicable to the Escrow Fund.

4. <u>Payments or Transfers From Escrow Fund</u>. (a) Subject to the provisions of Section 5 below, Escrow Agent shall hold Escrow Fund in escrow in accordance with this Agreement and shall, from time to time, make payments or transfers from Escrow Fund, but only (i) in accordance with Section 4(b) and 4(c) below or (ii) as otherwise directed by order of a court of competent jurisdiction; provided that by April 30, 2019, if neither of the events described in this Section (a)(i) or (ii) above have occurred, Escrow Agent may resign upon ten days' written notice to the other parties in accordance with Section 5(h) below. Upon the expiration of such ten days' notice, the Escrow Agent shall deliver the Escrow Fund to a successor escrow agent appointed by mutual agreement of Buyer and Seller, or if no successor escrow agent has been appointed, deposit Escrow Fund in court as provided in Section 5(f)

below. Upon either such delivery, Escrow Agent's obligations hereunder shall terminate and Escrow Agent shall be released from any and all obligations under this Agreement.

(b)     From time to time before 5:00 p.m. on April ___, 2019, (the "Escrow Termination Date"), Buyer may give notice (a "Claim") to the Escrow Agent and the Seller specifying a reasonable detail the nature and dollar amount of any Claim that Buyer may have under Articles 1 B. or 4 D. of the Purchase Agreement ("Claim Notice"). If Seller gives notice to Buyer and the Escrow Agent disputing any Claim setting forth the reasonable basis for the dispute (a "Dispute Notice") prior to 5:00 p.m. within ten days following delivery of the Claim Notice, such Claim shall be resolved as provided in Section 4(c) below. If the Escrow Agent does not receive a Dispute Notice within the ten day period, then the dollar amount of the Claim as set forth in Buyer's Claim Notice shall be deemed established for purposes of this Agreement and the Purchase Agreement and, on the first Business Day following the end of such ten day period, the Escrow Agent shall pay from (and only to the extent of) the Escrow Fund to Buyer the dollar amount of the Claim specified in the Claim Notice. The Escrow Agent shall not inquire into or consider whether a Claim complies with the requirements of the Purchase Agreement. In no case shall the Escrow Agent be required to pay an amount that exceeds the balance of the Escrow Fund.

(c)     If Seller gives a Dispute Notice with respect to a Claim, the Escrow Agent shall make payment with respect thereto only in accordance with (i) joint written instructions of Buyer and Seller or (ii) a final, nonappealable order, judgment or decree of a court of competent jurisdiction. The Escrow Agent shall act on such court order without further question. Any order, judgment or decree that is presented to the Escrow Agent as requiring the Escrow Agent's payment of all or part of the Escrow Fund shall be presented in written form.

(d)     On the first Business Day following the Escrow Termination Date, the Escrow Agent shall pay to Seller the then balance, if any, in the Escrow Fund, minus the aggregate dollar amount of the Claims then pending (as shown in any unresolved Claim Notice). If an amount of the Escrow Fund is retained by the Escrow Agent after the Escrow Termination Date, said amount shall be held subject to the terms of this Agreement until the Escrow Agent receives joint written instructions of the Buyer and Seller as to the disposition of such amount, or a final, nonappealable order of a court of competent jurisdiction directs the disposition of such amount as contemplated by Section 4(c). Notwithstanding the foregoing provisions of this Agreement, the Escrow Agent shall promptly deliver all or any part of the Escrow Fund in accordance with the terms of a written notice jointly executed by Buyer and Seller.

5.     Conditions to Escrow. Escrow Agent agrees to hold Escrow Fund and to perform in accordance with the terms and provisions of this Agreement. Buyer and Seller agree that Escrow Agent does not assume, and shall not have, any responsibility for the failure of Buyer and Seller to perform in accordance with the Purchase Agreement. The acceptance by Escrow Agent of its responsibilities hereunder is subject to the following terms and conditions, which the parties hereto agree shall govern and control with respect to Escrow Agent's rights, duties, liabilities and immunities:

(a)     Escrow Agent shall be entitled to rely upon, and shall be fully protected from all liability, loss, cost, damage or expense in acting or omitting to act pursuant to, any

instruction, order, judgment, certification, affidavit, demand, notice, opinion, instrument or other writing delivered to it hereunder ("Document"), which Escrow Agent in good faith reasonably believes to be genuine and to have been signed or presented by the proper parties in accordance with the terms of this Agreement, without being required to determine the authenticity of such Document, the correctness of any fact stated therein, the propriety of the service thereof or the capacity, identity or authority of any party purporting to sign or deliver such Document.

(b)    The duties of Escrow Agent are only as herein specifically provided, and are purely ministerial in nature. Escrow Agent shall neither be responsible for, or under, nor chargeable with knowledge of, the terms and conditions of the Purchase Agreement or of any other agreement, instrument or document in connection herewith, and shall be required to act in respect of Escrow Fund only as provided in this Agreement. This Agreement sets forth all the obligations of Escrow Agent with respect to any and all matters pertinent to the escrow contemplated hereunder and no additional obligations of Escrow Agent shall be implied from the terms of this Agreement, the Purchase Agreement or any other agreement. Escrow Agent shall incur no liability in connection with the discharge of its obligations under this Agreement or otherwise in connection therewith, except such liability as may arise from delivery of Escrow Fund in violation of this Agreement, or the willful misconduct or gross negligence of Escrow Agent.

(c)    Escrow Agent may consult with counsel of its choice, which may include attorneys in its law firm, and shall not be liable for any action taken or omitted to be taken by Escrow Agent in accordance with the advice of such counsel except such liability as may arise from delivery of Escrow Fund in violation of this Agreement, or the willful misconduct or gross negligence of Escrow Agent. Furthermore, Escrow Agent, acting as Escrow Agent pursuant to this Agreement, shall not preclude its representation of Seller in connection with the Purchase Agreement, provided however, if a dispute arises among Buyer and Seller under the Purchase Agreement which remains unresolved for a period of 60 days after the date on which a party hereto has given notice of such dispute to Escrow Agent, Escrow Agent shall deliver the Escrow Fund to a successor escrow agent appointed by mutual agreement of the other parties, or if no successor escrow agent has been appointed, deposit Escrow Fund in court as provided in Section 5(f) below. Upon either such delivery, Escrow Agent's obligations hereunder shall terminate and Escrow Agent shall be released from any and all obligations under this Agreement.

(d)    Escrow Agent shall not be bound by any modification, cancellation or rescission of this Agreement unless in writing and signed by Escrow Agent.

(e)    Escrow Agent shall have no tax reporting duties with respect to Escrow Fund.

(f)    Escrow Agent is acting as a stakeholder only with respect to Escrow Fund. If any dispute arises as to whether Escrow Agent is obligated to deliver Escrow Fund or as to whom Escrow Fund are to be delivered or the amount thereof to be delivered, or if Escrow Agent shall receive instructions from any party hereto with respect to Escrow Fund which, in its reasonable opinion, are in conflict with any of the provisions of this Agreement or any instructions received from one of the other  parties to this Agreement, Escrow Agent shall not be required to make any delivery. In that case, Escrow Agent shall hold Escrow Fund until it

receives instructions signed by Buyer and Seller directing the disposition of Escrow Fund. In the absence of such authorization, Escrow Agent shall hold Escrow Fund until receipt of a certified copy of a "final judgment" (defined below) of a court of competent jurisdiction providing for the disposition of Escrow Fund. If such instructions are not received, or proceedings for such determination are not commenced within 30 days after receipt by Escrow Agent of notice of any such dispute and diligently continued, Escrow Agent may either (i) hold Escrow Fund until receipt of (x) such written instructions or (y) a certified copy of a final judgment of a court of competent jurisdiction providing for the disposition of Escrow Fund, or (ii) deposit Escrow Fund with the clerk of a court of competent jurisdiction; provided, however, that notwithstanding the foregoing, Escrow Agent may, but shall not be required to, institute legal proceedings of any kind. For purposes of this Section 5(f), there shall be deemed to have been a "final judgment" of the rights of the applicable parties with respect to Escrow Fund at such time as Landlord or Tenant shall deliver to Escrow Agent a certified copy of a court order as to which time to appeal has expired determining the rights of the parties with respect to the amount of Escrow Fund in question.

(g)     Each of Buyer and Seller agree to reimburse Escrow Agent on demand for, and to indemnify and hold Escrow Agent harmless against and with respect to any and all loss, liability, damage, or expense (including, without limitation, attorneys' fees and costs), but excluding costs and expenses incurred with respect to the day to day administration of Escrow Agent's duties hereunder, that Escrow Agent may suffer or incur in connection with the entering into of this Agreement and performance of its obligations under this Agreement or otherwise in connection therewith, except to the extent such loss, liability, damage or expense arises from the gross negligence or willful misconduct of Escrow Agent.

(h)     In addition to resignation rights under Section 4(a) above, Escrow Agent and any successor escrow agent may at any time resign as such by delivering the Escrow Fund to either (i) any successor escrow agent designated by all the parties hereto (other than Escrow Agent) in writing, or (ii) any court having competent jurisdiction. Upon its resignation and delivery of the Escrow Fund as set forth in this paragraph, Escrow Agent shall be discharged of, and from, any and all further obligations arising in connection with the escrow contemplated by this Agreement.

6.     Successors and Assigns. This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective heirs, legal representatives, successors and assigns. Nothing in this Agreement, express or implied, shall give to anyone, other than the parties hereto and their respective heirs, legal representatives, successors and assigns, any benefit, or any legal or equitable right, remedy or claim, under or in respect of this Agreement.

7.     Business Days. If any date on which Escrow Agent is required to take action pursuant to the provisions hereof is not a Business Day, then Escrow Agent shall take such action on the next succeeding Business Day. Notwithstanding anything herein to the contrary, in no event shall Escrow Agent be required to disburse funds (or take any other actions required of Escrow Agent) sooner than two (2) Business Days following the receipt of instructions or the passage of the applicable time period.

8. Notices. All notices, consents, approvals and requests required or permitted hereunder, including any Claim Notice or Dispute Notice, shall be given and be deemed received as provided in Article VII A. of the Purchase Agreement. Notice to the Escrow Agent shall be addressed as follows:

> Rivkin Radler LLP
> 926 RXR Plaza
> Uniondale, NY 11556-0926
> Attention: William Cornachio, Esq.

9. <u>Termination</u>.

(a) This Agreement shall terminate on the earliest to occur of:

(i) the date on which Escrow Agent shall have been notified in writing by Buyer and Seller that this Agreement shall be terminated and jointly direct Escrow Agent to distribute the Escrow Fund in accordance with written instructions accompanying such written notice; or

(ii) the date on which Escrow Agent shall have delivered the entire Escrow Fund in accordance with the provisions of Section 4 or Section 5.

(b) Upon termination of this Agreement in accordance with this Section 9, Escrow Agent shall be discharged from all further obligations or responsibilities hereunder.

10. <u>Entire Agreement</u>. This Agreement contains the entire understanding of the parties hereto with respect to Escrow Fund and may be amended, modified, supplemented or altered only by a writing duly executed by Escrow Agent, Buyer and Seller.

11. <u>Assignment</u>. This Agreement shall not be assignable or transferable, in whole or in part, by any of the parties hereto except upon the express prior written consent of each of the other parties hereto, except that Escrow Agent may assign its rights and delegate its duties hereunder in accordance with Section 5(b) hereof.

12. <u>No Other Third Party Beneficiaries</u>. Except as otherwise expressly provided herein, nothing herein expressed or implied is intended to or shall be construed to confer upon or to give any person other than the parties hereto and their respective successors and permitted assigns any rights or remedies under or by reason of this Agreement .

13. <u>No Waiver</u>. No failure or delay by any party hereto in exercising any right, power or privilege hereunder shall operate as a waiver thereof, and no single or partial exercise thereof shall preclude any right of further exercise or the exercise of any other right, power or privilege.

14. <u>Governing Law</u>. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAW THEREOF.

15. <u>Exclusive Jurisdiction</u>. Each party (i) agrees that all actions or proceedings shall be heard and determined in federal or New York State court located in the County of Nassau, New York, (ii) irrevocably submits to the jurisdiction of such courts in any such action or proceeding, and (iii) consents that any such action or proceeding may be brought in such courts and waives any objection that such party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court.

16. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument. A signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[End of text. Signatures appear on the following page.]

IN WITNESS WHEREOF, the parties have executed this Escrow Agreement.

Brite Tikes LLC

By:_____
    Name: Jubran C. Jubran
    Title: Managing Member

TLE at Queens-Long Island City

By:_____
    Name: Michael Shafir
    Title: Secretary

RIVKIN RADLER LLP

By:_____
    Name: William Cornachio
    Title: Partner

**EXHIBIT B**

**FRANCHISE TERMINATION AND GENERAL RELEASE AGREEMENT**

[attached]

**FRANCHISE TERMINATION AND GENERAL RELEASE AGREEMENT**

*Franchise #268 (Long Island City, New York)*

This FRANCHISE TERMINATION AND GENERAL RELEASE AGREEMENT (this "Agreement") is executed as of January ___, 2019, by and between BRITE TIKES, LLC, a New York limited liability company ("Franchisee," "you," "your" or "yours"), whose principal place of business is located at 375 North Broadway, Suite 311, Jericho, New York 11753; and The Learning Experience System LLC ("Franchisor") and TLE AT QUEENS-LONG ISLAND CITY, LLC, a Delaware limited liability company ("Purchaser," referred collectively with Franchisor as "we," "our" or "us"), whose principal place of business is located at 210 Hillsboro Technology Drive, Deerfield Beach, Florida 33441.

WHEREAS, Jubran C. Jubran, on behalf of Franchisee which at the time was not yet formed, entered into that certain franchise agreement with us dated May 3, 2013 (the "Franchise Agreement") and certain other franchise documents in connection therewith, designated as Franchise No. 268;

WHEREAS, you have entered into an Agreement for Purchase and Sale ("Purchase Agreement") with Purchaser, to which this Agreement is attached as <u>Exhibit B</u>;

WHEREAS, pursuant to the Purchase Agreement, you have agreed to sell the Business and the Assets, as defined therein, to Purchaser; and

WHEREAS, we have elected to consent to the sale of the Business and the Assets by you to the Purchaser, and to terminate Franchise No. 268 on the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the mutually agreed upon promises and covenants stated herein, and for other good and valuable consideration, the sufficiency of which is acknowledged, the parties hereby agree as follows:

1.    The termination of Franchise No. 268 shall be effective upon the date of the Closing, as defined in the Purchase Agreement (the "Effective Date"). Until the Effective Date, you shall continue to operate the Center.

2.    In connection therewith, the following documents shall be terminated in their entirety as of the Effective Date:

(a)    The Franchise Agreement and all of its attachments, exhibits and addenda, except for the Non-Disclosure, Non-Interference and Non-Competition Agreement Attachment described and amended in <u>Section 3</u> below; and

(b)    The Assignment and Assumption of Lease Agreement between you and Purchaser, dated June 22, 2017.

3.    In further consideration for the purchase price paid for the Business and Assets and as an inducement for Purchaser to purchase same, you recognize that after the Effective Date, you will continue to be subject to the Non-Disclosure, Non-Interference and Non-Competition Agreement, dated as of May 3, 2013, as limited and amended as set forth below (the "Non-Compete Agreement") (Attachment 3 to the Franchise Agreement), which will survive the Closing and termination of the Franchise Agreement.  Notwithstanding anything in the Non-Compete Agreement to the contrary, and in exchange for good and valuable consideration, the receipt of which is hereby acknowledged, we and you expressly agree to and recognize the following modifications and amendments to Section 6 of the Non-Compete Agreement:

(a) You and your officers, managers, members and affiliates shall be permitted to own, operate, or have an interest in a Competitive Business (as that term is defined in the Non-Compete Agreement) anywhere in the five boroughs of New York City, except for any location within a half-mile radius of the Center (as that term is defined in the Purchase Agreement);

(b) The phrase "twenty-five mile radius" shall be amended to read "five mile radius" in all instances in which that phrase appears in Section 6 of the Non-Compete Agreement;

(c) The word "hire" in Section 6(e) of the Non-Compete Agreement shall be deleted and replaced with the following text: "solicit for employment"; and

(d) Section 6(b) of the Non-Compete Agreement shall be deleted in its entirety.

You further agree that you will not make any public statements that are critical, derogatory or which may tend to injure the reputation or business of The Learning Experience Systems LLC or any of its affiliates, executives or employees, and you shall instruct your officers, directors, employees and any other persons under your control to refrain from making any such statements. You acknowledge and agree that we will be irreparably harmed and that there may be no adequate remedy at law for a violation of any of the covenants set forth in this Paragraph. Therefore, in addition to and without limiting any other remedies that may be available to any party hereto, upon any such violation or threatened violation, you agree that we shall be entitled to immediate injunctive relief.

4.    In exchange for our agreement to terminate Franchise No. 268, and our consent to the sale of the Business and the Assets, all as set forth herein, you agree to cooperate as reasonably in any and all actions necessary in the orderly transition of the Center's operations to Purchaser, whether before, on, or after the Effective Date.

5. You agree to refrain from any act or omission that would interfere with the assumption of the Center's operations. You agree to turn over to Purchaser or its affiliate all documents, instructions, operating manuals, display items, and like material belonging to us and/or having any trade names or trademarks on them.

6. (a) You hereby release, cancel, forgive and forever discharge us, our predecessors, parents corporations, holding companies, divisions, subsidiaries, affiliates, franchises, heirs, successors and assigns, and all of their respective officers, directors, members, managers, employees, shareholders, representatives, insurers and agents from any and all actions, claims, demands, damages, obligations, liabilities, controversies and executions, of any kind or nature whatsoever, whether known or unknown, whether suspected or not, arising under, resulting from or in any way in connection with the Franchise Agreement and the related franchise documents and/or the termination thereof as set forth above, from the first day of the world, including this day and each day hereafter, and you specifically waive any claim or right to assert any cause of action or alleged case of action or claim or demand which has, through oversight or error intentionally or unintentionally or through a mutual mistake, been omitted from this release.

(b) We hereby release, cancel, forgive and forever discharge you, your predecessors, parents corporations, holding companies, divisions, subsidiaries, affiliates, franchises, heirs, successors and assigns, and all of their respective officers, directors, members, managers, employees, shareholders, representatives, insurers and agents from any and all actions, claims, demands, damages, obligations, liabilities, controversies and executions, of any kind or nature whatsoever, whether known or unknown, whether suspected or not, arising under, resulting from or in any way in connection with the Franchise Agreement and the related franchise documents and/or the termination thereof as set forth above, from the first day of the world, including this day and each day hereafter, and we specifically waive any claim or right to assert any cause of action or alleged case of action or claim or demand which has, through oversight or error intentionally or unintentionally or through a mutual mistake, been omitted from this release.

(c) The foregoing releases expressly exclude the parties' respective rights and obligations under this Agreement and the Purchase Agreement.

7. By signing this Agreement, you additionally intend to bind your spouse, heirs, legal representatives, assigns and anyone else claiming under you. You have not assigned any claim covered by this Agreement to any other party.

8. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**[SIGNATURES FOLLOW]**

IN WITNESS WHEREOF, the parties have signed this Agreement as of the date first noted above.

BRITE TIKES, LLC

By: _____
Name: Jubran C. Jubran
Title: Managing Member


_____
Jubran C. Jubran, individually and as
the person signing the Franchise Agreement
on Franchisee's behalf

THE LEARNING EXPERIENCE SYSTEMS LLC

By: _____
Name: Michael Shafir
Title: Senior Vice President & General Counsel

# EXHIBIT C

## LIST OF ITEMS TO BE ADJUSTED AND PRORATED

Items to be adjusted and/or prorated include the following:

1. Customer deposits.
2. Prepaid tuition.
3. License fees (if the same are transferred to Buyer).
4. Payroll of staff hired by Buyer (if the closing does not occur at the end of a pay period).
5. Rent.
6. Inventory on hand.
7. Inventory and supplies in transit.

# EXHIBIT B



**The Learning Experience**

Academy of Early Education

# JUBRAN C. JUBRAN,
## in trust for an entity to be formed

THE LEARNING EXPERIENCE SYSTEMS LLC
FRANCHISE AGREEMENT

## **Table of Contents**

1. Parties......................................................................................................1

2. Recitals.....................................................................................................1

3. Definitions.................................................................................................1

4. Grant of Franchise Center.........................................................................5

5. Site Location..............................................................................................8

6. Payments by Franchisee.............................................................................9

7. Obligations of Franchisee........................................................................13

8. Operations................................................................................................14

9. Services Offered by your Franchisor; Relationship of Parties................24

10. Transfer of Franchise...............................................................................29

11. Termination of Franchise.........................................................................31

12. Miscellaneous Provisions........................................................................36

ATTACHMENT 1 – SITE LOCATION INFORMATION
ATTACHMENT 2 – SCHEDULE OF MINIMUM INSURANCE REQUIRED
ATTACHMENT 3 – NON-DISCLOSURE, NON-INTERFERENCE AND NON-COMPETITION
        AGREEMENT
ATTACHMENT 4 – PERSONAL GUARANTY AND SUBORDINATION AGREEMENT

# 1. PARTIES

This FRANCHISE AGREEMENT (this "Agreement") is made as of _Mair 3_____, 2013 (the "Effective Date") by and between **THE LEARNING EXPERIENCE SYSTEMS LLC** ("The Learning Experience," "franchisor," "we," "us" or "our"), a Delaware limited liability company, with its principal office at 4855 Technology Way, Suite 700, Boca Raton, Florida 33431 and **JUBRAN C. JUBRAN**, in trust for an entity to be formed, having a mailing address at 64 The Glen, Glen Head, New York 11545 ("you" or "your" or "yours"). Unless it is defined in a sentence, each capitalized term will have the meanings stated in Section 3 below.

