**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE LEARNING EXPERIENCE AT QUEENS-LONG ISLAND CITY, LLC and THE LEARNING EXPERIENCE SYSTEMS LLC,<br><br>    Plaintiffs/Counter-Defendants,<br><br>vs.<br><br>BRITE TIKES LLC, NICOLE COLLINS, ARA PASAOGLU, and JUBRAN C. JUBRAN,<br><br>    Defendants/Counter-Plaintiffs. | CIVIL ACTION<br><br>Case No. 1:20-cv-02504 |

**PLAINTIFFS' RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the Southern and Eastern Districts of New York, Plaintiffs and Counter-Defendants The Learning Experience at Queens-Long Island City, LLC ("TLE at Queens-LIC") and The Learning Experience Systems, LLC ("TLE Systems"), (collectively, "TLE") set forth the following undisputed material facts in support of its Motion for Summary Judgment.

## I.   **PARTIES**

1.     Plaintiff and Counter-Defendant TLE at Queens-Long Island City ("TLE at Queens-LIC") is a Delaware limited liability company whose principal place of business is located at 210 Hillsboro Technology Drive, Deerfield Beach, Florida. (Am. Compl., Dkt. No. 14 at ¶ 5). Plaintiff and counterclaim defendant The Learning Experience Systems LLC ("TLE Systems") is a Delaware limited liability company whose principal place of business is located at 210 Hillsboro Technology Drive, Deerfield Beach, Florida. (Am. Compl., Dkt. No. 14 at ¶ 6). As set forth herein, TLE at Queens-LIC, TLE Systems, and TLE Corporation, are collectively referred to as "TLE" unless otherwise stated.

2.     Defendant Brite Tikes LLC ("Brite Tikes") is a New York limited liability company established on or about October 21, 2014 with a principal place of business located at 366 North Broadway, Suite 206, Jericho, New York. Brite Tikes was engaged in the business of operating a franchised child learning and care center located at 27-28 Thomson Avenue, Long Island City, New York 11101, doing business as The Learning Experience (the "Center").  (Am. Compl., Dkt. No. 14 at ¶ 7; Answer & Countercl., Dkt. No. 17 at ¶¶ 201-202).

3.     The two managing members of Brite Tikes LLC are Defendants Jubran C. Jubran ("Jubran"), a resident in Nassau County, New York, and Nicole Collins ("Collins"), a resident of Queens County, New York and daughter of Defendant Jubran. (Am. Compl., Dkt. No. 14 at ¶ 14; Answer & Countercl., Dkt. No. 17 at ¶ 14). As set forth herein, Brite Tikes,  LLC, Nicole Collins, and Jubran C. Jubran are collectively referred to as the "Brite Tikes' Defendants" unless otherwise stated.

4.     Defendant Ara Pasaoglu ("Pasaoglu") is a resident of Orange County, New York and was employed by Brite Tikes as Director of Operations and Quality Assurance at the Center

from approximately October 2017 until the assets of Center were purchased from Brite Tikes ownership by TLE at Queens, LLC on or around June 30, 2019. Pasaoglu continued his employment at the Center under TLE ownership and was employed as Executive Center Director until he resigned on January 15, 2020.  (Declaration of Jason Kislin, Esq., dated March 18, 2022 ("Kislin Decl."), Ex. 1, Defendant Pasaoglu's Responses to Interrogatories Nos. 1, 4).

5.     While Brite Tikes operated the Center, it was run by Defendant Collins as both Executive Director and co-owner, and by Defendant Ara Pasaoglu who was hired by Collins as the Center's Director of Operations and Quality Assurance. Together, Collins and Pasaoglu ran the day-to-day operations of the Center. (Kislin Decl., Ex. 2, Brite Tikes' Defendants' Response to Interrogatory No. 6).

## II.  FRANCHISE AGREEMENT & THE FORMATION OF FRANCHISE NUMBER 268.

6.     On May 3, 2013, TLE Systems and Defendant Jubran, in trust for an entity to be formed, entered into a Franchise Agreement creating Franchise No. 286 ("Franchise Agreement") (Kislin Decl., Ex. 3 at pp. 225-269). The Franchise Agreement also incorporated numerous attachments and addendums, but the most relevant attachment in this case is Personal Guaranty and Subordination Agreement ("Personal Guaranty") included as Attachment 4 to the Franchise Agreement. (Kislin Decl., Ex. 3 at pp. 277-278).

7.     Under the Personal Guaranty, Jubran personally and individually guaranteed to perform all obligations set forth in the Franchise Agreement "in the same manner as if the Franchise Agreement was signed between Franchisor and the Guarantor directly." (Kislin Decl., Ex. 3 at 277, ¶ 1).  The relevant provisions of the Personal Guaranty state:

> 1. Guarantor unconditionally, jointly and severally, personally and individually guarantees to Franchisor, its successors and assigns, the prompt

full payment and performance of all obligations ("Obligations") of Franchisee that are or may become due and owing to Franchisor, including, but not limited to, all Obligations arising under, resulting from or in any way in connection with the Franchise Agreement, any other franchise document related to the Franchise Agreement, or any lease for the Center, in the same manner as if the Franchise Agreement was signed between Franchisor and the Guarantor directly.

. . . .

3. This is an irrevocable, unconditional and absolute guaranty of payment and performance and the Guarantor agree(s) that his, her, or their liability under this Guaranty will be immediate and will not be contingent upon the exercise or enforcement by Franchisor of whatever remedies it may have against the Franchisee or others, or the enforcement of any lien or realization upon any security Franchisor may at any time possess.

. . . .

7. If this Guaranty is signed by more than one individual, each person signing this Guaranty will be jointly and severally liable for the obligations in this Guaranty.

(Kislin Decl., Ex. 3 at pp. 277-278, ¶¶ 1,3,7).

8.     By subsequent addendum dated September 5, 2015, Defendant Collins was added as a party to the Franchise Agreement and all attachments and addendums to the Franchise Agreement. (Kislin Decl., Ex. 3 at pp. 281-282). In executing the addendum, Collins explicitly acknowledged that she agreed to be bound by all of the terms and conditions contained in the Franchise Agreement and the attachments and addendums included therein. (Kislin Decl., Ex. 3 at 281 ¶ 2) ("Nicole Collins is hereby added as franchisee party to all of the Franchise Documents, including without limitation, the Franchise Agreement . . . [and] the Personal Guaranty and Subordination Agreement (Attachment 4 to the Franchise Agreement) . . . and she agrees to be bound by all of the terms and conditions contained therein.")).

9.     On October 17, 2016, Jubran and Collins assigned all their rights and obligations under the Franchise Agreement to Brite Tikes LLC, of which Jubran and Collins are each a

managing member (the "Assignment and Assumption Agreement"). (Kislin Decl., Ex. 3 at pp. 284-285).

10.     When Jubran and Collins assigned their rights under the Franchise Agreement to Brite Tikes, LLC, they both reaffirmed and acknowledged that as assignors they were still personally liable, pursuant to the Personal Guaranty, for upholding the obligations contained in the Franchise Agreement. (Kislin Decl., Ex. 3 at pp. 284-285; Kislin Decl., Ex. 4 Collins Dep. at Tr. 33:20-38:25). Indeed, the second paragraph of the Assignment and Assumption Agreement explicitly states:

> Assignor acknowledges that in connection with the Franchise Documents, Assignor also executed a Non-Disclosure. Non-Interference and Non-Competition Agreement, a Personal Guaranty and Subordination Agreement and certain other documents in Assignor's individual and personal capacity (collectively, the "Personal Documents" ). Assignor hereby acknowledges and agrees that this Assignment does not apply to the Personal Documents and Assignor hereby reaffirms and ratifies Assignor's personal individual liability under such documents and hereby reaffirms and ratifies Assignor's personal representations, signatures and the like in such documents.

(Kislin Decl., Ex. 3 at 284 ¶ 2).

