UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

THE LEARNING EXPERIENCE SYSTEMS, LLC
and THE LEARNING EXPERIENCE AT
QUEENS-LONG ISLAND CITY, LLC,

                Plaintiffs,

          v.

NICOLE COLLINS, BRITE TIKES LLC,
JUBRAN C. JUBRAN, and ARA PASAOGLU,

               Defendants.

-------------------------------------------------------------

**MEMORANDUM & ORDER**
20-CV-2504 (MKB)

MARGO K. BRODIE, United States District Judge:

I.   Background ................................................................................................ 3
  a.   Factual background ............................................................................ 3
    i.   The franchise agreement and Personal Guaranty .......................... 3
    ii.   New York City health code ............................................................ 5
    iii.   Brite Tikes Defendants' operation of the Center............................ 7
    iv.   Sale of Center from Brite Tikes Defendants to Plaintiffs............... 8
    v.   Transition of the operation of the Center to Plaintiffs................... 11
    vi.   Plaintiffs' ownership of the Center............................................... 12
    vii.   Fraudulent documents and Defendants' involvement .................. 15
  b.   Procedural background..................................................................... 16
II.   Discussion............................................................................................... 16
  a.   Standard of review .......................................................................... 16
  b.   Adverse inference............................................................................ 17
  c.   Breaches of representation and warranties claim against Brite Tikes Defendants ........ 22
    i.   Plaintiffs' motion....................................................................... 25
    ii.   Brite Tikes Defendants' motion ................................................. 26
  d.   Fraud claims against all Defendants................................................ 28
    i.   Material misrepresentations or omissions of fact...................... 32
    ii.   Knowledge................................................................................. 34

|  | iii. | Intent ................................................................................................................ | 37 |
|  | iv. | Reasonable reliance ....................................................................................... | 39 |
| e. |  | Fraudulent inducement claims against all Defendants .................................. | 45 |
| f. |  | Conspiracy to commit fraud claim against all Defendants ............................ | 47 |
| g. |  | Negligent misrepresentation and omission claim against Brite Tikes Defendants ........ | 49 |
| h. |  | Indemnification claim against Brite Tikes Defendants .................................. | 51 |
| i. |  | Breach of the duty of good faith and fair dealing claim against Brite Tikes Defendants 54 |  |
| j. |  | Negligence claim against Brite Tikes and Collins ......................................... | 57 |
| k. |  | Negligent supervision claim against Collins .................................................. | 59 |
| l. |  | Breach of the Franchise Agreement claim against Brite Tikes Defendants................... | 60 |
| m. |  | Brite Tikes Defendants' indemnification counterclaim against Plaintiffs .................... | 62 |
| n. |  | *In pari delicto* ................................................................................................ | 64 |
| III. | Conclusion | ................................................................................................................. | 66 |

Plaintiffs The Learning Experience Systems, LLC and The Learning Experience at Queens-Long Island City, LLC (together "TLE"), commenced the above-captioned action against Defendants Nicole Collins, Brite Tikes LLC, Jubran C. Jubran (the "Brite Tikes Defendants"), and Ara Pasaoglu on June 4, 2020, alleging that Defendants fraudulently operated a childcare center by fabricating and doctoring required background checks and medical clearance forms for the childcare center staff. (Compl. ¶ 1, Docket Entry No. 1.) Plaintiffs seek damages and assert claims of breaches of representations and warranties, common law fraud, fraudulent inducement, conspiracy to commit fraud, indemnification, breach of the duty of good faith and fair dealing, negligence, negligent supervision, and breach of the franchise agreement. (*Id.* ¶¶ 78–144.) Plaintiffs filed an Amended Complaint on October 6, 2020, reasserting the above claims and adding a claim of negligent misrepresentation and omission. (Am. Compl. ¶¶ 144–155, Docket Entry No. 14.) On October 28, 2020, Pasaoglu filed an answer to the Amended Complaint, (Pasaoglu Answer, Docket Entry No. 16), and on November 23, 2020, the

Brite Tikes Defendants filed an answer and counterclaim against Plaintiffs seeking indemnification, (Brite Tikes Defs.' Answer, Docket Entry No. 17).

All parties filed cross-motions for summary judgment on May 17, 2022.[1]  For the reasons set forth below, the Court denies Plaintiffs' motion for summary judgment in its entirety, grants in part and denies in part Brite Tikes Defendants' motion for summary judgment, and grants Pasaoglu's motion for summary judgment.

## I.  Background

### a.  Factual background

The following facts are undisputed unless otherwise noted.[2]

#### i.  The franchise agreement and Personal Guaranty

Plaintiffs are Delaware limited liability companies based in Florida.  (Pls.' 56.1 ¶ 1; Defs.' 56.1 Resp. ¶ 1.)  Defendant Brite Tikes LLC is a New York limited liability company engaged in the business of operating a franchised child learning and care center located at 27-28 Thomson Avenue, Long Island City, New York 11101 (the "Center").  (Pls.' 56.1 ¶ 2; Defs.'

---

[1]  (Pls.' Mot. for Summ. J. ("Pls.' Mot."), Docket Entry No. 65; Pls.' Mem. in Supp. of Summ. J. ("Pls.' Mem."), Docket Entry No. 68; Brite Tikes Defs.' Mem. in Opp'n ("Brite Tikes Defs.' Opp'n"), Docket Entry No. 57; Pasaoglu Mem. in Opp'n ("Pasaoglu Opp'n"), Docket Entry No. 66; Pls.' Reply. in Supp. of Summ. J. ("Pls.' Reply"), Docket Entry No. 74; Brite Tikes Defs.' Mot. for Summ J. ("Brite Tikes Defs.' Mot."), Docket Entry No. 53; Brite Tikes Defs.' Mem. in Supp. of Summ. J. ("Brite Tikes Defs.' Mem."), Docket Entry No. 55; Pasaoglu Mot. for Summ. J. ("Pasaoglu Mot."), Docket Entry No. 62; Pasaoglu Mem. in Supp. of Summ. J. ("Pasaoglu Mem."), Docket Entry No. 63-1; Pls.' Mem. in Opp'n ("Pls.' Opp'n"), Docket Entry No. 70; Brite Tikes Defs.' Reply Mem. in Supp. of Summ. J. ("Brite Tikes Defs.' Reply"), Docket Entry No. 60.)

[2]  The Court relies on the parties' statements of undisputed material facts.  (Pls.' Rule 56.1 Stmt. of Undisputed Material Facts ("Pls.' 56.1"), Docket Entry No. 69; Brite Tikes Defs.' Objections and Resp. to Pls.' Rule 56.1 Stmt. of Undisputed Material Facts ("Defs.' 56.1 Resp."), Docket Entry No. 72; Brite Tikes Defs.' Rule 56.1 Stmt. of Undisputed Facts ("Brite Tikes Defs.' 56.1"), Docket Entry No. 56; Pasaoglu Rule 56.1 Stmt. of Undisputed Facts ("Pasaoglu 56.1"), Docket Entry No. 63-2; Pls.' Resp. to Brite Tikes Defs.' Rule 56.1 Stmt. of Undisputed Material Facts ("Pls.' 56.1 Resp."), Docket Entry No. 59.)

56.1 ¶ 5.)  The two managing members of Brite Tikes LLC are Jubran C. Jubran and Jubran's daughter Nicole Collins.  (Pls.' 56.1 ¶ 3; Defs.' 56.1 ¶ 5.)[3]

On May 3, 2013, Jubran entered into a franchise agreement with Plaintiffs creating Franchise No. 286 (the "Franchise Agreement").  (*Id.* ¶ 6.)  The Franchise Agreement incorporated various attachments and addendums, including a Personal Guaranty and Subordination Agreement (the "Personal Guaranty").  (*Id.*)  Under the Personal Guaranty, Jubran personally and individually guaranteed the performance of all obligations in the Franchise Agreement.  (*Id.* ¶ 7.)  On September 5, 2015, Collins was added as a party to the Franchise Agreement and agreed to be bound by the terms and conditions contained in the agreement and the attachments and addendums to the agreement including the Personal Guaranty.  (*Id.* ¶ 8.)  On October 17, 2016, Collins and Jubran assigned all their rights and obligations under the Franchise Agreement to Brite Tikes LLC (the "Assignment and Assumption Agreement").  (*Id.* ¶ 9.)  Upon assigning their rights to the Brite Tikes LLC, Collins and Jubran reaffirmed that they were still personally liable, pursuant to the Personal Guaranty, for their obligations contained in the Franchise Agreement.  (*Id.* ¶ 10.)

The Franchise Agreement also obligated the Brite Tikes Defendants to comply with "all federal, state, and local laws and regulations pertaining, directly or indirectly, to [the] Center" and "keep [] current all licenses, permits, bonds, and deposits made to or required by any government agency in connection with the operation of your Center."  (*Id.* ¶ 14.)  In addition, the Franchise Agreement obligated the Brite Tikes Defendants to "maintain at all times a staff of competent, trained employees sufficient to operate your Center in compliance with our System

---

[3] Brite Tikes Defendants dispute these statements in Plaintiffs' 56.1 Statement on the grounds that Plaintiffs cannot rely on their own unverified Complaint as affirmative evidence.

and standards and all applicable governmental, licensing and labor laws" and established the Brite Tikes Defendants as being "responsible for all employment decisions and functions of the Center including, without limitation, those related to hiring, firing, training, establishing remuneration, compliance with wage and hour requirements, personnel policies, benefits, recordkeeping, supervision and discipline of employees, regardless of whether you receive advice from us on these subjects." (*Id.* ¶ 16 (emphasis omitted).) Pursuant to the Franchise Agreement and Personal Guaranty, the Brite Tikes Defendants also represented to Plaintiffs, that:

> neither you nor any staff member at your Center has any record of child molestation or abuse, immoral conduct or criminal behavior (collectively referred to as "Unacceptable Conduct"), and you additionally represent that you have not engaged in a pattern of conduct ("Pattern of Conduct") which might jeopardize the welfare of children registered in your Center or reflect adversely on our goodwill or the safety and concern of your staff for these children. You further warrant and represent that you will at all times refrain, and will ensure that all of your staff refrains, from such Unacceptable Conduct and/or Pattern of Conduct during the term of this Agreement.

(*Id.* ¶ 18.)

### ii. New York City health code

Article 47 of the New York City Health Code ("Health Code") provides the regulatory framework for receiving, renewing, and maintaining the necessary licenses and permits for operating a childcare center in New York City. (*Id.* ¶ 19; *see also* Title 24 R.C.N.Y. §§ 47.01-.79 *et. seq.*) The Brite Tikes Defendants had to ensure the Center staff received the required clearances and were qualified to competently supervise children. (Pls.' 56.1 ¶ 20.) Pursuant to Health Code § 47.07, a center cannot receive a permit unless it obtains and submits to the New York Department of Health ("DOH") a certificate of occupancy and a fire safety statement. Health Code § 47.07(a), (b). In addition, a child care center must complete criminal justice and child abuse screenings for the staff, which requires proof that the permittee submitted

"[d]ocumentation satisfactory to the Department that the permit applicant has submitted all necessary forms and requests for all persons requiring criminal justice and Statewide Central Register of Child Abuse and Maltreatment (SCR) screening in accordance with Section 47.19 of this Article." *Id.* § 47.07(c). Documentation regarding criminal justice and child abuse screenings "must be kept on site and made available to the [DOH] upon request." *Id.*

Section 47.19 requires staff to undergo both a criminal background check and also a child abuse screening from the SCR before beginning employment and, in the case of SCR screenings, staff must be screened every two years in order to maintain employment. Specifically, under subsection (b), titled "Screening," permittees are required to "obtain and verify credentials, including certificates and educational transcripts, as applicable, and references prior to employment of all persons listed in subdivision (a)." *Id.* § 47.19(b). Subdivision (a), titled "Applicability," includes the following:

> any person who has, will have, or has the potential for unsupervised contact with children in a program, and shall include, but not be limited to: individual owners, permittees, partners, members and shareholders of corporations, limited liability companies or other entities who are the owners or operators of the program; educational, child supervision, administrative and maintenance employees.

*Id.* § 47.19(a).

In addition to the background check requirements and clearances, Health Code section 47.33(b) requires, as a condition of continued employment, that childcare center personnel undergo a physical evaluation every two years and submit a certificate from a medical professional confirming that the individual is both physically and mentally able to perform assigned duties. Furthermore, section 47.37(a)–(d) mandates that all teaching staff complete certain trainings within a specific timeframe. All the completed training certificates must be

maintained at the childcare center and made available for inspection by DOH.  *Id.* §§ 47.37(b)(1), (b)(2), (b)(4), (b)(6)(C).

### iii.   Brite Tikes Defendants' operation of the Center

On or about September 12, 2017, Brite Tikes "opened" the Center.  (Pls.' 56.1 ¶ 28.)
Collins operated as co-owner and Executive Director of the Center and coordinated with childcare center staff and representatives from DOH to submit staff records and ensure that the staff satisfied the requirements set forth by the health code so that the Center could receive its license from DOH.  (*Id.* ¶ 29.)  On October 23, 2017, Pasaoglu began working as the Center Director.  (*Id.* ¶ 32.)  Pasaoglu was hired because of his previous experience and expertise in managing staff compliance in childcare, his experience with overseeing DOH inspections, and his knowledge of the regulatory framework of childcare operations.  (*Id.* ¶ 34.)  Pasaoglu's responsibilities included ensuring that staff satisfied the clearance requirements, but Collins also oversaw Pasaoglu in his role relating to hiring and compliance with regulations.  (*Id.* ¶ 35.)
Collins would regularly view Pasaoglu access staff files and discussed issues of staff compliance with him on a consistent basis.  (*Id.* ¶¶ 38–39.)

The process for obtaining a background check clearance from the Department of Investigations ("DOI") varied depending on whether the employee had been previously employed by a childcare center in New York; if they had been so employed, then Pasaoglu would send a duplicate fingerprint request to the DOI with the employee's name and social security number, and request that a duplicate copy of the DOI clearance letter be sent to the Center.  (*Id.* ¶¶ 42–43.)  It took approximately two to six weeks to receive the duplicate letter from DOI.  (*Id.* ¶ 43.)  If the prospective employee had not worked at a New York childcare center, then they would have to complete an application to get fingerprinted, visit a DOI location to get fingerprinted, pay a fee, and wait until the fingerprints were cleared by the DOI and the

DOI mailed a clearance letter. (*Id.* ¶ 44.) During Brite Tikes' operation, the Center was inspected many times by DOH's Early Childhood Education Consultant Loubella Calicdan who concluded that "staff and children's files were checked and recorded as up to date." (*Id.* ¶¶ 50–51.)

During Brite Tikes' ownership and operation of the Center, the Center had a positive reputation in the community, a strong client base, and expanding growth. (Defs.' 56.1 ¶ 8.) It was also one of the highest grossing TLE franchises in the country. (*Id.* ¶ 11.) As executive director, Collins was involved in the day-to-day operation of the Center, but the parties dispute the extent of Jubran's involvement.[4] (Pls.' 56.1 Resp. ¶¶ 14–16, 18–19.) Jubran did not work on site at the Center. (Defs.' 56.1 ¶ 17.)

After the Center opened under Brite Tikes' ownership, periodic reviews of staff files were conducted by Plaintiffs' personnel, (*id.* ¶ 22), and representatives of DOH "regularly visited childcare centers and spot checked employee files to ensure that they were in order and compliant with the licensing requirements," (*id.* ¶ 23).