# 2. RECITALS

**2.1    Ownership of System.** We are the holder or licensee of certain intellectual property rights, including the Trade Name "The Learning Experience," and the Marks, as defined in this Agreement. We or our Affiliates have spent a considerable amount of time, effort and money to devise, and continue to develop, childcare methods, technical knowledge and marketing ideas including, but not limited to, trade secrets, commercial ideas, advertising materials, computer software, marketing strategies, information on sources of supply, administrative procedures, curricula, forms, distinctive signage, trade dress, architectural design and uniforms, and employee training techniques that, taken together, comprise a proprietary System for the operation of childcare Centers.

**2.2    Benefits of System.** You recognize and acknowledge the benefits and consideration of being identified with and licensed by us, allowed to use the Marks in accordance with this Agreement and trained to operate a Center as part of The Learning Experience Franchise System, offering to the public childcare and educational services of uniformly high quality.

**2.3    Recitals Incorporated.** You and we confirm the accuracy of, and repeat and reiterate, these Recitals as if they were set forth at length in this Agreement.

# 3. DEFINITIONS

For purposes of this Agreement, when any of the following words and phrases begins with a capital letter, its meaning is defined in this Section 3:

**3.1    Affiliate.** "Affiliate" or "Affiliates" means people and companies associated with us or you, as the context suggests, including, but not limited to, owners, general partners, members, limited partners, or shareholder owning a Substantial Interest in us or in you, corporations in which we or you have a Substantial Interest, corporations in which any person or entity owning a Substantial Interest in you also have a Substantial Interest, or officers, directors, employees or agents of us or of you. The phrase "Substantial Interest" means the right to ten percent (10%) or more of the capital or earnings of a partnership or a limited liability company, or the ownership or right to vote or direct the voting of ten percent (10%) or more of the voting stock of a corporation.

**3.2    Agreement.** "The Agreement" or "this Agreement" means this Franchise Agreement and includes all the Attachments to this Franchise Agreement.

**3.3    Approved Location.** "Approved Location" as defined in <u>Attachment 1</u> of this Agreement means a location that we have approved in writing as a site at which you may license and operate a Center.

**3.4 Basic Software.** "Basic Software" includes the operating system, Child Safe 'N Secure® (including third party Childcare Manager and MicroStrategy), communication software, and Microsoft Office®.

**3.5 Center.** "Center" means a business that provides child care and child development programs, including any related and unrelated products and services, under the Trade Name, Marks, and System.

**3.6 Center Director/Business Manager.** "Center Director" and "Business Manager" are individuals qualified or certified by the State in which your Center is located, whom you have appointed to manage your Center and whom we have approved in writing. A Center Director will be the individual who manages the day to day operations of the Center, such as the curriculum. In some states, the Center Director will be required to have prior experience and/or an educational degree in Early Childhood Education. The Business Manager will be the individual who manages the financial aspects of the operations of the Center, such as payroll, budgets, employees and collections. You must serve as the Business Manager, although we may waive this requirement in our sole discretion. Assuming you satisfy all of the requirements for a Center Director, you may also serve in that position.

**3.7 Child Safe 'N Secure®.** Child Safe 'N Secure® means the authorized business management system composed of several third-party software programs that produce the following modules: Family Data Module, Time Clock Data Module (general ledger, payables, receivables, payroll), Report Generator Module and Communication System (technical support, continuous upgrades and automated uploading of data or viewing by us), and our designed entry systems for parents based on a computerized entry system. As the software and hardware were developed by third parties, we may designate or modify at any time its requirements of selected software companies.

**3.8 Corporate Childcare.** Corporate Childcare is a program we or our Affiliates offer to implement for the benefit of participating Centers. We will solicit and enter into a contract with third party corporations (a "Corporate Contract") for recognition as the corporation's corporate childcare provider. Some of these Corporate Contracts will have a direct impact on your Center while others will be beneficial to all of our Centers. Under a Corporate Contract, the corporation agrees to introduce and market our Centers to their employees as an employee benefit. Under the terms of the current form of Corporate Contract, we offer various programs, from tuition subsidies to tuition discounts of up to fifteen percent (15%), if the corporation agrees to provide collection of tuition through an automatic payroll deduction or up to ten percent (10%) if the employee is directly responsible for payment for our services; we may from time to time modify the terms of the Corporate Contract, including without limitation, the amounts and bases for any subsidies and /or discounts. If we decide to solicit corporations in your area, you will be required to participate in the program and follow all of the terms set forth in Section 6.17.

**3.9 "Existing Center" and "New Center".** Based upon a variety of circumstances defined in this Agreement, you may be granted franchise rights to an existing company-owned and ready to open childcare facility or a currently operating childcare facility ("Existing Center") or you may be granted the franchise rights to operate a new, to be located and/or to be developed Center ("New Center") (New Center and Existing Center may also be collectively referred to as "Center").

**3.10 Franchise System.** "Franchise System" means all TLE Centers, including but not limited to the Centers owned and/or managed by franchisees, us, and/or any of our or your Affiliates or other third parties.

**3.11 Good Standing.** "Good Standing" means that you and your Affiliates (a) are in compliance with all applicable state and local laws, and (b) have timely, consistently and continuously operated your

Center, without interruption, in compliance with all provisions of this Agreement (and any other agreement entered into by and between you and your Affiliates and us or our Affiliates), the lease, Assignment and Assumption of Lease Agreement (or controlling real estate agreement), the System and the Manual, specifically including, but not limited to, provisions for timely payment of amounts owed by you to us or our Affiliates and in compliance with the quality standards required for a Center. Good Standing is automatically lost when and if you receive a notice of default or termination. You may, however, regain Good Standing after a curable event of default occurs, by curing the default; provided, however, that if you receive three (3) default notices within any twelve (12) month period, it will be in our sole discretion whether you may regain Good Standing.

**3.12    Gross Revenue.** "Gross Revenue" means the total amount of consideration, whether cash, credit, or payment in kind, received by you and your Affiliates for all goods sold and services rendered from the Approved Location or in connection with the Trade Name or Marks, including barter (exchange of tuition for services or products), and excluding any and all refundable registration deposits, uncollectible debts, taxes collected and paid to a taxing authority, and tuition credits for your children and the staff's children, provided such tuition credits will not exceed three percent (3%) percent of Gross Revenue. To the extent that Gross Revenue is used in this Agreement with respect to our operations, Gross Revenue will have the same meaning based upon the goods sold and services rendered by us and our Affiliates from the location at issue.

**3.13    Immediate Family Member.** "Immediate Family Member" means parents, spouses, offspring and siblings, and the parents and siblings of spouses.

**3.14    Licensed Capacity.** "Licensed Capacity" means the maximum number of students that will be allowed in your Center at any one time under the applicable governmental agency and regulations governing child care in your market.

**3.15    Manual.** "Manual" means, collectively, the online Confidential Operations Manuals and any other manuals (online or hardcopy), including any revisions that we may periodically make in our sole discretion. The Manuals will contain materials such as confidential and proprietary information, teaching materials, forms, requirements for the establishment and operation of a Center, instructions for use of the Marks, specifications for goods that will be used in or sold by your Center, educational techniques, curricula, information on marketing, management, and administration methods developed by us for use in your Center, names of approved suppliers, and other information that we believe may be necessary or helpful to you in your operation of your Center.

**3.16    Marks.** "Marks" means selected trademarks, service marks, trade dress, logos, slogans, copyrights and other commercial symbols licensed by us to you under this Agreement.

**3.17    Opening Date.** "Opening Date" means, in the case of a New Center, the date when the New Center first opens its doors for business and provides childcare for its first student. In the case of an Existing Center, the Opening Date means the date when you become obligated to first open your doors for business after you execute this Agreement.

**3.18    Proprietary Product.** "Proprietary Product" means any product, including but not limited to equipment, software, curricula, furnishings, fixtures and décor that: (i) has been produced in accordance with our specifications; (ii) has been packaged or labeled with the Marks; or (ii) in our sole discretion, is an important component of the System.

**3.19    Protected Territory and Target Area.** "Protected Territory," means the geographic area described in <u>Attachment 1</u> that surrounds the Approved Location and within which we agree to refrain

from specified competitive activities. Prior to locating a mutually agreeable location for your Center, the "Target Area" is a non-exclusive, mutually agreeable general area described on <u>Attachment 1</u> annexed to this Agreement, wherein you have indicated to us you would like to open and operate your New Center. For instance, <u>Attachment 1</u> would state your Target Area as "ABC County(s), XYZ State". The availability of a site to you is usually determined and offered by us to you based on the timing of signing this Agreement relative to others within that Targeted Area. Once your Approved Site has a signed lease or purchase agreement, the Target Area as identified is replaced by the issuance of a new <u>Attachment 1</u>, clearly identifying the Approved Location and Protected Territory.

**3.20    Site.** "Site" means the property and building on or in which your approved Center is located.

**3.21    Software.** "Software" or "Licensed Software" means the computer program that is selected and bundled as a whole (entry, management, uploading, etc.), currently named Child Safe 'N Secure® , and all codes, techniques, software tools, formats, designs, concepts, methods and ideas associated with that computer program, and any successor/replacement software programs that we may implement. The term also includes all copies of any part of the Software, as well as the documentation and other printed materials contained in this package or distributed afterwards. The term also includes any computer programs or software associated with the L.E.A.P. Interactive Program (defined in Section 6.18 herein).

**3.22    System.** "System" means the distinctive, unique Center methods, processes, technical knowledge and marketing ideas licensed by us to you under this Agreement, including, but not limited to, the right to use our trade secrets, purchasing arrangements, curriculum, commercial ideas, confidential training manuals, advertising materials, computer software, marketing strategies, information on sources of supply, administrative procedures, Center forms, distinctive signage, trade dress, architectural design of the Center, and employee training techniques and manuals. You acknowledge the existence and the benefits of the System and its distinctive and unique nature. You also agree to follow the System without deviation.

**3.23    Termination.** "Termination" means expiration of this Agreement, non-renewal of this Agreement, or termination, under the circumstances described in Section 11 of this Agreement, of the then-current term of this Agreement before its normal expiration date.

**3.24    Trade Name.** "Trade Name" means the commercial name "The Learning Experience" and "The Learning Experience Academy of Early Education," or any other names and marks designated by us from time to time to be used at the Centers.

**3.25    Transfer.** "Transfer" means any one or cumulative sale, gift, or other change in ownership to a transferee of all or any part of the rights and obligations of this Agreement or of your Center(s), or of an ownership interest in you of at least ten percent (10%). If you are a partnership, Transfer will mean one or more transactions (regardless of whether or not they are related) in which there is a cumulative change in the rights to ten percent (10%) or more of your capital or profits; if you are a corporation, Transfer will mean one or more transactions (regardless of whether or not they are related) in which there is a cumulative change in beneficial ownership of ten percent (10%) or more of your voting stock; if you are a limited liability company, Transfer will mean one or more transactions, related or not, in which there is a change in the membership of ten percent (10%) or more. If there comes a time when you have transferred, through one or a series of transactions, ten percent (10%) or more of your ownership interest in the rights to the capital or profits of your Center or management control of your Center, then all the transactions making up the ten percent (10%) or more change in ownership, no matter when or how long ago consummated, will be considered a Transfer, subject to the requirements and obligations relating to a Transfer enumerated in this Agreement.

**3.26    The Learning Experience.** "The Learning Experience" means exclusively The Learning Experience Systems LLC or any person or entity to which The Learning Experience Systems LLC allocates all or part of its rights and obligations under this Agreement for the offering to the public childcare and educational services of uniformly high quality.

**3.27    "You", "your" or "yours".** "You", "your" or "yours" means the person or entity that: (a) is named "you", "your" or "yours" in Section 1 of this Agreement; and (b) all persons or entities that succeed to your interest by Transfer or operation of law. If you execute this Agreement "in trust for an entity to be formed," you must assign this Agreement to any entity that is approved by us at least three (3) months prior to your Opening by signing an Assignment of Franchise Agreement, a form of which is attached to the Disclosure Document as Exhibit H. If you are a business entity, or upon the assignment of your rights and obligations under this Agreement to a business entity, the terms "you," "your" and "yours" shall be deemed to include, where appropriate and/or necessary for the enforcement of this Agreement, each and every one of the entity's owners, general partners, members, limited partners, or shareholders owning a Substantial Interest in the entity.

**3.28    "We", "us" or "our".** "We", "us" or "our" means The Learning Experience Systems LLC.

**3.29    "CPI".** "CPI" means the Consumer Price Index - All Urban Consumers as defined by the United States Bureau of Labor Statistics.

# 4. GRANT OF FRANCHISE CENTER

**4.1    Granting Clause.** In consideration for your payment of the Franchise Fee and your agreement to comply with the provisions of this Agreement, we grant you and you accept from us a license to operate one (1) franchise Center at an Approved Location using the Trade Name, Marks and System always in accordance with the terms of this Agreement, its Attachments and all other ancillary documents. As part of this grant of license, you acknowledge that you have the continuing obligation to always remain in Good Standing and continuously operate your Center without interruption for the full term of this Agreement. We reserve all rights in the Trade Name, Marks and System not expressly granted in this Agreement, including but not limited to the right to sell Proprietary Products and to use and sell the Software and Proprietary Products within the Protected Territory through any means of distribution not specifically prohibited by Section 4.2 of this Agreement.

**4.2    Protected Territory.**

    **4.2.1    Rights Protected.** Each Approved Location will be at or near the geographic center of a Protected Territory. The Protected Territory and Approved Location will be designated in Attachment 1 of this Agreement, if possible, or by a replacement Attachment 1 that is signed by both parties at the time that your Approved Location has a signed lease or purchase agreement. The Protected Territory will be measured from the outside wall of your building that houses your Center. Except as described in Section 4.2.2, we will not establish or operate, or permit any Affiliate or franchisee or entity to establish or operate, a Center at any location within the Protected Territory.

    **4.2.2    Exclusions From Territorial Protection.** You expressly acknowledge and agree that, except as provided in Section 4.2.1, the franchise is non-exclusive. We and our Affiliates retain the right, among others, in any manner and on any terms and conditions that we deem advisable, and regardless of the proximity to, or financial impact on, the Center established pursuant to this Agreement:

        (a)    To own, acquire, establish and/or operate, and license others to establish and/or operate, Centers outside the Protected Territory;

(b)     To own, acquire, establish and/or operate, and license others to establish and/or operate, any businesses other than a Center at any location within or outside the Protected Territory under other Trade Name or Marks or other systems, and regardless of whether such businesses are the same, similar or different from the Center or may compete with the Center;

(c)     To sell or distribute, at retail or wholesale, directly or indirectly, or license others to sell or distribute, any services or products (including Proprietary Products) which bear any trademarks, including the Trade Name and Marks, whether within or outside the Protected Territory, and through any distribution channel or venue other than a Center.

(d)     To own and/or operate an "on-site" corporate childcare program (a "Corporate On Site Program") for an entity or entities chosen by us in our sole discretion (the "Corporate Sponsors") located within your Protected Territory at a corporation's grounds or off its grounds if it is the exclusive Site to the corporation.  If it does so, we will pay you twenty percent (20%) of the tuition that you can demonstrate that you lost from students who were actually enrolled and paying tuition at your Center on the date of the opening of the Corporate On Site Program, as documented in your contemporaneous books and records, but who subsequently leave and enroll at the Corporate On Site Program, for as long as each previously enrolled student remains enrolled at the Corporate On Site Program.  Our solicitation of "off site" contracts under the Corporate Childcare Program as defined in Section 6.17 below will not be a violation of your Protected Territory.

(e)     We may acquire competing childcare systems or Centers other than The Learning Experience within your Protected Territory.  In such event, we will offer you a first right to acquire the competing Center that was acquired by us under the same terms that we acquired it, including all costs for acquisition, at which time such Center will be subject to all of the terms and conditions of this Agreement, or if you elect to pass on such opportunity, we must sell such competing business to a third party within eighteen (18) months of such acquisition, or close the Center.  At all times, neither we nor our Affiliates have any restrictions against seeking or retaining any ownership of real estate within the Protected Territory.

    **4.2.3     Relocation.** You may relocate your Center within your Protected Territory only with our prior written consent, which will be granted only if the following conditions are fulfilled:

(a)     You and your Affiliates are in Good Standing;

(b)     You plan, construct, equip (including fixtures), and decorate your new Center at your sole expense so that the premises fully meet the standards of appearance and function applicable to the premises of new Centers at the time of relocation;

(c)     You have presented to us for our review complete information regarding the proposed site that is compliant with our guidelines, including without limitation, the site demographics of the new location and the terms and conditions of the new lease agreement or controlling real estate agreement and after such review, we give our written approval;

(d)     You execute and deliver to us a general release, substantially in the form as attached as Exhibit O to the Disclosure Document, that releases us and our Affiliates, and indemnifies and holds us and our Affiliates harmless with respect to the existing lease and all other claims arising through and from you and your Affiliates up to the date of approval;

(e)     The new location does not infringe upon the Protected Territory of another Center; and

(f)     The geographic area comprising the Protected Territory will remain the same as the Protected Territory of the original Center location, notwithstanding the new Center location.

## 4.3     Term and Renewal.

**4.3.1     Initial Term.** The initial term ("Initial Term") of the franchise will be the greater of (a) fifteen (15) years or (b) the initial term of your lease for the Center premises, but in no event will the Initial Term be longer than twenty (20) years. In the event that you or your Affiliate owns the real estate on which your Center is located, the initial term will be fifteen (15) years. This Agreement begins and is effective as of the Effective Date and ends on the expiration of the franchise (as extended) unless sooner terminated or extended in accordance with its terms.

**4.3.2     Renewal.** You will have the opportunity to renew the franchise for three (3) additional and consecutive five (5) year terms. The first renewal term shall be subject to the following pre-conditions:

(a)     You and your Affiliates are in Good Standing;

(b)     You have notified us in writing at least one hundred eighty (180) days before the expiration date of this Agreement of your desire to renew;

(c)     You must execute our then-current form of Franchise Agreement, and any addenda thereto, for the first renewal term. You acknowledge that our then-current form of franchise agreement in use at the time of your renewal may differ materially from, and be less advantageous to you than, the terms of this Agreement; provided, however, that (i) you will not be required to pay any initial franchise fee; (ii) the number of remaining renewal terms will be determined by this Agreement; (iii) the royalties disclosed in your then-current document shall not be modified; and (iv) any prerequisites for obtaining the second renewal term will be set forth in the then-current form of franchise agreement, which agreement shall incorporate (i)-(iv) above. You must sign the renewal franchise agreement, without amendment, within 30 days after we provide it to you;

(d)     You have satisfied the requirements of Section 8.6.9 below;

(e)     You have renewed or have the right to renew the lease for the Approved Location for a term at least as long as the renewal term of the franchise;

(f)     You and all of your Affiliates and the shareholders, members, partners, and principals of such Affiliates, as the case may be, have executed and delivered to us, in form and content satisfactory to us, a general release, in the form provided by us, that releases and holds harmless us, our officers, directors, employees, affiliates, agents or assigns from all liability to you or your owners under this Agreement. You expressly acknowledge and agree that we will not grant a renewal term unless and until you provide the release(s) required by this subsection (f);

(g)     There is no renewal fee paid to us; the only required payment is the Upgrade Requirement, which is made to third parties and used to renovate your facility. Training and other start-up requirements will also be waived, provided that you have complied with all requirements of the then-current Franchise Agreement; and

(h)     You have executed and delivered to us all agreements required by us in our reasonable discretion, for the operation of Centers.

**4.3.3.   Our Right to Refuse to Renew.** We will not be obligated to renew this Agreement if we have determined in good faith to cease offering new and renewal franchises within the state within which the Approved Location is located, but only if (i) we notify you within 15 days after receipt of your renewal notice of our exercise of our non-renewal right pursuant to this Section 4.3; (ii) we do not grant any new or renewal franchises within the state within which the Approved Location is located from the date of notice through the expiration date of the initial term of this Agreement; (iii) we have waived your post-term non-competition covenant as set forth in Section 9.2.8 of this Agreement; and (iv) you have de-identified all Marks, trade dress and Systems then offered by us.

**4.4     Franchisee Entity Documents.** In the event that there is more than one principal owner of your legal entity, you are required to prepare written agreements between the principal owners (e.g. operating agreement, partnership agreement or shareholders agreement) containing an appropriate buy/sell or similar dispute resolution mechanism in the event of a material disagreement between the principal owners.

## 5. SITE LOCATION

**5.1     Service Election.** When you execute this Agreement, you will be required to decide whether (a) you will locate and develop a New Center yourself and only retain our assistance in the development of a New Center ("Site Coordination Service"), or (b) you will retain us to locate a developer/landlord who will construct and deliver a build-to-suit, turnkey New Center to you ("Site Development Service"). This choice is called the "Service Election," and the fees for each service are materially different. You must make the Service Election at the time you execute this Agreement. The Service Election is made by executing either the Site Coordination Addendum ("SC Addendum") or the Site Development Service Charge Addendum ("SDSC Addendum"). One of these addendums must be executed and delivered to us with this Agreement, and will be incorporated by reference into this document.

**5.2     Sites.** You acknowledge and agree that certain Suitable Sites that may be presented to you will not ultimately lead to a lease or sublease arrangement due to various factors such as, without limitation, the unwillingness of the landlord to conclude a lease arrangement on our customary terms and conditions. As such, we may, but are not obligated to, lease or sublease every Suitable Site. Further, even when a lease is concluded, the Suitable Site may never be developed because of various factors such as, without limitation, the landlord's inability to obtain development approvals or construction financing. Further, you acknowledge and agree that our provision of Site Development Service does not in any way constitute our assurance, guaranty or promise that the Site chosen will be successful or profitable, or that it will generate any income for you or your Affiliates at all.