11.     The detailed terms and obligations set forth in the Franchise Agreement are critical to maintaining TLE's brand and reputation as a consistently high-quality childcare provider. TLE has spent a considerable amount of time, effort and money to devise, and continue to develop, childcare methods, technical knowledge and marketing ideas that, taken together, comprise a proprietary franchise system for the operation of childcare centers. The franchisee is permitted, once the Franchise Agreement and the attachments thereto are executed, to utilize TLE's trade name, marks, and proprietary franchise system in the operation of their center.

12.     Pursuant to the Franchise Agreement, Brite Tikes, and by virtue of the Personal Guaranty Agreements, Jubran and Collins, expressly acknowledged that they "have the continuing obligation to always remain in Good Standing and continuously operate your Center without interruption." (Kislin Decl., Ex. 3, §4.1 at p. 231).

13.     "Good Standing" is defined as maintaining "compliance with all applicable state and local laws" and having "timely, consistently and continuously operated your Center, without interruption, in compliance with all provisions of this Agreement (and any other agreement entered into by and between you and your Affiliates and us or our Affiliates), the lease, Assignment and Assumption of Lease Agreement (or controlling real estate agreement), the System and the Manual" (Kislin Decl., Ex. 3, §3.11 at pp. 228-229).

14.     The Franchise Agreement also obligated Brite Tikes, and by virtue of the Personal Guaranty Agreements, Jubran and Collins, to comply with "with all federal, state, and local laws and regulations pertaining, directly or indirectly, to your Center" and  "must keep all current all licenses, permits, bonds, and deposits made to or required by any government agency in connection with the operation of your Center." (Kislin Decl., Ex. 3 §8.12.1 at p. 250).

15.     Collins confirmed during her deposition, taken in both her individual capacity and as Brite Tikes 30(b)(6) representative, that Brite Tikes was obligated to comply with §8.12.1 and that she also had an individual obligation to comply with §8.12.1 pursuant to the Personal Guaranty Agreements. (Kislin Decl., Ex. 4 Collins Dep. Tr. 52:13-53:13).

16.     Moreover, the Franchise Agreement obligates Brite Tikes, and by virtue of the Personal Guaranty Agreement, Jubran and Collins, to "maintain at all times a staff of competent, trained employees sufficient to operate your Center in compliance with our System and standards and all applicable governmental, licensing and labor laws" and further establishes Brite Tikes,

Jubran, and Collins as being "responsible for <u>all employment decisions and functions of the Center</u> including, without limitation, <u>those related to hiring, firing, training,</u> establishing remuneration, compliance with wage and hour requirements, <u>personnel policies,</u> benefits, <u>recordkeeping, supervision and discipline of employees,</u> regardless of whether you receive advice from us on these subjects." (Kislin Decl., Ex. 3, §8.7.3(a) at p. 247) (emphasis added).

17. Collins confirmed during her deposition, taken in both her individual capacity and as Brite Tikes 30(b)(6) representative, that Brite Tikes was obligated to comply with §8.7.3 and that she also had an individual obligation to comply with §8.7.3 pursuant to the Personal Guaranty Agreements. (Kislin Decl., Ex. 4 Collins Dep. Tr. at 51:20-52:12).

18. Lastly, and perhaps most significantly, Brite Tikes, and by virtue of the Personal Guaranty Agreement, Jubran and Collins, represented to TLE:

> [T]hat neither you nor any staff member at your Center has <u>any record of child molestation or abuse, immoral conduct or criminal behavior</u> (collectively referred to as "Unacceptable Conduct"), and you additionally represent that you <u>have not engaged in a pattern of conduct ("Pattern of Conduct") which might jeopardize the welfare of children registered in your Center or reflect adversely on our goodwill or the safety and concern of your staff for these children.</u> You further warrant and represent that <u>you will at all times refrain, and will ensure that all of your staff refrains, from such Unacceptable Conduct and/or Pattern of Conduct during the term of this Agreement.</u>

(Kislin Decl., Ex. 3 §8.7.2 at p. 247) (emphasis added).

## III. ARTICLE 47 OF NEW YORK CITY HEALTH CODE

19. The regulatory framework for receiving, renewing, and maintaining the necessary licenses and permits to for operating a childcare center in New York City is set forth in Article 47 of New York City Health Code ("Health Code"). See Title 24 R.C.N.Y. §§ 47.01-.79 et. seq.

20. In order to apply for and obtain the necessary permits to open the Center, Collins

had to ensure, *inter alia*, that her staff received the required clearances and were qualified to competently supervise children. (Kislin Decl., Ex. 4 Collins Dep. Tr. at 78:21-79-11; *Id.* at 81:19-82:7).

21.     Indeed, only cleared and qualified staff are considered when determining whether a center satisfies staff/child ratios. *See* §47.01(e) (stating competent supervision "must be provided by qualified and cleared staff and in compliance with the minimum staff/child ratios required by Section 47.23(f) of this Article").

22.     According to Health Code §47.07, a center cannot receive a permit unless it has obtained and submits to the DOH: (a) certificate of occupancy; (b) fire safety statement; and (c) staff has completed criminal justice and child abuse screening, which requires proof that the permittee submitted "[d]ocumentation satisfactory to the Department that the permit applicant has submitted all necessary forms and requests for all persons requiring criminal justice and Statewide Central Register of Child Abuse and Maltreatment (SCR) screening in accordance with Section 47.19 of this Article. Such documentation must be kept on site and made available to the D[OH] upon request."

23.     In turn, §47.19 requires staff to undergo both a criminal background check and  also a child abuse screening from the State Registry for Child Abuse and Maltreatment (SCR) before beginning employment and, in the case of SCR screenings, staff must be screened every two-years in order to maintain employment. Specifically, under subsection (b), titled "Screening"  it requires that the permittee – in this case Brite Tikes, any by extension Collins who signed the permit application in her individual capacity as Brite Tikes' managing member (Kislin Decl., Ex. 5 at TLE001382) – to "obtain and verify credentials, including certificates and educational transcripts, as applicable, and references *prior to employment* of all persons listed in subdivision (a)." Art.

47.19(b) (emphasis added). Subdivision (a), titled "Applicability," includes the following: "*any person who has, will have, or has the potential for unsupervised contact with children* in a program, and shall include, but not be limited to: individual owners, permittees, partners, members and shareholders of corporations, limited liability companies or other entities who are the owners or operators of the program; *educational, child supervision, administrative and maintenance employees*[.]" Put together, subsections (a) and (b) requires Brite Tikes, and by extension Nicole, to obtain and verify credentials for childcare employees before they begin their employment.

24.    Subsection (c), titled "Screening" also provides that "permittee shall not permit any employee or individual in any other capacity specified in Section 47.19(a) to begin work . . . until either:

> (1) the following, arranged by the permittee, have been completed:
>     (a) fingerprinting, and receipt and review of records of criminal convictions and pending criminal actions, and
>     (b) receipt and review of report from the Statewide Central Register of Child Abuse and Maltreatment (hereinafter "SCR"), and either:
>         (A) the results of the screenings are satisfactory; or
>         (B) if any of the results of the screenings are unsatisfactory, the permittee has received approval of a corrective action plan  submitted pursuant to Section 47.21 of this Code; or
>         (C) the permittee has ensured that the individual must be continuously supervised by a satisfactorily screened staff member with authority to intervene in the actions of such individual.

> §47.19(c) (emphasis added).

Moreover, permittees are required to keep all "documents obtained in accordance with the requirements of this section, along with any required English language translations" and must make them "available to the [DOH] upon request." §47.19(c).

25.     In addition to the background check requirements and clearances, Health Code § 47.33(b) requires, as a condition of continued employment, that childcare center personnel undergo a physical evaluation every two years and submit a certificate from a medical professional confirming that the individual is both physically and mentally able to perform assigned duties.