### iv. Sale of Center from Brite Tikes Defendants to Plaintiffs

In or around October 1, 2018, Jubran and the Plaintiffs' representatives began discussing a potential sale of the Center from the Brite Tikes Defendants to Plaintiffs so that Plaintiffs could run the Center as a corporate location. (Pls.' 56.1 ¶ 52.) On or about December 21, 2018, the

---

[4] Defendants assert that Jubran was "not involved in handling new or current employee credentials at the Center." (Pls.' 56.1 Resp. ¶¶ 15–18.) Plaintiffs "object[] to the term 'involved'" on the basis that "[w]hether Jubran was physically present at the Center or 'involved' [in the] day-to-day involvement of Center operations is not material insofar that Jubran, as co-managing member of Brite Tikes LLC, and as personal guarantor for Brite Tikes LLC's obligations and responsibilities under the Franchise Agreement" was "responsible for 'all employment decisions and functions of the Center, including . . . those related to hiring, firing, training . . . personnel policies, benefits, recordkeeping, supervision and discipline of employees.'" (*Id.* ¶¶ 15–18 (citation omitted).)

parties executed an agreement with a purchase price of $2,500,000 payable as all cash at the closing (the "Purchase Agreement"), (*id.* ¶ 55), and on January 8, 2019, Brite Tikes and Plaintiffs executed the Purchase Agreement, pursuant to which Brite Tikes would sell the business and its assets to Plaintiffs,[5] (Purchase Agreement, annexed to Defs.' Mot. as Ex. 5, Docket Entry No. 54-5; *see also* Pls.' 56.1 ¶ 59).  Plaintiffs and Brite Tikes were represented by counsel in the negotiation and execution of the Purchase Agreement, and Pasaoglu played no role in the negotiation or execution of the agreement.  (Defs.' 56.1 ¶¶ 29–30.)  In the Purchase Agreement, Brite Tikes represented and warranted that it would cooperate to ensure the orderly transition of the operations of the Center to Plaintiffs, that it would maintain all required licenses for the business until such licenses were transferred to Plaintiffs or until Plaintiffs became fully licensed by the state of New York in their own name, and that it would continue to operate the Center in the ordinary course of business until the closing.  (Pls.' 56.1 ¶¶ 61–63.)  The parties dispute whether the Purchase Agreement required Brite Tikes, and via the Personal Guaranty Agreements, Collins and Jubran, to cooperate in transitioning the Center to Plaintiffs' ownership or that Collins and Jubran had to maintain all necessary licenses for operating the Center and cooperate in the process of relicensing the Center to Plaintiffs.  (Defs.' 56.1 Resp. ¶¶ 65–66.) The Purchase Agreement also stated that all of Brite Tikes' representations and warranties were confined to Article II of the Purchase Agreement:

> Seller shall not be deemed to have made to Purchaser (or any representative of Purchaser) any representation or warranty other than as expressly made by Seller in Article II hereof. Without limiting the generality of the foregoing and notwithstanding any

---

[5]  The Court notes that the Franchise Agreement was signed by The Learning Experience Systems, LLC, (Franchise Agreement 2), and the Purchase Agreement was signed by The Learning Experience at Queens-Long Island City, LLC, (Purchase Agreement 2).  Because the parties refer to the two Plaintiffs collectively and interchangeably as "TLE" or "Plaintiffs," the Court also refers to the Plaintiffs in this manner.

> otherwise express representations and warranties made by Seller in Article II hereof, Seller makes no representation or warranty to Purchaser with respect to: (i) any projections, estimates or budgets available or made available to Purchaser or its counsel of future revenues, expenses or expenditures, or future or past results of the Business; or (ii) any other information or documents available or made available to Purchaser or its counsel, accountants or advisors with respect to the Business, except as expressly covered by a representation and warranty contained in Article II hereof.

(Purchase Agreement, art. VII.D.)

Although the Purchase Agreement was executed on January 8, 2019, the parties agreed that the obligations set forth in the Franchise Agreement would not terminate until the closing. (Pls.' 56.1 ¶ 67.) Attachment B to the Purchase Agreement states in relevant part:

> NOW THEREFORE, in consideration of the mutually agreed upon promises and covenants stated herein, and for other good and valuable consideration, the sufficiency of which is acknowledged, the parties hereby agree as follows:
>
> 1. The termination of Franchise No. 268 shall be effective upon the date of the Closing, as defined in the Purchase Agreement (the "Effective Date"). Until the Effective Date, you shall continue to operate the Center.
>
> 2. In connection therewith, the following documents shall be terminated in their entirety as of the Effective Date:
>
> (a) The Franchise Agreement and all of its attachments, exhibits and addenda, except for the Non-Disclosure, Non-Interference and Non-Competition Agreement Attachment described and amended in Section 3 below.

(Franchise Termination and General Release Agreement ("Release Agreement") 1, annexed to Defs.' Mot. as Ex. 6, Docket Entry No. 54-6.) The Release Agreement was executed on June 30, 2019 which was the last day that Brite Tikes maintained its license to operate the Center. (Pls.' 56.1 ¶ 69.) The Release Agreement further provides that:

> [Plaintiffs] hereby release, cancel, forgive and forever discharge you [Brite Tikes], your predecessors, parents corporations, holding companies, divisions, subsidiaries, affiliates, franchises, heirs,

successors and assigns, and all of their respective officers, directors, members, managers, employees, shareholders, representatives, insurers and agents from any and all actions, claims, demands, damages, obligations, liabilities, controversies and executions, of any kind or nature whatsoever, whether known or unknown, whether suspected or not, arising under, resulting from or in any way in connection with the Franchise Agreement and the related franchise documents and/or the termination thereof as set forth above, from the first day of the world, including this day and each day hereafter, and we specifically waive any claim or right to assert any cause of action or alleged case of action or claim or demand which has, through oversight or error intentionally or unintentionally or through a mutual mistake, been omitted from this release.

(Release Agreement § 6(b).)

### v.   Transition of the operation of the Center to Plaintiffs

Plaintiffs retained the management and staff already at the Center including Pasaoglu as Center Director.  (Pls.' 56.1 ¶¶ 71–72.)  Plaintiffs extended an offer of employment to Pasaoglu on January 17, 2019 and offered him the position of Executive Center Director commensurate with salary increases and bonuses which Pasaoglu accepted.  (*Id.*)  Part of the process of transitioning ownership of the Center to Plaintiffs required sending staff clearances to the DOH. (*Id.* ¶ 75.)  The DOH licensor responsible for this was Calicdan – who was Pasaoglu's student when Pasaoglu was an adjunct professor at New York University.  (*Id.*)  The parties dispute the extent of Pasaoglu and Calicdan's relationship.[6]  (Defs.' 56.1 Resp. ¶¶ 75–76.)  On May 31, 2019, Pasaoglu emailed Calicdan from the Center's email account an excel spreadsheet that contained clearance information for the staff then teaching at the Center and who would stay on once Plaintiffs assumed ownership.  (Pls.' 56.1 ¶ 76.)  The parties also dispute the process of

---

[6]  Plaintiffs assert that when Pasaoglu was an adjunct professor at New York University, Calicdan was one of Pasaoglu's students and they "formed a friendly relationship."  (Pls.' 56.1 ¶ 75.)  Defendants deny this assertion on the basis that it "does not include a citation to evidence which would be admissible."  (Defs.' 56.1 Resp. ¶ 75.)

Plaintiffs' license acquisition; Plaintiffs contend that the license was "transferred" from Brite Tikes, but Brite Tikes argues that Plaintiffs were required to, and ultimately did, obtain a license in their own name from the state. (*Compare* Defs.' 56.1 Resp. ¶¶ 75–77 *with* Pls.' 56.1 Resp. ¶¶ 35–38.)

The excel spreadsheet, titled "Book 3," identifies the staff clearances required by the Health Code on the first row and then populates staff information in the rows below. (Pls.' 56.1 ¶ 77.) The parties dispute the extent to which this spreadsheet contained incorrect and fraudulent information. (Defs.' 56.1 Resp. ¶¶ 78–79.) Plaintiffs assert that the spreadsheet "is littered with incorrect and completely fraudulent information." (Pls.' 56.1 ¶ 78.) Defendants dispute this and contend that Plaintiffs' allegations "do[] not include a citation" to admissible evidence and that Plaintiffs "do[] not explain how any particular information in this spreadsheet was 'fraudulent.'" (Defs.' 56.1 ¶ 78.) Plaintiffs' corporate representative, Jennifer Murray, a vice-president with TLE and Plaintiffs' then-general counsel, was present at the Center on June 6, 2019 along with Pasaoglu and Calicdan. (*Id.* ¶ 80.) Calicdan subsequently issued a preliminary approval of the Center, although the parties dispute the extent to which Calicdan reviewed all of the employee files. (*Id.* ¶ 81; Pls.' 56.1 Resp. ¶ 44.)

During the transition period, Plaintiffs were permitted to review any documents they wished, and they completed their due diligence review to their satisfaction. (Defs.' 56.1 ¶¶ 33–34.)

### vi. Plaintiffs' ownership of the Center

During Brite Tikes' operation of the Center, DOH inspected the Center three times but did not issue any violation. (*Id.* ¶ 53.) A month after Plaintiffs took over operations of the Center, DOH issued the Center its first violation. (*Id.* ¶ 54.) In or around August of 2019, New York state notified childcare center providers that the state would be implementing new

comprehensive criminal background check requirements for new and prospective employees of childcare centers.  (*Id.* ¶ 51.)

According to Plaintiffs, on or around January 14, 2020, TLE Regional Manager Danielle Morris was reviewing personnel files at the Center and asked Pasaoglu about certain records she could not locate.  (Pls.' 56.1 ¶ 83.)  Pasaoglu informed Morris that the documents were on his personal laptop, and when he opened the laptop, he pulled up a Microsoft Word version of an SCR clearance form from the New York Office of Children and Family Services ("OCFS").[7] (*Id.*)  Morris immediately contacted her supervisor, Murray, to inform her of what she had witnessed.  (*Id.* ¶ 84.)

Murray testified that once Morris saw Pasaoglu pulled up a word template on his personal computer to show her one of the state agency forms, Morris began re-checking medical forms and saw Pasaoglu had changed dates on the forms.  (*Id.* ¶ 85.)  On or about January 15, 2020, Morris and her supervisor Murray made copies of staff files to review and then Murray confronted Pasaoglu about some of the concerning records that she had discovered.  (*Id.* ¶ 86.)  When Murray showed Pasaoglu some of the documents, she recalled that "[Pasaoglu] said, in his professional opinion, they were definitely doctored or forged, whatever word he used, but that he had not done it."  (*Id.* ¶ 86.)  Murray asked Pasaoglu to sign a declaration attesting that he did not forge or alter any documents, but he resigned the next day without executing the declaration. (*Id.* ¶¶ 87–88.)

---

[7] Brite Tikes Defendants do not respond to these statements in Plaintiffs' 56.1 Statement on the grounds that Plaintiffs cannot rely on their own unverified Complaint as affirmative evidence.

Plaintiffs claim they hired a private investigative group to conduct a thorough internal investigation which uncovered additional evidence of forged or altered staff clearances for almost all of the staff at the Center.  (*Id.* ¶ 89.)  On February 13, 2020, Plaintiffs self-reported these fraudulent documents to the DOH and after two field inspections, DOH closed the Center until it became Health Code compliant.[8]  (*Id.* ¶ 90.)

Pasaoglu ultimately discarded his laptop and upgraded to a new one.  (*Id.*; Defs.' 56.1 Resp. ¶ 90.)  The parties dispute whether Plaintiffs uncovered evidence of Pasaoglu emailing himself manipulated DOI letters, SCR letter templates, and training certificates with Center staff identified on the manipulated document.  (Defs.' 56.1 Resp. ¶ 94.)  The parties also dispute which personnel files are fraudulent or authentic.  Plaintiffs engaged a forensic document examiner, Tiffany Ford, to review staff clearances maintained in the personnel files at the Center and to opine on the authenticity of the staff clearances.  (Pls.' 56.1 ¶ 95.)  Ford created an expert report in which she "opined as to the authenticity of the referenced document and citations to where Pasaoglu invoked his fifth amendment right against self-incrimination when asked about the specific document."  (*Id.*)  Brite Tikes Defendants deny that Ford's expert report demonstrates evidence of fraud by the Brite Tikes Defendants because Ford did not offer an opinion on when any documents were forged or who forged or altered them.[9]  (Defs.' 56.1 Resp. ¶ 95.)

---

[8]  Brite Tikes Defendants do not respond to these statements in Plaintiffs' 56.1 Statement on the grounds that Plaintiffs cannot rely on their own unverified Complaint as affirmative evidence.

[9]  Plaintiffs' 56.1 Statement includes a table of various staff clearance documents alleged to be fraudulent, Ford's analysis and opinion on the authenticity of the documents, and citations to where Pasaoglu invoked his Fifth Amendment right when asked about the specific document. (Pls.' 56.1 Resp. ¶ 95.)  Defendants object to this statement on several grounds: (1) that

### vii.   Fraudulent documents and Defendants' involvement

The parties dispute whether Pasaoglu admitted to Collins that he forged staff credentials. Defendants claim that Plaintiffs do not know who forged or altered the documents, and Plaintiffs claim that Pasaoglu told Collins he forged staff credentials. (Pls.' 56.1 Resp. ¶ 62.)  The parties also dispute when the forgeries occurred: Plaintiffs allege they occurred during Brite Tikes' ownership of the Center and Defendants allege they occurred only after Plaintiffs took over ownership.  (Pls.' 56.1 Resp. ¶ 63.)

During his deposition, Pasaoglu invoked the Fifth Amendment a number of times in response to questions from Plaintiffs' attorneys including questions such as: "Ara, did you alter or falsify or create DOI fingerprint duplicate letters for employees at the Center during Brite Tikes' operation of the Center?" and "And it is an E-mail, Ara, as you see from you to you dated January 13, 2020.  And you can see by the attachments that it attaches several training certificates for various employees at the Center . . . Are these examples of certificates and documents that you falsified?"  (Pls.' 56.1 ¶ 96.)

The parties agree that Collins and Jubran did not personally forge or alter any documents, no one witnessed them forge or alter any documents, and they did not ask Pasaoglu or anyone else to forge or alter any documents while the Center was under Brite Tikes ownership.  (Pls.' 56.1 Resp. ¶¶ 65–67; 70–73.)  Murray testified that only three employees confirmed that their records were forged, altered, or otherwise manipulated.  (Pls.' 56.1 Resp. ¶¶ 76–82.)

---

paragraph ninety-five is "not a short and concise statement as required," (2) none of the documents are evidence of fraud because Ford did not offer an opinion about when any of the documents were forged or altered or who forged or altered them, (3) Ford did not speak to anyone at DOI or at the New York SCR Registry to "confirm that any of the documents she opined" on were fraudulent, (4) any forgeries before the closing were released by TLE, and (5) Pasaoglu took the Fifth in response to questions about his actions during his employment with TLE so it is "equally (if not more) likely that any alteration of the documents by Pasaoglu occurred while Pasaoglu was working for TLE."  (Defs.' 56.1 Resp. ¶ 95.)

### b.   Procedural background

Plaintiffs filed the Complaint on June 4, 2020 against the Brite Tikes Defendants and Pasaoglu, alleging that Defendants fraudulently operated the Center by fabricating and doctoring required background check and medical clearance forms for the Center staff.  (Compl. ¶ 1.) Plaintiffs seek damages and assert claims of breaches of representations and warranties, common law fraud, fraudulent inducement, conspiracy to commit fraud, indemnification, breach of the duty of good faith and fair dealing, negligence, negligent supervision, and breach of a franchise agreement.  (*Id.* ¶¶ 78–144.)  On October 6, 2020, Plaintiffs filed their Amended Complaint reasserting the same claims and adding a claim of negligent misrepresentation and omission. (Am. Compl. ¶¶ 144–155.)