**5.3     SC Addendum.** If you sign an SC Addendum, we first must approve the Center lease that you will sign. We require that the lease contain certain provisions that are designed to protect our rights as described in the SC Addendum. You, your landlord, and, if applicable, any lender for the site, also may have to sign our then-current form of Conditional Assignment and Assumption of Lease (the "Lease Assignment"), which is annexed as <u>Attachment 1</u> to the SC Addendum. If you purchase the site, you may also have to sign our then-current form of Agreement to Lease (the "Lease Agreement"), which is annexed as <u>Attachment 2</u> to the SC Addendum.

**5.4     No Warranty.** You acknowledge that our approval of a Center lease does not constitute a guarantee, assurance or warranty, express or implied, of the successful operation or profitability of a Center operated at the site. Our approval indicates only that we believe that the site and the terms of the

lease fall within the criteria we have established for site approval as of the time of our approval. You further acknowledge that we have advised you to have an attorney review and evaluate the lease and all other documents provided hereunder.

**5.5   Ownership and Financing.**   If you choose to purchase the real property and structure containing your Center, at any time prior to acquisition or subsequently thereafter you or your Affiliates propose to obtain any financing with respect to the site or for your Center or for any of your assets in which any of such items are pledged as collateral to secure your performance under such financing, you must meet certain conditions. The form of any purchase contract with the seller of a site and any related documents, and the form of any loan agreement with or mortgage in favor of any lender and any related documents, must be approved by us before you sign them. Our consent to such documents may be conditioned upon the inclusion of various terms and conditions, including without limitation the following:

(a)   a provision which requires any lender or mortgagee concurrently to provide us with a copy of any written notice of deficiency or default under the terms of the loan or mortgage sent to you or your Affiliates or the purchaser;

(b)   a provision granting us, at our option, the right (but not the obligation) to cure any deficiency or default under the loan or mortgage (should you fail to do so) within fifteen (15) days after the expiration of a period in which you may cure such default or deficiency;

(c)   a provision which expressly states that any default under the loan or mortgage, if not cured within the applicable time period, constitutes grounds for termination of this Agreement, and that any default under this Agreement, if not cured within the applicable time period, also constitutes a default under the loan or mortgage; and

(d)   your delivery to us of the form of Agreement to Lease annexed as <u>Attachment 2</u> to the SC Addendum, which requires you, at our option, to lease the site to us if this Agreement is terminated, assigned, or transferred, in accordance with our standard form of Lease Agreement, a form of which is annexed as <u>Exhibit K</u> to the Disclosure Document.

**5.6   Site Criteria.**   When determining whether a site is in a location that may be suitable for the development and operation of a Center, you must ensure that certain demographic criteria ("Site Criteria") required by our guidelines is present, as such guidelines and criteria may be changed from time to time.

## 6. PAYMENTS BY FRANCHISEE

**6.1   Franchise Fee.**   The Franchise Fee for a childcare Center is $60,000 and is due and payable to us upon the execution of this Agreement. The Franchise Fee is non-refundable except as expressly stated to the contrary in this Agreement.

**6.2   Acquisition Fee for Existing Centers.**   If you are buying an Existing Center owned by us and/or our Affiliates, the initial acquisition fee ("Acquisition Fee') paid to us will be determined in our sole discretion upon several factors, which may include enrollment, tuitions, lease term and market conditions. The Acquisition Fee for this franchise is $N/A (Filled in if applicable.)

**6.3   Royalties.**

(a)   In consideration for our continuing advice and support of your franchise, on or before the first (1st) day of each month after the Opening Date, you will pay us a monthly royalty (the "Royalty") in

the amount of 7%. The Royalty is calculated as a percent of the monthly Gross Revenue of your Center received by you in the immediately preceding month. For the purpose of computing monthly Gross Revenue, any prepaid enrollment fees are deemed attributable to the month in which you receive them. If you do not pay the Royalty in full by the 10th day of the month, you shall be deemed in default of this Agreement and we have the right to require you to pay the Royalties and any other delinquent fees on a weekly basis, without waiving our rights to other remedies contained in this Agreement. Further, you will be required to permit us to make withdrawals from your accounts via electronic draft or wire transfer.

(b)     In the event and at any time a governmental agency puts into law that sales taxes must be collected on franchise revenue, you will be required to pay any sales tax levied on any fees payable to us in accordance with this Agreement.

**6.4     Advertising Fund Contributions.**  You agree to pay to the Advertising Fund a monthly contribution of one percent (1%) of Gross Revenue during the previous month. We have the right to increase the Advertising Fund contribution up to two and a half percent (2.5%), but only in amounts charged uniformly to all franchisees. If you default in making payments of any kind to us or our Affiliates, from and after such default, we may require you to pay both your Advertising Fund and Royalty contributions on a weekly basis, without waiving our rights to other remedies contained in this Agreement, and you may be required to permit us to receive such payments through withdrawals via electronic draft or wire transfer. The Advertising Fund is not obligated to make expenditures for you or any other franchisee which are equivalent or proportionate to your or another franchisee's contribution, or to ensure that any particular franchisee benefits directly or *pro rata* from the marketing or promotion conducted by the Advertising Fund. The Advertising Fund is not a trust fund. We will not have any fiduciary duty to you or any franchisee in connection with the collections or expenditures of Advertising Fund monies or any other aspect of the Advertising Fund's operations.

**6.5     Inspection/Audit.**  We have the unlimited right during normal working hours to inspect and/or audit all of your books and records, including your business tax returns ("Audit") without prior notice. The audit may be conducted by us or by our designated third-party auditor. If an inspection or audit reveals any underpayment of Royalties or Advertising Fund contributions payable under this Agreement ("Underpayment"), you must immediately pay these amounts to us, together with late charges and accrued interest on the amount underpaid in accordance with Sections 6.12 and 6.13 below. In addition, if the Underpayment exceeds three percent (3%) of the monthly Royalty and/or Advertising Fund contributions payable for any period covered under the Audit ("Substantial Underpayment"), you must take the following actions: (a) within thirty (30) days from the notice of Substantial Underpayment, you must reimburse us for all expenses that we incur in connection with the Audit, including paying the cost and expenses of our auditor, if applicable; and (b) you must have your annual financial statements audited and certified at your expense. If, however, the Underpayment exceeds five percent (5%) ("Material Underpayment"), we will assess the greater of (i) a penalty equal to three (3x) times the amount of Material Underpayment, plus expenses, or (ii) a penalty of $5,000 per month until such under payment, penalties and expenses have been received, and at all such times we may terminate your Agreement immediately. The remedies described in this Section 6.5 are not exclusive and will not deprive us of any other remedies we may have under this Agreement, applicable law or equity.

**6.6     Service Election Charge.**  The cost of your Service Election, and the terms and conditions relating to that cost, are governed by the applicable addendum, which will be either the SDSC Addendum or the SC Addendum (collectively referred to as the "Service Election Addenda"). The complete terms and conditions of the applicable Service Election Addendum are fully incorporated by reference into this Agreement.

**6.7     Lease Administration Fee.** If you have executed an SDSC Addendum, and consequently we or our Affiliates continue to be liable under a lease after it is assigned or subleased to you, you will pay us or our Affiliates an annual Lease Administration Fee of the greater of: (a) One Dollar and Fifty Cents ($1.50) per square foot of the Center; or (b) eight percent (8%) of annual Base Rent (as defined in the lease). You must pay the annual Lease Administration Fee on a prorated monthly basis due on the first day of each month. The monthly fee is 1/12th of the total annual Lease Administration Fee. In our sole discretion, the Lease Administration Fee will either be paid as part of a sublease arrangement from us or our Affiliates to you, or as part of an assignment of Lease, in both cases as required by the Assignment and Assumption of Lease Agreement.

**6.8     Training Fees and Costs.** You will be required to engage in extensive training before you will be permitted to operate your Center, as will be more fully described in Section 7 below. We will not charge a fee for the initial training program ("ITP") for up to two (2) members of your management team that are approved by us prior to training, of which one must have an equity ownership interest of at least 50% of the franchise. However, if additional people are trained, we may charge, and you agree to pay, the One Thousand Five Hundred Dollar ($1,500) training fee for each additional trainee. We will not charge a training fee for continuing education programs. For all training offered by us, you agree to pay the costs of travel, lodging, meals and other incidental expenses incurred by you or your employees. All training attendees must sign the Non-Disclosure, Non-Interference and Non-Competition Agreement attached as <u>Attachment 3</u> to this Agreement.

**6.9     Software Fees.** You must pay us an initial one-time fee of Two Thousand Three Hundred Ninety Nine Dollars ($2,399) for the computer set-up (the "Computer Set-up Fee"). Thereafter, you will be charged a recurring service fee (the "Software Service Fee") of Two Hundred Fifty Dollars ($250.00) per month, payable on the opening of your Center and on the first day of each month thereafter. This fee is subject to annual reasonable adjustments in accordance with the CPI, not to exceed 5% annually of the then-current fee. This fee is not for software, but for our general software support (including support relating to software associated with the L.E.A.P. Interactive Program, as defined herein).

(a)     The Software Service Fee entitles you to a total of two (2) non-consecutive hours of telephone support per month. In the event that you exceed the two (2) hours per month or require an on-site service call, there is an additional charge to you of $100 per hour, plus any travel expenses. This fee is subject to annual reasonable adjustments in accordance with the CPI, not to exceed 5% annually of the then-current fee.

(b)     In the event that you experience a hardware failure, we will provide you with repair service support at a cost of $100.00 per hour, subject to reasonable adjustments in accordance with the CPI, not to exceed 5% annually of the then-current fee. In the event that the hardware is not under warranty, you will also have to pay for any repair parts. During the repair period, we will ship you any necessary loaner hardware within forty-eight (48) hours of your request. All shipping will be at your cost.

(c)     You will pay any sales tax levied on the software licensing fees described above.

(d)     You are obligated to pay the costs of high speed Internet/broadband access, which will be needed to interface with us. You recognize that we will have access to your administrative computers at all times.

**6.10     Payment for Proprietary Products.** Refer to Section 8.6 regarding payments for Proprietary Products.

**6.11     Transfer Fee.**  As one of the conditions of Transfer of your franchise, you must pay, before Transfer, a transfer fee of Twenty Five Thousand Dollars ($25,000.00) (the "Transfer Fee").  This Transfer Fee shall fixed for the first five (5) years of the Term of this Agreement, and shall thereafter be subject to reasonable adjustments in accordance with the CPI, not to exceed 5% annually of the then-current fee.

**6.12     Late Charge.**  You agree to pay us a late charge of ten percent (10%) of any payment not received by us by the tenth (10th) day of the month. This fee is intended to partially compensate us for internal administrative costs resulting from late payment, which would otherwise be difficult to measure with precision.  The fact that such charges are imposed should not be construed as a waiver of our right to timely payment.

**6.13     Interest on Late Payments.**  Any payment not received by us within thirty (30) days following the due date will bear interest at eighteen percent (18%) per annum or at the highest rate allowed by applicable law (whichever is less) from the date when the payment was due.  The interest charges are intended to compensate us for loss of use of the funds.  The fact that such charges are imposed should not be construed as a waiver of our right to timely payment.

**6.14     Returned Check Charge.**  If any check issued by you to us or our Affiliates is dishonored by your bank because of insufficient funds or because you have closed the account, then, upon receipt of written notice of this occurrence, you must pay us, in addition to the face amount of the dishonored check, a returned check charge equal to the greater of: (a) One Hundred Dollars ($100.00); or (b) five percent (5%) of the amount of the check, plus the actual charges imposed by our financial institution to cover our costs in dealing with the returned check.

**6.15     Refresher Training Non-Attendance Charge.**  Your failure to attend refresher training twice in any calendar year constitutes a default under this Agreement for which we may, at our option, terminate this Agreement pursuant to Section 11.1, or we may impose, and you must pay, an administration charge of Five Hundred Dollars ($500.00) for each such failure, subject to reasonable adjustments in accordance with the CPI, not to exceed 5% annually of the then-current fee.

**6.16     Withholding of Payments.**  You are not entitled to withhold (which term includes payments placed in escrow or made to any other payee) payments of any fees, Royalties, charges, Advertising Fund contributions, or any other amounts owed to us, our Affiliates or our preferred, recommended or referred third party vendors for products you purchased, for any reason, including but not limited to our non-performance or breach of this Agreement.   You acknowledge that your sole remedies for non-performance by us or our Affiliates are those described in Section 11 of this Agreement, and you expressly waive any other remedies at law or in equity.

**6.17     Corporate Childcare Program.**

    (a)     We have the right, but not the obligation, to directly solicit, and enter into agreements with, organizations located within your Protected Territory, pursuant to which your Center will provide its customary child care services to the organizations' employees' families.  Your Center must accept and provide your customary child care services to any employee under a Corporate Contract.

    (b)     The Corporate Contract will likely provide for a discount from the tuition and other fees that your Center normally charges, and also may contain other provisions that differ from your Center's typical arrangements.  To the extent that there is any inconsistency, the terms of the Corporate Contract will supersede your Center's arrangements, and you must following the provisions appearing in the Corporate Contract.

(c)     You must provide us with all required periodic reports at the time(s) and containing such information as we direct in the Manual or otherwise in writing. Failure to provide periodic reports by the 10th of each month will result in an additional fee of 5% of each enrolled corporate child's tuition per each day the child is enrolled.

(d)     If, for any reason, a Corporate Contract is terminated, you will have the right, but not the obligation, after the effective date of termination to immediately adjust the children's' tuition to reflect your Center's standard rates, in which event your obligations under subsection (c) will end. If you do not adjust the children's' tuition to your standard rates, then your obligations under subsection (c) will continue unless and until you do so.

(e)     You are not permitted to solicit, or enter into, any Corporate Contracts on your own, nor are you permitted to communicate directly with any third-party organization concerning the Corporate Contract program. Only we may do so.

(f)     We reserve the right to (i) establish the terms and conditions of each Corporate Contract; (ii) terminate the Corporate Contract program at any time; and (iii) establish and periodically modify, in the Manual or otherwise in writing, standards, operational procedures and other similar features of a Center's performance under the Corporate Contract.

**6.18    L.E.A.P. Interactive Fees.** You acknowledge that we are currently in the testing phase of a new technology-based curriculum program known as L.E.A.P. Interactive (the "L.E.A.P. Interactive Program"), and that we may, at any time in the future and in our sole and absolute discretion, determine that all Centers, including your Center, be required to participate in the L.E.A.P. Interactive® Program. In the event that we determine, in our sole discretion, to implement the L.E.A.P. Interactive Program at your Center, you must, at the time of such implementation, purchase the required hardware from approved suppliers and pay an initial setup fee. The cost of the required hardware and the setup fee is currently estimated to be approximately $6,750, but is subject to change based on the results of our testing phase and due to manufacturer price increases, taxes, and other variables. If your Center is required, in our sole discretion, to implement the L.E.A.P. Interactive Program, you will be charged a recurring service fee (the "L.E.A.P. Interactive Service Fee") of One Hundred Fifty Dollars ($150.00) per month, payable on the implementation of the L.E.A.P. Interactive Program at your Center and on the first day of each month thereafter. This fee is subject to annual reasonable adjustments in accordance with the CPI, not to exceed 5% annually of the then-current fee. This fee is for continued receipt and use of L.E.A.P. Interactive proprietary software and curriculum.

(a)     In the event that you experience a failure of any hardware associated with the L.E.A.P. Interactive Program, we will assist you in contacting and working with the relevant manufacturer or other warranty provider. In the event that the hardware is not under warranty, you will have to pay for any repair or replacement parts from our approved suppliers.

(b)     In the event that the L.E.A.P. Interactive Program is implemented, at our sole discretion, at your Center, you will pay any sales tax levied on any software licensing fees associated with the implementation of the L.E.A.P. Interactive Program.

(c)     In the event that the L.E.A.P. Interactive Program is implemented, at our sole discretion, at your Center, you will be obligated to pay the costs of high speed Internet/broadband access, which will be needed to utilize and implement the L.E.A.P. Interactive Program.

# 7. OBLIGATIONS OF FRANCHISEE

**7.1    Initial Training.**

(a)    Before the opening of your Center, you must fully complete the training requirements listed in this Section before you will be permitted to use our Marks and System in the operation of your New Center. Your completion of such training is a condition precedent to your being permitted to open or operate a Center.

(i)    First, you will be required to attend ten (10) business days of on-site training ("On-Site Training") at a Company-owned Center that we designate. We do not charge you for On-Site Training.

(ii)    Second, you will be required to attend an initial training program ("ITP") of up to ten (10) consecutive business days at our corporate headquarters. The ITP covers the essential points necessary to the operation of your Center under our System. Even if you operate an existing Center, you must attend the ITP. If this is your first Center, you may be required to have as many as two (2) members of your prospective management team attend ITP. Two (2) individuals from your team may attend the ITP at no charge; however, we do charge $1,500 per trainee if you wish to have additional people trained. We will conduct the ITP when necessary as determined in our sole discretion. You become eligible for the ITP after you have been matched to a New Center or Existing Center, based on the timing of the ITP training then offered by us.

(iii)    Third, you will be required to be present at your own Center at the time of issuance of a temporary or permanent certificate of occupancy, as the case may be, prior to your Center Opening ("Center Training"). During this training, you and your Center Director must assist us with setting up your New Center. You and your Center Director will coordinate with our New Center Development Department to get the Center into ready-to-open condition, including setting up the toys, books, bulletin boards, computers and any other tangible non-fixture item required to be installed or placed in your New Center. Your participation in and assistance with setting up the Center is a necessary part of your Center Training that is required before you will be permitted to take possession of the New Center. We do not charge you for Center Training.

(b)    For all training offered by us, you will pay all costs of travel, lodging, meals and other incidental expenses incurred by you or your employees. If, after your Center opens, the employment of your Center Director ends, you must employ a new Center Director within thirty (30) days or such earlier date if required by applicable law. At that time, you may choose to have your new Center Director attend any of the above training at your cost, currently $1,500 per trainee, subject to reasonable adjustments in accordance with CPI, not to exceed 5% annually of the then-current fee

(c)    We will arrange for the training to be performed, and you must complete this training before you will be permitted to operate your New Center.

**7.2    Continuing Education/Training Programs ("CEP").** From time to time, but not more often than four (4) times a year, we may offer local or regional CEPs on matters related to the operation or promotion of your Center on a mandatory basis. You will receive at least forty-five (45) days prior written notice of the date of the CEP to avoid scheduling conflicts. You will not pay for the instructor's time, but you will bear the cost of any incidental expenses incurred by you or your staff in attending the programs. You or your Center Director must attend all four CEPs, but your attendance is mandatory for at least two of the CEPs. We will exercise commercially reasonable efforts to select locations for which the costs and expenses for attendance at the CEPs are geographically reasonable. If you or your Center

Director fails to attend the required number of CEPs, we will assess and you will be obligated to pay a non-attendance fee of Five Hundred Dollars ($500.00), subject to reasonable adjustments in accordance with the CPI, not to exceed 5% annually of the then-current fee.

**7.3    Attendance at Conventions.**  You must attend each annual convention that we sponsor and you must bear the reasonable travel, lodging and other incidental expense of such attendance, when and if it occurs.  We will exercise commercially reasonable efforts to select a location for which the cost and expense for attendance at the convention are geographically reasonable.  If you do not attend the convention, we will charge you a non-attendance fee as a penalty, and you must pay on our demand a fee to cover the costs of your absence, which will be the greater of (i) One Thousand Five Hundred Dollars ($1,500.00), or (ii) 80% of the cost charged to franchisees to attend the convention.

**7.4    Supplemental Training.**  Training for the remainder of your staff members will be provided on-site by one or more of our corporate representatives.  Our manuals are also intended to provide instructional assistance for all Center personnel.  Additionally, supplemental training may be held either at your Center, one of our nearest Centers or at our corporate headquarters.  Training may take place on weekends, evenings and during regular working hours by trainers selected by us.  We will send you notice of upcoming training sessions, which notice will provide you with the estimated costs for lodging and other expenses and costs for these training sessions.

**7.5    Center Operations.**  Beginning on the twenty-fourth (24th) month after your Center's opening, at no time can your Center operate at below sixty-five percent (65%) of actual Licensed Capacity (excluding July and August of any calendar year) for any three (3) consecutive months in a revolving twelve (12) month period.

## 8. OPERATIONS

**8.1    Facilities and Inventory.**  The premises and facilities of your Center must be of a size and appearance which meets or exceeds all governmental requirements. You must have adequate inventories of our systems and supplies to allow the continuous operation of your Center so as to maintain the excellent reputation of our System.

**8.2    First Aid and Safety.**  You must constantly be alert for unsafe conditions within your Center. You must require all employees to assist in observing and reporting these conditions. You must ensure that all personnel utilized within your Center who are involved in supervising children are properly licensed and adequately trained and competent in first aid measures. You agree to conduct and require all such personnel to participate in safety, CPR and first aid training courses and receive their certification from a nationally recognized agency. These courses of study must be offered to all personnel who are not current in their certification. Such courses are to be offered twice annually.