26.     Additionally, Health Code § 47.37(a)-(d) mandates that all teaching staff must complete certain trainings within a specific timeframe. Indeed, staff must complete at least 15 hours of training every 24 months, and at least five hours of which shall be completed in each 12-month period. § 47.37(b)(6). All completed trainings certificates must be maintained at the Center and be made available for inspection by the DOH. §§ 47.37(b)(1),(b)(2),(b)(4),(b)(6)(C).

27.     The training topics are also regulated by §47.37. Specifically, §47.37(b)(1) requires that every 24 months each staff member must complete at least 2 hours of training in preventing, identifying, and reporting child abuse, maltreatment and neglect ("mandated reporter trainings"). Section 47.37(b)(2) requires that, "within three months of hire . . . or of the effective date of this rule, whichever is later, all teaching staff receive training in infection control within three months of being hired" ("infection control trainings). Section 47.37(c) requires staff to complete training in "sudden infant death syndrome ("SIDS"), safe sleep practices, and "shaken baby syndrome" identification and prevention training before beginning to provide services" (respectively, "SIDs trainings" and "shaken baby syndrome trainings"). For the remaining training hours, the Educational Director of the Center has ability to pick trainings as long as they relate to child health and safety. §47.37(b)(6)(B).

## IV. BRITE TIKES' OPERATION OF THE CENTER AND THE USE OF FRAUDULENT STAFF CLEARANCES.

28.     The Brite Tikes Defendants opened the Center in or around September 12, 2017.

Answer & Countercl., Dkt. No. 17 at ¶ 211.

29.     However, in the period leading up to the Center's opening, Collins, as co-owner and Executive Director, along with then-Center Director Kimberly Palumbo, coordinated with Center staff and representatives from the DOH to submit staff records and ensure that Center staff satisfied the requirements set forth by the Health Code, (as discussed *supra* at ¶¶ 19-27), which was a condition of the Center receiving its license from the DOH.  (Kislin Decl., Ex. 6 at TLE008242-TLE008243; Kislin Decl., Ex. 7 at TLE080090; Kislin Decl., Ex. 8 at TLE090000-TLE090003,   TLE090028-TLE090029,   TLE090049-TLE090050,TLE090068   TLE090080-TLE090081).

30.     As Executive Director, Collins understood that having cleared and qualified staff was required for the Center to continue operating legally and in conformity with DOH regulations. (Kislin Decl., Ex. 9 TLE78128-TLE78133 at ¶¶ 5, 19, 28; Kislin Decl., Ex. 4 Collins Dep. Tr. at 66:2-70:25; 72:19-79:11;  81:19-82:7; 84:23-86:23). Collins understood that she could not open classrooms to children without having cleared and qualified teaching staff in those classrooms. (Kislin Decl., Ex. 10 at TLE080083-TLE080084; Kislin Decl., Ex. 11 at TLE080505; TLE080094-TLE080095).

31.     Approximately one month after opening the Center, former Center Director, Kim Palumbo resigned from the position due to illness. (Kislin Decl., Ex. 4 Collins Dep. Tr. at 97:5-99:24).

32.     Collins began interviewing other candidates for the Center Director position and ultimately extended an employment offer to Defendant Ara Pasaoglu on October 11, 2017 with a start date of October 23, 2017. (Kislin Decl., Ex. 12 TLE-BT00000001-TLE-BT00000002 at p. 1). The letter states that "as director, you will report directly to Nicole Collins, Managing Director

and Franchise Owner. Your specific duties and responsibilities will be determined by her." *Id.*

33. A few days after Pasaoglu's start date, on October 25, 2017, Collins emailed former DOH, Bureau of Childcare Consultant, Ms. Madeline O'Donohue to inform her of Kim Palumbo's resignation as Center director and advised that Pasaoglu has been hired as the new Center director. In the same email, Collins confirmed to Ms. O'Donohue that Pasaoglu's "SCR is in [p]rocess and Fingerprints have been requested" but, in the meantime, attached the required staff clearances from his previous childcare employer. (Kislin Decl., Ex. 13, at TLE080764 -TLE080786).

34. Collin's hired Pasaoglu because of his previous experience and expertise in managing staff compliance in the childcare setting, his experience with overseeing DOH inspections, and overall knowledge of the regulatory framework of childcare operations. (Kislin Decl., Ex. 4, Collins Dep. Tr. at 113:1-10).

35. Collins confirmed that Ara was responsible for ensuring staff satisfied the clearance requirements (Kislin Decl., Ex. 4, Collins Dep. Tr. at 120:22-121-2) but acknowledged that she oversaw his role as relating to hiring and compliance with regulations and that ultimately, as his direct superior, he answered directly to her. (*Id.* at 114:24-115:10).

36. Moreover, Collins, as Executive Director of the Center, and direct supervisor to Pasaoglu, understood what staff clearances were required by Article 47, and also acknowledged that those clearances needed to be in the staff member's file before that staff member began employment. (Kislin Decl., Ex. 4, Collins Dep. Tr. at 63:12-65:19).

37. The staff clearances were located in personnel files that were maintained in a cabinet near Pasaoglu's desk in the joint office space shared Pasaoglu shared with Collins. (Kislin Decl., Ex. 2, Brite Tikes' Defendants' Response to Interrogatory No. 8; Kislin Decl., Ex. 4 Collins Dep. Tr. at 125:16-26:19).

38.     Collins, who could see Pasaoglu working from her desk, saw Pasaoglu regularly accessing the staff files, explaining:

> A. So he used a spreadsheet, and he would go through the staff files regularly to make sure things were being updated and we had what we needed.
> Q. How do you know that?
> A. I see him.
> Q. Well, explain that to me, what do you mean, you see him?
> A. I mean, he sat in -- maybe 15 feet away.

(Kislin Decl., Ex. 4, Collins Dep. Tr. at 125:10-19).

39.     Besides physically seeing Pasaoglu regularly accessing staff files, Collins also discussed issues of staff compliance with Pasaoglu on a consistent basis, such as when trainings were coming up or what needed to be renewed in terms of staff clearances. (Kislin Decl., Ex. 4, Collins Dep. Tr. at 126:20-128:6).

40.     Collins, however, did not regularly physically review the staff files for compliance, but rather only accessed staff files when she needed a specific information about a staff member. (Kislin Decl., Ex. 4 Collins Dep. Tr. at 126:20-128:6).

41.     Pasaoglu confirmed in his testimony that each of the following clearances were required by the DOH to be completed  and maintained in each staff file:  (i) Criminal background check clearances from the Department of Investigations ("DOI clearances") (Kislin Decl., Ex. 14, Pasaoglu Dep. Tr. at 90:12-18); (ii) Statewide Central Register of Child Abuse and Maltreatment screenings ("SCR clearances"), which needed to be completed and cleared prior to employment (*Id.* at 95:22-96:8; 99:14-17)); (iii) medical health forms, which are to be submitted every two-years ("medical clearances") (*Id.* at 101:14-16) (iv) certificates showing completion of the following mandated trainings (a) mandated reporter training certificate to be completed every two years (*Id.* at 99:25-100:5); (b) infectious control trainings (*Id.* 100:6-9); (c) foundations of health

training (*Id.* 100:18-21); (d) sudden infant death syndrome training (*Id.* 100:22-24); and (d) shaken baby syndrome training (*Id.* 100:25-101-2).

42.    As it related to the background check clearances from the DOI, Pasaoglu explained that the process for getting staff cleared varied depending on whether the employee had previously been employed by a childcare center in New York. (Kislin Decl., Ex. 14, Pasaoglu Dep. Tr. at 90:12-91:18).

43.    If the prospective employee was previously employed by a childcare center, Pasaoglu would send, via fax, a duplicate fingerprint request to the DOI with the employee's name and social security number, and request that a duplicate copy of DOI clearance letter to be sent to the Center. According to Pasaoglu it took approximately two weeks to a month and half to receive the duplicate letter from the DOI. (Kislin Decl., Ex. 14, Pasaoglu Dep. Tr. at 90:12-92:8).