On October 28, 2020, Pasaoglu filed an answer to the Amended Complaint, (Pasaoglu Answer), and on November 23, 2020, the Brite Tikes Defendants filed an answer and counterclaim against Plaintiffs for indemnification, (Brite Tikes Defs.' Answer).  All parties filed cross-motions for summary judgment on May 17, 2022.[10]

## II.   Discussion

### a.   Standard of review

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022); *Borley v. United States*, 22 F.4th 75, 78 (2d Cir.

---

[10] Plaintiffs do not seek summary judgment with regard to all of their claims.  They seek summary judgment with regard to the following claims: (1) breach of representations and warranties in the Purchase Agreement, (2) common law fraud; (3) fraudulent inducement; (4) negligent misrepresentation; (5) indemnification under the Purchase Agreement; and (6) breach of the Franchise Agreement.  (Pls' Mem. 14.)  Plaintiffs do not seek summary judgment with regard to their claims of (1) conspiracy to commit fraud; (2) breach of the duty of good faith and fair dealing; (3) negligence; and (4) negligent supervision.

2021).  The court must "constru[e] the evidence in the light most favorable to the nonmoving

party," *Radwan*, 55 F.4th at 113 (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d

Cir. 2011)), and "resolve all ambiguities and draw all permissible factual inferences in favor of

the party against whom summary judgment is sought," *Koral v. Saunders*, 36 F.4th 400, 408 (2d

Cir. 2022) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)); *see also Lenzi v.

Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (same).  The role of the court "is not to resolve

disputed questions of fact but only to determine whether, as to any material issue, a genuine

factual dispute exists."  *Kee v. City of New York*, 12 F.4th 150, 167 (2d Cir. 2021) (quoting

*Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)); *see also Rogoz v. City of

Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (same).  A genuine issue of fact exists when there is

sufficient "evidence on which the jury could reasonably find for the [nonmoving party]."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The "mere existence of a scintilla of

evidence" is not sufficient to defeat summary judgment.  *Id.*  The court's function is to decide

whether, "after resolving all ambiguities and drawing all inferences in favor of the nonmovant, a

reasonable jury could return a verdict for the nonmovant."  *Miller v. N.Y. State Police*, No. 20-

CV-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022); *see also Pinto v. Allstate Ins. Co.*,

221 F.3d 394, 398 (2d Cir. 2000) (same).

        **b.   Adverse inference**

        As a threshold matter, Plaintiffs argue that they are entitled to an "adverse inference" for

every instance that Pasaoglu "invoked his fifth amendment right."  (Pls.' Mem. 15–16.)

Plaintiffs argue that Pasaoglu invoked his Fifth Amendment right forty-eight times, including in

response to "whether he falsified or forged specific records during his time as Center Director for

Brite Tikes," and "whether he intended [DOH] to rely upon the records for purposes of

licensing."  (*Id.*)  For each question Pasaoglu responded to by invoking his Fifth Amendment

right, Plaintiffs argue that the Court should treat it as if it were answered favorable for Plaintiffs — i.e., when asked whether he falsified certain records, the Court should infer that he did. (*Id.*) Specifically, Plaintiffs argue that they are entitled to an adverse inference that the following documents were falsified, forged, or otherwise altered: Mandated Report Training Certificates, Infectious Disease Control Training, DOI fingerprint clearance letters, and Medical Records. (*Id.* at 16–17.) In support, Plaintiffs argue that there is admissible evidence that documents were forged during Brite Tikes' ownership of the Center because many of the falsified documents are dated during the Brite Tikes ownership period, and Pasaoglu's email to DOH sent during his time as the Brite Tikes Center Director specifically references falsified and fraudulent files. (Pls.' Reply 12–14.)

Brite Tikes Defendants argue there is "no basis to draw an adverse inference" against them because the law is clear that an "adverse inference should be drawn only when it is corroborated by independent evidence and is trustworthy under all the circumstances and advances the search for the truth." (Defs.' Opp'n 3 (emphasis omitted).) Brite Tikes Defendants argue that there is no corroborating evidence because Plaintiffs' expert admitted she is not offering an opinion with respect to when documents were forged or who altered them, and an adverse inference against them would not be trustworthy under all the circumstances because Pasaoglu took the Fifth Amendment in response to questions about his employment with Plaintiffs as well. (*Id.* at 3–4, 10–13.) In addition, Brite Tikes Defendants argue that even if the adverse inference is admissible against Brite Tikes, it is not admissible against Collins or Jubran individually because they did not personally employ Pasaoglu. (*Id.* at 13–14.)

Pasaoglu argues that the Court should not draw an adverse inference against him because, at the summary judgment stage, the Court should construe all evidence, including a defendant's

silence, in the light most favorable to the nonmoving party. (Pasaoglu Opp'n 6–7.) In addition, Pasaoglu argues that the moving party must present additional evidence and cannot rely solely on the adverse inference. (*Id.* at 7.)

Unlike in a criminal proceeding, "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 98 (2d Cir. 2012) (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)). Moreover, "[a]n adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader." *Libutti v. United States*, 178 F.3d 114, 120 (2d Cir. 1999). However, a party's "silence is 'only one of a number of factors to be considered by the finder of fact in assessing a penalty, and [it is to be] given no more probative value than the facts of the case warrant.'" *Nu–Chem Labs., Inc. v. Dynamic Labs., Inc.*, No. 96–CV–5886, 2001 WL 35981560, at *19 (E.D.N.Y. Mar. 30, 2001) (quoting *Lefkowitz v. Cunningham*, 431 U.S. 801, 808 n.5 (1977)); *see also S.E.C. v. Suman*, 684 F. Supp. 2d 378, 386 (S.D.N.Y. 2010) (noting that "the strength and cogency of the adverse inference should, of course, be tested against the other evidence in the case"), *aff'd*, 421 F. App'x 86 (2d Cir. 2011). Other factors to be considered in drawing the adverse inference include "the nature of the proceeding, how and when the privilege was invoked, and the potential for harm or prejudice to opposing parties." *United States v. Certain Real Prop. & Premises Known as 4003-4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 84 (2d Cir. 1995); *see also Donoghue v. Retrophin, Inc.*, No. 14-CV-7640, 2015 WL 13882435, at *2 (S.D.N.Y. July 20, 2015) ("The decision whether to draw the inference will turn at least in major part on whether invocation of the privilege has prevented the other side from obtaining relevant information.").

"Although a summary judgment motion 'cannot be granted on an adverse inference alone,' a court may grant summary judgment after weighing the adverse inference with other evidence in the matter and determining that no genuine issues of fact exist." *Ball v. Cook*, No. 11-CV-5926, 2012 WL 4841735, at *5 (S.D.N.Y. Oct. 9, 2012) (quoting *Suman*, 684 F. Supp. 2d at 387); *United States v. Nagelberg*, 772 F. Supp. 120, 123 (E.D.N.Y. 1991) ("[I]t is well-established that an adverse inference drawn from a defendant's invocation of the Fifth Amendment may not be the sole basis for a finding of liability.  Independent, corroborative evidence of wrong-doing must be shown.")  In addition, "the overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." *Banks v. Yokemick*, 144 F. Supp. 2d 272, 289 (S.D.N.Y. 2001).

Pasaoglu invoked his Fifth Amendment privilege during his deposition in response to a number of questions relating to whether he altered or falsified or created certificates and other documents for employees while both Brite Tikes and Plaintiffs operated the Center.  (Defs.' 56.1 Resp. ¶ 96.)  Pasaoglu's claim of privilege caused harm to Plaintiffs, to an extent, because it prevented them from discovering more information about the fraudulent documents including who forged or altered them, whether the forging or altering occurred during Brite Tikes ownership of the Center, and whether the documents were forged or altered in an attempt to deceive DOH.  However, Plaintiffs have not shown that there exists independent, corroborative evidence of wrong-doing separate from Pasaoglu's invocation of the Fifth Amendment. Plaintiffs point to the falsified documents themselves and the email from Pasaoglu to DOH which contained an excel spreadsheet that included references to falsified documents, but Plaintiffs' expert, Ford, opined that she could not state when the documents were forged or

20

altered or who forged or altered them.  In addition, Plaintiffs concede that Collins and Jubran did

not personally alter any documents nor is there any evidence demonstrating that Collins and

Jubran were aware of the forgeries.  Further, Pasaoglu also invoked the Fifth Amendment in

response to questions regarding whether he forged or altered documents during Brite Tikes'

ownership of the Center when Pasaoglu was the executive Center Director.  Considering the

"potential for harm or prejudice" to Brite Tikes Defendants, the Court concludes that an adverse

inference is not appropriate at this time.  *Certain Real Prop. & Premises Known as 4003-4005

5th Ave., Brooklyn, N.Y.*, 55 F.3d at 84.

      While litigants such as Plaintiffs who are deprived of key facts through an opposing

party's assertion of their Fifth Amendment privilege have little recourse other than to comment

upon the privilege, *see id.* at 82, Pasaoglu's invocation of his Fifth Amendment privilege also

conflicts with his own interest in testifying.  For example, Pasaoglu has to suffer the

consequences of being unable to provide testimony that clarifies or disputes the evidence that

Plaintiffs have presented such as the testimony from Morris who noticed Pasaoglu had edited

versions of certification documents on his laptop.  (Pls.' 56.1 ¶ 85.)  *See Louis Vuitton Malletier

S.A.*, 676 F.3d at 98 ("[A] party who asserts the privilege against self-incrimination must bear the

consequence of lack of evidence, and the claim of privilege will not prevent an adverse finding

or even summary judgment if the litigant does not present sufficient evidence to satisfy the usual

evidentiary burdens in the litigation."); *Chapdelaine v. Desjardin*, No. 20-CV-00779, 2022 WL

4448890, at *11 n.16 (D. Conn. Sept. 23, 2022) ("At this stage in the proceedings, however, the

adverse consequence of [defendant's] asserting her Fifth Amendment privilege is that she is not

freed by doing so from 'adducing proof in support of a burden which would otherwise have been

[hers].'" (quoting *United States v. Certain Real Prop. & Premises Known as 4003-4005 5th Ave.,*

*Brooklyn, N.Y.*, 55 F.3d at 83)).  However, the denial of the inference at this stage does not

preclude the invocation of an adverse inference by the trier of fact at trial.  *See Chapdelaine*,

2022 WL 4448890, at *11 n.16 ("[Defendant's] evasive answers during and after her deposition

may bear on her credibility, but this is a question for the trier of fact at trial, not for [the court] at

summary judgment.").

### c.    Breaches of representation and warranties claim against Brite Tikes Defendants

Plaintiffs and Brite Tikes Defendants cross-move for summary judgment on Plaintiffs'

claim for breaches of representations and warranties in the Purchase Agreement.

Plaintiffs make several arguments in support of this claim.  First, through the Purchase

Agreement, Brite Tikes made "express representations and warranties regarding the licensing

and operation of the Center" including that Brite Tikes would operate the business in the

ordinary course of business, maintain all required licenses, and take reasonable and customary

measures necessary to assist Plaintiffs to obtain licenses.  (Pls.' Mem. 28.)  Second, the

"representation and warranty regarding maintaining its licenses and assisting TLE in obtaining

replacement licenses 'survive[d] the Closing and termination of the franchise.'"  (*Id.* (alteration

in original).)  Third, these representations and warranties were "backstopped" by the Personal

Guaranties executed by Collins and Jubran including that "Collins and Jubran guaranteed that the

Center would comply with all state and local laws and regulations pertaining to the Center and to

keep current all licenses and permits required by any government agency in connection with the

operation of the Center."  (*Id.*)  Fourth, "it is undisputed that the warranties were breached"

because the use of fraudulent records to satisfy regulatory obligations cannot be considered

operating a business in the ordinary course.  (*Id.* at 29.)  Fifth, while the licenses for the Center

were maintained, they were maintained via fraudulent means and while Brite Tikes Defendants

22

assisted Plaintiffs in obtaining the licenses for the Center, this was also done in reliance on fraudulent records.  (*Id.*)  In support, Plaintiffs argue that Murray's testimony explains that "if Brite Tikes use[d] falsified staff credentials, it is axiomatic that Brite Tikes did not maintain its licenses."  (Pls.' Opp'n 11.)  Sixth, the Brite Tikes Defendants failed to operate the Center in the ordinary course because the use of "falsified staff documents during Brite Tikes operation of the Center" demonstrates a failure to operate in the "ordinary course."  (*Id.* at 13.)

In opposing Plaintiffs' motion and in support of their motion for summary judgment as to this claim, Brite Tikes Defendants make several arguments.  First, there is no evidence that Brite Tikes breached the Purchase Agreement because it operated the business in its ordinary course, kept the Center running before the closing, and maintained all required licenses as admitted by Plaintiffs' corporate representative Murray.  (Defs.' Opp'n 16; Defs.' Mem. 18.)  Second, Plaintiffs do not cite any legal authority for their claim that the Center was not operated in the ordinary course of business.  (Defs.' Opp'n 16–17.)  Third, the Purchase Agreement makes clear that Brite Tikes made no representations about documents made available to Plaintiffs, and it would render meaningless the representations and warranties if the Court interpreted the "ordinary course of business" line to impose a general warranty regarding the accuracy of the Center's documents.  (Defs.' Mem. 19.)  In support, they argue that (a) the Purchase Agreement does not explicitly define "ordinary course of business," but it includes "the timely payment of Base Rent, Additional Rent, and any other sums required to be paid pursuant to the Lease Agreement for the Center"; (b) they operated the Center in the ordinary course of business pursuant to the terms of the Purchase Agreement because the Purchase Agreement was forward-looking such that Brite Tikes Defendants were only making a representation beginning the date the Purchase Agreement was effective, not times prior to then; (c) there is no admissible

evidence that any documents were forged or fabricated from January 8, 2019 (date of the contract of sale) to June 28, 2019 (date of closing) because Plaintiffs have not produced evidence that the records with dates from the time period alleged were actually created on those dates, created by Collins or Jubran, created for a wrongful purpose, or were ever presented to DOH; and (d) under New York law, forged documents can be created in the ordinary course of business, so even if they were, Brite Tikes Defendants would not have breached their promise to operate in the ordinary course.  (Defs.' Mem. 18–22.)

Under New York law, to state a claim of breach of express warranty, "a plaintiff must [allege] 'an affirmation of fact or promise by the seller, the natural tendency of which was to induce the buyer to purchase' and that the warranty was relied upon." *Factory Assocs. & Exps., Inc. v. Lehigh Safety Shoes Co.*, 382 F. App'x 110, 111–12 (2d Cir. 2010) (quoting *Schimmenti v. Ply Gem Indus., Inc.*, 549 N.Y.S.2d 152, 154 (1989)); *Wynn v. Topco Assocs., LLC*, No. 19-CV-11104, 2021 WL 168541, at *7 (S.D.N.Y. Jan. 19, 2021) ("To state a claim for an express breach of warranty under New York law, the plaintiff must plead '(1) the existence of a material statement amounting to a warranty, (2) the buyer's reliance on this warranty as a basis for the contract with the immediate seller, (3) breach of the warranty, and (4) injury to the buyer caused by the breach.'" (quoting *Goldemberg v. Johnson & Johnson Consumer Cos.*, 8 F. Supp. 3d 467, 482 (S.D.N.Y. 2014))); *Avola v. Louisiana-Pac. Corp.*, 991 F. Supp. 2d 381, 391 (E.D.N.Y. 2013); *Reed v. Pfizer, Inc.*, 839 F. Supp. 2d 571, 578 (E.D.N.Y. 2012) ("A successful claim of a breach of express warranty requires proof that an express warranty existed, was breached, and that plaintiff had relied on that warranty.").  Moreover, "[i]n order to assert a breach of express warranty claim under New York law, 'a buyer must provide the seller with timely notice of the alleged breach of warranty.'" *Lugones v. Pete & Gerry's Organic, LLC*, 440 F. Supp. 3d 226,

244 (S.D.N.Y. 2020) (quoting *Quinn v. Walgreen Co.*, 958 F. Supp. 2d 533, 544 (S.D.N.Y. 2013)); *see also* N.Y.U.C.C. § 2-607(3)(a) ("[T]he buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy.").