**8.3    Software Use.**  During the term of this Agreement, you must use such software as we may from time to time direct, whether owned by us, an Affiliate or a third party, and sign any and all software licenses as may be requested by the software licensor to enable you to lawfully use such any software. You and your employees must comply with all of the terms and conditions of any such software licenses. We will provide software support, not to exceed more than two (2) hours per month. These hours do not roll-over from month to month or from year to year. Any additional hours our support employees spend supporting you or your Center will be billed to you at a fixed rate of Seventy-Five Dollars ($100.00) per hour, including travel time, subject to reasonable adjustments in accordance with the CPI, not to exceed 5% annually of the then-current fee. In the event that we direct you to the software developer, and the software developer provides support directly, we will not charge you. The scope of the warranty for designated software cannot be increased by any written or oral information, advice, or assurances that we

or our employees or agents may provide. Do not rely on such oral or written communication. If any of our employees or agents warrants or guarantees anything that conflicts with, modifies or supplements the terms of this Agreement, you should ignore these changes and must immediately notify our president in writing.

**8.4     Software and Hardware Compliance.**  You agree to purchase computers, Software, the front door proximity device (or any other security device in addition thereto, or in replacement of such device, as determined and required by us now or in the future) and the designated security system from our preferred vendors (now or in the future) at a price not to exceed fair market value. You must provide copies of all data files to us as requested. You agree to install, at your own cost, high-speed Internet access (cable, DSL or equivalent) with a minimum speed of 5Mbps (or the highest speed available in your area), which minimum speed requirement we may periodically increase, at our option, as System needs increase and/or technology permits.  We have the right to require you to upgrade, update, enhance, substitute, add to and/or modify your Center's computer hardware and software when necessary, including, but not limited to, maintenance and updates of anti-virus, firewall and spyware software. There are no contractual limitations on our right to do this.  You also must provide us with all administrative passwords and back-up your system to an external source such as a USB Flash Drive or an External Hard Drive on a daily basis.  The Software contains valuable proprietary rights belonging to us and others. If you default in any part of this Agreement, we may terminate this Agreement and/or your right to use the Software.  If such termination occurs, you must immediately return all copies of the Software to us. You further agree to permit and provide us with twenty-four (24) hour per day continuous access to your computer system through the Internet (which means that your computers must remain on twenty-four (24) hours a day, seven (7) days per week) and grant us the right from time to time and at any time to retrieve and use for any purpose whatsoever such data and information from your computer system as we in our sole discretion deem necessary or desirable.  You may not:

(a)     Let any other individual or corporation use the Software, except you and/or your designated employees.

(b)     Copy the Software, except to make a backup copy as described above.

(c)     Operate the Software at a location other than the location granted herein.

(d)     Modify or merge the Software with another program without our consent.  Any modified or merged portion of the Software is subject to this Agreement and you will have no ownership or other rights to it.

(e)     Reverse-engineer, disassemble, decompose, or make any attempt to discover the source code of the Software.

(f)     Translate or create derivative works based on the Software.

(g)     Transfer the Software in violation of the United States Export Administration Act or this Agreement.

(h)     Lend, sell, rent, lease, or sublicense any portion of the Software.

(i)     Remove, obscure or alter any notice of the patent, copyright, or other proprietary rights related to the Software including, without limitation, Trademark, patent or copyright the proprietary rights related to the Software.

**8.5    Use of Marks.**

    **8.5.1    Context.** You may use the Marks only in the operation of a Center at an Approved Location. You may not use, nor may you authorize others to use, our Trade Name or Marks or any marks associated with the Software for any other purpose. You may not use any other trade name or marks in connection with a Center.

    **8.5.2    Changes in Marks.** We reserve the right to change, revise or substitute different Marks and Trade Name for use in identifying the Franchise System, the Centers, and the products and services used or sold at the Center, if the Marks or Trade Name no longer can be used, or if we, in our sole discretion, determine that substitution of different Marks or Trade Name will be beneficial to the Franchise System. In such circumstances, the use of the substituted Marks or Trade Name will be governed by the terms of this Agreement, and we will not compensate you for any expenses you incur in making any substitution we require.

    **8.5.3    Advertising Materials.** You agree to submit to us copies of all advertising and promotional materials that you propose to use at least thirty (30) days before the first time they are broadcast or published. We will review the materials within fifteen (15) days after receiving them and will notify you whether we approve or reject them. You may re-use previously approved materials without our approval so long as they that are substantially and materially similar to the version previously approved for your Center. Even if we have approved specified materials, we may later withdraw our approval if we reasonably believe it necessary to make the advertising conform to changes in the System or to correct unacceptable features of the advertising, including but not limited to any misrepresentation in the advertising material. In the event we withdraw our approval of previously approved advertising or promotional materials, you must immediately discontinue use of any such materials upon receiving written notice from us that we have withdrawn our approval of the materials, and you must return any existing copies of the materials to us, at our expense, within fifteen (15) days of such written notice. You agree and warrant that any advertising you conduct will be completely factual and conform to the highest standards of ethical marketing, applicable law and the promotion policies that we may prescribe from time to time.

    **8.5.4    Legal Protection.** In the event that the trademark law is amended so as to render inapplicable any of the provisions of this Agreement, you will execute any documents, and do such acts and things as in our opinion may be necessary to affect the intent and purpose of the provisions of this Agreement; provided, however, that we will bear all costs associated with such request.

    **8.5.5    Trademark Infringement.** You must promptly notify us of any suspected unauthorized use of, or any challenge to, the validity or ownership of the Marks or Trade Name, or of our right to use, and to license others to use, or your right to use, the Marks or Trade Name. You acknowledge that we have the right to direct and control any administrative proceeding, litigation, or other adjudicative proceeding involving the Marks or Trade Name, including any settlement thereof. We have the right, but not the obligation, to take action against uses by others that may constitute infringement of the Marks or Trade Name. We will defend you against any third-party claim, suit, or demand arising out of your use of the Marks or Trade Name. If we, in our sole discretion, determine that you have used the Marks and/or Trade Name in accordance with this Agreement, the cost of such defense, including the cost of any judgment or settlement, shall be borne by us. If we, in our sole discretion, determine that you have not used the Marks and/or Trade Name in accordance with this Agreement, the cost of such defense, including the cost of any judgment or settlement, shall be borne by you. In the event of any litigation relating to your use of the Marks and/or Trade Name, you must execute any and all documents and do such acts as may, in our opinion, be necessary to carry out such defense or prosecution, including, but not limited to, becoming a nominal party to any legal action. Except to the extent that such litigation is the

result of your use of the Marks and/or Trade Name in a manner inconsistent with the terms of this Agreement, we will reimburse you for your out-of-pocket litigation costs in doing such acts.

## 8.6    Quality Control.

**8.6.1    Opening.** You may not open your Center to the public without our prior written approval, which approval will be conditioned upon your fulfillment of all of your pre-opening obligations as set forth in the Agreement and/or our Manuals. You should not construe our statement as any assurance, warranty or representation by us that your Center will be successful, make a profit, or continue to comply with all of our requirements and governmental requirements for a childcare Center. Your success is dependent on a number of factors, which primarily include, but are not limited to, your skill, hard work and general economic conditions; these are factors that are not within our control.

**8.6.2    Compliance with System Standards and Manual.** To ensure that the highest degree of quality and service is maintained, you must operate the Center in strict conformity with such methods, standards, and specifications as we may from time to time prescribe in the Manual or otherwise in writing. You must refrain from (a) deviating from such standards, specifications, and procedures without our prior written consent and (b) otherwise operating in any manner which reflects adversely on our Marks, Trade Name and the Franchise System. We may make changes in these standards and specifications when, in our reasonable discretion, change is needed for the continued success and development of the Franchise System. Such changes may require the purchase of equipment, supplies, furnishings or other goods, completion of additional training by your employees, or other costs to you. You must promptly conform to the modified standards and specifications at your own expense. You must keep your copy of the Manual current by inserting into it any revised pages that we provide to you and deleting superseded pages from it. If there is any dispute as to the requirements of the Manual at any point in time, the terms of the master copy of the manual maintained by us will control. In addition, we will, from time to time, send you promotional materials, new curricula, and bulletins on new systems and new sales and marketing developments and techniques. You agree that you must use the ideas and implement the changes described in these materials within your Center in a commercially reasonable manner and time period.

**8.6.3    Approved Products and Services.** You may use, offer and sell only those products, services and related supplies that we expressly approve in writing for use and sale by Centers (the "Approved Products and Services"). You may not use or sell any other products or services without our prior written consent. We may designate Approved Products and Services as required or optional. You must use and sell all Approved Products and Services that we designate from time to time as required. You have the right (but no obligation) to use or sell any Approved Products and Services that we designate as optional. You must, within 30 days after our written notice to you, discontinue offering any products or services for which we revoke approval. We have the right to revise the Approved Products and Services at any time, in our sole discretion. You must pay the full purchase price of any Proprietary Products you purchase, plus an eighteen percent (18%) handling fee and the actual cost of any shipping, freight, insurance and applicable sales or use tax, as specified by us and applicable law, together with each order of Proprietary Products. We have the right to require payment in cash, electronic fund transfer, cashier's check or other means of making funds immediately accessible to us in our sole discretion. You may charge less than the suggested resale price set by us.

**8.6.4    Center Facilities.** You must purchase and install at the Center, at your expense, all fixtures, furnishings, equipment, décor, signs, upgrades and other items as we may reasonably direct from time to time in the Manual or otherwise in writing, and shall refrain from installing or permitting to be installed on or about the Center premises any fixtures, furnishings, equipment, décor, signs or other items not previously approved in writing as meeting our standards and specifications.

**6.8.5   Purchases of Products, Equipment, Supplies and Materials.**  To the extent that we have selected approved suppliers, you must purchase all products, equipment, such supplies, and materials used or sold by the Center solely from such suppliers (including manufacturers, wholesalers and distributors).  We may select approved suppliers based on factors such as their ability to meet our reasonable standards and specifications for such items; whether they possess adequate quality controls and capacity to supply your needs promptly and reliably; whether approval will or will not jeopardize the availability of special pricing or other benefits offered by existing suppliers based on systemwide purchases; and the supplier's agreement to sign our current form of supplier agreement for products and services.  If you desire to purchase products from other than approved suppliers, you must submit to us a written request to approve the proposed supplier, together with such evidence of conformity with our supplier-approval policies as we may reasonably require, or you must request the supplier itself to do so. We will have the right to inspect and evaluate the supplier's products or services to be supplied, and you must pay all of our reasonable expenses incurred in so doing.  We may from time to time reevaluate the products and/or services of any approved supplier and revoke our approval of particular products or services or suppliers if we determine, in our sole discretion, that such products or services or suppliers no longer meet our standards.  Upon receipt of written notice of such revocation, you must cease to use or sell any disapproved products or services and cease to purchase from any disapproved supplier.  As a condition of approving a supplier of any products that bear the Trade Name or Marks, the supplier must sign our License Agreement or other agreements in form and content satisfactory to us or that we, in our sole discretion, may require.

**6.8.6   Restrictions on Choice of Suppliers**.  We have the right to restrict the availability of Proprietary Products as well as other current and future products, supplies, or services to (i) us; (ii) one of our Affiliates; or (iii) third party supplier(s) designated or approved by us.  Use or sale of any substitute product or service for the Proprietary Products is strictly prohibited.

**6.8.7   Approved Supplier Program**.  We may, in our sole discretion, establish one or more strategic alliances or preferred vendor programs with one or more suppliers who are willing to supply all or some Centers with some or all of the Proprietary Products and/or other products and services that Centers are authorized to offer to the public.  You recognize that any such program(s) may limit and/or require you to use suppliers other than those that you would otherwise use, and/or limit the number of approved suppliers with whom you may do business.

**6.8.8   Maintenance and Inspections.**  You must maintain your Center in a manner consistent with the condition and appearance of other Centers.  We have the right to approve any cleaning or janitorial vendor and to require you and any such vendor to clean the premises in accordance with a schedule and using approved materials necessary to maintain the Center to our specifications, as described in the Manuals. In addition, the facility must be modern, clean, convenient, and efficiently operated, and must provide high quality learning experiences and effective, courteous service. Your maintenance responsibilities include replacement of worn out or obsolete fixtures, furnishings, equipment and signs at your sole expense. You must conduct, and we may conduct, a weekly inspection in accordance with the standards described in the Manual, and you must retain the checklist for each such inspection for ninety (90) days for our review.  We will conduct periodic quality control inspections of your Center during normal Center hours. Quality control inspections may be made with or without prior notice. We have the right to observe the manner in which you render your services, to confer with your employees (in person or through surveys), and, upon forty-eight (48) hours prior notice, to speak with your customers.  During inspections, we may select products and supplies for testing and evaluation purposes to make certain that the learning services, teaching materials, products, equipment, and operations of your Center meet the quality control provisions and performance standards that we have established. At our request and upon three (3) business days' written notice, we will require you to be

available and present for a walk-through of your Center and/or to participate in a conference at your Center with our representatives. If you are not available due to circumstances outside your control, then you must deliver written notification to us requesting additional time. You will be granted up to ten (10) business days to notify us of an available time, not to be unreasonably delayed. In no event may your delay in satisfying our request exceed fifteen (15) business days. You must promptly correct any deficiencies in your operation that we bring to your attention.

**8.6.9    Renovation and Upgrading.** You (whether or not leasing or subleasing from us or an Affiliate) must conform to our requirements with regard to alterations, remodeling, upgrading or other improvements to your Center. You will be required to make these alterations and upgrades from time to time during the term of your franchise and any renewal terms in accordance with our standards for new Centers. However, you agree to abide by our minimum requirement that every five (5) years you will, at your own expense, remodel, modernize and upgrade the Center, and the fixtures and equipment within your Center, to our satisfaction. You will be required to spend, and prove to us that you have spent, an amount equivalent to at least eight percent (8%) of your total Gross Revenue (the "Upgrade Requirement"). To arrive at the Gross Revenue number from which you calculate the Upgrade Requirement, take your Gross Revenue as reported to us for the prior twelve (12) month period and multiply that number by 8%. You will then calculate all upgrades as identified by us for the prior five (5) year period to arrive at your Upgrade expenditures, and submit such expenditure budget, along with your calculations and supporting documentation, in writing to us for our written approval.

**8.6.10    Notification of Receipt of Legal Summons and/or Complaint.** You must notify us promptly if you are served with a Summons and/or Complaint in any legal proceeding that is in any way related to your Center, or if you become aware that you are the subject of any complaint to or investigation by a governmental licensing authority, administrative agency or consumer protection agency.

**8.6.11    Payments from Suppliers**. You acknowledge that we and/or our Affiliates will receive commissions, rebates, promotional allowances, volume discounts and other payments and benefits from all or some of the approved suppliers based on purchases by you and other franchisees. You agree that we have the right, except as limited by applicable law, to retain all payments and benefits that we receive based on your purchases. You hereby assign to us all of your right, title and interest in such payments and benefits and authorize us to collect and retain them.

**8.6.12    Employee, Center and Customer Satisfaction Program.** You must distribute, and we may distribute, customer and/or employee response/survey cards that we provide to you in your Center in the form prescribed by us for return by these customers/employees to us. If your scores from the surveys/response cards do not meet our currently effective standards as described in the Manual, we may suggest ways in which you can improve your scores. In addition, at any time we reserve the right to engage third parties to conduct "mystery shopping," either by phone or direct visitation at your Center. These "mystery shoppers" will not identify themselves as being our representatives, but will act as potential customers. These people will report their findings to us and a grade will be issued to your Center based upon the standards and qualifications set by us.

**8.7    Personnel.**

**8.7.1    Management.** You must serve as the Business Manager for your Center. You must employ at your Center a Center Director, although you may also serve as the Center Director provided that you have the proper qualifications. We must approve of your Center Director before he/she/you may be employed at the Center. After we approve your Center Director, but before he/she/you may be employed at your Center, he/she/you must sign our Non-Disclosure, Non-interference, and Non-

Competition Agreement (attached to this Agreement as <u>Attachment 3</u>). The Center Director and Business Manager must each devote all of their productive and full-time attention and effort to the management and operation of your Center, and must be present during the operation of your Center for at least forty (40) hours per week. The Center Director, or another employee who has successfully completed our training program, must be present at the Approved Location whenever your Center is open for business. If you own more than one Center, an additional Center Director will be employed for each such additional Center. If we, in our sole discretion, determine that a Center Director or Business Manager is not properly performing his/her/your duties, we will advise you in writing and you must immediately take steps to correct the situation. If you do not correct or rectify the situation within thirty (30) days of our written notice to you, we may require you to immediately replace either one or both of these individuals. You are required to keep us informed as to the current identity of your Center Director and Business Manager, and upon the termination of employment of either employee, you must appoint a successor within thirty (30) days or within the applicable time required by law, whichever is earlier. Any successor must successfully complete the next available training conducted by us, which will in no event be more than sixty (60) days from the start of his/her/your employment. In the event there is no training scheduled or available within said sixty (60) days, we will, at our earliest possible opportunity, provide your Center Director or Business Manager with an on-site training program at your facility, at a cost to you not to exceed One Thousand Five Hundred Dollars ($1,500.00) per week, which cost includes all of our travel, lodging and other expenses, provided, however that we are will not obligated to provide this service more than once every two (2) years and nothing in this Agreement will relieve you from having the continuing obligation to ensure that your Center Director and Business Manager complete the initial and all on-going training as required by this Agreement.

**8.7.2    Unacceptable Conduct.**  You represent that neither you nor any staff member at your Center has any record of child molestation or abuse, immoral conduct or criminal behavior (collectively referred to as "Unacceptable Conduct"), and you additionally represent that you have not engaged in a pattern of conduct ("Pattern of Conduct") which might jeopardize the welfare of children registered in your Center or reflect adversely on our goodwill or the safety and concern of your staff for these children. You further warrant and represent that you will at all times refrain, and will ensure that all of your staff refrains, from such Unacceptable Conduct and/or Pattern of Conduct during the term of this Agreement.

**8.7.3    Employees.**

(a)    You must maintain at all times a staff of competent, trained employees sufficient to operate your Center in compliance with our System and standards and all applicable governmental, licensing and labor laws. You are solely responsible for all employment decisions and functions of the Center including, without limitation, those related to hiring, firing, training, establishing remuneration, compliance with wage and hour requirements, personnel policies, benefits, recordkeeping, supervision and discipline of employees, regardless of whether you receive advice from us on these subjects.

(b)    You must carefully screen all employees before employing them to ascertain their fitness for employment in the child care industry. Specifically, you must use your best efforts to ensure that no person is employed who has a record of child molestation or abuse, immoral conduct, criminal behavior, or a pattern of conduct which might jeopardize the welfare of attended children in your Center or reflect adversely on the safety or concern of your staff for these children. You agree to expressly address these issues with each prospective employee in accordance with applicable law before approval for employment, and to take all reasonable measures necessary to confirm the suitability of each employee based on inquiries with references and past employers. If you learn, or if we advise you that we have learned, that one or more of your employees does not meet our written standards or is in violation of any applicable laws or regulations, you agree to promptly investigate the situation and discharge and replace the employee or employees if they do not meet these standards, in accordance with applicable

law. Nevertheless, you are solely responsible for the selection, training and conditions of employment and compensation of all employees at your Center.

## 8.8    Advertising.

**8.8.1    Opening Marketing Efforts.** You must spend, at our direction, at least Thirty Thousand Dollars ($30,000.00) on a pre- and post-opening advertising program conducted in accordance with the guidelines for such program as set out in the Manual. Your advertising plan must be submitted to us for review and approval not less than ninety (90) days before the issuance of a Certificate of Occupancy (either temporary or permanent) for your Center, must require you to spend at least Fifteen Thousand Dollars ($15,000.00) on Opening Marketing Efforts between the date that the Certificate of Occupancy is issued for your Center and the date that your Center opens, and must require you to spend the remaining Fifteen Thousand Dollars ($15,000.00) between the Center's opening and the earlier of: (i) the date that you hold a grand opening event for the Center and (ii) eight weeks from the date of the Center's opening. Except for this pre- and post- opening advertising program, you will not be required to spend a specified portion of your Center revenues on local advertising.

**8.8.2    Advertising Promotion.** Granting of this franchise is expressly conditioned upon your successful infiltration of the childcare marketplace. You agree to actively and aggressively promote your services within your Protected Territory. You further agree that any advertising, promotion and marketing you conduct will be completely clear and factual and not misleading, and will conform to applicable law and the highest standards of ethical marketing promotion policies which we prescribe from time to time. Samples of all advertising, promotional and marketing materials which we or our Affiliate has not prepared or previously approved must be submitted to us in writing for approval before you use them in accordance with Section 8.5.3. You may not use any advertising or promotional materials that we have disapproved. Your failure to meet the requirements of this paragraph will constitute a breach of this Agreement, unless you, in good faith, promptly adopt and follow our reasonable suggestions for improving your performance.

## 8.9    Standard Review Board.

Although the standards of our Franchise System are solely established by us at our sole discretion, we have the right, but not the obligation, to establish a non-binding internal mediation panel known as the Standard Review Board ("SRB"). The SRB is designed to investigate, evaluate and seek to informally resolve certain issues relating to Centers' compliance with designated System standards. The organization, membership, scope of responsibilities, powers, resources, and operational procedures will be developed by us and set forth in the Manual, and are subject to periodic revision, in our sole discretion.

## 8.10    Financial Information.

**8.10.1** You agree to keep and preserve, for at least six (6) years from the dates of their preparation, business tax returns, reports, and complete and accurate financial records for your Center in accordance with generally accepted accounting principles in the United States and in the form and manner that we prescribe. The financial statements and/or other periodic reports described below must be prepared to segregate the income and related expenses of your Center from those of any other business, including any other childcare Center which you may operate and for which Royalties are not payable to us.