44.    If, however, the prospective employee had not worked at another childcare center before, and therefore was not fingerprinted and previously screened by the DOI, that prospective employee would fill out an application to get fingerprinted, physically go down to the DOI  and get fingerprinted, pay the fingerprint fee of over one hundred dollars, and then wait until the fingerprints were cleared by the DOI and the DOI mailed the clearance letter. In both circumstances, the DOI clearance letter was mailed to Center and in both circumstances an employee could not begin working at the center unless the Center had a DOI clearance letter on file. (Kislin Decl., Ex. 14 Pasaoglu Dep. Tr. at 92:12-95:21; *Id.* at 97:1-4)).

45.    The DOI clearance letter would be sent to the Center and, up until June 30, 2019 would be addressed to Collins. The top of the letter contains the employee's name, the employee's

social security number[1]; the date the employee was fingerprinted; and the unique DOI identification number assigned to that individual.  (Kislin Decl.,  Ex. 4 Collins Dep. Tr. at 225:19-226:12; Kislin Decl., Ex. 14 Pasaoglu Dep. Tr. at 101:23-102:6).

46.    As it relates to SCR clearances employees would simply, "fill[] out an application, it was inputted in to the -- a New York State database and maybe a couple days later we'd just go back on the database, log in to the employee's account and print out the clearance letter." (Kislin Decl., Ex. 14 Pasaoglu Dep. Tr. at 96:12-17).

47.    Pasaoglu inputted the information contained in the employee's application into the electronic database and then used the Brite Tikes' corporate credit card to pay the $25 processing fee. (Kislin Decl., Ex. 14 Pasaoglu Dep. Tr. at 97:5-99:13).

48.    Pasaoglu also confirmed that each staff member was required to have the completed SCR form in their file. (Kislin Decl., Ex. 14 Pasaoglu Dep. Tr. at 99:14-17).

49.    The DOH is also required to annually inspect childcare centers while they are in operation and will inspect "documents that are required by this Article to be kept on the premises and provided upon request." § 47.03(d).

50.    During Brite Tikes' operation, the Center was inspected  on August 29, 2017 (Kislin Decl., Ex. 15 at TLE081929-TLE081937; TLE081916-TLE081922), December 6, 2017 (Kislin Decl., Ex. 16 at TLE080971-TLE080976; TLE080978-TLE080983), May 3, 2018 (Kislin Decl., Ex. 17 at TLE081910-TLE081915; TLE081923-TLE081928), November 1-2, 2018 (Kislin Decl., Ex. 18 at TLE063677-TLE063684; TLE063693-TLE063702), and December 6, 2018 (Kislin Decl., Ex. 19 at TLE063928-TLE063928; TLE063935-TLE063940).

---

[1] Beginning in 2019 DOI clearance letters stopped included the employee's social security number. Everything else on the form remained the same.

51.     The November 1-2, 2018 inspections were performed by DOH Early Childhood Education Consultant Loubella Calicdan. According to the inspection reports, Ms. Calicdan reviewed staff and child and concluded "STAFF AND CHILDREN'S FILES WERE CHECKED AND RECORDED AS UP TO DATE." (Kislin Decl., Ex. 20 at TLE063682-84; Kislin Decl., Ex. 21, TLE063698-72).

## V.  PURCHASE AGREEMENT

52.     In or around October 1, 2018 Defendant Jubran and TLE representatives began discussing a potential sale of the Center from Brite Tikes LLC, Jubran, and Collins to TLE so TLE could run the Center as a corporate location. (Kislin Decl., Ex. 22, at BT00142-BT00145).

53.     The parties began discussing the price and terms of such a sale with Jubran proposing a $2,500,000 purchase price for the Center and its assets.  (Kislin Decl., Ex. 23, BT00435-BT0438). Jubran justified this price by explaining that the Center was "still in its infancy" and would be enrolling 11 new students in January 2019, and that, since the Center was already over staffed, there would not be a need to hire staff to satisfy ratios for those new students. (*Id.* at BT00437).

54.     Jubran continued "keep in mind that we are licensed to hold 161 children and in November we were only at 135 which leaves more room for additional enrollments which we believe we can post as much as 300,000 per month in the future. With the onset of Amazon coming to town and the additional building in our area we should have no problem operating a nearly full capacity each month." *Id.*

55.     The parties eventually executed a Letter of Intent to Purchase Business Assets ("LOI") on December 21, 2018.  (Kislin Decl., Ex. 24, TLE011360-TLE011363). The LOI set forth the purchase price as $2,500,000 payable as all cash at closing, which was set to after the

buyer (TLE) secured the required licensing to run the Center. (*Id.* at TLE011360).

56.     Moreover, the definitive agreement states "as noted above, the closing under the [Purchase] Agreement is subject to transference of all required licenses and no material changes to business operations prior to closing." (*Id.* at TLE011361).

57.     Brite Tikes further warranted that "[s]eller will not harm the business and shall use best efforts to ensure that the business is operated in the ordinary course from the date of execution hereof through the date of closing." (*Id.* at TLE011361).

58.     Upon executing the LOI Jubran stated in an email to TLE representatives, which Nicole Collins was carbon copied, that "[a]s much as we love this wonderful center and are sad to let it go . . . it in the best interest for us to sell," while touting the Center as TLE's potential "flagship in NY or even world wide" and further claimed that the Center "had much more potential at this location . . . ." (Kislin Decl., Ex. 25, BT00130).

59.     On January 8, 2019, Brite Tikes, through Defendants Jubran and Collins, and Plaintiff TLE at Queens-LIC executed a Purchase Agreement, pursuant to which Brite Tikes would sell the Business (defined as the operation of a child learning and care center) and the Assets (including all furniture, fixtures, student records, and goodwill associated with the Business) to Plaintiff for a total purchase price of $2,500,000.00.  As managing member of Brite Tikes, Jubran signed the Purchase Agreement on behalf of Brite Tikes, LLC. (Kislin Decl., Ex. 26, at pp. 199-209).

60.     The success and goodwill associated with the Center, which made it one of the highest grossing TLE franchises in the country, was the primary reason Plaintiffs chose to purchase the Center and run it as a corporate location.  (Am. Compl., Dkt. No. 14 at ¶¶ 41-42). This was evident from the payment breakdown outlined in the Purchase Agreement reflects how highly

Plaintiff valued the goodwill associated with the Center, with TLE at Queens-LIC paying $2,000,000 for goodwill, $100,000 for a covenant not to compete, $100,000 for customer lists, and $300,000 for tangible property. (Kislin Decl., Ex. 26 at p. 201).

61.     In Article II subsection (G) of the Purchase Agreement, Brite Tikes represented and warranted that it "shall cooperate as reasonably necessary to ensure the orderly transition of the operations of the [Center] to [TLE], whether before, at or after the Closing, including without limitation the transfer of all utility and service accounts." (Kislin Decl., Ex. 26 at p. 202).

62.     In Article II subsection (H) of the Purchase Agreement, Brite Tikes represented and warranted that it "shall maintain all required licenses for the Business in its own name, until such licenses are transferred to [TLE], or until [TLE] is fully licensed by the State of New York in its own name, whichever occurs first. Seller shall cooperate with Purchaser with respect to Purchaser obtaining a childcare license and take such reasonable and customary measures necessary to assist Purchaser to obtain its required licenses. This Paragraph shall survive Closing and termination of the franchise." (Kislin Decl., Ex. 26 at p. 202).

63.     Lastly, in Article II, subsection (I) of the Purchase Agreement, Brite Tikes represented and warranted that "at all times prior to the Closing, [Brite Tikes LLC] shall operate the Business in the ordinary course of business." (Kislin Decl., Ex. 26,  at p. 202).