### i.   Plaintiffs' motion

Construing the facts in favor of the Brite Tikes Defendants on Plaintiffs' motion for summary judgment, Plaintiffs are not entitled to summary judgment on their claim of breach of the representations and warranties in the Purchase Agreement because there are disputed issues of material facts regarding whether Brite Tikes Defendants breached any express warranty.[11] Plaintiffs claim the Brite Tikes Defendants breached three warranties: (1) that Brite Tikes would operate the business in the "ordinary course of business," (2) that Brite Tikes would "maintain all required licenses for the business . . . until such licenses are transferred to [Plaintiffs], or until [Plaintiffs are] fully licensed by the State of New York," and (3) that Brite Tikes would "take such reasonable and customary measures necessary to assist [Plaintiffs] to obtain its required licenses." (Pls.' Mem. 28.)  The parties dispute the meaning of "ordinary course of business" as it relates to the Purchase Agreement.  Brite Tikes Defendants argue it refers to "routine tasks needed to keep the business running" and "not a guarantee that no employee thereafter would do a single thing wrong," (Defs.' Opp'n 18), while Plaintiffs argue it encompasses preventing "the use of fraudulent records to satisfy regulatory obligations," (Pls.' Mem. 28–29).  Thus, there is a disputed issue of material fact regarding the definition of "ordinary course of business" as it applies to the contractual relationship between Plaintiffs and Brite Tikes Defendants that must be decided by a jury.  *Nippon Yusen Kaisha v. FIL Lines USA Inc.*, 977 F. Supp. 2d 343, 349

---

[11]   The only element the parties dispute in their moving papers is whether the Brite Tikes Defendants breached the warranties in the Purchase Agreement.

(S.D.N.Y. 2013) ("Where the interpretation of a contract is at issue, 'a motion for summary judgment may be granted only where the agreement's language is unambiguous and conveys a definite meaning.'" (quoting *Am. Home. Assur. Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 316 (2d Cir. 2006))); *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1096 (2d Cir. 1993) (reversing grant of summary judgment where contractual language was "ambiguous").

In addition, the parties dispute whether Brite Tikes failed to take reasonable and customary measures to assist Plaintiffs in obtaining the required licenses. It is undisputed that Brite Tikes Defendants maintained all required licenses until they transferred ownership to Plaintiffs. Plaintiffs' employee Murray testified that Collins "assisted TLE to get the license," and that "TLE got the license." (Jennifer Murray Dep. 235:6–14, annexed to Brite Tikes Defs.' Mot. as Ex. 15, Docket Entry No. 54-15.) However, Plaintiffs contend that although Brite Tikes Defendants maintained licenses for the Center, they did so "through the use of fraudulent records," which "cannot be considered reasonable or customary measures." (Pls.' Opp'n 29.) Therefore, a jury needs to decide these disputed issues of fact in order to determine whether Brite Tikes Defendants breached the representations and warranties in the Purchase Agreement. *See, e.g.*, *Sayers*, 7 F.3d at 1096; *Nippon Yusen Kaisha*, 977 F. Supp. 2d at 349.

The Court therefore denies Plaintiffs' motion for summary judgment as to this claim.

### ii.   Brite Tikes Defendants' motion

Construing the evidence in the light most favorable to Plaintiffs, the existence of disputed material, factual issues also preclude the grant of summary judgment to Brite Tikes Defendants.

The Brite Tikes Defendants argue that although there are fraudulent documents dated during the time period between the date the Purchase Agreement was executed and the closing, there is no evidence that the documents were actually forged during the time frame in which they

26

promised to operate the business in the "ordinary course of business." (Defs.' Mem. 20.) The Brite Tikes Defendants state that "no one knows" when the documents were forged, which is precisely why there is an issue of fact that precludes a grant of summary judgment in favor of Brite Tikes Defendants on this issue. (*Id.*)

The Brite Tikes Defendants argue that even if the documents were forged during the time period between the execution of the Purchase Agreement and the closing, under New York law, that does not necessarily mean they did not operate in the ordinary course of business. (*Id.* at 21.) In support, Brite Tikes Defendants rely on *People v. Kennedy*, 68 N.Y.2d 569 (1986), but this case is inapposite. (*Id.*) In *Kennedy*, the New York Court of Appeals held that the loansharking records of a criminal enterprise could be considered business records admissible as evidence pursuant to a hearsay exception.[12] *Kennedy*, 68 N.Y.2d at 576. The New York Court of Appeals did not consider the definition of "ordinary course of business," and in any event, did not consider the meaning of the phrase in the context of a purchase agreement similar to the agreement at issue before the Court. Therefore, there is a material issue of fact regarding whether Brite Tikes Defendants breached the express warranty in the Purchase Agreement to continue operating Brite Tikes in the "ordinary course of business." The Court therefore denies Brite Tikes Defendants' motion for summary judgment as to this claim.

---

[12] In *Kennedy*, the New York Court of Appeals considered "a novel application of the business records exception to the hearsay rule." *People v. Kennedy*, 68 N.Y.2d 569, 571 (1986). The government prosecuted the defendant for conspiracy and criminal usury and at trial, introduced evidence of two pocket diaries kept as records of a loanshark in the "regular course of his business." *Id.* The Court of Appeals concluded that such criminal records could be admitted as evidence under the hearsay exception because they were made "in the course of some 'business.'" *Id.* at 577. Brite Tikes Defendants argue that because the New York Court of Appeals held that these records could be admitted as being made in the course of business, so too can the fraudulent records at issue here be made in the "ordinary course of business."

Because of the disputed issues of material fact, the Court denies the summary judgment motions by Plaintiffs and Brite Tikes on the breach of representations and warranties claim.

### d.   Fraud claims against all Defendants

Plaintiffs, Brite Tikes Defendants, and Pasaoglu cross-move for summary judgment on Plaintiffs' claim of common law fraud against all Defendants.

Plaintiffs argue that an otherwise valid release may be set aside on the traditional bases of fraud and that Plaintiffs were induced to enter into and close on the Purchase Agreement by fraud committed by Pasaoglu in his capacity as an agent for the Brite Tikes Defendants.  (Pls.' Mem. 26–27.)  In support, Plaintiffs argue first that the "undisputed facts demonstrate that the Brite Tikes employee files were littered with falsified and fraudulent documentation." (*Id.* at 14.)  Second, that Pasaoglu knowingly committed fraud through the use of fraudulent records with the intent to deceive Plaintiffs and Plaintiffs suffered damages from reasonably relying on that fraud.  (*Id.* at 18–21.)  Third, that Pasaoglu's knowledge and conduct can be imputed to the Brite Tikes Defendants because he was acting as their agent.  (*Id.* at 21–23.)  Fourth, that the Brite Tikes Defendants can also be held liable through a vicarious liability theory because they were Pasaoglu's employer.  (*Id.* at 24.)  Fifth, that the Brite Tikes Defendants and Plaintiffs were not in a typical arm's length negotiation between two parties that had no prior relationship, but instead Plaintiffs were entitled to rely on the Brite Tikes Defendants promises and representations in the Franchise Agreement and Personal Guaranties.  (Pls.' Opp'n 15.)  Sixth, that it is undisputed that they performed reasonable due diligence considering the context and nature of the parties' relationship and therefore, this case is distinguishable from cases in which plaintiffs failed to examine the opposing party's representations or perform due diligence in the first place.  (*Id.* at 15–18.)

28

Brite Tikes Defendants argue that Plaintiffs' fraud claim is barred by the representations and warranties in the Purchase Agreement. (Defs.' Opp'n 21.) In support, Brite Tikes Defendants argue that first, Plaintiffs represented that they understood that neither Brite Tikes nor any of its employees or agents were making representations about the subject matter of the transaction other than what was set forth in Article II of the Purchase Agreement. (*Id.*) Second, Plaintiffs released Brite Tikes and its members, employees and agents from all known and unknown claims with any connection to the Franchise Agreement and its termination. (*Id.*) Third, Plaintiffs represented they independently examined the business and its assets. (*Id.*) Fourth, Plaintiffs represented they were buying the Center "as is," and sale of the Center was conditioned on a review by Plaintiffs of the Center's "student files, staff files, and other books and records." (*Id.*) Fifth, under New York law, a specific disclaimer destroys a plaintiff's complaint that the agreement was executed in reliance upon contrary representations. (*Id.* at 22– 23.) Sixth, Plaintiffs are sophisticated parties and the disclaimers at issue were the result of negotiations between the parties, that Plaintiffs had "unfettered access" to every personnel file and record maintained at Brite Tikes, and that Plaintiffs submitted no evidence supporting their position that they "reasonably relied" on the records to their detriment. (*Id.* at 25.) In the alternative, Brite Tikes Defendants argue that Plaintiffs have failed to identify, by clear and convincing evidence, any material misrepresentations, scienter, or reasonable reliance in support of their common law fraud claim. (*Id.* at 25–26.)

Pasaoglu argues that Plaintiffs should not be granted summary judgment on their common law fraud claim because he did not take part in any way in the sale of the Center to Plaintiffs and Plaintiffs have not alleged any misrepresentation or omission of fact made by Pasaoglu to Plaintiffs that Plaintiffs relied on prior to entering the Purchase Agreement.

(Pasaoglu Opp'n 4–6.)  In support, he argues that it is undisputed that he was not an owner of Brite Tikes and did not have any "material role in the transfer of ownership of the childcare center from Brite Tikes to [Plaintiffs] in June 2019."  (Pasaoglu Mem. 2.)  Pasaoglu also argues that, as a mere employee, he had no role in the negotiation nor execution of the Purchase Agreement made between the Brite Tikes Defendants and Plaintiffs.  (*Id.*)

"Under New York law, the essential elements of a fraud claim include 'representation of a material existing fact, falsity, *scienter*, deception, and injury.'"  *Manning v. Utils. Mut. Ins. Co.*, 254 F.3d 387, 400 (2d Cir. 2001) (quoting *N.Y. Univ. v. Cont'l Ins. Co.*, 639 N.Y.S.2d 283, 289 (1995)); *see also Cortes v. 21st Century Fox Am., Inc.*, 751 F. App'x 69, 72 (2d Cir. 2018) (stating the elements of a fraudulent misrepresentation claim).  Specifically, "[t]o state a claim for fraud under New York law, a plaintiff must allege (1) a material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) which the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff."  *Housey v. Proctor & Gamble Co.*, No. 22-CV-888, 2022 WL 17844403, at *1 n.1 (2d Cir. Dec. 22, 2022) (quoting *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 402 (2d Cir. 2015)); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259 (2d Cir. 2021) (same); *GEM Advisors, Inc. v. Corporación Sidenor, S.A.*, 667 F. Supp. 2d 308, 333 (S.D.N.Y. 2009) ("The second element of fraud in New York is intent to defraud, or scienter, which includes knowledge of the falsity of the representation." (citing *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995))).

"At the summary judgment stage, a plaintiff must offer enough evidence to allow a reasonable jury to find by clear and convincing evidence that each of the elements is met."  *Loreley Fin. (Jersey) No. 3 Ltd.*, 13 F.4th at 259–60 (citing *Merrill Lynch & Co. v. Allegheny*

30

*Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007)); *see also Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006) ("[T]he five elements of a fraud claim must be shown by clear and convincing evidence."). "Clear and convincing evidence is evidence that satisfies the factfinder that it is highly probable that what is claimed actually happened and it is evidence that is neither equivocal nor open to opposing presumptions." *Loreley Fin. (Jersey) No. 3 Ltd.*, 13 F.4th at 260 (quoting *Seon v. N.Y. State Dep't of Motor Vehicles*, 74 N.Y.S.3d 20, 25 (2018)).

"[T]hough mental states may be pleaded 'generally,' [a fraud claimant] must nonetheless allege facts 'that give rise to a strong inference of fraudulent intent.'" *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006))). A "strong inference of fraudulent intent" can be shown "by (1) alleging facts to show that defendants had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Gabriele v. Am. Home Mortg. Serv., Inc.*, 503 F. App'x 89, 97 (2d Cir. 2012) (quoting *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 634 (2d Cir. 1996)). A plaintiff must also establish that the defendant made the false material misrepresentation with the intent to deceive. *See, e.g., Meda AB v. 3M Co.*, 969 F. Supp. 2d 360, 386 (S.D.N.Y. 2013) ("A fraud claim is not actionable without evidence that the misrepresentations were made with the intent to deceive." (quoting *Friedman v. Anderson*, 803 N.Y.S.2d 514, 517 (App. Div. 2005))).

"Reasonable reliance entails a duty to investigate the legitimacy of an investment opportunity where 'plaintiff was placed on guard or practically faced with the facts.'" *Crigger*, 443 F.3d at 234 (quoting *Mallis v. Bankers Tr. Co.*, 615 F.2d 68, 81 (2d Cir. 1980)). "Only [w]hen matters are held to be peculiarly within defendant's knowledge[ ] [is it] said that plaintiff

may rely without prosecuting an investigation, as he ha[d] no independent means of ascertaining the truth." *Id.*

    **i.**  **Material misrepresentations or omissions of fact**

    Plaintiffs argue that "Brite Tikes presented the fraudulent records to Plaintiffs" and "misrepresented the validity of the information in the personnel files." (Pls.' Mem. 18.) They argue that in light of the fraudulent documents, the material misstatements included that Brite Tikes would "maintain good standing," "comply with all relevant laws and regulations," "maintain the necessary licenses and permits," and "employ qualified staff and to maintain records for their staff." (Pls.' Opp'n 14–15.) Plaintiffs also argue that Brite Tikes Defendants' statement that they would "operate the business in the ordinary course between execution of the Purchase Agreement and closing" was a material misstatement because that necessarily includes "using genuine staff records, as opposed to falsified or fraudulent staff records." (*Id.*) As to Collins, Plaintiffs argue that her "detailed responses to due diligence requests from TLE" were material misstatements. (*Id.*)

    Brite Tikes Defendants argue that Plaintiffs have failed to identify, by clear and convincing evidence, any material misrepresentations, and the statements that Plaintiffs allege are misrepresentations are "nonsensical." (Defs.' Opp'n 24.) In support, they contend that Jubran's statement that the Center operated by Plaintiffs would be their "flagship in NY" was not a material misrepresentation, but a statement of opinion made after the parties agreed to terms. (Defs.' Mem. 25.) In addition, Brite Tikes Defendants argue that Collins' suggestion to Plaintiffs that employee Ambar Rodriguez was a "qualified designee" for Center Director was not a material misstatement because Collins was unaware that Rodriguez had not completed all of her education course work — Collins made a suggestion based on her sincere belief, not a misrepresentation. (*Id.* at 26.)

Pasaoglu argues that Plaintiffs have "failed to allege any misrepresentation or omission of fact made by Pasaoglu to TLE that TLE relied upon." (Pasaoglu Opp'n 5.)

### 1. Plaintiffs' motion

Construing the evidence in Defendants' favor on Plaintiffs' motion for summary judgment, Plaintiffs have demonstrated that Pasaoglu made a material misrepresentation or omission of fact by providing evidence that Pasaoglu had altered documents on his laptop. Because the parties do not dispute that forged or altered documents existed, Plaintiffs have established this element by clear and convincing evidence as to Pasaoglu.