**8.10.2    Meeting Performance Standard.** You must engage a person qualified by education and experience to generate accurate financial records ("Qualified Finance Person"). If you fail to engage a Qualified Finance Person, we may engage such a person for you on your behalf and at your expense. The requisite reports are as follows:

(a)     **Weekly Report.** We may request at any time that you supply to us reports of the prior week's income and all other financial activity, and it is mandatory that you remain current with the weekly reports generated by the Software licensed to you in accordance with this Agreement.

(b)     **Monthly Summary Report.**

(i)     On or before the seventh (7th) day of each month, you will provide us with required monthly records and monthly Center Summary Reports for franchises which includes, without limitation, the Enrollment Report, Payroll Analysis Report, Student Drop, Attendance Report, Outstanding Tuition Reports, lead analysis and all other reports in accordance with the Manual.

(ii)    Within fifteen (15) days after the end of each month, you will deliver to us monthly cash basis financial statements (P&L) in form and substance acceptable to us, utilizing our approved coding format and approved software (currently QuickBooks). In addition, you will deliver to us copies of all bank statements during your first 18 months of operations, or until your Center is profitable for two (2) consecutive months.

(c)     **Quarterly Financial Reports.** You must also deliver to us each quarter, on or before the twentieth (20th) day following the end of the quarter, unaudited financial statements, profit & loss statements, balance sheets, cash flow statements, and support for all of these statements.

(d)     **Annual Statement.** Within ninety (90) days after the close of your fiscal year, you must furnish us with a complete set of financial statements prepared in accordance with generally accepted accounting principles, which has been reviewed by an independent Certified Public Accountant ("CPA") and accurately reflects and reports your financial position for the year then ended. You may request, in writing, an extension of an additional thirty (30) days, but in no event will total extensions exceed one hundred twenty (120) days.

(e)     **Income Tax Return.** Within ten (10) days after preparation and filing, but no later than twenty (20) days after the last extension permitted by the IRS rules, you must furnish us with a copy of your annual federal income tax return.

(f)     **Additional Reports.** From time to time, we may request certain supplemental financial documents, including without limitation bank statements and copies of cashed checks, which you must submit to us within two (2) days of our request.

## 8.11    Insurance.

(a)     You must purchase and maintain in full force and effect during the term of this Agreement, at your sole expense, all insurance policy or policies with a licensed insurance company rated best "A" or higher, with commercially reasonable deductibles, protecting you and us and the officers, directors, partners and employees of both against any loss or liability for personal and bodily injury, death, property damage or expense or other liabilities arising from or in connection with your Center that we may, in our sole discretion, require. All liability policies must name "The Learning Experience Systems LLC" as an additional insured and must provide that we will receive notice of your default in payment of any premium and thirty (30) days' prior written notice of termination, cancellation, expiration or alteration to provide less coverage. The coverage may not be limited in any way by reason of any insurance that we maintain. Our current minimum insurance requirements are attached to this Agreement as _Attachment 2_. We may from time to time require that additional coverage be purchased or that minimum limits be increased as reasonably necessary for your and our protection.

(b)     We have pre-approved a number of non-Affiliated insurance brokers and companies. The pre-approval confirms that the coverage that they will provide to you will be in strict accordance with our minimum insurance requirements. You have no obligation to use any of these insurance brokers or companies. However, in the event that you choose to use a different insurance broker/company, you must submit the proposed policy to our retained insurance consultant for his/her review and pay us an insurance review fee, which is currently $1,500.

(c)     All insurance certificates must be submitted to us upon the earliest of the following dates: (i) when the landlord requests same under the Lease, (ii) the delivery of the furniture, fixtures and equipment to the Center, (iii) the Certificate of Occupancy for your Center is issued by the municipality, and (iv) the Opening of your Center. You must submit evidence annually of the renewal or extension of the policies.

(d)     If you fail to purchase and maintain any required insurance coverage or furnish satisfactory evidence of coverage to us, we, in addition to our other remedies, may, but are not obligated to, purchase the insurance coverage for you. If this occurs, you must pay us on demand the amount of any premiums and reasonable expenses that we have incurred in obtaining the insurance, plus an administration charge of eighteen percent (18%) of these costs.

## 8.12    Financial and Legal Responsibility.

**8.12.1  Compliance with Law.** You must comply with all federal, state, and local laws and regulations pertaining, directly or indirectly, to your Center. You must keep current all licenses, permits, bonds, and deposits made to or required by any government agency in connection with the operation of your Center.

**8.12.2  Payment of Indebtedness.** You must pay promptly when due all taxes and debts that you incur in the conduct of your Center.

## 8.13    Assignment of Inventions.

(a)     We agree that all new inventions and improvements used in our System which are acquired or developed by us during the term of this Agreement will be available for your licensed use. In return for this grant of future improvements, and in return for agreement by other franchise owners to assign their inventions to us for use in the nationwide Franchise System, you agree that during the term of this Agreement you will assign to us all franchise-related and education-related inventions and improvements which you or your employees create and which we wish to acquire. You agree to promptly disclose inventions and improvements to us.

(b)     You agree to cooperate with us in preparing all necessary documentation required to perfect our legal rights in these inventions or improvements. We will bear the expense of any legal proceedings for this purpose.

(c)     If we elect not to use your improvement or invention within one year after your disclosure of same to us, you may submit a written request for our release of any claim to the invention or improvement. We will not unreasonably withhold such release.

(d)     You grant to us an exclusive, perpetual, worldwide, royalty-free license to use, and to grant to others the right to use, any idea, improvement, or new invention that you reveal to us, including

all new ideas and inventions that you reveal to us in writing in a form acceptable to us for filing with the U.S. Patent and Trademark Office on or before the date that you sign the Agreement.

## 9. SERVICES OFFERED BY YOUR FRANCHISOR; RELATIONSHIP OF PARTIES

**9.1    Services Offered by Your Franchisor.**

**9.1.1    Consultation.** For no additional charge, we will make our personnel available to you for consultation on such matters as operations, advertising and promotion, and administration throughout the term of the franchise. We will provide continuing assistance to you in the development and operation of your Center by means of periodic visits by our field representative(s) and by the maintenance of an office staff of trained personnel experts at our headquarters.

**9.1.2    Research and Development.** We will continue to research and develop products, curricula, and techniques for operating and promoting a Center. We agree that when any such developments are accepted by us for ongoing use in our own Centers, they will be made a part of our System and provided to you upon the same terms and conditions as those applicable to our other franchise owners.

**9.1.3    Manual.** You must comply with the contents of the Manual at all times during the term, and you must treat the Manual and the information contained therein as confidential. The Manual must be kept in a secure place at your Center. You shall not at any time copy, duplicate, record, or otherwise reproduce the Manual, in whole or in part, or otherwise make it available to any unauthorized person. The Manual shall at all times remain our sole property. You shall ensure that your copy of the Manual is kept current at all times, and in the event of any dispute as to the contents of the Manual, the terms of the master copy of the Manual maintained by us shall be controlling.

**9.1.4    Advertising.**

**9.1.4.1    Advertising Fund.** Recognizing the value of advertising and marketing to the goodwill and success of Centers, we will establish a system wide marketing fund (the "Advertising Fund" or "Fund") for such advertising, marketing and public relations programs and materials as we deem necessary or appropriate in our sole discretion. We will administer the Advertising Fund, which will be kept in a separate bank account. The purpose of the Fund is to pool our advertising monies along with each of our franchisees' advertising monies so as to achieve greater benefits for all in promoting the Marks. The Fund may be used to pay for market research, advertising materials, media space and time for a national or regional advertising program, a referral program, or any combination of them. The Fund may also be used for advertising grants to franchisees, collectively on a regional basis or individually on a local basis. In addition, the Fund may be used to pay for point-of-purchase materials or public relations projects. Five percent (5%) of Fund money is used to compensate us for overhead and other expenses incurred in connection with our administration of the Fund. We will distribute to our franchisees, once a year, an Advertising Fund report which will set out the total amounts of money collected and spent by the Fund during the past year and list, by general category, the manner in which the money was spent.

**9.1.4.2    Allocation of Expenditures.** We will give preference to Advertising Fund projects that are regional or national in scope when the case warrants, but we may make allocations of Advertising Fund monies to regional groups of franchisees or individual franchisees when we consider it desirable. Because the benefits of advertising and promotion are difficult to measure with precision, we reserve the unqualified right to decide, in our sole and absolute discretion, how, when and where Advertising Fund monies may be spent; the only condition is that the money must be used in a manner

that is directly or indirectly related to the general promotion of the Marks. We will direct all programs financed by the Advertising Fund, with sole discretion over the creative concepts, materials, and endorsements in the geographic market in the immediate placement and allocation. You agree that the Advertising Fund may be used to pay the cost of comparing and producing video, audio, and written advertising materials; administering regional and multi-regional advertising programs, including, without limitation, purchasing, direct mail and other media advertising and employing advertising, promotion and marketing agencies; and supporting public relations, market research and other advertising, promotion and marketing activities. The Advertising Fund periodically will furnish you with samples of advertising, marketing and promotional formats and materials at no cost. Multiple copies of such materials will be furnished to you at our direct cost of producing them, plus any related shipping, handling and storage charges. We may spend on behalf of the Advertising Fund, in any fiscal year, an amount greater or less than the aggregate contribution of all our Centers to the Advertising Fund in that year, and the Advertising Fund may borrow from us or others to cover deficits or invest any surplus for future use. All interest earned on monies contributed to the Advertising Fund will be used to pay advertising costs before other assets of the Advertising Fund are expended. We have the right to cause the Advertising Fund to be incorporated or formed through a separate entity at such time as we deem appropriate, and such successor entity will have all the rights and duties specified in this Agreement.

## 9.2 Relationship of Parties.

**9.2.1  Interest in Marks and System.** You will not at any time do or cause to be done anything that has the effect of contesting or impairing our interest in our Trade Name, Marks or System. You obtain no rights in any of these things except for your right to use them in accordance with the express terms of this Agreement. We retain the right to grant other franchisees or licensees use of the Trade Name, Marks and System upon any terms that we wish, subject only to your limited territorial rights described in Section 4 of this Agreement and <u>Attachment 1</u> to this Agreement.

**9.2.2  Independent Status.** You are an independent legal entity which has licensed the right to operate a Center (you do not own your franchise, but are a licensee of our Marks, logos and System) and must make this fact clear in your dealings with suppliers, landlords, government agencies, employees, customers and others. You will rely on your own knowledge and judgment in making business decisions, subject to the requirements of this Agreement, the System and the Manual. You may not expressly or impliedly hold yourself out as an employee, partner, shareholder, joint venture or representative of The Learning Experience, nor may you expressly or impliedly state or suggest that you have the right or power to bind us to any agreement or to incur any liability on our behalf. You may not use the Trade Name as part of your corporate name or limited partnership name. You are specifically granted the right to use the Trade Name at your Approved Location only during the term of this Agreement as long as you have complied with all laws and regulations concerning use of fictitious business names.

**9.2.3  Display of Disclaimer.** You must conspicuously display a sign that states that "THIS CENTER IS OPERATED BY AN INDEPENDENT LICENSEE UNDER A FRANCHISE AGREEMENT WITH THE LEARNING EXPERIENCE®" at the Approved Location. Business cards, stationery, purchase order forms, invoices, leases, tax returns and other documents you use in your business dealings with suppliers, lessors, government agencies, employees and customers must clearly identify you and list your legal name as an independent entity. We may request a survey to be completed by your customers. In addition your cards, stationary, advertising and other documents at the discretion of the Franchisor must state "This is an independent owner/operator."

**9.2.4  Confidentiality.** You acknowledge and agree that the information, ideas, forms, teaching methods, curricula, software, marketing plans and other materials revealed to you under this Agreement, whether or not included in the Manual, are our confidential and proprietary information and trade secrets

("Confidential Information"). During and after the term of this Agreement, you agree to maintain the confidentiality of all such material. You must at all times treat the Manual as confidential, and may not at any time disclose, copy, duplicate, record or otherwise reproduce, in whole or in part, the contents of the Manual, or any of our other confidential information or trade secrets. You will obtain from your key employees a written agreement detailing their obligations with respect to confidentiality and non-disclosure. You may not disclose Confidential Information to any third party, except to your employees and agents as necessary in the regular and ordinary course of your Center's business and operations, and except as we authorize in writing. You will be responsible for requiring compliance of your Affiliates with the provisions of this section. You must obtain written non-disclosure agreements, using our then-current form of non-disclosure agreement, from each site director and each of your Affiliates, and you must send us a copy of each such agreement within ten (10) days after each site director and/or Affiliate begins its relationship with you. A copy of our current form is <u>Attachment 3</u> to this Agreement.

**9.2.5    Indemnification.** You agree to indemnify, defend and hold us and our affiliated officers and directors harmless from all expenses and liabilities of any kind or nature arising from or in any way connected to any activity of yours even if our negligence or culpability is alleged, unless the expenses or liabilities result solely from our willful misconduct or gross negligence as determined by a judicial tribunal of competent jurisdiction. If we are made a party to a legal proceeding in connection with your act or omission, we may hire counsel to protect our interests, and you agree to pay for all such costs and expenses incurred by us. You agree to promptly reimburse us for any such costs or fees. Subject to your strict compliance with all of the terms and conditions of this Agreement, we agree to indemnify, defend and hold you harmless with respect to liabilities you incur to third parties in defending your license and right to use the copyrighted materials and trademarks provided under this Agreement on the following additional conditions: (a) you notify us of the claim, along with all related documentation, within ten (10) days of your notice of it; (b) you have used such materials and trademarks strictly in accordance with this Agreement and our instructions and have not modified them in any way; (c) you cooperate with us and our attorneys with respect to the claim; and (d) we will control the proceedings and any settlement in our sole and absolute discretion.

**9.2.6    In-Term Covenant Not to Compete.** You agree that you have received and will receive certain valuable information about your Center, including its development, operation and the System, and that this information would not have been given to you without your execution of this Agreement. You agree that we have developed this information over a number of years at great effort and expense and that this information includes, without limitation, marketing techniques, operational procedures, business practices, and management methods ("Business Systems") not known to the general public. You agree that none of these Business Systems was known to you before your execution of this Agreement and all will be of significant competitive advantage to you. You agree that these Business Systems constitute valuable information, which are our trade secrets. After conducting an independent investigation of us and our individual Centers before the date of the execution of this Agreement, you concede that either you had no prior experience in the child care business or, if you had any prior experience in the child care business, you had no experience or knowledge comparable to that of us. You acknowledge that it would take years of hard work and great expense for you to develop even a portion of our knowledge and experience in the childcare business, if you could do so at all. You agree that gaining access to the Business Systems used in your franchised Center is a primary reason for your execution of this Agreement, that the training received and knowledge imparted to you are essential in and to the operation of your Center, and that said training and knowledge would not be so imparted except for execution of this Agreement. You agree that you have earned a livelihood before entering into this Agreement and have the skills to do so in the future if the covenant not to compete provisions in this Section 9 were to be enforced against you. You agree that the representations in this Section 9 will survive the expiration, termination or transfer of this Agreement. You covenant and agree that during the term of this Agreement,

except as otherwise approved in writing by us, you will not, either directly or indirectly, for yourself, or through, on behalf of, or in conjunction with any person or entity:

(a)     engage any entity or person that competes with or that operates any business that is competitive with any Center or have any interest, directly or indirectly, in any entity or person that provides childcare services or related administrative or management services to any childcare Center or facility (a "Competitive Business"), whether as an employee, officer, director, shareholder, partner, contractor, consultant or advisor; and/or

(b)     perform services as a director, officer, manager, employee, consultant, representative, agent, independent contractor or otherwise for any Competitive Business, except other Centers operated under Agreements with us; and/or

(c)     have any direct or indirect financial, equity, legal, beneficial or employment interest in any entity which is granted or is granting franchises or licenses to others to operate a Competitive Business, except other Centers operating under franchise agreements with us; and/or

(d)     recruit or hire any employee of ours, our Affiliates or our franchise owners without our prior written consent and/or that of the other franchise owner or Affiliate. If you knowingly or if you should have knowingly employed any person who has been employed by us or by any other franchisee during the preceding twelve (12) months before employment, then, unless you have obtained our prior written consent or the relevant franchisee, you must pay to us or to the relevant franchisee of the other Center, as the case may be, an amount equal to two hundred percent (200%) of the employee's most recent annual salary (including the value of any bonus, stock option or similar additional compensation) while employed by us or the other Center. The payment will serve as compensation for the training and development provided to the employee by the previous employer and for the loss of the employee's experience and support, and not as a penalty. If the employee was employed by another Center, then the owner of that Center will be a third-party beneficiary of the provisions of this section with an independent right to enforce its terms; and/or

(e)     directly or indirectly, on behalf of yourself or any other person, or as an employee, proprietor, consultant, agent, contractor, employer, affiliate, partner, owner, officer, director or associate, or stockholder of any other person or entity, or in any other capacity, solicit, divert, take away, or interfere with any of the business, customers, referral sources (including all charitable organizations, religious organizations, political organizations, trade associations and civic organizations associated in any way with any Center or with the System), clients, contractors, trade or patronage of ours, our Affiliates or any of our franchise owners as such may exist during the term of this Agreement or afterwards.

**9.2.7    Covenants From Individuals.** You agree to obtain covenants similar to those set forth in this section 9.2.7 from each employee of yours who attends any training program conducted by us or has access to our Manual.

**9.2.8    Post-Term Competitive Restrictions.** Commencing upon the date of: (a) a transfer permitted under Section 10 of this Agreement; (b) expiration of this Agreement; or (c) termination of this Agreement (regardless of the cause for termination), and continuing for an uninterrupted period of three (3) years thereafter, you must not operate, own, or control, directly or indirectly more than a one percent (1%) beneficial interest in a Competitive Business that is located within a twenty-five (25) mile radius of any Center in existence or planned as of the date of termination or expiration of this Agreement. In the event that litigation is required to enforce this provision, the commencement date of the post-term obligation will be the date that a final Order is entered. You agree, prior to the Opening Date of your

Center, to obtain the individual written agreement of each of your Affiliates to the provisions of this section in the form of <u>Attachment 3</u> to this Agreement. After the Opening Date, you agree to obtain the individual written agreement of each of your Affiliates to the provisions of this section in the form of <u>Attachment 3</u> to this Agreement within ten (10) days after each Affiliate assumes that status with you. You further agree that neither you, nor any member of your immediate family, nor any such shareholder or partner will:

(a)  engage in a Competitive Business, directly or indirectly, on behalf of yourself or any other person or as an employee, proprietor, owner, partner, agent, contractor, employer, consultant, Affiliate, or as a director, officer or associate or as a stockholder of any person or entity within your Protected Territory, and/or within an area that is within a twenty-five (25) mile radius of: (i) your Protected Territory; (ii) any other Center in existence or in development; or (iii) any area in which a Center provides service; and/or

(b)  have any direct or indirect interest, as a disclosed or beneficial owner, in any Competitive Business within the area described in Section 9.2.8 above, except in accordance with other Agreements with us; and/or

(c)  perform services as a director, officer, manager, employee, consultant, representative, agent, independent contractor or otherwise for any Competitive Business, except other Centers operated under Agreements with us; and/or

(d)  have any direct or indirect interest in any entity which has granted or is granting franchises or licenses to others to operate a Competitive Business, except other Centers operating under franchise agreements with us; and/or

(e)  recruit or hire any employee of ours, our Affiliates, or our franchise owners without our prior written consent and/or that of the other franchise owner or Affiliate; and/or

(f)  directly or indirectly, on behalf of yourself or any other person, or as an employee, proprietor, consultant, agent, contractor, employer, Affiliate, partner, owner, officer, director or associate, or stockholder of any other person or entity, or in any other capacity, solicit, divert, take away, or interfere with any of the business, customers, referral sources (including all charitable organizations, religious organizations, political organizations, trade associations and civic organizations associated in any with any Center), clients, contractors, trade or patronage of ours, our Affiliates or any of our franchise owners as such may exist during the term of this Agreement or afterwards.

**9.2.8.1** Notwithstanding the terms of this Section 9.2.8, the ownership of other Centers under agreements with us, and the aggregate ownership of five percent (5%) or less of the issued and outstanding shares of any class of stock of a publicly traded company by the persons to whom this Section 9 applies, is not prohibited by this section. The time period of the post-term competitive restrictions will be extended by any length of time in which you or any of your Affiliates, successors or assigns or any other party described above are in breach of any term of this Agreement. The terms of this Section 9 will continue in full force and effect through the duration of the extended time period.

**9.2.9  Continuing Obligations.** All obligations under this Agreement (whether yours or ours) which expressly or by their nature survive the expiration or termination of this Agreement (including any indemnification obligations) will continue in full force and effect after and notwithstanding its expiration or Termination until they are satisfied in full or by their nature expire.

**9.3    The Learning Experience Assignment.** We have the right to transfer or assign all or any part of our rights or obligations under this Agreement to any person or legal entity.  With respect to any assignment which results in the subsequent performance by the assignee of all of our obligations under this Agreement, the assignee shall expressly assume and agree to perform such obligations, and shall become solely responsible for of our obligations, under this Agreement from the date of assignment.  In addition, and without limitation to the foregoing, you expressly affirm and agree that we may sell our assets, our Marks and/or Trade Name, or our System; may sell our securities in a public offering or in a private placement; may merge, acquire other corporations, or be acquired by another corporation; and may undertake a refinancing, recapitalization, leveraged buy-out, or other economic or financial restructuring.

## 10. TRANSFER OF FRANCHISE

**10.1    Purpose of Conditions for Approval of Transfer.**  Our grant of this franchise is made in reliance upon your integrity, ability, experience and financial resources. Neither the franchise nor your Center operated under it may be Transferred (as the term "Transfer" is defined in Section 3.25 hereof) unless you have first obtained our written consent, which may not be unreasonably withheld.  In order to ensure that no Transfer jeopardizes the Trade Name, the Marks, or our interest in the successful operation of your Center after the Transfer, we will consent to a transfer only if you comply with the provisions of Sections 10 and if the Transfer otherwise complies with law.