64.     Closing, in turn,  was defined in Article V subsection (A) as having taken place "on the later of  (i) within five (5) days after the relevant governmental agency has either issued a childcare license to Purchaser in its own name to operate the Center, or has approved the transfer of Seller's childcare license to Purchaser and (ii) January 31, 2019." (Kislin Decl., Ex. 26 at p. 204). Collins, in her individual capacity and as Brite Tikes' 30(b)(6) representative, confirmed that this provision meant that closing would not take place unless and until the new license was issued

to TLE. (Kislin Decl., Ex. 4, Collins Dep. Tr. at 173:19-174:16).

65.     Collins, in her individual capacity and as Brite Tikes' 30(b)(6) representative, acknowledged that the Purchase Agreement required Brite Tikes, by virtue of the Personal Guaranty Agreements, Jubran and herself, to cooperate in transitioning the Center to TLE's ownership. (Kislin Decl., Ex. 4, Collins Dep. Tr. at 170:1-24).

66.     Collins further confirmed that Brite Tikes, and by virtue of the Personal Guaranty Agreements, Jubran and herself, had to maintain all necessary licenses for operating the Center and had to cooperate in the process of relicensing the Center to TLE's ownership. (Kislin Decl., Ex. 4, Collins Dep. Tr. at 171:1-172:2).

67.     Importantly, although the Purchase Agreement was executed on January 8, 2019, the obligations set forth in the Franchise Agreement and the ancillary documents included therein, did not terminate until the Closing of the Purchase Agreement, which as discussed above, would not take place unless and until the new license was issued to TLE. (Kislin Decl., Ex. 26 at p. 204).

68.     Indeed, the conditions for terminating of the Franchise Agreement was explicitly provided in Attachment B to the Purchase Agreement. (Kislin Decl., Ex. 3, at pp. 219-222). Exhibit B titled "FRANCHISE TERMINATION AND GENERAL RELEASE AGREEMENT" ("Franchise Termination Agreement") provided, in pertinent part:

> NOW THEREFORE, in consideration of the mutually agreed upon promises and covenants stated herein, and for other good and valuable consideration, the sufficiency of which is acknowledged, the parties hereby agree as follows:
>
> 1.     The termination of Franchise No. 268 shall be effective upon the date of the Closing, as defined in the Purchase Agreement (the "Effective Date"). Until the Effective Date, you shall continue to operate the Center.
>
> 2.     In connection therewith, the following documents shall be terminated in their entirety as of the Effective Date:

> (a) The Franchise Agreement and all of its attachments,
> exhibits and addenda, except for the Non-Disclosure, Non-
> Interference and Non-Competition Agreement Attachment
> described and amended in Section 3 below[.]

(*Id.* 3 at p. 219).

69.     The Termination Agreement was mutually executed on June 30, 2019 which was

the last day Brite Tikes LLC maintained their license to operate the Center. (Kislin Decl., Ex. 27,

at BT00053- BT00056).

### VI.  TRANSITION TO TLE OWNERSHIP

70.     Pasaoglu was informed about the sale of the Center no later than December 18,

2018. (Kislin Decl., Ex. 4 Collins Dep. Tr. at 178:17-179:10). Because TLE did not want to change

the Center's day-to-day operations in any significant way and sought only to build upon the

reputation and client base that Brite Tikes had acquired, TLE wanted to retain the management

and staff already at the Center. Indeed, as Collins testified, TLE requested that Collins speak

directly with Pasaoglu to inquire about whether he would be willing to remain on as Center

Director once TLE took over Center operations. (Kislin Decl., Ex. 4 Collins Dep. Tr. at 190:15-

191).

71.     On or around January 16, 2019 – exactly one week after the Purchase Agreement

was executed – Pasaoglu had agreed to remain as Center Director under TLE management and had

committed to the transition process along with Collins. Indeed, in an email exchange between-

Collins and Ms. Deborah O'Byrne, who worked at TLE's corporate office and handled quality

assurance issues, in which Ms. O'Byrne requested a call with Collins to discuss licensing, Collins

asked Ms. O'Byrne if Pasaoglu should be on the call, to which Ms. O'Byrne responded "[n]eed to

discuss licensing – is [Pasaoglu] ready to commit to the [transition] process" and Collins confirmed

"I believe so.  Should he expect a offer letter from TLE? I know he communicated a few concerns yesterday to Scott and Tracey.  I believe they were able to accommodate *[sic]* him.  In that case, I believe he's on board!" (Kislin Decl., Ex. 28, at TLE084543- TLE084544; Kislin Decl., Ex. 4 Collins Dep. Tr. at 197:13-198:19).

72.     TLE extended an offer of employment to Pasaoglu on January 17, 2019 after completing an interview process with TLE senior management. (Kislin Decl., Ex. 29 at TLE-BT0000125). By letter dated January 17, 2019, TLE offered Pasaoglu the position of Executive Center Director with a $25,000 salary increases, plus bonus opportunities, and had a start date to be determined because it was still unknown when the license would be issued to TLE. (Kislin Decl., Ex 29, at TLE-BT0000125). Pasaoglu executed the employment offer letter on January 18, 2019. (*Id.*).

73.     After executing the Purchase Agreement and confirming that Pasaoglu was onboard with the transition of licenses to TLE, Collins and Pasaoglu assisted in transmitting the license from Brite Tikes to TLE, which was an explicit requirement of the Purchase Agreement. (Kislin Decl., Ex. 29, at TLE090132 to TLE090139 (fax prepared by Pasaoglu to send to DOI requesting duplicate DOI clearances for new permit numbers); Kislin Decl., Ex. 14 Pasaoglu Dep. Tr. 106:18-107:25; Kislin Decl., Ex. 31, at TLE081563-TLE081568; Kislin Decl., Ex. 32  at TLE084542-TLE084545).

74.     Additionally, Brite Tikes, and by virtue of the Personal Guaranty Agreements, Jubran and Collins were obligated during this transition to comply with all obligations set forth in the Franchise Agreement and the ancillary documents included therein. Indeed, the Franchise Termination Agreement – which expressly contemplated the termination of Brite Tikes, Jubran and Collin's obligations under the Franchise Agreement – was not effective until the Closing of

the Purchase Agreement which would only take place when the licenses were issued to TLE. (Kislin Decl., Ex. 26 at pp. 219-222).

75.     Part of the process of transitioning the license to TLE necessitated sending staff clearances to the DOH since Article 47 requires a Center to employ only cleared and qualified staff. The licensor responsible for transitioning the license from Brite Tikes to TLE was Loubella Calicdan, who was employed by the DOH as an Early Childhood Education Consultant. (Kislin Decl., Ex. 33, at TLE081892). Notably, when Pasaoglu was an adjunct professor at New York University, Loubella was one his students, and Pasaoglu and Loubella formed a friendly relationship. (Kislin Decl., Ex. 4  at Collins Dep. Tr. at 115:24-116:15).

76.     Indeed, less than a month before the license was transitioned to TLE, on May 31, 2019 Pasaoglu emailed Loubella from the Center's email address an excel spreadsheet which contained clearance information for the staff who were currently teaching at the Center and would continue to teach at the Center when TLE took over less than a month later. (Kislin Decl., Ex. 34 at TLE065624-TLE065625). In the email to Loubella, Pasaoglu writes:

> Hi Loubella, great catching up with you today. I'm attaching a spreadsheet of our staff with trainings. I believe everything is updated but if you see any flags please let me know so that I can make the necessary updates or clarify. Have a great weekend.
>
> All the best, Ara.
>
> (Kislin Decl., Ex. 34 at TLE065624)

77.     The excel spreadsheet attached to the May 31 email, titled "Book 3", identifies the staff clearances required by the Health Code on the first row and then fills in staff information in the rows below. By way of reference, below is screenshot of the top row of Book 3 with the first two staff entries contained therein:

| | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Name | Hire Date | D.O.B. | LORs | Medical ( 2yrs) | Foundations/ H&S | Mandated Reporter (2yrs) | SIDS | Shaken Baby | DOI fingerprint | SCR (2yrs) | CPR (2yrs) |
| 2 | TWAD A (2) -rm134 | | | | | | | | | | | |
| 3 | Karen Peguero | 10/16/2017 | 23-Aug-92 | 3X | 7/12/2017 | 8/11/2017 | 10/28/2018 | 11/22/2017 | 11/20/2017 | 4/14/2014 | 2/25/2019 | 8/30/2018 |
| 4 | Isabella Pizarro | 3/8/2018 | 21-Apr-92 | 3X | 3/14/2018 | 3/15/2018 | 10/28/2017 | 3/18/2016 | 3/16/2018 | 4/26/2018 | 2/27/2019 | 8/30/2018 |