### 2. Brite Tikes Defendants' motion

On Brite Tikes Defendants' motion for summary judgment, the Court construes the evidence in Plaintiffs' favor. Brite Tikes Defendants have not demonstrated that the statements made by Brite Tikes to comply with relevant laws and regulations and employ qualified staff and maintain records were not material misrepresentations. If, as Plaintiffs allege, the underlying staff records were fraudulent at the relevant time, then these statements would constitute material misrepresentations because Plaintiffs would have been unlikely to purchase the Brite Tikes franchise. In addition, Brite Tikes Defendants have not shown that Collins' responses to due diligence requests are not material misrepresentations because if her statements were incorrect, and both sides agree that they were, then they were misrepresentations that were material to the deal to purchase Brite Tikes. *See, e.g.*, *Hatteras Enters., Inc. v. Forsythe Cosmetic Grp., Ltd.*, No. 15-CV-5887, 2022 WL 3682270, at *14 (E.D.N.Y. Aug. 25, 2022) (finding that untrue statements regarding the sale of defendants' business, a non-public company, were material misstatements); *Scottsdale Ins. Co. v. Priscilla Props., LLC*, 254 F. Supp. 3d 476, 483 (E.D.N.Y. 2017) (finding that party failed to satisfy its evidentiary burden on summary judgment where it

failed to show that its misrepresentations were not material).

However, Brite Tikes Defendants have demonstrated that Jubran's statement that the Center would become the "flagship in NY," is not a material misrepresentation because statements which are opinions regarding future events are insufficient to establish a fraud claim. *See W. Valley KB Venture, LLC v. ILKB LLC*, No. 20-CV-3278, 2021 WL 4171918, at *8 (E.D.N.Y. Sept. 13, 2021) ("Statements 'which are mere 'puffery' or opinions as to future events are not sufficient to establish a fraud claim.'" (quoting *N.Y. Islanders Hockey Club v. Comerica Bank-Texas*, 71 F. Supp. 2d 108, 118 (E.D.N.Y. 1999))).

### 3.   Pasaoglu's motion

On Pasaoglu's motion for summary judgment, the Court construes the evidence in Plaintiffs' favor.  In view of the Court's finding that Plaintiffs have demonstrated that Pasaoglu made a material misrepresentation or omission of fact, he cannot show otherwise on his motion for summary judgment.

### ii.   Knowledge

Plaintiffs argue that "Brite Tikes, through Pasaoglu, knowingly misrepresented the validity of the information in the personnel files."  (Pls.' Mem. 18.)  They contend that "Pasaoglu was charged with maintaining the personnel files and ensuring regulatory compliance at the Center," and "was directly responsible for forging, falsifying, or altering the personnel files." (*Id.* at 19.)  Plaintiffs also argue that "[e]ven if the Brite Tikes Defendants did not know about Pasaoglu's fraud . . . they are none-the-less liable because Pasaoglu was acting at all times as their agent," and the Brite Tikes Defendants are also "vicariously liable for Pasaoglu's fraud as his employer."  (*Id.* at 21–24.)  In support, Plaintiffs argue that under New York agency law, the "acts and knowledge of an agent acting within the scope of his agency are imputed to the agent's principal," (Pls.' Opp'n 18 (quoting *In re Maxwell Newspapers, Inc.*, 164 B.R. 858, 866 (Bankr.

34

S.D.N.Y. 1994)), and "where conduct falls within the scope of the agents' authority, everything they know or do is imputed to their principals," (*id.* at 19 (quoting *In re Maxwell Newspapers, Inc.*, 164 B.R. at 866)).  In addition, Plaintiffs argue that the "doctrine of respondeat superior" renders the Brite Tikes Defendants, including Collins and Jubran, liable for Pasaoglu's torts. (Pls.' Opp'n 19.)  In support, Plaintiffs contend that because "Collins and Jubran personally guaranteed the obligations of the Center," Pasaoglu was operating as their agent as well.  (*Id.* at 20.)

Brite Tikes Defendants argue that there is no clear and convincing evidence that Jubran or Collins knew about any misdeeds in record keeping, and specifically argue that there is no evidence that Collins knew that employee Ambar Rodriguez was not qualified because certain of her education work had not been completed.  (Defs.' Mem. 25–26.)

### 1.  Plaintiffs' motion

Construing the evidence in Defendants' favor on Plaintiffs' motion for summary judgment, Plaintiffs have shown by clear and convincing evidence that Pasaoglu had knowledge of the falsity of the information in the personnel files.  The evidence relied on by Plaintiffs demonstrates that Pasaoglu's responsibilities included "control of the personnel files and compliance with the laws and regulations regarding the personnel files."  (Pls.' Mem. 23; Pls.' 56.1 ¶¶ 35–39, 41–44.)  Plaintiffs also present evidence demonstrating that Murray testified that Pasaoglu "pulled up a word template on his personal computer to show her one of the State agency forms and she kn[ew] it wasn't right."  (Pls.' 56.1 ¶ 85.)  Plaintiffs also present evidence that Pasaoglu invoked his Fifth Amendment right repeatedly when asked whether he falsified documents.  (*Id.* ¶ 96.)  Therefore, Plaintiffs have demonstrated by clear and convincing evidence that Pasaoglu had knowledge of material misrepresentations and omissions.  *See, e.g.,*

*E\*TRADE Fin. Corp. v. Deutsche Bank AG*, 631 F. Supp. 2d 313, 382 (S.D.N.Y. 2009), (finding that plaintiff established defendant's knowledge of the falsity of a misrepresentation where defendant's testimony "was not persuasive"), *aff'd*, 374 F. App'x 119 (2d Cir. 2010).

### 2.   Brite Tikes Defendants' motion

On Brite Tikes Defendants' motion for summary judgment and construing the evidence in Plaintiffs' favor, there is no dispute that Pasaoglu was an employee of Brite Tikes and as Center Director, he was responsible for obtaining personnel clearances.  Thus, Pasaoglu was acting within the scope of his actual authority when allegedly falsifying and forging personnel records.  Therefore, Plaintiffs have demonstrated by clear and convincing evidence that Pasaoglu's knowledge of fraud can be imputed to Brite Tikes. *See In re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 453–54 (S.D.N.Y. 2001) (finding that knowledge of fraudulent inducement was imputed to principals where their agent acted within the scope of his authority to execute allegedly fraudulent trades, even absent the principals' "knowledge of the fraud or lack of their own fraudulent intent"); *see also Fineberg v. Stone (In re Brainard Hotel Co.)*, 75 F.2d 481, 482 (2d Cir. 1935).

However, as to Collins and Jubran personally, Plaintiffs fail to show that Pasaoglu's knowledge can be imputed to them as a matter of law.  Pasaoglu was an employee of Brite Tikes, not a personal employee of Collins and Jubran.  Plaintiffs have not argued or shown that the corporate veil should be pierced in order to impute liability onto Collins and Jubran as owners of Brite Tikes, nor can the Court identify any reason to pierce the corporate veil.

In addition, Collins' statement regarding Rodriguez's qualifications for the position of Center Director — though a material statement — was not made with knowledge of its falsity because Plaintiffs have not provided any evidence that Collins had knowledge her statement was

36

false.  *See Vineyard Oil & Gas Co. v. Stand Energy Corp.*, 846 N.Y.S.2d 516, 517 (App. Div. 2007) (finding that where a plaintiff had a good faith belief in applicability of a contract provision, defendant failed to establish by clear and convincing evidence that plaintiff's reliance on that provision was knowingly false).  Indeed, Plaintiffs have conceded that Collins and Jubran did not forge any documents and did not ask Pasaoglu or anybody else to forge or alter any documents, (Pls.' 56.1 Resp. ¶¶ 65–66, 70–73), and there is no evidence that Collins and Jubran knew that any documents had been forged or altered.  Therefore, Plaintiffs fail to establish the element of knowledge as to Collins and Jubran and their fraud claim against Collins and Jubran fail.

Because the Court finds that Defendants have shown there is no dispute that Collins and Jubran did not have knowledge of any material misstatements or omissions, Plaintiffs cannot maintain their common law fraud claim against Collins and Jubran and the Court therefore grants the motion for summary judgment as to Collins and Jubran as to this claim.

### 3.   Pasaoglu's motion

Pasaoglu does not make any arguments regarding the knowledge element.  (*See* Pasaoglu Mem.)  As discussed above, Plaintiffs have shown by clear and convincing evidence that Pasaoglu had knowledge of the falsity of the information in the personnel files.  Therefore, Pasaoglu cannot demonstrate lack of knowledge.

### iii.   Intent

Plaintiffs argue that "Brite Tikes presented the fraudulent records to Plaintiffs with the intent that Plaintiffs rely upon them."  (Pls.' Mem. 18.)  Plaintiffs argue that intent can be shown through circumstantial evidence that supports a strong inference that the Defendants possessed the requisite fraudulent intent.  (*Id.* at 19.)

Brite Tikes Defendants argue that at best, Plaintiffs have "offered circumstantial evidence

37

that a former employee of the Brite Tikes Defendants prepared forged personnel records to meet certain [DOH] regulatory requirements, for which management of Brite Tikes had no knowledge." (Defs.' Opp'n 27.)  In support, Brite Tikes Defendants argue there has been "no showing of an intent by the Brite Tikes Defendants to deliberately use those documents to defraud" Plaintiffs, and "[a]t most, it was a failure by Brite Tikes to realize an employee was shirking his responsibilities." (*Id.* at 27 (emphasis omitted).)

### 1. Plaintiffs' motion

Plaintiffs have not set forth clear and convincing evidence that the Brite Tikes Defendants intended to defraud Plaintiffs.  The circumstantial evidence does not establish that any of the Brite Tikes Defendants knew or should have known about the alleged forged documents.  The undisputed facts indicate that Collins and Jubran had no part in the altering or forging of documents nor are there any facts that establish they had knowledge that documents were forged.  Therefore, they could not have intended to defraud Plaintiffs.  Accordingly, the Court denies Plaintiffs' motion for summary judgment on their fraud claim as to the Brite Tikes Defendants.

As to Pasaoglu, the evidence presented by Plaintiffs demonstrates that documents in possession of Pasaoglu or at least under his supervision were forged or altered.  The DOI clearance letters for various staff members all have the same fingerprint date, same DOI ID number, and the same social security number.  (City of N.Y. Dep't of Investigation, Duplicate Letters, annexed to Pls.' Mot. as Ex. 50, Docket Entry No. 67-50.)  Confronted with these documents, Pasaoglu invoked his Fifth Amendment privilege.  (*See* Pasaoglu Dep. Tr. Excerpts, annexed to Pls.' Mot. as Ex. 14, Docket Entry No. 67-14.)  In addition, one Brite Tikes employee's files had multiple DOI letters including letters dated before she was even hired at

Brite Tikes.  (*See* Pls.' Mem. at 16–17; City of N.Y. Dep't of Investigation, Duplicate Letters Re:

Luiza Marcu, annexed to Pls.' Mot. as Ex. 49, Docket Entry No. 67-49.)  Pasaoglu also invoked

his Fifth Amendment privilege when confronted with this discrepancy.  Given the various

discrepancies and oddities in the Brite Tikes Defendants' staff's files and Pasaoglu's position as

Center Director and his responsibilities of credentialing employees and his role in hiring,

Plaintiffs have presented clear and convincing evidence that Pasaoglu intended to commit fraud.

### 2.   Brite Tikes Defendants' motion

On Brite Tikes Defendants' motion for summary judgment and construing the evidence

in Plaintiffs' favor, there is no dispute that Brite Tikes Defendants had any part in the altering or

forging of documents and there are no facts showing they had knowledge that documents were

forged.  Because Plaintiff fails to show that Brite Tikes Defendants had knowledge of the fraud,

they cannot therefore show that Brite Tikes Defendants had the intent to defraud Plaintiff. The

Court finds that Brite Tikes Defendants have met their burden of demonstrating that there is no

issue of material fact that they had the requisite intent to defraud Plaintiff.  Thus, Plaintiffs

cannot sustain their common law fraud claim against Brite Tikes Defendants.

### 3.   Pasaoglu's motion

Pasaoglu does not make any arguments regarding the intent element.  (*See* Pasaoglu

Mem.)  As discussed above, Plaintiffs have shown by clear and convincing evidence that

Pasaoglu intended to commit fraud.  Therefore, Pasaoglu cannot demonstrate lack of intent.

### iv.   Reasonable reliance

Plaintiffs argue that they (1) "relied upon the fraudulent records when assessing whether

the Brite Tikes franchise location was compliant with the Franchise Agreement," and (2) "relied

upon the fraudulent records in making [their] decision to execute the [Purchase Agreement] and,

ultimately, close on the purchase."  (Pls.' Mem. 19–20.)  In addition, Plaintiffs argue their

reliance was reasonable because where "the accuracy of the records is peculiarly within Defendants' knowledge, a plaintiff may reasonably rely upon the information presented by a defendant without prosecuting an investigation because the plaintiff would have no independent means of ascertaining the truth." (*Id.* at 20.) Plaintiffs further argue they performed "reasonable due diligence considering the context and nature of the parties' relationships," and they were not "obligated to perform forensic analysis of staff clearances and other records maintained by Brite Tikes." (Pls.' Opp'n at 15–16.) In support, Plaintiffs argue that the alterations or impropriety of the staff records were discreet or not immediately recognizable. (*Id.*)

In addressing the "anti-reliance disclaimers" in the Purchase Agreement, Plaintiffs argue that: (1) "only one of the cited provisions . . . is actually contained in the 'Purchaser Representations' section of the Purchase Agreement," (2) the disclaimers "do not specifically reference staff files," and (3) the disclaimer "is not enforceable because a non-reliance clause is enforceable only if it tracks the substance of the alleged misrepresentation" and "general disclaimer language is ineffective to preclude a fraud claim as a matter of law." (Pls.' Reply 30–31.) Plaintiffs also argue that the "peculiar knowledge exception" applies here. (*Id.* at 33.) The peculiar knowledge exception states that "a specific disclaimer of reliance can be insufficient to bar a fraud claim where the facts allegedly misrepresented are within the defendant's knowledge." (*Id.* at 33–34 (quoting *DIMON Inc. v. Folium, Inc.*, 48 F. Supp. 2d 359, 368 (S.D.N.Y. 1999).)

Brite Tikes Defendants argue that Plaintiffs cannot now claim to have reasonably relied on any representations made by Brite Tikes or any of its employees or agents because Plaintiffs' fraud claims "are barred by the representations and warranties in the Purchase Agreement." (Defs.' Opp'n 21.) In support, Brite Tikes Defendants argue that "a specific disclaimer defeats"

any such fraud claim.  (Defs.' Opp'n 23.)  In addition, Brite Tikes Defendants argue that even if there was evidence of misstatements, Plaintiffs are held to a "higher level of scrutiny as a sophisticated business entity that had access to pertinent information."  (Defs.' Mem. 26 (citation omitted).)  They point out that Plaintiffs were also represented by counsel, they had "unfettered access to every personnel file and record maintained at Brite Tikes," (Defs.' Opp'n 25), they had the right to review, and in fact did review, the files.  (Defs.' Mem. 26–27.)