**10.2    Notice of Proposed Transfer.**  If you wish to Transfer this franchise, you must submit to us at least sixty (60) days before the proposed date of Transfer a package consisting of the following: (a) the form of franchise purchase application then in effect completed by the prospective transferee, or if no form is then in effect, a letter setting forth the general terms of the Transfer request; (b); a copy of the signed purchase contract with the proposed buyer; (c) an acknowledgment of receipt, signed by the proposed transferee, of a copy of our currently effective Franchise Disclosure Document ("Disclosure Document"); and (d) the Transfer Fee described in Section 6.11 of this Agreement.  If the Transfer is not approved by us, we will return the Transfer Fee to you after deducting our direct costs incurred in connection with the proposed Transfer.

**10.3    Our Consent; Right of First Refusal.**  We must respond to your Transfer request within thirty (30) days following our receipt of the package described in Section 10.2 above.  However, if we request additional information, we must respond to your request within fifteen (15) days after receipt of the additional information. After receipt of all the necessary information, we may: (i) consent to the Transfer; (ii) tell you our reason for refusing to consent; or (iii) purchase your Center ourselves upon the same terms and conditions as those offered by the third party.  You should not construe our silence as consent. If we consent to the Transfer, then you may Transfer the interest described in the notice only to the named transferee and only upon the terms and conditions set forth in the notice.  Our consent to a particular transfer will not constitute consent to any other or subsequent transferee.

**10.4    Conditions for Consent to Transfer.**  Our consent is subject to certain conditions (which shall not apply if we or our assigns is the transferee), including, without limitation, all of the following:

(a)    We are satisfied in our sole discretion that the proposed transferee meets all of the criteria of character, Center experience, financial responsibility, net worth and other standards that The Learning Experience customarily applies to new franchisees at the time of Transfer;

(b)    You are in Good Standing;

(c) Signing by the transferee of the then-current form of Franchise Agreement with an addendum that shortens the term to the remainder of the current term and waives payment of an initial fee by the proposed transferee;

(d) Your payment of the Transfer Fee described in Section 6 of this Agreement;

(e) Written agreement by the transferee to complete ITP, at a time and place designated by us in our discretion;

(f) You (and your transferring owner) have executed a general release in form and content satisfactory to us, of any and all claims against us and our shareholders, officers, directors, employees and agents;

(g) You obtain a customary estoppel letter from your Landlord, confirming, among other things, that all rent is paid in full under your lease and there are no tenant defaults;

(h) You make any repairs/upgrades to your Center required by us prior to the Transfer to bring your Center up to our then-current standards for newly constructed Centers. In the event it is impractical to make such repairs/upgrades prior to the Transfer, we may, in our sole discretion, permit you to escrow with us such amounts as determined by us to cover the costs of such repairs or upgrades, which escrow will be released to you upon our satisfactory re-inspection of the repairs/upgrades;

(i) We have the right, but not the obligation, to attend the Transfer closing;

(j) In the event the transferee is financing the purchase of the franchise, the total debt service coverage ratio shall be at least 200%. That is, the monthly net profits as defined by GAAP must be at least 200% of the projected monthly debt payments; and

(k) You will guaranty the transferee's obligations to us for the first six (6) months following the Transfer.

**10.5    Excluded Transfers.**   As used in this Agreement, the term "Transfer" does not mean an assignment to:

(a) Any trustee, guardian or conservator for the account and benefit of a spouse, ancestor or descendant;

(b) Any business entity if the beneficial ownership of the business entity immediately following the assignment is the same and in the same proportions as the beneficial ownership immediately before the assignment. However, no such assignment will relieve the original party of any of its obligations under this Agreement. Information on the identity of the shareholders and officers of the corporation, the percentage of ownership, and the address where corporate records are maintained must be submitted promptly to us;

(c) Any of your employees under any employee stock option plan or stock purchase plan, provided that any share certificate distributed under such a plan is marked with a legend describing the restrictions and conditions of Transfer required by this Agreement; or

(d) Upon your death, any spouse or adult child or children who have been previously approved in writing by us and who wish to continue to operate your Center.

**10.6    Transfer upon Death.** If you die during the term of this Agreement, your heirs or beneficiaries (other than pre-approved individuals described in the preceding section) may have sixty (60) days within which to show to our satisfaction that they meet all of the criteria of character, business experience, financial responsibility, net worth and other standards that we require of new franchisees at that time. If we approve your heirs or beneficiaries as transferees of the "franchise," we will waive any Transfer Fees in connection with the Transfer. If we advise your heirs or beneficiaries in writing that we will not approve them as transferees of the franchise, or if we fail to approve or disapprove the Transfer within sixty (60) days following your death, your heirs or beneficiaries will have one hundred twenty (120) additional days from the date of disapproval of the Transfer or the end of the sixty (60) day period, whichever is first, within which to find and notify us of a proposed Transfer to a qualified transferee in conformity with the provisions of Sections 10.2, 10.3 and 10.4 of this Agreement. If your heirs or beneficiaries do not advise us of a qualified transferee within the specified period, the franchise will automatically terminate at the end of the period unless a written extension of time has been granted by us.

## 11. TERMINATION OF FRANCHISE

**11.1    Termination With Opportunity to Cure.** Except as otherwise provided in Section 11.2 of this Agreement, you shall have thirty (30) days after receipt from us of a written Notice of Default within which to remedy the default specified therein and to provide evidence thereof to us. If any such default is not cured within the specified time, this Agreement shall terminate without further notice to you, effective immediately upon the expiration of the thirty (30) day period or such longer period as applicable law may require. You shall be in default pursuant to this Section 11.1 for failure to comply with any of the requirements imposed by this Agreement, as it may from time to time reasonably be modified or supplemented by the Manual, or failure to carry out the terms of this Agreement in good faith, including without limitation:

(a)    If you fail to submit to us in a timely manner any information or signed agreements/addenda that you are required to submit under this Agreement;

(b)    If you fail to operate your Center in accordance with this Agreement, the System and the Manual;

(c)    If you default in the performance of any material obligation under this Agreement or any other agreement with us or our Affiliates, or to which we or our Affiliate is a party, including but not limited to (i) payment of rent; (ii) the requirements of Section 8.7.3; (iii) the requirements of Section 7.1; (iv) the requirements of Section 7.5; or (v) a default under another franchise agreement for a separate TLE Center owned by you.

**11.2    Termination Without Opportunity to Cure.** You acknowledge and agree that strict compliance with many of the obligations agreed to by you in this Agreement is crucial to the success of the System and the Centers, and that any breach thereof would so jeopardize the well-being of the entire Franchise System or otherwise have such an adverse effect on the relationship between us, or be of such significance, that you no longer will be able to effectively function as a franchisee under this Agreement. Accordingly, you agree that if you commit any action described in Section 11.2 (a) through (n), you shall be in default hereunder, and we may, at our option, terminate this Agreement and all its rights granted hereunder and retain the Franchise Fee, SDSC and/or Site Coordination Fee, without affording you any opportunity to cure the default, effective immediately upon receipt of written notice by you. The actions are:

(a)     If you fail to make any payment when due under this Agreement or any other agreement between you and us or our Affiliate, or to which we or our Affiliate is a party within five (5) days after written notice is given to you.

(b)     If you misuse or impair the Marks or the System or engage in conduct which reflects materially and unfavorably upon the goodwill associated with them, or if you use in a Center any names, marks, systems, logotypes or symbols that we have not authorized you to use;

(c)     If you or any of your Affiliates has any direct or indirect interest in the ownership or operation of a Competitive Business or any business that uses the System or the Marks, or if you fail to give us a signed copy of the Non-Disclosure and Non-Competition Agreement for each of your Affiliates or principal employees within ten (10) days after the Affiliates or principal employees assume that status with you;

(d)     If you attempt to assign your rights under this Agreement in any manner not authorized by this Agreement;

(e)     If you or your Affiliate has made any material misrepresentation in connection with the acquisition of a Center or to induce us to enter into this Agreement, including Section 8.7.2;

(f)     If you act without our prior written approval or consent in regard to a matter for which our prior written approval or consent is expressly required by this Agreement, including, without limitation, Section 8.7.2;

(g)     In the event you have executed the SC Addendum and you have failed to open your Center within forty-eight (48) months following the Effective Date of this Agreement, unless, within our sole discretion, we extend the time in writing;

(h)     If you cease to operate your Center, unless: (i) operations are suspended for no more than sixty (60) days; and (ii) the suspension was caused by fire, earthquake, hurricane, condemnation, or act of God;

(i)     If you fail to permanently correct a breach of this Agreement or to meet the standards set out in the Manual after receiving three (3) requests in writing by us to correct the same or a similar breach in any twelve (12) month period;

(j)     If we make a reasonable determination that the operation of your Center poses a threat to public health or safety;

(k)     Except as otherwise required by the United States Bankruptcy Code, if you become insolvent, are adjudicated bankrupt, or file or have filed against you a petition in bankruptcy, reorganization or similar proceeding;

(l)     If you are indicted or arrested, charged, publicly accused by or in the national or regional media or convicted of any felony whatsoever, or if you are convicted of any criminal misconduct which is relevant to the operation of your Center, or which, in our sole discretion, indicates moral turpitude or that is adverse to the Marks or is a breach of trust;

(m)     You have three (3) Material Underpayments during the term of this Agreement or two (2) Substantial Underpayments in any twelve (12) month period; or

(n)     You fail to maintain the child care license for your Center.

**11.2.2  SC Addendum Termination**.  In the event that you fail to deliver the site review book within the time period required by the SC Addendum, or any longer period if we grant such extension in our sole discretion, Section 10 of the SC Addendum allows us to terminate this Agreement and the SC Addendum and to retain any franchise fee already paid.

### 11.2.3   Cross-Default.

(a)     Any default by you under any other agreement between us or any of our Affiliates as the one party, and you or any of your Affiliates as the other party, that is so material as to permit us to terminate or declare a default under such other agreement will be deemed to be a default of this Agreement, and we will have the right, at our option, to terminate this Agreement, effective immediately upon notice to you.

(b)     In the event that you or one of your Affiliates owns a separate franchise with us, then any default by you under this Franchise Agreement will be deemed to be a default of the Franchise Agreement for the other franchise, and we will have the right, at our option, to any of the remedies available hereunder or thereunder, at law or in equity, including termination of the Franchise Agreement for such other franchise and/or your eviction from the Center, effective immediately upon notice to you.

**11.2.4  Notice to Clients.**  We may directly notify your enrolled parents that you are in default of this Agreement and that your right to operate the Center may be (or has been) terminated.

## 11.3    Termination by You.

(a)     If you have elected the Site Development Service from us and executed an SDSC Addendum, we must show you two Suitable Sites within twenty-four (24) months from the execution of this Agreement and the SDSC Addendum. If, at the conclusion of the twenty-fourth (24th) month, we fail to satisfy our Site Location Obligation (as defined under the SDSC Addendum), you may cancel this Agreement and the SDSC Addendum by delivering to us written notice of your desire to Terminate ("Termination Notice"). Within thirty (30) days following the Termination Notice, we must make the first of twelve (12) equal refund payments to you, repaying dollar for dollar your Franchise Fee and any SDSC deposit paid, which payments will be made over a period of twelve (12) months; provided, however, that you fully understand that your choice of termination of this Agreement and the SDSC Addendum, and the subsequent return of your Franchise Fee and SDSC deposit, is your sole and exclusive legal or equitable remedy for our non-performance in the presentation to you of Suitable Sites.  As a condition to your receipt of the refund, you and your principals will execute a release substantially in the form as shown in Exhibit O to the Disclosure Document.

(b)     Reciprocally, if during the twenty-four (24) month period, or at any time after the twenty-four (24) month period but prior to our receipt from you of any Termination Notice, we satisfy our Site Location Obligation by showing you two (2) Suitable Sites, and you reject them and/or fail to timely accept them (timely acceptance is defined as within ten (10) days after all Site Criteria is presented to you for your review, including the lease or other relevant binding real estate agreement), then and in that event: (i) our obligation to show you additional Suitable Sites will cease in its entirety; (ii) the Franchise Fee paid will become fully non-refundable and will be considered earned by us for our time, effort and restriction relative to your Site Location; and (iii) we may, in our sole option, terminate the SDSC Addendum, by delivering to you a Termination Notice, and thereafter it will become your sole responsibility to locate and develop your New Center according to our plans, specifications and Site Criteria, and in accordance with the terms and conditions of an SC Addendum, which you must execute

with us within ten (10) days following the Termination Notice. If you fail and/or refuse to execute the SC Addendum, it will be considered a default under Section 11.1 of this Agreement.

**11.4     Rights and Obligations after Termination.**

**11.4.1     Obligations.** Upon termination of this Agreement for any reason, your rights to use the Marks, Trade Name and System will immediately terminate; and

(a)     You will not use the Marks, Trade Name and System in any manner whatsoever. You will immediately cease operating the Center and will not identify or represent that you are operating a Center or that you are or were a franchisee. Within five (5) days of the expiration or termination of this Agreement for any reason, you must take any one or more of the following actions at our option: (1) you will notify all of your customers in writing that you no longer operate a Center and that you have no rights to the Marks, Trade Name and System, and you will send a copy of this notice to us for our inspection prior to distribution; (2) you will submit to us all reports required under this Agreement; (3) all of your customer contracts will be assigned to us; (4) you will take such actions as may be necessary to cancel any assumed name registration or equivalent registration obtained by you which contains the Mark, The Learning Experience or any other Marks, and you will furnish us with evidence satisfactory to us of compliance with this obligation within five (5) days; and (5) you hereby irrevocably appoint us or our nominee to be your attorney-in-fact coupled with an interest, and with power of substitution, to execute and to file for you any relevant document necessary to accomplish the acts contemplated by this Agreement;

(b)     Upon our written request, you will change the premises in the manner and in the time period that we require to distinguish the premises from its former appearance and from any Center. In the event you fail and/or refuse to comply with the requirements of this Section 11.4.1(b), we will have the right, and you hereby consent to the entry of, an emergency court order, by order to show cause, permitting us to enter upon the premises for the purpose of making or causing to be made such changes as may be required at your expense, which you agree to pay upon demand. You also irrevocably waive any right for compensation from us that you may have for any right you may have acquired as a result of your use of the Marks or System;

(c)     You will not use, or disclose to others, anything in the Manual, Confidential Information, or any of our trade secrets, curriculum, operating or business practices. You will return to us the Manuals, all copies of, summaries of, and extracts from the Manuals, and all other material containing any of our trade secrets, operating or business practices relating to the operation of the Franchised Center (and any copies of the Manual, Confidential Information, our trade secrets, curriculum, operating or business practices, even if such copies were made in violation of this Agreement), all of which are acknowledged to be Confidential Information and our trade secrets. Confidential Information and these trade secrets, curriculum, operating and business practices include, without limitation, uniform standards, specifications, policies, and procedures for the System. You will cease using our Software programs, including Child Safe N Secure®, and return to us all copies of it and all related documentation. You will retain no copy or record of any of the foregoing, except for your copy of this Agreement, any correspondence between the parties, and any other documents you reasonably need for compliance with applicable law;

(d)     You must promptly pay all sums owing to us and our Affiliates. In the event of termination for any default of yours, such sums will include all damages (including future royalty fees that otherwise likely would have been paid from the termination date through the end of the initial term, but for the early termination of the Agreement), costs, and expenses, including reasonable attorneys' fees, incurred by us as a result of the default, which obligation shall give rise to and remain, until paid in full, a

lien in favor of us against any and all of the personal property, furnishings, equipment, signs, fixtures, and inventory owned by you as well as on the Center premises. You hereby appoint us as your attorney-in-fact, with full power and authority to execute on your behalf such documents as are necessary to obtain and perfect such lien. Future royalty fees due will be calculated as the present value of the average monthly royalty fees that you were obligated to pay during the 12-month period immediately preceding the month that the Franchise Agreement is terminated, multiplied by the number of months remaining in the initial term at the date of termination;

(e) You will comply with all provisions of this Agreement that survive its Termination and expiration, including but not limited to the non-compete covenants contained in this Agreement;

(f) We will have no further obligations under this Agreement;

(g) You must promptly sign any documents and take any steps that, in our judgment and sole discretion, are necessary to delete your listings from all classified telephone directories, computer bulletin boards, and Internet web sites, and disconnect or, at our option, assign to us all telephone numbers that have been used in your Center, and terminate all other references that suggest you are or ever were associated with us or our System. By signing this Agreement, you irrevocably appoint us as your attorney-in-fact to take the actions described in this section if you do not do so yourself within seven (7) days after Termination of this Agreement; and

(h) After this Agreement is terminated, you must maintain all records required by us under this Agreement for not less than three (3) years after final payment of any amounts you owe to us, and must make available true copies of these records to us for audit upon reasonable notice.

### 11.4.2 Right to Possession upon Termination or Expiration.

**11.4.2.1** If you have been leased a Center, executed an Assignment and Assumption of Lease, or subleased a Center from us, then upon Termination or expiration of this Agreement and our written request, you will immediately vacate the premises of your Center, and we, without any recourse to you, will have the right to take immediate possession of the Center and assume all operations with respect to such Center. All revenues realized thereafter will be our property. Furthermore, you agree to execute any and all documents required or believed by us to be necessary to perfect our possession of the Center, including without limitation documentation required by any landlord, financing institution or developer. Furthermore, you agree to tender possession to us without resort to any legal proceedings and waive all rights to protest any such taking of possession by us upon Termination of this Agreement. Additionally, except for items of personal property unrelated to your operation of the Center, you agree that upon default and subsequent termination of this Agreement, all equipment, supplies and inventory and other property within the Center that is used in the operation of the Center will become our sole and exclusive property. We also have an option to replace you as lessee under any equipment lease for equipment that is used in connection with your Center, and upon our request, you must immediately give us copies of the leases for all equipment used in your Center.

**11.4.2.2 Own or Leased.** If you own the premises of your Center or have leased the premises directly from a landlord or developer, upon Termination or expiration of this Agreement we will have the following options:

(a) If you own the premises, we will be deemed to have an option to buy and may elect in our sole discretion to purchase the premises from you in consideration of the fair market value of the property. We must send written notice to you within thirty (30) days after termination of this

Agreement of our election to exercise the option to purchase, and must be prepared to close the transaction within sixty (60) days after the fair market value has been determined. If the parties fail to agree upon the fair market value of the property within the option period, each must appoint an appraiser and the two appraisers thus appointed must agree on a third appraiser within ninety (90) days after we have given notice of our election to purchase. The appraisers, or a majority of them, must determine the fair market value of your Center premises. This determination will be final and binding upon both you and us.

(b)     If you own the premises, we may elect not to lease the premises from you under the Agreement to Lease annexed as <u>Attachment 2</u> to your SC Addendum, at which time the parties must follow the terms and conditions contained in Section 11.4.1 of this Agreement, and you also must;

(i)     Convert the location to a use other than a childcare Center; or

(ii)     Sell the land, building, equipment, and other personal property, if owned by you, to a third party, subject to our right of first refusal. Even if we elect not to take possession of the Center, we have an option to replace you as lessee under any equipment lease for equipment that is used in connection with your Center. Upon our request, you must give us copies of the leases for all equipment used in your Center immediately upon Termination. Additionally, we will be entitled to any or all of the physical assets contained in the Center, including its equipment, supplies and inventory involved in the day-to-day operations of the Center. We will pay to you for these items:

(A)     The lower of cost or fair market value of the supplies and inventory;

(B)     Depreciated value of other tangible personal property calculated on the straight line method over a five (5) year life, less any liens or encumbrances; and

(C)     If the parties do not agree on a price within thirty (30) business days of expiration or Termination of this Agreement, there will be appointed an independent appraiser who is mutually satisfactory to the parties. If the parties fail to agree upon an appraiser within the specified period, each must appoint an appraiser and the two appraisers thus appointed must agree on a third appraiser within ninety (90) days after termination, and the appraisers, or a majority of them, must determine the price for the physical assets of your Center in accordance with the standards specified above. For purposes of determining the purchase price, you will not be given any credit whatsoever for the value of goodwill associated with the Marks. This determination will be final and binding upon both you and us. The fees and expenses of any appraiser(s) will be paid by you.

(c)     We may elect to execute upon our security interest in the premises, take the premises from you and then lease the premises of the Center from you under the applicable Agreement to Lease and other relevant documents executed by and between you and us, and annexed as Attachment 2 to your SC Addendum.

**11.4.2.3**     If the franchise granted in this Agreement is terminated because of your default, our rights described above may not be our exclusive remedies, but will instead supplement any other equitable or legal remedies available to us. If this Agreement is terminated because of your material default, nothing in this section may be construed to deprive us of the right to recover damages as compensation for lost profits. Termination of this Agreement will not end any obligation of either party that has come into existence before termination. All obligations of the parties which by their terms or by reasonable implication are to be performed in whole or in part after termination will survive termination.

**11.5    Liquidated Damages.**  In the event we terminate this Agreement pursuant to Section 11.1 or 11.2, or you improperly terminate this Agreement through your act or omission, it is acknowledged that estimating the damages suffered by will be difficult.  Our expenses include the costs of possibly taking back the Center, staffing, possible renovations, re-equipping, increased advertising, lost Royalty income, as well as damage to our reputation and the Marks. The parties therefore agree that as liquidated damages, we will be entitled to recover, without actual proof of loss, the sum calculated in accordance with the following formula: six percent (6%) of the single highest monthly Gross Revenues from the previous thirty-six (36) month period before the termination, multiplied by twelve (12) and the result multiplied by the number of remaining years under this Agreement had it not been terminated and that number being reduced to net present value using a 6% discount rate,  plus a default rate of two (2x) times that value. You agree that this formula is a reasonable estimate of damages and not a penalty. This formula is stipulated to be acceptable to all parties and to be used by any court of competent jurisdiction in calculating the award of damages to us for termination of this Agreement.