(Kislin Decl., Ex. 35  at TLE065625_Native)

78.     As discussed in detail *infra*, this spreadsheet, which was sent directly to a DOH representative during the transition period and while still operating under Brite Tikes, is littered with incorrect and completely fraudulent information as outlined below. Moreover, during Pasaoglu's deposition, although he acknowledged that the spreadsheet was something he regularly maintained while employed as the Center Director for Brite Tikes, (Kislin Decl., Ex. 14, Pasaoglu Dep. Tr. at 166:24-167:14), when Pasaoglu was questioned about the specific contents of the spreadsheet, whether the records referenced on the spreadsheet were fraudulent and whether he intended DOHMH to rely upon it, he invoked his Fifth Amended right against self-incrimination.

79.     Less than a week after Pasaoglu sent the spreadsheet full of false and fraudulent information to a DOH representative, that same representative and personal friend to Pasaoglu, Loubella Calicdan, performed the final inspection of the Center on June 6, 2019. (Kislin Decl., Ex. 33, at TLE081892). Pasaoglu testified that when staff files were being inspected, it was only him and Loubella in the office, although Collins was on site at the Center. (Kislin Decl., Ex. 14 Pasaoglu Dep. Tr. at 61:23-63:3).

80.     TLE corporate representative, Jennifer Murray was also at the Center on June 6 and briefly spoke with Pasaoglu and Calicdan before getting the impression that Pasaoglu wanted Murray to leave. Specifically, as TLE's 30(b)(6) representative, Mrs. Murry explained the situation as follows:

> A. [Loubella] did come out to the center, she did have conversation I believe about the personnel files. It was a very interesting dynamic between Loubella and Ara in that Loubella almost wouldn't talk to us and only wanted to deal with Ara because they had a prior

personal relationship. So that made it difficult in a lot of situations because we are dealing with a State agency and the State agency has a personal relationship with our center director, whether that be underneath Nicole's leadership or my leadership, and  that licensor really was kind of stars in her eyes for Ara.

(Kislin Decl., Ex. 36, at Murray Dep. Tr. at 108:22-109:12).

. . . .

Q. And [Loubella] looked through the personnel records to make sure that everything was in order?

A. So, again, it was very much like Ara being like I got this, I'm going to deal with Loubella, you know. I went into the office more so at the end to introduce myself and, you know, Loubella was very nice and accommodating and, you know, she had -- Ara had files in front of him, she had files. It was like the two of them and I was going to be a disturbance or an interruption, or possibly negatively – like he made me kind of feel like you're going to negatively impact this, let me deal with her, I got this. And he did. He had the relationship with the licensor, I did not.

Q. Are you saying then that you don't even know if she reviewed all those personnel files?

A. I wasn't witness to her reviewing every single personnel file.

 (Kislin Decl., Ex. 36, at Murray Dep. Tr. at 111:10-112:7).

81.     After Ms. Calicdan's inspection on June 6 she issued a preliminary approval and approved eight rooms with a capacity of 113 students. (Kislin Decl., Ex. 33, at TLE081892).

## VII.   TLE'S OPERATION OF THE CENTER UNTIL THE DISCOVERY OF FRAUDULENT  STAFF CLEARANCES.

82.     In anticipation of changes in the Health Code relating to background checks and SCR clearances for childcare centers, TLE dispatched field teams to all TLE centers across New York State to assist in the review of personnel files and ensure that all staff clearances were updated and compliant with state and local laws and regulations. Regional Manager Danielle Morris (f/k/a Danielle LaPolla) was tasked with reviewing personnel files at the Center. (Am. Compl., Dkt. No.

14 at ¶ 60).

83.     On or around January 14, 2020, Morris asked Pasaoglu about certain records she could not locate. Pasaoglu informed Morris that the documents were on his personal laptop, and when he opened the laptop, he pulled up a Microsoft Word version of an SCR clearance from the New York Office of Children and Family Services ("OCFS"). (Am. Compl., Dkt. No. 14 at ¶ 61).

84.     As there was no valid reason for Pasaoglu to have a word version of an official government document, Morris immediately contacted her supervisor, Mrs. Murray, Vice President, East at TLE, and TLE's then general counsel to inform them of what she had witnessed. (Kislin Decl., Ex. 36, at  Murray Dep. Tr. at 34:16-35:6).

85.     As Murray testified, once Morris saw "that Ara had pulled up a word template on his personal computer to show her one of the State agency forms and she kn[ew] it wasn't right. She went on to say that she also then started re-looking at the medical forms and she saw dates changed on them." (Kislin Decl., Ex. 36 Murray Dep. Tr. at 34:16-34:23).

86.     On or about January 15, 2020, Murray and Morris made copies of staff files to review files later that night once the children had left. (Kislin Decl., Ex. 36, Murray Dep. Tr. at 36:10-36:6). That same night Murray confronted Pasaoglu about some of the concerning records that they were uncovering. When Murray showed Pasaoglu some of the documents that they had uncovered, she recalled that "[Pasaoglu]said, in his professional opinion, they were definitely doctored or forged, whatever word he used, but that he had not done it." (Kislin Decl., Ex. 36 Murray Dep. Tr. at 36:25-37:4).

87.     At one point during the conversation with Pasaoglu, he suddenly resigned but then recanted. (Kislin Decl., Ex. 36, at Murray Dep. Tr. at 39:5-18). Murray eventually asked Pasaoglu if he would sign a declaration attesting that he did not forge or alter any documents at the Center;

Pasaoglu initially agreed but after TLE's general counsel sent a declaration to Murray for Pasaoglu to review, he told Murray that he wanted to speak to an attorney before signing. (Kislin Decl., Ex. 36, Pasaoglu Dep. Tr. at 122:9-128:9).

88.     The next day Pasaoglu resigned from TLE without executing the declaration. (Kislin Decl., Ex. 14, Pasaoglu Dep. Tr. at 127:13-17).

89.     After uncovering the serious discrepancies with staff personnel forms and other Center documentation, Plaintiff engaged a private investigative group to conduct a thorough internal investigation, which uncovered additional evidence of forged or altered staff clearances – most notably, DOI letters, SCR clearances, and medical exams – for almost all of the staff at the Center. (Am. Compl., Dkt. No. 14 at ¶¶ 86-90).

90.     After realizing the extent of Defendants' fraudulent practice of using doctored and/or completely fabricated documentation and credentials for Center staff in order to satisfy the relevant regulatory requirements, TLE self-reported to the DOH on or around February 13, 2020. (Am. Compl., Dkt. No. 14 at ¶ 94). After two field inspections, the DOH closed the Center until it could comply with Health Code regulations. (Am. Compl., Dkt. No. 14 at ¶ 95-97).

91.     Text messages exchanged between Pasaoglu and Collins after Pasaoglu resigned confirm that Pasaoglu was concerned that he was going to be in legal trouble as a result of the fraudulent documents uncovered by TLE:

> 2020-01-25
> P. I'm trying to stay as positive as possible but I'm freaking  out
> C. Dont freak
> C. Nothing has happened
> P. I never more scared in my life
> . . .
> P. Cant eat. Can't sleep, chain smoking, so scared of losing Gavin
> C.I believe worst case scenario is you dont work in chikdcare [sic]

C. I think that's all this may amount to

P. I was reading something posted in 2020, they say most
cases end up in a plea bargain, since I didn't gain
anything from the city, if I end up out of child care I'm
totally good with that

. . . .