Pasaoglu argues that he "did not take part in any way, shape or form in Brite Tikes sale of the childcare facility to [Plaintiffs]."  (Pasaoglu Opp'n 5.)  In support, Pasaoglu contends that Plaintiffs have not alleged nor set forth any evidence that he "either spoke with or provided any documentation to any representative of TLE prior to TLE's execution of the Purchase Agreement," or "that [he] made any representations to TLE what-so-ever that the childcare center was in good standing or otherwise prior to the purchase."  (*Id.*)

The Release Agreement states that Plaintiffs:

> hereby release, cancel, forgive and forever discharge [Brite Tikes Defendants], predecessors, parents corporations, holding companies, divisions, subsidiaries, affiliates, franchises, heirs, successors and assigns, and all of their respective officers, directors, members, managers, employees, shareholders, representatives, insurers and agents from any and all actions, claims, demands, damages, obligations, liabilities, controversies and executions, of any kind or nature whatsoever, whether known or unknown, whether suspected or not, arising under, resulting from or in any way in connection with the Franchise Agreement and the related franchise documents and/or the termination thereof as set forth above, from the first day of the world[.]

(Release Agreement 3.)

### 1.   Plaintiffs' motion

Construing the evidence in favor of Defendants, the Court finds that there is no dispute of material fact regarding whether Plaintiffs' reliance on any alleged misrepresentations was

41

reasonable in light of the release.  Because the Purchase Agreement explicitly states, "Seller shall not be deemed to have made to Purchaser (or any representative of Purchaser) any representation or warranty other than as expressly made by Seller in Article II hereof,"[13] (Purchase Agreement Art. VII. D), Plaintiffs cannot now claim that they justifiably relied on the representations beyond the confines of Article II of the Purchase Agreement.  *See Cobalt Partners, L.P. v. GSC Cap. Corp.*, 944 N.Y.S.2d 30, 42 (App. Div. 2012) ("Accordingly, plaintiffs expressly disclaimed reliance on any representations other than those they received from the Fund alone and cannot now complain that Group made them some sort of independent promise."); *Matana v. Merkin*, 989 F. Supp. 2d 313, 319 (S.D.N.Y. 2013) (same); *Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*, 382 F. Supp. 2d 411, 417 (S.D.N.Y. 2003) ("Where a party specifically disclaims reliance upon a representation in a contract, that party cannot, in a subsequent action for fraud, assert it was fraudulently induced to enter into the contract by the very representation it has disclaimed.").

As acknowledged by Plaintiffs, New York law "takes a contextual view, focusing on the level of sophistication of the parties, the relationship between them, and the information available at the time of the operative decision." *JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 406 (S.D.N.Y. 2004).  Plaintiffs cannot attack the validity of a release that they willingly signed as part of an arms-length commercial transaction.  *See Centro Empresarial*

---

[13] Article II of the Purchase Agreement titled "Seller's Representations" includes Brite Tikes Defendants' representations, warranties, and covenants to, among other things, "convey to [Plaintiffs] at Closing good and marketable title," Brite Tikes "shall cooperate as reasonably necessary to ensure the orderly transition of the operations of the Business to [Plaintiffs]," Brite Tikes "shall maintain all required licenses for the Business in its own name, until such licenses are transferred to [Plaintiffs], or until [Plaintiffs are] fully licensed by the State of New York," and "[a]t all times prior to the Closing, [Brite Tikes] shall operate the Business in the ordinary course of business, including without limitation the timely payment of all Base Rent, Additional Rent, and any other sums required to be paid."  (Purchase Agreement Art. II.)

*Cempresa S.A. v. Am. Móvil, S.A.B. de C.V.*, 17 N.Y.3d 269, 278 (2011) ("Plaintiffs here are large corporations engaged in complex transactions in which they were advised by counsel. As sophisticated entities, they negotiated and executed an extraordinarily broad release with their eyes wide open. They cannot now invalidate that release by claiming ignorance of the depth of their fiduciary's misconduct."). The parties were represented by counsel during the negotiation of the Purchase Agreement, Plaintiffs had access to every personnel file and record maintained at the Center, and Plaintiffs do not present any evidence demonstrating that they *reasonably* relied on the fraudulent records to their detriment. *See Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir. 1984) ("Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance."); *Merrill Lynch & Co.*, 382 F. Supp. 2d at 416–17 (same). Therefore, there is no issue of material fact as to whether Plaintiffs' reliance on any false representation was reasonable.

Plaintiffs' argument that the peculiar knowledge exception applies fails for the same reasons. The exception does not apply because the facts allegedly misrepresented were not peculiarly within Defendants' knowledge. Although the parties had a pre-existing relationship because Brite Tikes was a TLE franchise, it is undisputed that Plaintiffs had access to the staff files and did, in fact, review them. Therefore, this exception is inapplicable as Plaintiffs had many opportunities to discover any fraudulent documents. *See Banque Arabe et Internationale D'Investissement*, 57 F.3d at 156 (holding that the party could not reasonably rely on the other party to disclose the allegedly fraudulently concealed information because the information generally was readily accessible to anyone who inquired and the risk associated with this information was known and disclosed).

In order to negate the Release Agreement, Plaintiffs would have to argue that they were fraudulently induced into agreeing to that portion of the Release Agreement. *See Centro Empresarial Cempresa S.A.*, 17 N.Y.3d at 276 ("Notably, a release may encompass unknown claims, including unknown fraud claims, if the parties so intend and the agreement is fairly and knowingly made. . . . [A] party that releases a fraud claim may later challenge that release as fraudulently induced only if it can identify a separate fraud from the subject of the release." (internal quotation marks and citations omitted)). The Court does not understand Plaintiffs to be arguing that they were fraudulently induced into the Release Agreement itself because Plaintiffs have not "identif[ied] a separate fraud from the subject of the [Release Agreement]." *Id.* Therefore, the Court finds that there is no factual dispute that the Franchise Agreement terminated upon the closing and no dispute of material fact that Plaintiffs' reliance on any alleged misrepresentation was unreasonable.

Accordingly, the Court denies Plaintiffs' motion for summary judgment on their fraud claim.

### 2.  Brite Tikes Defendants' motion

In addition to failing to demonstrate that Brite Tikes Defendants intended to defraud Plaintiffs, Plaintiffs' claim against them also fails because there is no dispute of material fact as to the unreasonableness of Plaintiffs' reliance. The Court finds that Brite Tikes Defendants have met their burden of demonstrating that Plaintiffs did not reasonably rely on any alleged misrepresentations. Therefore, the Court grants Brite Tikes Defendants' motion for summary judgment on Plaintiffs' common law fraud claim and dismisses this claim against the Brite Tikes Defendants.

### 3.   Pasaoglu's motion

Pasaoglu has provided undisputed evidence that Plaintiffs did not reasonably rely on any alleged misrepresentations by him.  As discussed above, the Release Agreement expressly states that Plaintiffs "hereby release, cancel, forgive . . . you, [and] your . . . employees . . . from any and all actions, claims, demands, damages, obligations, liabilities . . . arising under, resulting from or in any way in connection with the Franchise Agreement and the related franchise documents."  (Release Agreement § 6(b).)  The Release Agreement undisputedly covered employees of Brite Tikes, including Pasaoglu.  In addition, Pasaoglu was not a party to the Purchase Agreement and therefore, Plaintiffs could not have reasonably relied on any of his statements.  (Pls.' 56.1 ¶ 59).  Because Pasaoglu has met his burden in demonstrating that Plaintiffs did not reasonably rely on any alleged misrepresentations, the Court grants Pasaoglu's motion for summary judgment on Plaintiffs' common law fraud claim.

Because there is no dispute of material fact that Plaintiffs' reliance was unreasonable, the Court denies Plaintiffs' motion for summary judgment, and grants the Defendants' motions for summary judgment on Plaintiffs' common law fraud claim.

### e.   Fraudulent inducement claims against all Defendants

Plaintiffs, Brite Tikes Defendants, and Pasaoglu cross-move for summary judgment on Plaintiffs' fraudulent inducement claims against all Defendants.

The parties raise the same arguments as they did on their motions for summary judgment on the common law fraud claim.[14]  (*See supra* section II(d).)

---

[14]  Brite Tikes Defendants and Pasaoglu also argue that Plaintiffs' fraudulent inducement claim is impermissibly duplicative of the common law fraud claim and must be dismissed because both claims "arise out of the same facts."  (Defs.' Mem. 27; Pasaoglu Opp'n 6.) Plaintiffs do not respond to these arguments.  Because the Court dismissed the common law fraud claim, the Court reviews the fraudulent inducement claim.

Under New York law, the elements of fraudulent inducement are similar to those of common law fraud. *See Senior Health Ins. Co. of Pa. v. Beechwood Re Ltd.*, 345 F. Supp. 3d 515, 527 (S.D.N.Y. 2018) (citing *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 165 (App. Div. 2003)). "[A] plaintiff must show that '(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance.'" *NRW, Inc. v. Bindra*, 775 F. App'x 22, 24 (2d Cir. 2019) (quoting *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415–16 (2d Cir. 2006)); *see also Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 62 (2d Cir. 2012) (stating the elements of fraudulent inducement).

Similar to a common law fraud claim under New York law, one of the elements of a fraudulent inducement claim requires that "the plaintiff reasonably relied upon the representation," made by the defendant. *NRW, Inc.*, 775 F. App'x at 24 (quoting *Wall*, 471 F.3d at 415–16). For the reasons stated above in addressing Plaintiffs' common law fraud claim, *supra* section II(d)(iv), the Court finds that there is no dispute of material fact regarding whether Plaintiffs' reliance on any alleged misrepresentations was reasonable in light of the release. Because the Court finds that there is no dispute of material fact that Plaintiffs' reliance was unreasonable, Plaintiffs cannot succeed on their motion for summary judgment on their fraudulent inducement claim. For the same reason that there is no dispute of material fact that Plaintiffs' reliance was unreasonable, the Court finds that Brite Tikes Defendants and Pasaoglu have met their burdens of demonstrating that Plaintiffs did not reasonably rely on any alleged misrepresentations. *See Brady v. Town of Colchester*, 863 F.2d 205, 210–11 (2d Cir. 1988) ("[I]n cases where the nonmovant will bear the ultimate burden of proof at trial on an issue, the

moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.").

Because there is no dispute of material fact that Plaintiffs' reliance was unreasonable, the Court denies Plaintiffs' motion for summary judgment, and grants Brite Tikes Defendants' and Pasaoglu's motions for summary judgment on Plaintiffs' fraudulent inducement claim.

### f. Conspiracy to commit fraud claim against all Defendants

Brite Tikes Defendants and Pasaoglu move for summary judgment on Plaintiffs' conspiracy to commit fraud claim.

Brite Tikes Defendants argue that there is no evidence that demonstrates that any of the Brite Tikes Defendants and Pasaoglu agreed to commit any alteration of documents. (Defs.' Mem. 28–29.) Pasaoglu argues that there is no evidence that establishes that any of the Defendants together, or with anyone else, agreed to commit any alteration of documents or to otherwise defraud Plaintiffs. (Pasaoglu Mem. 7.) Plaintiffs do not respond to Defendants' argument.

"New York does not recognize an independent tort of conspiracy" and liability can only be available based on the establishment of "an independent underlying tort." *Dell's Maraschino Cherries Co. v. Shoreline Fruit Growers, Inc.*, 887 F. Supp. 2d 459, 482 (E.D.N.Y. 2012) (quoting *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 402 (2d Cir. 2006)); *see also Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 114 (2d Cir. 2018) ("As to the civil conspiracy claim, the District Court noted that New York 'does not recognize an independent tort of conspiracy' and concluded that, because [plaintiff] has not provided evidence of 'an otherwise actionable tort' here — the tortious interference claim — its civil conspiracy claim failed as a matter of law." (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 123 F. Supp. 3d 478, 510–11

47

(S.D.N.Y. 2015)); *McCall v. Chesapeake Energy Corp.*, 509 F. App'x 62, 65 (2d Cir. 2013) ("There is no independent tort of conspiracy in New York . . . . Because the claims that could have provided a basis for the civil conspiracy claim were dismissed, this claim must also fail as a matter of law and was rightly dismissed by the district court." (citations omitted)); *Jean–Laurent v. Hennessy*, 840 F. Supp. 2d 529, 560 (E.D.N.Y. 2011) ("New York does not recognize an independent tort of civil conspiracy, such a cause of action is available only if there is evidence of an underlying actionable tort." (quoting *Baker v. R.T. Vanderbilt Co.*, 688 N.Y.S.2d 726, 729 (App. Div. 1999))); *In re Hoge*, 946 N.Y.S.2d 350, 353 (App. Div. 2012) ("New York does not recognize civil conspiracy to commit a tort as an independent cause of action." (citations omitted)). A defendant is entitled to summary judgment on a conspiracy to commit a tort where the plaintiff fails to sustain any underlying tort claims. *See Nissan Motor Acceptance Corp. v. Scialpi*, 944 N.Y.S.2d 160, 162 (App. Div. 2012) ("The respondents were entitled to summary judgment dismissing the causes of action to recover damages for conspiracy to commit fraud and conspiracy to commit a tortious act insofar as asserted against them, since a cause of action sounding in civil conspiracy cannot stand alone, but stands or falls with the underlying torts.").

Plaintiffs have failed to establish the underlying fraud and fraudulent inducement claims, therefore the conspiracy to commit fraud claim also fails. Moreover, even construing the evidence in Plaintiffs' favor, there is no evidence that demonstrates Brite Tikes Defendants and Pasaoglu made an agreement to alter any documents. As discussed above, Plaintiffs have conceded that Collins and Jubran did not forge any documents and did not ask Pasaoglu or anybody else to forge or alter any documents, (Pls.' 56.1 Resp. ¶¶ 65–66, 70–73), and there is no evidence that Collins and Jubran knew that any documents had been forged or altered.

Accordingly, the Court grants Defendants summary judgment as to Plaintiffs' conspiracy claim and dismisses this claim as to all Defendants.

### g.   Negligent misrepresentation and omission claim against Brite Tikes Defendants

Plaintiffs and Brite Tikes Defendants cross-move for summary judgment on Plaintiffs' negligent misrepresentation and omission claim against the Brite Tikes Defendants.

Plaintiffs argue that Brite Tikes, as a franchisee, had a "special relationship with TLE and a duty to provide accurate information to TLE." (Pls.' Mem. 25.)  Relying on the Franchise Agreement, Plaintiffs argue that Brite Tikes Defendants and Pasaoglu "were required to protect Plaintiffs' brand" and were under other independent legal obligations. (Pls.' Opp'n 21.)  In addition, they argue that a special relationship existed because the misrepresented facts were "peculiarly within" the Defendants' knowledge. (*Id.* at 21–22.)  Further, Plaintiffs argue that by presenting the fraudulent documents to Plaintiffs, Pasaoglu, acting as agent for the Brite Tikes Defendants, made false representations which are imputed to the Brite Tikes Defendants as his principal. (Pls.' Mem. 25.)

Brite Tikes Defendants argue that Plaintiffs' negligent misrepresentation claim is duplicative of its other claims and is barred by the parties' release and representations. (Defs.' Opp'n 27.)  In addition, they argue that Plaintiffs have not alleged a special relationship between Brite Tikes and Plaintiffs or any legal duty independent of the Purchase Agreement. (Defs.' Mem. 29.)  In support, they argue that this was an "arm's length transaction between two commercial parties, represented by counsel" and because Collins and Pasaoglu were not individual parties to the Purchase Agreement, there is no special relationship. (*Id.*)  Lastly, Brite Tikes Defendants argue that no files were omitted or misrepresented. (*Id.*)

Under New York law, a claim for negligent misrepresentation or omission requires "(1)

49

the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect [or withheld]; and (3) reasonable reliance on the information [or omission].'" *ICD Cap., LLC v. Codesmart Holdings, Inc.*, 842 F. App'x 705, 706 (2d Cir. 2021) (quoting *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 490 (2d Cir. 2014)); *see also J.A.O. Acquisition Corp. v. Stavitsky*, 831 N.Y.S.2d 364, 366 (2007); *United Merch. Wholesale, Inc. v. IFFCO, Inc.*, 51 F. Supp. 3d 249, 273 (E.D.N.Y. 2014) (applying these factors in the negligent omission context). "In the commercial context, liability for negligent representation is imposed 'only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified.'" *ICD Cap., LLC*, 842 F. App'x at 706 (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004)).