**11.6    Nonexclusivity of Remedy.**  No right or remedy conferred upon or reserved to either of us under this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy.

## 12. MISCELLANEOUS PROVISIONS

**12.1    No Liability to Others; No Other Beneficiaries.**  We will not, because of this Agreement or by virtue of any approvals, advice or services provided to you, be liable to any person or legal entity who is not a party to this Agreement. Except as specifically described in this Agreement, no other party has any rights because of this Agreement.

**12.2    Construction.**  The headings of the sections are for convenience only. If two or more persons are at any time franchise owners hereunder, whether or not as partners or joint venturers, their obligations and liabilities to us are joint and several. This Agreement may be signed in multiple copies, each of which will be an original. "A or B" means "A" or "B" or both.

**12.3    Time is of the Essence.**  It will be a breach of this Agreement if you fail to perform any obligation within the time required or permitted by this Agreement. In computing time periods from one date to a later date, the words "from" and "commencing on" (and the like) mean "from and including"; and the word "to," "until" and "ending on" (and the like) mean "to but excluding."  Indications of time of day mean Eastern Standard Time.

**12.4    Governing Law.**  The Agreement takes effect upon its acceptance and execution by us in Florida, and any claim or controversy arising out of or related to this Agreement, or the making, performance, breach, interpretation, or termination thereof, except to the extent governed by the United States Trademark Act of 1946, shall be interpreted and construed under the laws of the State of Florida.  In the event of any conflict of law, the laws of Florida shall prevail, without regard to the application of Florida conflict-of-law rules.  If, however, any provision of this Agreement would not be enforceable under the laws of Florida, and if the Protected Territory is located outside of Florida and such provision would be enforceable under the laws of the state in which the Protected Territory is located, then such provision shall be interpreted and construed under the laws of that state.  Nothing in this Section 12.4 is intended by the parties to subject the Agreement to any franchise or similar law, rule, or regulation of the State of Florida to which it would not otherwise be subject.  You and we acknowledge that our agreement regarding the application of Florida law provides each of us with the mutual benefit of uniform interpretation of this Agreement or our relationship created by this Agreement, and you further acknowledge the receipt and sufficiency of mutual consideration for such benefit.

**12.5    Jurisdiction.** Any judicial action brought by you against us shall be brought exclusively, and any action brought by us against you may be brought, in the federal district court covering the location at which we have our principal place of business at the time the action is commenced; provided, however, that if the federal court would not have subject matter jurisdiction had the action been commenced in such court, then, in such event, the action shall (with respect to actions commenced by you) and may (with respect to actions commenced by us) be brought in the state court within the judicial district in which we have our principal place of business at the time the action is commenced. The parties waive all questions of personal jurisdiction or venue for the purpose of carrying out this provision. You and we acknowledge that our agreement regarding jurisdiction provides each of us with the mutual benefit of uniform interpretation of this Agreement or our relationship created by this Agreement, and you further acknowledge the receipt and sufficiency of mutual consideration for such benefit.

**12.6    Waiver of Jury Trial. UNLESS PROHIBITED BY LAW, YOU AND WE AGREE TO IRREVOCABLY WAIVE A TRIAL BY JURY IN ANY ACTION, COUNTERCLAIM OR JUDICIAL PROCEEDING BROUGHT BY YOU OR US, WHETHER AT LAW OR IN EQUITY, ABOUT ALL ISSUES THAT ARISE OUT OF, CONCERN OR RELATE TO, THIS AGREEMENT, ANY AND ALL TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, YOUR PERFORMANCE OR OUR PERFORMANCE UNDER THIS AGREEMENT, OR OTHERWISE, DURING THE TERM OF THIS AGREEMENT AND AFTERWARDS. YOU AND US MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF YOUR AND OUR CONSENT TO THE WAIVER OF A TRIAL BY JURY. YOU AND US HAVE READ THIS PROVISION AND UNDERSTAND ITS EFFECT. YOU HAVE CONSULTED WITH, AND HAVE BEEN ADVISED BY, COUNSEL ABOUT THE TRANSACTION GOVERNED BY THIS AGREEMENT AND SPECIFICALLY ABOUT THE TERMS OF THIS SECTION 12.6, WHICH CONCERNS THE WAIVER OF RIGHT TO TRIAL BY JURY BY YOU AND US. YOU AND US AGREE THAT YOUR REPRESENTATIONS WILL SURVIVE THE EXPIRATION, TRANSFER OR TERMINATION OF THIS AGREEMENT.**

**12.7    Cumulative Remedies.** The rights and remedies provided in this Agreement are cumulative, and neither you nor we will be prohibited from exercising any other right or remedy provided under this Agreement or permitted by law or equity.

**12.8    Notices.** The parties to this Agreement should direct any notices to the other party at the following addresses:

> Us:
> The Learning Experience Systems LLC
> 4855 Technology Way, Suite 700
> Boca Raton, FL 33431
> Attn.: Richard S. Weissman, President
>
> You:
> Jubran C. Jubran
> 64 The Glen
> Glen Head, NY 11545

or at other addresses if advised in writing that an address has been changed. Notice may be delivered by facsimile (with simultaneous mailing of a copy by first class mail), nationally recognized overnight courier, U.S. first class mail or Certified Mail, RRR. Notice by facsimile will be considered delivered upon transmission; by courier, upon delivery to such address; and by first class mail or Certified Mail, RRR, three (3) days after posting. Notice of any termination must be by overnight courier or Certified

Mail, RRR. The Manual, any revisions to the Manual, and/or any written instructions that we furnish to you relating to operational matters shall not be deemed as "Notices" for the purposes of any delivery requirements of this Section 12.8.

**12.9    Amendments/Modifications.** This Agreement may not be amended or modified orally, but may only be amended or modified by a writing signed by all of the parties to this Agreement or by its/their authorized agents.

**12.10    Waiver.** We will not be deemed to have waived our right to demand exact compliance with any of the terms of this Agreement, even if at any time: (a) we do not exercise a right or power available to us under this Agreement; or (b) we do not insist on your strict compliance with the terms of this Agreement; or (c) if there develops a custom or practice which is at variance with the terms of this Agreement; or (d) if we accept payments which are otherwise due to us under this Agreement. Similarly, our waiver of any particular breach or series of breaches under this Agreement, or of any similar term in any other agreement between you and us or between us and any other franchise owner, will not affect our rights with respect to any later breach by you or anyone else.

**12.11    Entire Agreement.** This Agreement, including the introduction, addenda and Attachments to it, constitutes the entire agreement between you and us. There are no other oral or written understandings or agreements between you and us concerning the subject matter of this Agreement. However, nothing in this Agreement or in any related agreement is intended to disclaim the representations we made in our Franchise Disclosure Document, including any exhibits or amendments thereto.

**12.12    Injunctive Remedy for Breach.** You recognize that you are a member of a Franchise System and that your acts and omissions may have a positive or negative effect on the success of other Centers operating under our Trade Name and in association with our Marks. Failure on the part of a single franchisee to comply with the terms of this Agreement is likely to cause irreparable damage to us, and to some or all of our other franchisees. You agree that if we can prove to a court of competent jurisdiction that there is a substantial likelihood of a breach or threatened breach of any of the terms of this Agreement by you, we will be entitled to an injunction restraining the breach and/or to a decree of specific performance, without showing or proving any actual damage, until a final determination is made. If we can prove an actual or threatened breach that may cause or is causing irreparable harm to us, you agree that we will be entitled to an injunction granting us possession of your Center and removing you from the Center, with us assuming control during the pendency of the proceedings. The rights and remedies provided in this Agreement and addenda are cumulative and neither you nor we will be prohibited from exercising any other right or remedy provided under this Agreement or permitted by law or equity. Upon termination of this Agreement for any reason set forth in Section 11.2., you waive all right to seek injunctive relief in the event we take possession of Center pursuant to Section 11.4.2 of this Agreement or this Section 12.12. In the event we must seek injunctive relief to take possession of Center, you waive all defenses to such injunctive relief being entered and agree to entry of an order of possession by a court of competent jurisdiction.

**12.13    Limitation of Claims.** ANY AND ALL CLAIMS ARISING OUT OF THIS AGREEMENT OR THE RELATIONSHIP AMONG YOU AND US MUST BE MADE BY WRITTEN NOTICE TO THE OTHER PARTY WITHIN ONE (1) YEAR FOLLOWING THE OCCURRENCE OF THE FACTS GIVING RISE TO SUCH CLAIM, REGARDLESS OF WHEN IT BECOMES KNOWN; EXCEPT FOR CLAIMS ARISING FROM: (A) UNDER-REPORTING OF GROSS REVENUES; (B) UNDERPAYMENT OF AMOUNTS OWED TO US OR OUR AFFILIATES; (C) CLAIMS FOR INDEMNIFICATION; AND/OR (D) UNAUTHORIZED USE OF THE MARKS. HOWEVER, THIS PROVISION DOES NOT LIMIT OUR RIGHT TO TERMINATE THIS AGREEMENT IN ANY WAY.

**12.14   Attorneys' Fees and Costs.**  If legal action, including any action on appeal, is necessary to enforce the terms and conditions of this Agreement, the prevailing party will be entitled to recover reasonable compensation for preparation, investigation and other costs and reasonable attorneys' fees, as fixed by a court of competent jurisdiction.

**12.15   Limitation of Liability.**  Neither of the parties will be liable for loss or damage or deemed to be in breach of this Agreement if failure to perform obligations results from: compliance with any law, ruling, order, regulation, requirement or instruction of any federal, state or municipal government, or department or agency; or Acts of God or acts or omissions of a similar event or cause.  However, such delays or events do not excuse payments of amounts owed at any time.

**12.16   Disclaimer of Representations.**  YOU ACKNOWLEDGE, AGREE AND REPRESENT THAT NO REPRESENTATIONS OR PROMISES OF ANY KIND HAVE BEEN MADE BY US TO INDUCE YOU TO SIGN THIS AGREEMENT EXCEPT THOSE SPECIFICALLY SET FORTH IN THE FRANCHISE DISCLOSURE DOCUMENT THAT HAS BEEN DELIVERED TO YOU. YOU FURTHER ACKNOWLEDGE, AGREE AND REPRESENT THAT NEITHER WE NOR ANY OTHER PERSON HAS GUARANTEED THAT YOU WILL SUCCEED IN THE OPERATION OF YOUR CENTER OR HAS PROVIDED ANY SALES OR INCOME PROJECTIONS OF ANY KIND TO YOU. YOU FURTHER AGREE THAT IF THE ABOVE IS NOT TRUE, YOU ARE OBLIGATED TO NOTIFY OUR PRESIDENT, IN WRITING, OF ANY VIOLATION OF THIS SECTION. YOU HAVE MADE AN INDEPENDENT INVESTIGATION OF ALL IMPORTANT ASPECTS OF YOUR CENTER. YOU UNDERSTAND THAT WE ARE NOT A FIDUCIARY AND HAVE NO SPECIAL RESPONSIBILITIES BEYOND THE NORMAL RESPONSIBILITIES OF A SELLER IN A BUSINESS TRANSACTION. MOST IMPORTANTLY, YOU ACKNOWLEDGE, AGREE AND UNDERSTAND THAT WE HAVE BEEN INDUCED INTO EXECUTING THIS AGREEMENT BY VIRTUE OF THE ABOVE REPRESENTATIONS MADE BY YOU IN THIS SECTION.

**12.17   Severability; Substitution of Valid Provisions.**  Except as otherwise stated in this Agreement, each term of this Agreement, and any portion of any term, is severable. The remainder of this Agreement will continue in full force and effect. To the extent that any provision restricting your competitive activities is deemed unenforceable, you and we agree that such provisions will be enforced to the fullest extent permissible under governing law. This Agreement will be deemed automatically modified to comply with such governing law if any applicable law requires: (a) a greater prior notice of the termination of or refusal to renew this Agreement; (b) the taking of some other action not described in this Agreement; or (c) if any of our System standards are found to be invalid or unenforceable. We may modify such invalid or unenforceable provision to the extent required to be valid and enforceable. In such event, you will be bound by the modified provisions.

**12.18   Approval and Guarantees.**  If you are a legal entity, all of your principals having a ten percent (10%) or greater interest in you must approve this Agreement and execute and deliver to us the Non-Disclosure, Non-Interference and Non-Competition Agreement attached to this Franchise Agreement as Attachment 3 and the Personal Guaranty and Subordination Agreement attached to this Agreement as Attachment 4, and allow you to furnish the financial information required by us, and agree to the restrictions placed on them, including restrictions on the transferability of its/their interests in the franchise and Center.

**12.19   Approval and Consents.**  Whenever this Agreement requires our advance approval, agreement or consent, you agree to make a timely written request for it. Our approval or consent will not be valid unless it is in writing. Except where expressly stated otherwise in this Agreement, we have the absolute right to refuse any request by you or to withhold our approval of any action or omission by you. If we provide to you any waiver, approval, consent, or suggestion, or if we neglect or delay our response or

deny any request for any of those, we will not be deemed to have made any warranties or guarantees which you may rely on, and will not assume any liability or obligation to you.

**12.20 Waiver of Punitive Damages.** EXCEPT FOR YOUR OBLIGATIONS TO INDEMNIFY US AND CLAIMS FOR UNAUTHORIZED USE OF THE MARKS OR CONFIDENTIAL INFORMATION, AND EXCEPT AS PROVIDED IN SECTION 11.4.2.3, YOU AND WE EACH WAIVE TO THE FULL EXTENT PERMITTED BY LAW ANY RIGHT TO, OR CLAIM FOR, ANY PUNITIVE OR EXEMPLARY DAMAGES AGAINST THE OTHER. YOU AND WE ALSO AGREE THAT IN THE EVENT OF A DISPUTE BETWEEN YOU AND US, THE PARTY MAKING A CLAIM WILL BE LIMITED TO EQUITABLE RELIEF AND RECOVERY OF ANY ACTUAL DAMAGES IT SUSTAINS.

**12.21 Our Judgment.** Whenever we exercise a right and/or discretion to take or withhold an action, or to grant or decline to grant you a right to take or withhold an action, except as otherwise expressly and specifically provided in this Agreement, we may make such decision or exercise such right and/or discretion on the basis of our judgment of what is in our best interests. "Best interests" includes what we believe to be the best interests of the System at the time the decision is made or the right or discretion is exercised, even though (a) there may have been other alternative decisions or actions that could have been taken; (b) our decision or action taken promotes our financial or other individual interest; or (c) our decision or the action it takes may apply differently to different franchisees or any company-owned or Affiliate-owned Centers. In the absence of an applicable statute, we will have no liability to you for any such decision or action. The exercise of the right or discretion will not be subject to limitation or review. If applicable law implies a covenant of good faith and fair dealing in this Agreement, we and you agree that such covenant will not imply any rights or obligations that are inconsistent with a fair construction of the terms of this Agreement and that this Agreement grants us the right to make decisions or take/refrain from taking actions not inconsistent with your rights and obligations hereunder.

**12.22 Our Acceptance.** This Agreement will not be binding upon us unless it has been signed by an authorized officer and you have paid us all initial fees.

**12.23 Interpretation of Agreement.** No provision of this Agreement shall be interpreted in favor of, or against, any party because that party drafted this Agreement.

[SIGNATURES FOLLOW]

IN WITNESS TO THE PROVISIONS OF THIS AGREEMENT, the undersigned have signed it as of the Effective Date.

**FRANCHISOR:**

**THE LEARNING EXPERIENCE SYSTEMS LLC,**
a Delaware limited liability company

By: _____

Name: RICHARD WEISSMAN

Title: PRESIDENT

**FRANCHISEE:**

**JUBRAN C. JUBRAN,** in trust for an entity to be formed

By: _____

Name: Jubran C. Jubran

**THE LEARNING EXPERIENCE FRANCHISE AGREEMENT**
**ATTACHMENT 1 TO FRANCHISE AGREEMENT**

SITE LOCATION INFORMATION

(This <u>Attachment 1</u> to be amended upon matching to Approved Location)

Target Area: Forest Hills, ~~Regal~~ *Repo* Park and Queens, NY *,*   *KEW GARDENS,  LI City*

Approved Location: (To be inserted upon matching to a specified address)

Boundaries of Protected Territory: (To be inserted upon matching to a specified address)

1.      The graphic representation of the boundary of the Protected Territory may be adjusted to conform to the distances and scale provided in the most recently published Dolph Map or, if not available, other recognized national mapping companies' map of the subject area by means of a circle having a scale diameter of two and one-half (2.5) miles, drawn from a central point on the exterior walls of your Center.

2.      Notwithstanding the foregoing, Approved Locations located in urban areas, such as the New York City boroughs or similar areas, will have a circle having a scale diameter, as determined by us, that would not cause a material adverse effect on the enrollment of your Center.

## ATTACHMENT 2 TO FRANCHISE AGREEMENT

## SCHEDULE OF MINIMUM INSURANCE REQUIRED

| Type Of Insurance | Minimum Required Limit | Minimum Required Aggregate |
|---|---|---|
| General Liability | $1,000,000 | $3,000,000 |
| Professional Liability (included w/General Liability) | $1,000,000 | $3,000,000 |
| Fire Damage Legal Liability | $400,000 | $400,000 |
| Sexual Abuse or Molestation | $1,000,000 | $2,000,000 |
| Employee Benefit Liability | $1,000,000 | $3,000,000 |
| Improvements and Betterments (if there is no building coverage) | $250,000 | |
| Personal Property | $100,000 | |
| Playground Equipment | $25,000 | |
| Business Income | $400,000 | |
| Hired/Non-owned Auto | $1,000,000 | |
| Umbrella | $4,000,000 | |
| Student Accident | $100,000 excess coverage | |
| Life Insurance | Covers one (1) year of Rent under the Lease; names the original tenant as beneficiary (TLE at [____], LLC) | |
| Workers Compensation | $1,000,000 and per state requirements | |

### Notes:

1.    All policies must be written by a licensed insurance company with an A.M. Best rating of "A" or higher.

2.    All policies must name the following as additional insureds:   The Learning Experience Holding Corp., The Learning Experience Systems LLC, the original Tenant under the Lease (TLE at [____], LLC), landlord and the landlord's lender/mortgagee, if any.

3.    All policies must provide that the additional insureds will receive notice of your default in the payment of any premium and must provide thirty (30) days prior written notice of termination, cancellation, expiration or alteration to provide less coverage.

4. Please note that the figures set forth in the above schedule are simply the minimum insurance requirements, and in no way limit or restrict your ability to purchase or obtain insurance with higher limits or any additional insurance not mentioned herein.

**ATTACHMENT 3 TO FRANCHISE AGREEMENT**

NON-DISCLOSURE, NON-INTERFERENCE AND
NON-COMPETITION AGREEMENT

THIS NON-DISCLOSURE, NON-INTERFERENCE AND NON-COMPETITION AGREEMENT (the "Agreement") is made as of _March 3_____, 2013 (the "Effective Date"), by and between **JUBRAN C. JUBRAN**, in trust for an entity to be formed and individually, and **PHYLLIS JUBRAN**, individually, having a mailing address at 64 The Glens, Glen Head, New York 11545 ("you" or "your" or "yours"), and **THE LEARNING EXPERIENCE SYSTEMS LLC**, a Delaware limited liability company, its affiliates and subsidiaries, each having its principal place of business at 4855 Technology Way, Suite 700, Boca Raton, Florida 33431 ("The Learning Experience," "we," "us" or "our").

RECITALS:

WHEREAS, in consideration of valuable information provided and to be provided, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, you agree to be bound by the following representations, warranties and covenants, to be effective, unless stated to the contrary, during, and at all times after, the termination of your affiliation with us.

NOW, THEREFORE, in consideration of the foregoing, the parties mutually agree as follows:

1.      Confidential Information. You acknowledge that you may have received or been given access to, or will receive or be given access to, certain confidential information and trade secrets of ours, all relating to or useful in our business and all labeled, treated as, or otherwise considered by us as confidential or proprietary information (collectively, the "Confidential Information"). The Confidential Information may include, without limitation, operating, marketing, promotions, advertising, human resources and training manuals; memoranda, video and audio tapes, slide presentations and other materials, characters, systems, logos and other similar property, creations and ideas, programs, studies, software, inventory control, agreements, correspondence, records, plans and reports used or created by or on behalf of us or supplied to us; customer lists, identities of suppliers, recruiting techniques, and operational, accounting and quality control procedures; architectural and construction related plans and specifications, and generally all other information sent to you or to which you are exposed to at our offices and other locations. Confidential Information also includes any documents or modifications to any Confidential Information made by or on behalf of you.

2.      Disclosure of Confidential Information.

        (a)      You specifically warrant and agree that at all times since the initial date of your discussion with us, you have kept and will continue to keep any and all of the Confidential Information from being used, made known or disclosed to any person or entity, except for the exclusive use and benefit of us. You will not reproduce or permit reproduction or dissemination of any of the Confidential Information.

        (b)      You specifically agree that in the event of a breach or a threatened breach by you of this Agreement, we will be entitled to an injunction restraining you from disclosing, in whole or in part, such Confidential Information, and from rendering any services to any person or entity to whom such Confidential Information in whole or in part has been disclosed or is threatened to be disclosed. Nothing in this Agreement will be construed so as to prohibit us from pursuing any other remedies available to us for such breach or threatened breach, including the recovery of damages from you. You recognize that the Confidential Information is of extraordinary value to us, and that the loss or unauthorized use of

disclosure of the Confidential Information would result in incalculable damages and irreparable harm to our business and reputation, for which monetary damages would not adequately compensate us.