P. Anything beats the slammer

. . . .

2020-01-26 12:13:33
P. I just don't wanna go to jail
P. This is so stressful

2020-01-27 10:53:35
C. Your attorney hasn't heard anything
P. No I don't think he would about the investigation.
P. He's not a criminal defense lawyer...he would only hear
something if I got bagged working in child care

2020-01-27 10:58:02
P. I'm just focusing on what to do if I get indited by DOI...I'm hoping
that since I'm not the owner, no money involved and I have a clean
jacket I'll be ok
C. I really think that at the most you cant work.in education

(Kislin Decl., Ex. 37 at BT_02146- BT_02156).

92.     At his deposition Pasaoglu denied that the above text messages were in reference

to a potential criminal conviction relating to document forgery. (Kislin Decl., Ex. 14 Pasaoglu

Dep. Tr. at 139-4-141:15).

93.     Within months after resigning from TLE and sending sending cryptic texts

referencing jail, the DOI, "plea bargains" and criminal defense attorneys to his friend and former

employer, Pasaoglu got rid of his personal laptop that he used at his job at TLE. (Kislin Decl., Ex.

1, Defendant Pasaoglu's Responses to Interrogatories Nos. 13, 14, 15). Pasaoglu explained that

the HP laptop that he used regularly while employed under Brite Tikes for "email, payroll,

correspondence and related" was "discarded in or around April 2020 during a relocation of my

27

residence. I upgraded to a new laptop."

94.     TLE has uncovered through discovery evidence of Pasaoglu emailing himself
manipulated DOI letters, SCR letter templates, and training certificates with Center staff identified
on the manipulated document.  (Kislin Decl., Ex. 38, TLE00000848- TLE00000878).

## VIII.   FRAUDULENT STAFF CLEARANCES

95.     The vastness of the fraud contained in Book 3 is outlined in subsections (i)-(iii) in
the tables below. As discussed below, TLE engaged forensic document examiner, Ms. Tiffany
Ford, M.S. to review staff clearances maintained in the personnel files at the Center and to opine
on the authenticity of said staff clearances. (Kislin Decl., Ex. 39, Tiffany Ford, M.S., Forensic
Expert Report dated Apr. 15, 2020 ("Expert Report") at pp. 1-11). The tables below include
citations Ms. Ford's expert report where she opined as to the authenticity of the referenced
document and citations to where Pasaoglu invoked his fifth amendment right against self-
incrimination when asked about the specific document.

### 1.   Mandated Reporter ("MR") Training Certificates (Table 1)

| Employee Name | Date in "Book 3" | MR Training Cert. in Employee's File | Authenticity of Document in Employee File | Invoc. of Fifth Amendment |
|---|---|---|---|---|
| Karen Peguero | 10/28/2018 | Dated: 10/28/2018 (Kislin Decl., Ex. 40 at TLE087411) | Considered fraudulent<br><br>QR code located on bottom right of certification scans to "Tiffany Jessie"[2] and not Karen Peguero. (Kislin Decl., Ex. 39, Expert Report at 1). | Ex. 14, at Pasaoglu Dep. Tr. at 170:5-171:6 |
| Addrienne McCord | June 8, 2017 | The only Mandatory Reporter Certificate in Ms. McCord's file is dated 10/28/2018. (Kislin Decl., Ex. 41 at TLE86834) | Considered fraudulent<br><br>QR code located on bottom right of certification scans to person named "Tiffany Jessie"  and not Addrienne McCord. (Kislin Decl., Ex. 39,  Expert Report at 1). | Ex. 14, at Pasaoglu Dep. Tr. at 171:7-172:15 |

[2] Tiffany Jessie was another employee at the Center.

| MaryAnn Steinbacher | 10/28/2018 | Dated: 10/28/2018 (Kislin Decl., Ex. 42, at TLE 88927) | QR code located on bottom right of certification scans to person named "Tiffany Jessie" and not MaryAnn Steinbacher. | Ex. 14, at Pasaoglu Dep. Tr. at 176:25-177:1; 177:22-178:5. |
|---|---|---|---|---|
| Nahida Ahad | 11/28/2018 | Dated: 11/28/2018 (Kislin Decl., Ex. 43, at TLE085304) | Considered fraudulent

QR code located on bottom right of certification scans to person named "Tiffany Jessie" and not Nahida Ahad. (Kislin Decl., Ex. 39 Expert Report at 1). | Ex. 14, at Pasaoglu Dep. Tr. at 178:22:179:2. |
| Alzarose Rocolcol | 10/28/2017 | The only Mandatory Reporter Certificate in Ms. Rocolcol's file is dated 11/28/2018 (Kislin Decl., Ex. 44, at TLE87861) | QR code located on bottom right of certification scans to person named "Tiffany Jessie" and not Alzarose Rocolcol. | Ex. 14, at Pasaoglu Dep. Tr. at 179:3-13 |
| Elaine Keith | 10/28/2018 | Dated: 10/28/2018 (Kislin Decl., Ex. 45, at TLE86698) | Considered fraudulent

QR code located on bottom right of certification scans to person named "Tiffany Jessie" and not Elaine Keith.(Kislin Decl., Expert ., Ex. 39, at 1). | Ex. 14, at Pasaoglu Dep. Tr. at 181:1-14; 182:1-7. |
| Tenir Washington | 10/28/2018 | Dated: 10/28/2018 (Kislin Decl., Ex. 46, at TLE89599) | Considered fraudulent

QR code located on bottom right of certification scans to person named "Tiffany Jessie" and not Tenir Washington.  (Kislin Decl., Ex. 39, at 1). | Ex. 14, at Pasaoglu Dep. Tr. at 182:25-183:8. |
| Vanessa Sanchez | 10/28/2018 | Dated: 10/28/2018 (Kislin Decl., Ex. 47, at TLE88340). | Considered fraudulent

QR code located on bottom right of certification scans to person named "Tiffany Jessie" and not Vanessa Sanchez. (Kislin Decl., Ex. 39 at 1).

Ms. Sanchez testified during her deposition on May 18, 2021 that she maintains the training certificates she completes for her personal records but did not have any record of completing MR | Ex. 14, at  Pasaoglu Dep. Tr. at 183:12-184:10;184:19-25 |

| | | | training on October 28, 2018. (Kislin Decl., Sanchez Dep. Tr. at 29:11-30:19). | |
|---|---|---|---|---|

## 2. Department of Investigation Letters (Table 2)

| Employee Name | Date in "Book 3" | DOI Letter(s) in Employee's File | Authenticity of Document in Employee File | Invoc. of Fifth Amendment |
|---|---|---|---|---|
| Raoufi Halima | 09/26/2016 | *Two DOI letters in file;<br><br>*Each DOI letter has different DOI ID listed;<br><br>*One of the DOI Letters in Ms. Halima's file has the same SSN as two other employees (Ashley Terry and Sherman Person-Colter).<br><br>(Kislin Decl., Ex. 48, at TLE83947; TLE83948). | Considered fraudulent<br><br>Three individuals have the same social security numbers, DOI ID's. Raoufi and  Person-Colter's names are a different font than the rest of the form, at least two are fraudulent. (Kislin Decl., at 39, at Report at 6). | Pasaoglu Dep. Tr. at 170:5-171:6 |
| Luiza Marcu | 01/03/13 | *Three DOI letters in file. (TLE86741, TLE 86742 TLE 86744);<br>*The first DOI letter issued has an SSN that does not match to the SSN sent via fax to DOI at TLE090134-TLE090135.<br><br>* Different DOI IDs for two of DOI Letters in file.<br><br>(Kislin Decl., Ex. 49, at TLE83947; TLE83948) | Considered fraudulent<br><br>Two different DOIs, at least one is fraudulent. (Kislin Decl., Ex. 39, at Report at 6).<br><br>Incorrect SSN on DOI Duplicate Letter request. | Pasaoglu Dep. Tr. at 179:25-180:21. |
| Ashley Terry | 1/28/2010 | *DOI Letter in file has the same SSN and DOI ID as Raoufi Halima's DOI Letter and Sherman Person-Colter's DOI Letter.<br><br>(Kislin Decl., Ex. 50, at TLE83866; TLE83219; TLE83209) | (All individuals named above have the same social security numbers, DOI ID's. Raoufi and  Person-Colter's names are a different font than the rest of the form, at least two are fraudulent).(Kislin Decl., 39 at 6). | Pasaoglu Dep. Tr. at 185:1-186:22. |