### 1. Plaintiffs' motion

Plaintiffs have not established the existence of a special relationship between the parties. Plaintiffs rely on the fact that Brite Tikes was a franchisee of TLE and therefore had a duty to provide accurate information particularly in connection with the Brite Tikes Defendants' compliance with laws and regulations. However, a franchisor-franchisee relationship does not constitute a special relationship sufficient to support a negligent misrepresentation claim. *See ILKB, LLC v. Singh*, No. 20-CV-4201, 2021 WL 2312951, at *5 (E.D.N.Y. June 7, 2021) ("[I]t is well established that, in general, the relationship between franchisor and franchisee does not constitute the sort of relationship needed to support a negligent misrepresentation claim." (quoting *JM Vidal, Inc. v. Texdis USA, Inc.*, 764 F. Supp. 2d 599, 625 (S.D.N.Y. 2011)); *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 215 (S.D.N.Y.

2007) ("A simple commercial relationship, such as that between a franchisor and franchisee, does not constitute the kind of special relationship necessary for a negligent misrepresentation claim."); *@Wireless Enters., Inc. v. AI Consulting, LLC*, No. 05-CV-6176, 2006 WL 3370696, at *12 (W.D.N.Y. Oct. 30, 2006) (same).  Plaintiffs do not point to any facts in the record suggesting that a special relationship existed between the parties outside of a franchisor-franchisee relationship.  In the absence of any evidence of a special relationship between the parties, Plaintiffs cannot sustain a claim for negligent misrepresentation or omission.  The Court therefore denies Plaintiffs' motion for summary judgment on this claim.

### 2.   Brite Tikes Defendants' motion

For the same reasons, the Court grants Brite Tikes Defendants' motion as to this claim. Brite Tikes Defendants have shown that there is no special relationship between the parties because a franchisor-franchisee relationship is not a special relationship under New York law. Plaintiffs' argument that the misrepresented facts were "peculiarly within" the Defendants' knowledge is unavailing because Plaintiffs concede that they had access to, and did in fact review, the staff files and other documents.  Therefore, the Court grants Brite Tikes Defendants' motion for summary judgment on the negligent misrepresentation and omission claim.

### h.   Indemnification claim against Brite Tikes Defendants

Plaintiffs and Brite Tikes Defendants cross-move for summary judgment on Plaintiffs' indemnification claim against Brite Tikes Defendants.  Plaintiffs seeks indemnification from the Brite Tikes Defendants' pursuant to the indemnification clause of the Purchase Agreement for liabilities Plaintiffs have incurred including "the costs incurred to report the documentation issues to the relevant authorities and to remediate the issues caused by [Brite Tikes] Defendants' conduct."  (Am. Compl. ¶¶ 156–159.)

Plaintiffs argue that the fraudulent records "created by Pasaoglu during his tenure as Center Director for Brite Tikes" represented a liability accrued by Brite Tikes before the closing. (Pls.' Mem. 29.)  They argue that because the Purchase Agreement included an indemnification clause for liabilities caused by Brite Tikes prior to closing, the Brite Tikes Defendants are obligated to indemnify and hold Plaintiffs' harmless from the harm they suffered as a result of this accrued liability.  (*Id.* at 29.)

Brite Tikes Defendants argue that Plaintiffs are not entitled to indemnification because they did not incur any liabilities prior to closing.  (Defs.' Opp'n 28.)  They contend that the Center was not the subject of an enforcement action until February 23, 2020 when DOH closed the Center.  (*Id.*)  By that date, Plaintiffs owned and controlled the Center for almost eight months and there is no evidence of any violation that occurred during Brite Tikes ownership of the Center that DOH relied on when issuing its closing order.  (*Id.* (citing Defs.' 56.1 ¶ 53).)

"'[U]nder New York law, absent 'unmistakably clear' language in an indemnification provision that demonstrates that the parties intended the clause to cover first-party claims, an agreement between two parties 'to indemnify' each other does not mean that one party's failure to perform gives rise to a claim for indemnification." *Lehman XS Tr., Series 2006-GP2 by U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, 916 F.3d 116, 125–26 (2d Cir. 2019) (quoting *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 21 (2d Cir. 1996)); *see also India Globalization Cap., Inc. v. Apogee Fin. Invs., Inc.*, No. 21-CV-1131, 2022 WL 671172, at *8 (S.D.N.Y. Mar. 4, 2022) ("Under New York law, indemnification clauses must be strictly construed to avoid implying obligations that were not in the consideration of the parties. . . . Accordingly, the default presumption in New York is that indemnity clauses cover only third-party claims and do not govern disputes between the contracting parties.") (internal

quotation marks, citations, and footnote omitted).   "[A]bsent such language, '[w]here parties

agree to 'indemnify' each other for losses incurred by a breach of contract, where those lo[s]ses

do not relate to liability to a third party, the characterization of 'indemnification' is no more than

an epithet for recovery for breach of contract.'"   *Lehman XS Tr.*, 916 F.3d at 126 (quoting *Xerox*

*State & Loc. Sols., Inc. v. Xchanging Sols. (USA), Inc.*, 216 F. Supp. 3d 355, 364 (S.D.N.Y.

2016)).

The indemnification provision of the Purchase Agreement states that, "Seller shall hold

harmless and indemnify Purchaser . . . from and against all liabilities of Seller accrued *prior to*

*Closing*, other than the Assumed Liabilities, and . . . Purchaser and Franchisor shall hold

harmless and indemnify Seller, and Seller's . . . shareholders, members, employees, . . . from and

against the Assumed Liabilities and all liabilities of Purchaser accrued *subsequent to Closing*."

(Purchase Agreement 7 (emphasis added)).

The indemnification provision does not include language of a clear agreement between

the parties to indemnify each other for losses not related to liability to a third party arising from a

breach of contract.   Therefore, as a matter of law, the indemnification clause does not apply to

claims between the contracting parties.   *See India Globalization Cap., Inc.*, 2022 WL 671172, at

*10 ("Because the Indemnity Clause in the Purchase Agreement does not unmistakably include

first-party claims, Counterclaim-Defendants' motion to dismiss that claim is granted, and the

claim is dismissed with prejudice."); *Sussman Sales Co., Inc. v. VWR Int'l, LLC*, No. 20-CV-

2869, 2021 WL 1165077, at *19 (S.D.N.Y. Mar. 26, 2021) (dismissing indemnification claim

where the indemnification clause lacked "exclusive or unequivocal" language to cover first-party

claims); *Genius Media Grp. Inc. v. Google LLC*, No. 19-CV-7279, 2020 WL 5553639, at *10 n.5

(E.D.N.Y. Aug. 10, 2020) ("Because the Terms of Service do not include language of a clear

agreement between the parties to indemnify each other for losses not related to liability to a third party arising from a breach of contract, the Court finds the indemnification claims redundant of the breach of contract claims and addresses only the breach of contract claims.") *aff'd sub nom. ML Genius Holdings LLC v. Google LLC*, No. 20-CV-3113, 2022 WL 710744 (2d Cir. Mar. 10, 2022).

Therefore, the Court denies Plaintiffs' motion for summary judgment on its indemnification claim against Brite Tikes Defendants and grants Brite Tikes Defendants' summary judgment motion as to Plaintiffs' indemnification claim.

### i.    Breach of the duty of good faith and fair dealing claim against Brite Tikes Defendants

Brite Tikes Defendants move for summary judgment on Plaintiffs' breach of the duty of good faith and fair dealing claim.[15]  They argue that the Release Agreement bars this claim and, in addition, this claim should be dismissed as duplicative of the breach of contract claim.  (Defs.' Mem. 30.)

Plaintiffs argue that Brite Tikes' falsified staff records were maintained at the Center during Brite Tikes' ownership and operation of the Center and that its use of falsified staff clearances during an inspection by the regulatory agency is so pervasive that it renders the entire Purchase Agreement invalid.  (Pls.' Opp'n 22.)

"Under New York law, 'implicit in every contract is a covenant of good faith and fair dealing[,] which encompasses any promises that a reasonable promisee would understand to be included.'" *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 128 (2d Cir. 2022) (quoting *Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d Cir. 2018)).  "'[N]either party

---

[15]  Plaintiffs do not seek summary judgment with regard to their claim for breach of the duty of good faith and fair dealing.

to a contract shall do anything [that] has the effect of destroying or injuring the right of the other party to receive the fruits of the contract,' or to violate the party's 'presumed intentions or reasonable expectations.'" *Spinelli*, 903 F.3d at 205 (alterations in original) (quoting *M/A–COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990)).

"New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach-of-contract claim, based upon the same facts, is also pled." *Joshi v. Trs. of Columbia Univ.*, No. 21-CV-418, 2022 WL 3205883, at *2 (2d Cir. Aug. 9, 2022) (quoting *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013)) (internal brackets omitted). Therefore, "[w]hen a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant." *Bus. Exposure Reduction Grp. Assocs., LLC v. Pershing Square Cap. Mgmt., L.P.*, No. 21-CV-1980, 2022 WL 950959, at *3 (2d Cir. Mar. 30, 2022) (quoting *Cruz*, 720 F.3d at 125); *see also Lussoro v. Ocean Fin. Fed. Credit Union*, 456 F. Supp. 3d 474, 486 (E.D.N.Y. 2020) ("[A] claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." (quoting *Perks v. TD Bank, N.A.*, 444 F. Supp. 3d 635, 641 (S.D.N.Y. 2020))). "In order to avoid redundancy, claims of breach of the implied covenant must be premised on a distinct set of facts from those underlying a claim for breach of contract." *Hochfelder v. Pac. Indem. Co.*, No. 22-CV-2012, 2023 WL 2430497, at *3 (S.D.N.Y. Mar. 9, 2023); *see also Fleisher v. Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 299 (S.D.N.Y. 2012) (same) (quoting *Deutsche Bank Sec. Inc. v. Rhodes*, 578 F. Supp. 2d 652, 664 (S.D.N.Y. 2008) (alteration omitted)).

Plaintiffs' claims for breach of contract and breach of the duty of good faith and fair

dealing rest on the same alleged deceptive practices by Defendants.  With respect to their claim for breach of the duty of good faith and fair dealing, Plaintiffs argue that they "have been deprived of the . . . primary benefit under the Purchase Agreement . . . to obtain the goodwill associated with the Center."  (Am. Compl. ¶¶ 162–163.)  In support of their claim, Plaintiffs allege that "[b]ecause of the fraudulent practices employed by Defendants, the Center was not operating under a valid license and Plaintiffs lost the goodwill associated with the ongoing operations of the Center."  (*Id.* ¶ 164.)  This is the same factual basis for Plaintiffs' breach of the Purchase Agreement claim: "[Brite Tikes Defendants] breached the representations and warranties in the Purchase Agreement by engaging in a pattern and practice of using doctored and/or completely fabricated documentation and credentials for Center staff in order to satisfy the relevant regulatory requirements."  (*Id.* ¶ 102.)

Because Plaintiffs allege both a breach of contract and breach of the covenant of good faith and fair dealing on the same facts, the Court dismisses Plaintiffs' breach of duty of good faith and fair dealing as redundant.  *See, e.g., Cruz*, 720 F.3d at 125 (dismissing breach of the implied covenant of good faith and fair dealing claim where plaintiff also alleged a breach of contract claim and both claims rested on the "same alleged deceptive practices"); *Lussoro*, 456 F. Supp. 3d at 486 (dismiss the plaintiff's claim for breach of the implied covenant of good faith and fair dealing because it relied upon the same facts as her breach of contract claim.).[16] Accordingly, the Court grants Brite Tikes Defendants' motion for summary judgment on this

---

[16] Even if the claims were not redundant, Plaintiffs' claim for breach of duty of good faith and fair dealing is barred by the Release Agreement.  *See Cobalt Partners, L.P.*, 944 N.Y.S.2d at 42 ("Accordingly, plaintiffs expressly disclaimed reliance on any representations other than those they received from the Fund alone and cannot now complain that Group made them some sort of independent promise."); *see also* section II(e)(iv)(1) for an in-depth discussion of the Release Agreement.

claim.

### j.   Negligence claim against Brite Tikes and Collins

Brite Tikes Defendants make several arguments in support of their motion for summary judgment as to this claim.  First, they argue that Plaintiffs' broad negligence claim is duplicative of the breach of contract claim.[17]  (Defs.' Mem. 30.)  Second, that this claim is precluded by the Release Agreement and termination of the Franchise Agreement.  (*Id.* at 30–31.)  Third, that the claim fails on the merits because Plaintiffs' negligence claim does not set forth any specific duty owed to Plaintiffs, the duty breached, causation, or damages.  (*Id.* at 31.)  Fourth, there is no evidence that Brite Tikes or Collins should have known about any fraudulent documentation because Pasaoglu never asked Collins to forge or alter documents nor told her that he had forged or altered any documents.  (*Id.*)  Plaintiffs do not respond to Defendants' arguments.

To establish a prima facie case of negligence under New York law, "a plaintiff must prove (1) that the defendant owed her a duty; (2) that the defendant breached that duty; and (3) that she suffered injuries proximately resulting from that breach."  *Coyle v. United States*, 954 F.3d 146, 148 (2d Cir. 2020) (quoting *Solomon ex rel. Solomon v. City of New York*, 66 N.Y.2d 1026, 1027 ( 1985)); *see also In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 758 F.3d 202, 210 (2d Cir. 2014) (quoting *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 428 (2d Cir. 2013)).  Furthermore, a plaintiff must establish that their injury was foreseeable.  *Aegis Ins. Servs. v. 7 World Trade Co.*, 737 F.3d 166, 177 (2d Cir. 2013) ("[A] plaintiff must establish that a harm was within the ambit of reasonably foreseeable risk . . . .");  *Pinero v. Rite Aid of N.Y., Inc.*, 743 N.Y.S.2d 21, 22 (App. Div. 2002) ("To establish a claim in negligence, plaintiff must

---

[17]  Plaintiffs do not seek summary judgment with regard to their negligence claim.

show that the defendant owed her a duty to protect her from injury; a duty that only arises when the risk of harm is reasonably foreseeable."), *aff'd*, 753 N.Y.S.2d 805 (2002).

Under New York law, "[a] simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated. This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." *Oceanview Assocs., LLC v. HLS Builders Corp.*, 126 N.Y.S.3d 755, 757 (App. Div. 2020) (quoting *Clark-Fitzpatrick, Inc. v Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987)). "Put another way, where the damages alleged 'were clearly within the contemplation of the written agreement . . . [m]erely charging a breach of a 'duty of due care,' employing language familiar to tort law, does not, without more, transform a simple breach of contract into a tort claim.'" *Id.* (alterations in original).

Plaintiffs' negligence claim is duplicative of their breach of contract claim. In support of their negligence claim, Plaintiffs allege that Brite Tikes and Collins "breached their duty to carry out the operations of the Center consistent with the relevant laws and regulations." (Am. Compl. ¶ 167.) This is precisely the same factual basis for their breach of the Purchase Agreement claim: "[Brite Tikes Defendants] breached the representations and warranties in the Purchase Agreement by engaging in a pattern and practice of using doctored and/or completely fabricated documentation and credentials for Center staff in order to satisfy the relevant regulatory requirements." (*Id.* ¶ 102.) *See Oceanview Assocs., LLC*, 126 N.Y.S.3d at 758 ("Here, the allegations upon which the cause of action sounding in fraud were based were the same as those underlying the cause of action alleging breach of contract and amounted to nothing more than a failure to perform under the contract.") Plaintiffs have not established a legal duty owed to them by Brite Tikes Defendants independent of the Purchase Agreement, and therefore fail to establish

a claim of negligence.  Accordingly, the Court grants Brite Tikes Defendants' motion for summary judgment on this claim.