(c) All of the Confidential Information will be treated in confidence and will not be disclosed and used for the benefit of you or your employees, personnel and/or agents.

3. <u>Degree of Care</u>. You agree that you will treat all Confidential Information with the same degree of care as you would accord your own confidential information, and you represent that you will exercise reasonable care to protect all Confidential Information.

4. <u>Limitation On Obligations</u>. Your obligations will be excused with respect to any Confidential Information to the extent that such Confidential Information:

(a) Is generally known to the public or trade at the time of disclosure or becomes generally known through no wrongful act on the part of you;

(b) Becomes known to you through disclosure by sources, other than us, having the legal right to disclose such Confidential Information;

(c) Is independently developed by you without reference to or reliance upon the Confidential Information; or

(d) Is required to be disclosed by you to comply with applicable laws or governmental regulations, <u>provided that</u> you provide prompt prior written notice of such disclosure to us, cooperate with us to obtain a protective order if requested by us, and take reasonable and lawful actions to avoid and/or minimize the extent of such disclosure at our expense.

5. <u>Return of Documents</u>. You will, upon our request, return to us all drawings, documents and other tangible manifestations, including all copies and reproductions that comprise or incorporate Confidential Information, to which you have been exposed pursuant to this Agreement.

6. <u>Competitive Restrictions</u>. During the term of this Agreement and for a period of three (3) years after any termination or expiration thereof, including any renewal or extension of this Agreement, you agree that you will not operate, own, or control, directly or indirectly more than a one percent (1%) direct or beneficial interest in a competitive business that is located within a twenty-five (25) mile radius of any Center in existence or planned as of the date of termination or expiration of your Franchise Agreement. You agree, prior to the Opening Date of your Center, to obtain the individual written agreement of each of your Affiliates to the provisions of this section. After the Opening Date, you agree to obtain the individual written agreement of each of your Affiliates to the provisions of this section within ten (10) days after each Affiliate assumes such status with you. You further agree that none of you, any member of your immediate family, any shareholder, member, stakeholder, debt holder or partner will:

(a) engage in a competitive business, directly or indirectly, on behalf of yourself or any other person or as an employee, proprietor, owner, partner, agent, contractor, employer, consultant, Affiliate, or as a director, officer or associate or as a stockholder of any person or entity within your Protected Territory, and/or within an area that is within a twenty-five (25) mile radius of: (i) Your Protected Territory; or (ii) of any other Center in existence or in development; or (iii) of any area in which a Center provides service; and/or

(b)     have any direct or indirect interest, as a disclosed or beneficial owner, in any Competitive Business within the area described in Section 9.2.8 of the Franchise Agreement, except in accordance with other Agreements with us; and/or

(c)     perform services as a director, officer, manager, employee, consultant, representative, agent, independent contractor or otherwise for any Competitive Business, except other Centers operated under Agreements with us; and/or

(d)     have any direct or indirect interest in any entity which has granted or is granting franchises or licenses to others to operate a Competitive Business, except other Centers operating under franchise agreements with us; and/or

(e)     recruit or hire any employee of ours, our Affiliates, or our franchise owners without our prior written consent and/or that of the other franchise owner or Affiliate; and/or

(f)     directly or indirectly, on behalf of yourself or any other person, or as an employee, proprietor, consultant, agent, contractor, employer, Affiliate, partner, owner, officer, director or associate, or stockholder of any other person or entity, or in any other capacity, solicit, divert, take away, or interfere with any of the business, customers, referral sources (including all charitable organizations, religious organizations, political organizations, trade associations and civic organizations associated in any with any Center System), clients, contractors, trade or patronage of ours, our Affiliates or any of our franchise owners as such may exist during the term of this Agreement or afterwards.

7.     <u>Miscellaneous</u>.

(a)     This Agreement supersedes all prior agreements, written or oral, between you and us relating to the subject matter of this Agreement. This Agreement may not be modified, changed or discharged, in whole or in part, except by an agreement in writing signed by you and us.

(b)     The provisions of this Agreement are necessary for the protection of the business and goodwill of the parties, and are considered by the parties to be reasonable for such purpose. You agree that any breach of this Agreement will cause us substantial and irreparable damages and, therefore, in the event of any such breach, in addition to other remedies which may be available, we will have the right to seek specific performance and other injunctive and equitable relief without the requirement of posting any form of bond.

(c)     Any notice given under this agreement to either party will be made in writing. Any such notice will be deemed to be given by mail to any such party by first class mail, postage prepaid, addressed to the last known address of any individual party or to the principal office of the company as the case may be.

(d)     You and all of your employees, personnel and/or agents further agree to execute any and all further lawful documents, including assignment, which may be deemed necessary or desirable by us to fully effectuate this Agreement and assignment and to retain all lawful title to said Confidential Information as vested in the name of The Learning Experience.

(e)     This Agreement will be binding upon and inure to the benefit of the parties to this Agreement and their respective heirs, successors and assigns.

(f)     This Agreement will be construed and interpreted in accordance with the laws of the State of Florida, without regard to conflict of law principles

(g)     This Agreement will govern all communications between the parties that are made during the period from the effective date of the Agreement to the date on which either party receives from the other written notice that subsequent communications will not be so governed; provided, however, that the provisions and obligations under Sections 2, 3, 4, 5, and 6 with respect to Confidential Information previously received will continue in perpetuity.

(h)     The headings of this Agreement are inserted for convenience only and are not to be considered in the construction of its provisions.

(i)     In the event of invalidity of any provision of this Agreement, the parties agree that such invalidity will not affect the validity of the remaining portions of this Agreement, and further agree to substitute for the invalid provision a valid provision which most closely approximates the intent and economic effect of the invalid provision.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**THE LEARNING EXPERIENCE SYSTEMS LLC,**
a Delaware limited liability company

BY: _____
Name: RICHARD WEISSMAN
Title: PRESIDENT

**JUBRAN C. JUBRAN,** in trust for an entity to be formed

By: _____
Name: Jubran C. Jubran

_____
Jubran C. Jubran, Individually

_____
Phyllis Jubran, Individually

PERSONAL GUARANTY AND SUBORDINATION AGREEMENT

THIS PERSONAL GUARANTY AND SUBORDINATION AGREEMENT (this "Guaranty"), made as of ⟨May 3⟩, 2013 (the "Effective Date"), by **Jubran C. Jubran**, individually, having a business address at 64 The Glen, Glen Head, New York 11545 ("Guarantor"), in favor of **The Learning Experience Systems LLC**, a Delaware limited liability company, having its offices at 4855 Technology Way, Suite 700, Boca Raton, Florida 33431 ("Franchisor").

RECITALS:

WHEREAS, Franchisor and Jubran C. Jubran ("Franchisee") entered into that certain Franchise Agreement dated as of even date herewith (the "Franchise Agreement");

WHEREAS, as a condition to the grant of the franchise under the Franchise Agreement, Guarantor is required to provide the personal guaranty and subordination as set forth below; and

WHEREAS, Guarantor is a principal owner in Franchisee and will materially benefit from the grant of the franchise.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Guarantor agrees as follows with the intention of being legally bound:

1. Guarantor unconditionally, jointly and severally, personally and individually guarantees to Franchisor, its successors and assigns, the prompt full payment and performance of all obligations ("Obligations") of Franchisee that are or may become due and owing to Franchisor, including, but not limited to, all Obligations arising under, resulting from or in any way in connection with the Franchise Agreement, any other franchise document related to the Franchise Agreement, or any lease for the Center, in the same manner as if the Franchise Agreement was signed between Franchisor and the Guarantor directly.

2.. Guarantor expressly waive(s) notice of the acceptance by Franchisor to or for the benefit of Franchisee of the purchase of inventory and goods by Franchisee, the maturing of bills and the failure to pay the same, the incurring by Franchisee of any additional future Obligations and liability to Franchisor, and any other notices and demands. This Guaranty will not be affected by the modification, extension, or renewal of any agreement between Franchisor and Franchisee, the taking of a note or other obligation from Franchisee or others, the taking of security for payment, the granting of an extension of time for payment, the filing by or against Franchisee of bankruptcy, insolvency, reorganization or other debtor relief afforded Franchisee under the Federal Bankruptcy Act or any other state or federal statute or by the decision of any court, or any other matter, whether similar or dissimilar to any of the foregoing; and this Guaranty will cover the terms and obligations of any of the modifications, notes, security agreements, extensions, or renewals. Guarantor's obligations will be unconditional in spite of any defect in the genuineness, validity, regularity, or enforceability of Franchisee's Obligations or liability to Franchisor, or any other circumstances whether or not referred to in this Guaranty that might otherwise constitute a legal or equitable discharge of a surety or guarantor.

3. This is an irrevocable, unconditional and absolute guaranty of payment and performance and the Guarantor agree(s) that his, her, or their liability under this Guaranty will be immediate and will not be contingent upon the exercise or enforcement by Franchisor of whatever remedies it may have against the

Franchisee or others, or the enforcement of any lien or realization upon any security Franchisor may at any time possess.

4.      Guarantor agrees that any indebtedness by Franchisee to Guarantor, for any reason, currently existing or which might arise in the future, will always be inferior and subordinate to any indebtedness owed by Franchisee to Franchisor.  The Guarantor will promptly modify any financing statements on file with state agencies to specify that Franchisor's rights are senior to those of Guarantor.

5.      Guarantor agrees that as long as Franchisee owes any money to Franchisor (other than Royalty and Advertising Fund Payments that are not past due), Franchisee will not pay and Guarantor will not accept payment of any part of any indebtedness owed by Franchisee to any of Guarantor, either directly or indirectly, without Franchisor's consent.

6.      In connection with any litigation or arbitration to determine Guarantor's liability under this Guaranty, Guarantor expressly waives his or her right to trial by jury and agrees to pay costs and reasonable attorney's fees as fixed by the court or arbitrator.

7.      If this Guaranty is signed by more than one individual, each person signing this Guaranty will be jointly and severally liable for the obligations in this Guaranty.

8.      This Guaranty will remain in full force and effect until all Obligations are fully paid and satisfied.

9.      All terms, covenants, provisions and conditions of the Franchise Agreement are hereby incorporated in this Guaranty with the same force and effect as if set forth at length in this Guaranty.

_____
Jubran C. Jubran, Individually

# FRANCHISE AGREEMENT ADDENDUM

To:     JUBRAN JUBRAN, in trust for an entity to be created ("you," "your," or "yours")

From:  THE LEARNING EXPERIENCE SYSTEMS LLC, a Delaware limited liability company
        ("we," "our," or "us")

We have prepared this Franchise Agreement Addendum to clarify and confirm our understanding regarding the Franchise Agreement and certain other related agreements between the parties dated this date (the "Franchise Documents"). This Addendum will supersede the Franchise Documents as to the issues specifically addressed and resolved in this Addendum and all other issues not addressed shall be governed by the Franchise Documents. Any capitalized terms not defined herein shall have the meanings as defined in the Franchise Documents.

## FRANCHISE AGREEMENT MODIFICATIONS

**Section 11.3, Termination by You**, is modified to provide that within sixty (60) days following our receipt of a written Termination Notice, The Learning Experience® must refund to you, dollar for dollar, your Franchise Fee and if applicable Site Development Service Charge deposit paid. The same change shall apply to Section 10.4 of the Site Development Service Charge Addendum.

Except as expressly amended in this Addendum, the terms and conditions of the Franchise Agreement and shall remain in full force and effect and are hereby ratified and confirmed by the parties hereto.

[SIGNATURES FOLLOW]

The foregoing is hereby agreed and accepted as of the 3rd day of May, 2013.

**FRANCHISOR:**

**THE LEARNING EXPERIENCE SYSTEMS LLC**, a
Delaware limited liability company

By: _____
Name: Richard S. Weissman
Title: President


**FRANCHISEE:**

**JUBRAN JUBRAN**, in trust for an entity to be
created

By: _____
Name: Jubran Jubran


I hereby agree to the terms of this Addendum:

_____
Jubran Jubran, Individually

# SECOND ADDENDUM TO FRANCHISE AGREEMENT

### Franchise Agreement #268

This Second Addendum to Franchise Agreement (the "Addendum") is made this 5th day of September, 2015 (the "Effective Date") by and among THE LEARNING EXPERIENCE SYSTEMS LLC, a Delaware limited liability company, having an address at 4855 Technology Way, Suite 700, Boca Raton, FL 33431 ("we", "us" or "our"), and JUBRAN C. JUBRAN and NICOLE COLLINS, in trust for an entity to be formed and individually, each having an address at 366 N. Broadway, Suite 206, Jericho, NY 11753 ("you", "your" or "yours").

## RECITALS

WHEREAS, Jubran C. Jubran entered into that certain Franchise Agreement with The Learning Experience Systems, LLC dated May 3, 2013 (the "Franchise Agreement"), including all exhibits, attachments and amendments, and other franchise documents related thereto (being collectively referred to with the Franchise Agreement as the "Franchise Documents"); and

WHEREAS, the Franchisee plan to form a legal entity in order to hold their right, title and interests in and to the Franchise Documents; and

WHEREAS, the Franchisee wishes to add Nicole Collins as a party to the Franchise documents.

NOW, THEREFORE, for good and valuable consideration, including the mutual covenants, undertakings and agreements contained herein, the parties hereto agree as follows:

1.    The above Recitals are true and correct and are incorporated herein by reference.

2.    Nicole Collins is hereby added as franchisee party to all of the Franchise Documents, including without limitation, the Franchise Agreement, the Non-Disclosure, Non-Interference and Non-Competition Agreement (Attachment 3 to the Franchise Agreement), and the Personal Guaranty and Subordination Agreement (Attachment 4 to the Franchise Agreement), the Site Development Service Charge Addendum and the Franchise Agreement Addendum and she agrees to be bound by all of the terms and conditions contained therein.

4.    This Addendum will supersede the Franchise Documents as to the issues specifically addressed and resolved in this Addendum and all other issues not addressed herein shall be governed by the Franchise Documents. Except as expressly amended in this Addendum, the terms and conditions of the Franchise Documents shall remain in full force and effect and are hereby ratified and confirmed by the parties hereto.

5.    Any capitalized terms not defined herein shall have the meanings as defined in the Franchise Documents.

[SIGNATURES FOLLOW]

The foregoing is hereby agreed to and accepted by the parties as of the Effective Date.

THE LEARNING EXPERIENCE SYSTEMS LLC, a Delaware limited liability company

By: _____

Name: PATRICK. CAMPOLO

Title: EXEC VICE PRESIDENT

JUBRAN C. JUBRAN and NICOLE COLLINS, in trust for an entity to be formed

By: _____

Name: Jubran C. Jubran

By: _____

Name: Nicole Collins

We hereby agree to the terms of this Addendum

_____

Jubran C. Jubran

_____

Nicole Collins

2

# EXHIBIT C

## ASSIGNMENT AND ASSUMPTION OF FRANCHISE DOCUMENTS
### (Franchise No. 268)

This Assignment and Assumption of Franchise Documents (this "Assignment") is made as of October 17, 2016 (the "Effective Date"), by JUBRAN C. JUBRAN and NICOLE COLLINS, in trust for an entity to be formed ("Assignor") and BRITE TIKES, LLC, a New York limited liability company ("Assignee").

## RECITALS:

WHEREAS, Assignor, in trust for an entity to be formed later, entered into a Franchise Agreement with The Learning Experience Systems LLC ("Franchisor") dated May 3, 2013 and certain other franchise documents in connection therewith (the "Franchise Documents"); and

WHEREAS, Assignor has formed Assignee as such "entity to be formed" and desires to assign all of its interest in the Franchise Documents to Assignee.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows with the intention of being legally bound:

1.      Assignor hereby assigns and transfers to Assignee all of its right, title and interest in and to the Franchise Documents, together with all its right, title, and interest in and to the franchise opportunity with Franchisor, to have and to hold from this day forward. Assignee hereby accepts the foregoing assignment and assumes all of the obligations of "Franchisee" under the Franchise Documents.

2.      Notwithstanding the foregoing, Assignor acknowledges that in connection with the Franchise Documents, Assignor also executed a Non-Disclosure, Non-Interference and Non-Competition Agreement, a Personal Guaranty and Subordination Agreement and certain other documents in Assignor's individual and personal capacity (collectively, the "Personal Documents"). Assignor hereby acknowledges and agrees that this Assignment does not apply to the Personal Documents and Assignor hereby reaffirms and ratifies Assignor's personal individual liability under such documents and hereby reaffirms and ratifies Assignor's personal representations, signatures and the like in such documents.

3.      The Learning Experience Systems LLC hereby consents to this Assignment.

[SIGNATURES FOLLOW]

ASSIGNOR:

JUBRAN C. JUBRAN and NICOLE COLLINS, in trust
for an entity to be formed

By: _____
Name: Jubran C. Jubran

By: _____
Name: Nicole Collins

ASSIGNEE:

BRITE TIKES, LLC, a New York limited liability
company

By: _____
Name: Jubran C. Jubran
Title: Manager

By: _____
Name: Nicole Collins
Title: Manager

Assignment Accepted by:
THE LEARNING EXPERIENCE SYSTEMS LLC

By: _____
Name: MICHAEL A. SHAFIR
Title: VP & General Counsel

2

# EXHIBIT D


Simone C. Hawkins,
Assistant. Commissioner
shawkins5@health.nyc.gov

Bureau of Child Care
125 Worth Street, Suite 315
New York, N.Y. 10013

Tel: (646) 632-6100
Fax: (347) 396-8054

## ORDER OF THE COMMISSIONER

**TLE at Queens Long Island City LLC**
**The Learning Experience**
**27-28 Thompson Avenue**
**Long Island City, N.Y. 11101**
**Permit # 104903 : Preschool**
**Permit # 104904 : Infant Toddler**
**and**
**Ambar Rodriguez**
**and persons in control of a**
**Group Child Care programs**

**Respondents**

 **Whereas,** on February 13, 2020, the respondent disclosed to the Department that former education director Ara Pasaoglu had altered official personnel forms including but not limited to medical and clearance records, DOE approval letters, staff qualification documents at the  permitted program located in Long Island City; and

 **Whereas,** a review of our records showed that The Learning Experience operates eleven sites in New York City under independent franchise holders and the Franchisor TLE assumed direct responsibility for the 27-28 Thompson Avenue child care programs from Brite Tikes LLC, receiving their permits on June 28, 2019; and.

 **Whereas,** in response the aforementioned communication the Department conducted an inspection of the programs operated at 27-28 Thompson Avenue on February 14th and 17th 2020; and

**Whereas,** the inspections found the following:

1) Evidence that Mr. Pasaoglu submitted altered documents in violation of Health Code §3.19(b) in relation to the qualifications of staff Ambar Rodriquez. Said evidence including indications that the qualifications were pending and under review by the State Education Department (SED) for an Initial Certification in Early Childhood Education. However, a review of the SED qualification tracking data system TEACH found significant discrepancies in the status of her qualifications in that she has not completed course work in Early Child Development, Language Development or passed her content specialty exam.

2) Staff records for medical clearance and required training prior to February 2020 had been removed and were not available for inspection in violation of Health Code §47.33(b) and §47.37(a).

3) A qualified education director for the Preschool program was not designated in violation of Health Code §47.13(c).

4) Current staff in both programs were not currently cleared under the new ownership in that they did not have criminal background checks or reviews of the State Central Registry for Abuse and Maltreatment in violation of Health Code §47.19(c).

5) No individual currently holding a current valid Certificate of Fitness F-07 (Fire and Emergency Drill Conductor) or S-95 (Supervisor of Fire Alarm Systems) was provided in violation of Chapter 4 of the Title 3 of the Rules of the City of New York

6) In a childcare program providing a food service no individual held a current valid Food Protection certificate in violation of Health Code §47.61(a).

; and

**Whereas,** I find that the operation of any child care service at the above mentioned premises without cleared and qualified staff, constitutes a detriment and a danger to the health and safety of the children being cared for at such premises, and that such conditions constitute a nuisance pursuant to Health Code §3.09 and §17-142 of the Administrative Code of the City of New York.

**IT IS HEREBY ORDERED,** that pursuant to Health Code §47.77(a)(1) that respondent shall close and discontinue operation, without further proceedings, and shall remain closed, and shall not provide any child care services at the above referenced premises until such time as any and all cited violations have been complied with.

If you wish to contest (object to) the order, please write or fax Christina Kang, Assistant General Counsel, New York City Department of Health and Mental Hygiene, 42-09 28th Street (WS 14-33) Long Island City NY 11101-4132; ckang@health.nyc.gov, telephone: 347-396-6081; fax: 347-396-6087, within three business days of receiving the order, and provide a statement of the

reasons for your objection to the order.

    For information on how to comply with this Order please contact Karen Lee at klee9@health.nyc.gov or (646) 632-6821.

Date: 2/18/2020

Simone C. Hawkins, Assistant Commissioner

**WARNING**
**FAILURE TO COMPLY WITH AN ORDER OF THE COMMISSIONER
OF HEALTH AND MENTAL HYGIENE IS A VIOLATION OF NEW
YORK CITY HEALTH CODE §3.05, AND A MISDEMEANOR, FOR
WHICH YOU MAY BE SUBJECT TO CIVIL AND CRIMINAL FINES,
PENALTIES AND FORFEITURES**

Delivered by: _____

Date and time delivered: _____

Received by: (Print name) _____

Title _____

Signature _____