### 3.  Medical Records (Table 3)

| Employee Name | Date in "Book 3" | DOI Letter(s) in Employee's File | Authenticity of Document in Employee File | Invoc. of Fifth Amendment |
|---|---|---|---|---|
| MaryAnn Steinbacher | 07/26/2017 | Date tested on medical record appears to have been 07/26/2017. ((Kislin Decl., Ex. 51, at TLE 88917-88918) | Considered Fraudulent Page two-date tested and date of exam changed from 17 to 18 (Kislin Decl., Ex. 39 at 6). | Pasaoglu Dep. Tr. at 176:10-11. |

## IX.  FIFTH AMENDMENT

96.     The below chart outlines the Pasaoglu's invocation of his Fifth Amendment privilege during his deposition on November 4, 2021. (Kislin Decl., Ex. 52 at p. 151 to 96).

| QUESTION | PASAOGLU'S INVOCATION OF FIFTH AM. PRIVILEGE. |
|---|---|
| (BT2368-2370; Ara Exhibit 12) Q. "I'm going to read paragraph 8, "In the  fall of 2019, while working at the center and after Nicole's departure, due to pressure that was exerted upon me by representatives of The Learning Experience, LLC, TLE Corporate, I altered certain documents for purposes of keeping myself in compliance with mandates set by TLE Corporate." Do you agree with that statement | [151:23-25 to 152:01-05] |
| Q. [Paragraph] number 9 says, "These alterations were made solely and exclusively as a result of pressure exerted upon me by TLE Corporate to keep all employee certifications up to date in the face of the looming New York -- NYS new rules." Do you agree with that statement? | [152:10-18] |
| Q. Number 10 says, "There was tremendous pressure exerted upon me by TLE Corporate and I feared that if one of the internal TLE Corporate audits revealed that an employee's certifications were not up to date I would lose my job." Do you agree with that statement? | [152:19-153:02] |
| Q. Number 12 says, "The alterations that I made were solely and exclusively in an effort to be in compliance with TLE Corporate's policies. As a result of overwhelming time constraints, I had no intention of submitting any changed records to New York State or New York City agencies." Do you agree with that statement | [153:15-23] |
| Q. Number 13 says, "I earned no extra income and did not receive any financial reward for altering these records. This was a desperate effort by me to avoid the threat of losing my job as a result of extreme pressure | [154:4-12]. |

| | |
|---|---|
| exerted upon me by TLE corporate. Do you agree with that statement? | |
| Q. [Paragraph number] 15 says, "Any and all changes that I made to any records at the center were done without any consultation with Nicole. In fact, all of this transpired months after Nicole left the center. None of this occurred when Nicole was working at the center as the executive director and I never even discussed these issues with her until after June 12, 2020." Do you agree with that statement? | [154:13-22; 154:23-24] |
| [Regarding BT's response to TLE's First Set of Rogs. No. 18]<br>"In addition, Collins had two or three telephone conversations with Ara after she was served with the complaint to inquire about the allegations. He further indicated that because of the overwhelming duties that were assigned to him, after Collins departed, he could not keep on top of ensuring that all of the employees credentials were up to date." Do you agree with that statement? | [155:22-25 –156:1-5] |
| [Regarding BT's response to TLE's First Set of Rogs. No. 18]<br><br>Q. It goes on to say, "The situation was exacerbated by the new regulations required by DOHMH that had recently been put into place. Ara indicated that he never altered any documents at any point prior to June 28, 2019 and specifically stated to Collins, quote, you were not involved in this, I'm sorry, and that none of this conduct ever transpired when Brite Tikes owned and operated the center." Do you agree with that statement? | [156: 8-17;-19] |
| [Regarding BT's response to TLE's First Set of Rogs. No. 18]<br><br>Q. You also indicated that certain changes to personnel files were done merely as place holders, in quotations, and that he intended to rectify the documents. Do you agree with that statement? | 156:20-24]: |
| Q. Ara, did you alter or falsify or create DOI fingerprint duplicate letters for employees at the center during Brite Tikes' operation of the center? | [157:-8-11]: |
| Q. Ara, did you alter, falsify or create SCR certificates for employees during Brite Tikes' operation of the center? | [157:-14-19]: |
| Q. Ara, did you alter, falsify or create certificates of Foundations of Health Training for Employees during Brite Tikes' operation of the center? | [158:6-158:11]: |

| | |
|---|---|
| Ara, did you alter, falsify or create certificates SIDS prevention training for employees while Brite Tikes operated the center? | [158:12-16] |
| Ara, did you alter, falsify or create  certificates of completion of shaken baby prevention training for employees while Brite Tikes operated the center? | [158:18-21] |
| Did you maintain on your personal laptop templates for DOI fingerprint clearance letters? shaken baby training prevention certificates? | [159:8-160:8] |
| Did you maintain on your personal laptop templates for mandatory reporter training certificate? | [159:8-160:8] |
| Did you maintain on your personal laptop templates for infectious disease control training certificates? | [159:8-160:8] |
| Did you maintain on your personal laptop templates for foundations of health training certificates? | [159:8-160:8] |
| Did you maintain on your personal laptop templates for SIDs training certificates? | [159:8-160:8] |
| Did you maintain on your personal laptop templates for shaken baby training prevention certificates? | [159:8-160:8] |
| [Regarding TLE-BT0000848-0000878]<br><br>And it is an E-mail, Ara, as you see from you to you dated January 13, 2020. And you can see by the attachments that it attaches several training certificates for various employees at the center. . . Are these examples of certificates and documents that you falsified?" | 160:13-161-1] |
| Re Alzarose Rocolcol MR training dated November 28, 2018 | [162:20-161-16] |
| Re Tiffany Sierra  SIDS training certificate | [163:17-164:5] |
| Regarding TLE-BT0000837- TLE-BT0000839 | [164:1-22] |
| Rev Karen Peguero MR Training | [169:1-14]; [171:1-6] |
| Re Addrienne McCord MR training | [171:25-172:15] |
| Re Raoufi Halima DOI Fingerprints | 172:23-175:3] |
| Re  Maryann Steinbacher Medical | 175:3-176:10] |
| Re Maryann Steinbacher MR training | [177:22-178:5] |
| Re Nahida Aham MR Training | [178:10-179:1-2] |
| Re Alzarose Rocolcol MR training | 179:3-12] |
| Re Marcu DOI Letter 12/05/2017 | [180:1-21] |
| Re Elaine Keith MR | [180:22-181:14]; [182:1-7] |
| Re Tenir Washington MR | [183:1-8] |
| Re Vanessa Sanchez MR | [184:2-10; 180:11-25] |
| Re A. Terry, H. Raoufi, S.Pearson-Colter DOI Letters | [185:14-186:22] |
| Re DOI letter forwarded by Ms. Carolina Dominguez | [187:1-188:17] |
| Re Ara Exhibit 30 | [194:5-196:16] |

-

Respectfully submitted,
**GREENBERG TRAURIG, LLP**

By:    */s/ Jason Kislin*
        Jason Kislin, Esq.
        500 Campus Drive, Suite 400
        Florham Park, NJ 07932-0677
        Email: kislinj@gtlaw.com
        *Attorneys for Plaintiffs The Learning Experience at*
        *Queens-Long Island City, LLC*, and *The Learning*
        *Experience Systems, LLC*

Dated: March 21, 2022