### k.   Negligent supervision claim against Collins

Brite Tikes Defendants move for summary judgment on Plaintiffs' negligent supervision claim against Collins.[18]  In support, Brite Tikes Defendants argue that this claim is duplicative of the breach of contract claim and is precluded by the Release Agreement.  (Defs.' Mem. 31.)  In addition, Brite Tikes Defendants argue that the claim fails on the merits because there is no evidence that Pasaoglu had a history of falsifying records, that Collins knew or should have known about it, or that Collins was on notice that Pasaoglu had done anything improper at Brite Tikes.  (Id. at 31–32.)  Plaintiffs do not address Brite Tikes Defendants' arguments on this issue.

This claim is barred by the Release Agreement.[19]  The Release Agreement states:

> [Plaintiffs] hereby release, cancel, forgive and forever discharge you [Brite Tikes], your . . . respective officers, directors, members, managers . . . from any and all actions, claims, . . . whether known or unknown, whether suspected or not, . . . and we specifically waive any claim or right to assert any cause of action or alleged case of action or claim or demand which has, through oversight or error intentionally or unintentionally or through a mutual mistake, been omitted from this release.

(Release Agreement § 6(b).)  Plaintiffs cannot now claim to rely on any representations Collins

---

[18]  Plaintiffs do not seek summary judgment with regard to their negligent supervision claim.

[19]  "Under New York law, in addition to the negligence elements of such a claim, a plaintiff must show: '(1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels.'"  Rich v. Fox News Network, LLC, 939 F.3d 112, 129 (2d Cir. 2019) (quoting Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir. 2004)).  Because the Court finds that the negligent supervision claim is barred by the Release Agreement, the Court does not discuss the merits of the negligent supervision claim.

made that have been released through the Release Agreement.  As discussed in section II(d)(iv)(1) above, the Purchase Agreement explicitly states, "Seller shall not be deemed to have made to Purchaser (or any representative of Purchaser) any representation or warranty other than as expressly made by Seller in Article II hereof."  (Purchase Agreement Art. VII. D.)  Plaintiffs cannot now claim that they justifiably relied on the representations beyond the confines of Article II of the Purchase Agreement.  *See Cobalt Partners, L.P.*, 944 N.Y.S.2d at 42 ("Accordingly, plaintiffs expressly disclaimed reliance on any representations other than those they received from the Fund alone and cannot now complain that Group made them some sort of independent promise.").  Accordingly, the Court grants Brite Tikes Defendants summary judgment on this claim.

### l.   Breach of the Franchise Agreement claim against Brite Tikes Defendants

Plaintiffs and Brite Tikes Defendants cross-move for summary judgment on Plaintiffs' breach of the Franchise Agreement claim.

Plaintiffs argue that the Brite Tikes Defendants' fraud and fraudulent inducement, as discussed above, renders the Release Agreement unenforceable and therefore, the Franchise Agreement remains operative, and the Brite Tikes Defendants breached multiple provisions of the agreement.  (Pls.' Mem. 26.)  In support, Plaintiffs argue that the "undisputed facts relating to documentation fraud demonstrate that the Brite Tikes Defendants breached" the following obligations: (1) to "[r]efrain from operating 'in a manner which reflects adversely on [TLE's] Marks, Trade Name and the Franchise System[;]'" (2) to "[e]nsure that [Brite Tikes] and its staff refrained from engaging in immoral conduct, criminal behavior or conduct that might jeopardize the welfare of the children in the Center or reflect adversely on TLE's goodwill;" (3) to "[m]aintain proper and competent staff sufficient to satisfy applicable governmental licensing

and labor laws[;]" and (4) to "[c]omply with all relevant laws and regulations governing the Center. (*Id.* at 27.)  In addition, Plaintiffs contend that under the Personal Guaranties, Collins and Jubran, guaranteed all of these obligations individually. (*Id.*)

In the alternative, Plaintiffs argue that the Franchise Agreement did not terminate until after the closing, which could not take place until Plaintiffs received the licenses from DOH to operate the Center. (Pls.' Opp'n 8–9.)  Therefore, Plaintiffs argue, the Franchise Agreement was operative, and the Brite Tikes Defendants were subject to its requirements when the parties discussed the sale of the Center, throughout their negotiations, and the eventual execution of the Purchase Agreement until the closing. (*Id.* at 9.)

Brite Tikes Defendants argue that the Franchise Agreement terminated upon the closing. (Defs.' Opp'n 29.)  In support, Brite Tikes Defendants argue that the Release Agreement clearly provides that, among other documents, "[t]he Franchise Agreement and all of its attachments" "shall be terminated in their entirety as of [the Closing]." (Release Agreement § 2.)  In addition, the Brite Tikes Defendants reiterate their arguments that Plaintiffs have not provided any basis to hold the Purchase Agreement unenforceable because "(1) it contained specific, express disclaimers about the Center's staff files and other records; (2) it incorporated a due diligence period for TLE to review the Center's records and cancel the transaction in its discretion; (3) TLE had access to all the relevant records; and (4) TLE is a sophisticated entity that was represented by counsel throughout the process." (Defs.' Opp'n 29.)

For the reasons discussed in section II(d)(iv) above, Plaintiffs have failed to demonstrate that the Release Agreement should be considered unenforceable.

Accordingly, the Court denies Plaintiffs' motion for summary judgment on their claim for breach of the Franchise Agreement.  In addition, because Plaintiffs fail to present any

evidence that the Franchise Agreement survived the closing of the sale of the Center, they have not shown that the Brite Tikes Defendants breached the Franchise Agreement.  Accordingly, the Court grants Brite Tikes Defendants' motion for summary judgment on Plaintiffs' breach of the Franchise Agreement claim.

### m.   Brite Tikes Defendants' indemnification counterclaim against Plaintiffs

Brite Tikes Defendants move for summary judgment on their counterclaim against Plaintiffs for indemnification, arguing that they are entitled to attorneys' fees in defending this lawsuit.  (Defs.' Mem. 33.)  In support, Brite Tikes Defendants argue that under the indemnification clause of the Purchase Agreement, the costs and expenses they have incurred in defense of Plaintiffs' claims are considered "liabilities [arising] out of the Purchase Agreement subsequent to Closing."  (*Id.*)

Plaintiffs argue that Brite Tikes Defendants cannot seek indemnification for losses they caused through their own wrongful conduct or through Pasaoglu's conduct for which they are responsible.  (Pls.' Opp'n 22.)

New York courts "ha[ve] been distinctly inhospitable" to claims for attorney's fees through indemnification provisions in contract.  *Gotham Partners, L.P. v. High River Ltd. P'ship*, 906 N.Y.S.2d 205, 205 (App. Div. 2010).  In order to obtain attorneys' fees under an indemnification clause, the language of the clause must be "'unmistakably clear' that the winning side should be awarded such fees."  *Id.* at 205–06 (quoting *Hooper Assoc. v. AGS Computs.*, 74 N.Y.2d 487, 492 (1989)).  "For an indemnification clause to serve as an attorney's fees provision with respect to disputes between the parties to the contract, the provision must unequivocally be meant to cover claims between the contracting parties rather than third party claims."  *Id.* at 208.

62

The indemnification clause in the Purchase Agreement is not unmistakably clear that the winning side should be awarded attorneys' fees.  The Purchase Agreement states: (i) "Seller shall hold harmless and indemnify Purchaser . . . from and against all liabilities of Seller accrued prior to Closing, other than the Assumed Liabilities, and (ii) Purchaser and Franchisor shall hold harmless and indemnify Seller and Seller's . . . shareholders, members, employees, . . . from and against the Assumed Liabilities and all liabilities of Purchaser accrued subsequent to Closing." (Purchase Agreement 7 (emphasis added)).

In both *Gotham Partners* and *Hooper*, the New York courts considered whether "the indemnification provision's list of potential grounds for claims . . . were exclusively or unequivocally referable to claims between the parties themselves" as opposed to being "susceptible to third-party claims." *Id.* at 206–07 (internal quotation marks omitted).  In *Hooper*, a plaintiff successfully sued for breach of contract, and then sought attorney's fees under the contract's indemnification clause.  The New York Court of Appeals concluded that indemnity provisions must be strictly construed "to avoid reading into it a duty which the parties did not intend to be assumed."  *Hooper Assocs., Ltd.*, 74 N.Y.2d at 491.  The court held that:

> The clause in this agreement does not contain language clearly permitting plaintiff to recover from defendant the attorney's fees incurred in a suit against defendant. On the contrary, it is typical of those which contemplate reimbursement when the indemnitee is required to pay damages on a third-party claim. It obligates defendant to "indemnify and hold harmless [plaintiff] . . . from any and all claims, damages, liabilities, costs and expenses, including reasonable counsel fees" arising out of breach of warranty claims, the performance of any service to be performed, the installation, operation and maintenance of the computer system, infringement of patents, copyrights or trademarks and the like. All these subjects are susceptible to third-party claims for failures in the installation or operation of the system. None are exclusively or unequivocally referable to claims between the parties themselves or support an inference that defendant promised to indemnify plaintiff for counsel fees in an action on the contract.

63

*Id.* at 492.  In *Gotham Partners*, the court, relying on *Hooper*, concluded that New York is

"distinctly inhospitable" to claims for attorney's fees based on indemnification provisions.

*Gotham Partners, L.P.*, 906 N.Y.S.2d at 205.  The court held that the "indemnification provision

. . . does not meet the exacting *Hooper* test of unmistakable intention," because it did not

"unequivocally reflect [an] intent" to "cover claims between the contracting parties rather than

third party claims."  *Id.* at 206–07.

Similar to the *Gotham Partners* and *Hooper* cases, the indemnification clause's list of

grounds for claims are more susceptible to third-party claims than exclusively to claims between

the parties themselves.  The indemnification provision at issue before the Court is broad and

covers "all liabilities accrued" with no explicit indication that the parties are unequivocally

indemnifying each other for attorney's fees claims.  Therefore, the Court dismisses Defendants'

counterclaim regarding indemnification for all attorneys' fees and costs incurred in the defense

of this lawsuit.

  **n.** ***In pari delicto***

Brite Tikes Defendants argue that the Court should dismiss Plaintiffs' claims under the

doctrine of *in pari delicto* which states that "courts will not intercede to resolve a dispute

between two wrongdoers."  (Defs.' Opp'n 31 (quoting *Kirschner v. KPMG LLP*, 15 N.Y.3d 446,

464 (2010).)  In support, the Brite Tikes Defendants argue that there is no "reliable evidence"

that the forgeries complained about by Plaintiffs took place on its watch because Pasaoglu

invoked the Fifth Amendment in response to whether he forged documents after the closing, and

Plaintiffs' expert admitted she could not "offer an opinion as to when any documents were

forged or altered."  (*Id.* at 31–32.)  Moreover, Brite Tikes Defendants argue that many of the

alleged forged documents pertain to employees hired after Plaintiffs took over the Center. (*Id.*)
Plaintiffs do not respond to this argument.

"The doctrine of *in pari delicto*, a term meaning 'of equal fault,' reflects the principle that
a plaintiff who has participated in wrongdoing equally with another person may not recover from
that other person damages resulting from the wrongdoing." *Republic of Iraq v. ABB AG*, 768
F.3d 145, 160 (2d Cir. 2014); *see also BrandAid Mktg. Corp. v. Biss*, 462 F.3d 216, 218 (2d Cir.
2006) ("The doctrine of *in pari delicto* means more than just 'two wrongs make a right.'"). "To
begin with, application of the doctrine requires that the plaintiff be 'an active, voluntary
participant in the unlawful activity that is the subject of the suit.'" *BrandAid Mktg. Corp.*, 462
F.3d at 218 (quoting *Pinter v. Dahl*, 486 U.S. 622, 636 (1988)). "Another requirement for
invocation of the doctrine of *in pari delicto* is that the plaintiff's wrongdoing be at least
substantially equal to that of the defendant." *Id.*; *see also Bateman Eichler, Hill Richards, Inc. v.
Berner*, 472 U.S. 299, 310–11 (1985); *Peltz v. SHB Commodities Inc.*, 115 F.3d 1082, 1090 (2d
Cir.1997); *Ross v. Bolton*, 904 F.2d 819, 824–25 (2d Cir. 1990). The defense "bars a party that
has been injured as a result of its own intentional wrongdoing from recovering for those injuries
from another party whose equal or lesser fault contributed to the loss." *In re Ridgemour Meyer
Properties, LLC*, 599 B.R. 215, 235 (S.D.N.Y. 2019) (quoting *In re Lehr Constr. Corp.*, 551
B.R. 732, 739 (S.D.N.Y. 2016)), *aff'd*, 791 F. App'x 279 (2d Cir. 2020). "The *in pari delicto*
doctrine is rooted in 'the idea that where parties are equally at fault, the defending party is in the
stronger position.'" *Id.* (quoting *Grubin v. Rattet (In re Food Mgmt. Grp., LLC)*, 380 B.R. 677,
693 (Bankr. S.D.N.Y. 2008)). "Comparison of the parties' degree of fault . . . will often depend
on findings of fact as to the circumstances of a plaintiff's involvement." *Republic of Iraq*, 768
F.3d at 162; *see also Goldberg v. Saint-Sauveur Valley Resorts, Inc.*, No. 2:17-CV-00061, 2018

WL 8370060, at *13 (D. Vt. Dec. 20, 2018) ("In order to find that the doctrine of *in pari delicto* bars [p]laintiff's claims, the court would have to determine the parties' respective culpability based on the allegations in the Second Amended Complaint.  It would then have to weigh that competing fault and determine whether equity favors dismissal.").

The Brite Tikes Defendants have not shown that Plaintiffs actively participated in the production of fraudulent, forged, or altered staff files in contravention of the New York Health Code.  Pasaoglu's invocation of the Fifth Amendment regarding whether he forged files while operating as the Center Director for Plaintiffs does not constitute evidence that Plaintiffs participated in any potential forgery.  Furthermore, Plaintiffs undisputedly discovered the alleged forgery and reported it to the New York DOH, leading to the Center's shutdown.  That action indicates that the parties are not "equally at fault."  *In re Ridgemour Meyer Properties, LLC*, 599 B.R. at 235 (concluding that the *in pari delicto* doctrine did not apply where the conduct was not "gravely immoral" or "illegal").  The Court therefore rejects Brite Tikes Defendants' argument.

### III. Conclusion

For the reasons stated above, the Court denies Plaintiffs' motion for summary judgment in its entirety.  The Court grants in part and denies in part Brite Tikes Defendants' motion for summary judgment.  The Court (1) grants Brite Tikes Defendants' motion as to Plaintiffs' claims for fraud, fraudulent inducement, conspiracy to commit fraud, negligent misrepresentations and omission, indemnification, breach of the covenant of good faith and fair dealing, general negligence, negligent supervision, and breach of the Franchise Agreement; and (2) denies Brite Tikes Defendants' motion as to (a) Plaintiffs' claim for breach of the Purchase Agreement, and (b) Brite Tikes Defendants' counterclaim for indemnification of attorneys' fees.  The Court

grants Pasaoglu's motion for summary judgment in its entirety.  Plaintiffs' claims for breach of

the Purchase Agreement may proceed.

Dated:  September 7, 2023
       Brooklyn, New York

                                     SO ORDERED:


                                     ___/s/ MKB_____
                                     MARGO K. BRODIE
                                     United States District Judge